609

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
 UNITED STATES OF AMERICA,    : 21-CR-0054(RPK)
                              :
                              :
                              :
                              :
                              : United States Courthouse
     -against-                : Brooklyn, New York
                              :
                              :
                              :
                              : Thursday, June 20, 2024
 DAVID GENTILE and            : 9:30 a.m.
 JEFFRY SCHNEIDER,            :
                              :
         Defendants.          :
- - - - - - - - - - - - - - -X

         TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
          BEFORE THE HONORABLE RACHEL P. KOVNER
          UNITED STATES DISTRICT JUDGE, AND A JURY

                    A P P E A R A N C E S:

 For the Government:    UNITED STATES ATTORNEY'S OFFICE
                        Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201
                        BY: ARTIE MCCONNELL, ESQ.
                            JESSICA WEIGEL, ESQ.
                            NICHOLAS AXELROD, ESQ.
                            KATE MATHEWS, ESQ.
                            Assistant United States Attorneys

 For the Defendant:     KOBRE & KIM, LLP
                        Attorneys for the Defendant -
                        David Gentile
                           800 Third Avenue
                           New York, New York 10022
                        BY: SEAN S. BUCKLEY, ESQ.
                            MATTHEW MENCHEL, ESQ.
                            ADRIANA RIVIERE-BADELL, ESQ.
                            JONATHAN D. COGAN, ESQ.

610

A P P E A R A N C E S:  (Continued.)


ARENT FOX SCHIFF, LLP
Attorneys for the Defendant -
Jeffry Schneider
        1301 Avenue of the Americas
        42nd Floor
        New York, New York 10019
BY: GLENN C. COLTON, ESQ.
    APEKSHA VORA, ESQ.


ARENT FOX SCHIFF, LLP
Attorneys for the Defendant -
Jeffry Schneider
        1717 K Street, NW
        Washington, DC 20006
BY: MICHAEL DEARINGTON, ESQ.
    LAURA ZELL, ESQ.


LAW OFFICE OF STEPHEN JAMES BINHAK, PLLC
Attorney for the Defendant -
Jeffry Schneider
        1 SE 3rd Avenue
        Suite 2600
        Miami, Florida 33131
BY:  STEPHEN J. BINHAK, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                Official Court Reporter
                Telephone: (718) 613-2487
                Facsimile: (718) 613-2694
                E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Proceedings*                                                              611

1              (In open court.)

2              COURTROOM DEPUTY:  United States v. Gentile, et

3    al.  Docket No. 21-CR-354.

4              Counsel, state your appearances for the record.

5              MR. MCCONNELL:  Your Honor, good morning.  Artie

6    McConnell, Jessica Weigel, Nick Axelrod for the

7    United States.  Joining us at counsel table is Paralegal

8    Specialist Madison Bates and Special Agent Jennifer Riecker.

9              MR. COGAN:  John Cogan, Sean Buckley, Adriana

10   Riviere-Badell, and Matt Menchel and our client David

11   Gentile.

12             MR. COLTON:  Glenn Colton, Apeksha Vora, Laura

13   Zell.  Michael Dearington, Steven Binhak with Mr. Schneider

14   at counsel table.

15             THE COURT:  We're still waiting on a juror.  The

16   juror called and let us know she was running few minutes

17   late and expected to be here at 10:20.  But this gives us a

18   few minutes to talk about issues regarding William Jacoby.

19             So I got a letter from the Government about the

20   statements it was intending to offer through its witness and

21   its theory of admissibility.  And I have a letter from

22   Mr. Menchel indicating you had some objections but I don't

23   know what they are to what exhibits so maybe we can talk

24   about that.

25             MR. MENCHEL:  On the exhibits, I'm going to defer

*Proceedings*                                                    612

1    it Mr. Colton, we've conferred.  What I wanted to do with

2    Mr. Jacoby is do a voir dire on the issue about the planes

3    and the Ferrari.  I don't think the witness has, actually, a

4    foundation to give this testimony and I wanted to explore

5    that outside the presence of jury because I think even the

6    introduction of a jet and a Ferrari can be highly

7    inflammatory.

8           THE COURT:  How do you feel about doing a voir

9    dire outside the presence of the jury on that?

10          MR. MCCONNELL:  I don't think it's necessary,

11   Judge.  I certainly don't think it's something that can or

12   should be done ex parte in the middle of trial.

13          The witness is going to speak about his personal

14   knowledge of this based on conversations with the defendants

15   in much the way that I described to your Honor when this

16   issue was broached when we were in court last.  This was a

17   series of expenses at a time when the fund was not

18   performing well and he raised this with the defendants

19   because it was impacting not only things at the fund level

20   but the bottom line of the portfolio companies which was

21   creating an even bigger hole to pay the investors the

22   distributions.

23          I think it's a fair comment, we're not going to

24   belabor the point.  But I think it's in line with your

25   Honor's ruling on fees and motive.  And given that the

*Proceedings*                                                      613

1   witnesses personal knowledge is based, at least in part, on

2   conversations with the defendants, I don't see any bar to

3   its admissibility.

4          THE COURT:  So that's what he's going to say as to

5   how he knows about this Ferrari and private jets?

6          MR. MCCONNELL:  Yes.  He had conversations

7   with -- well, he knows about it from looking at the books

8   and then he went and discussed it with the defendants.

9          MR. MENCHEL:  I wanted to make an ex parte proffer

10  to your Honor on why I don't think there's a basis for what

11  he just what he said but I don't want to expose it now

12  because I think there's absolutely no foundation what he

13  just said.  I'm not accusing Mr. McConnell, I think the

14  witness is just making stuff up and I would like to voir

15  dire him outside the presence of the jury because I think I

16  can establish that.

17         THE COURT:  Let's talk at sidebar because I was

18  suggesting if the defense wants to make an ex parte proffer.

19         MR. MCCONNELL:  So I can't come?

20         THE COURT:  Exactly.

21         MR. MCCONNELL:  Judge, before you begin, can I

22  just lodge an objection?

23         I don't think it's necessary or proper in the

24  middle of a trial.  I don't see how we can respond to

25  something that we're not aware of.

*Proceedings*                                                      614

1          THE COURT:  Okay.

2          (Continued on the next page.)

*Sidebar*                                                      615

1    (Sidebar held outside the presence of the jury.)



*Sidebar*                                                                    616

1

2          (Sidebar discussion concludes.)

3          (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                      617

1          (In open court.)

2          THE COURT:  I'm going to allow that part of the

3    transcript to be under seal because it discusses an

4    anticipated defense for cross-examination of a witness.

5          I'm not going to do a voir dire of this witness.

6    You have to lay a foundation, obviously, before he makes

7    statements about Ferrari and private jets for what his

8    basis for knowledge about that was.  But what you proffered

9    to me would be a basis for admitting those statements.  I

10   don't actually take the defense to be disputing that they

11   would be -- that that would be a basis, although we've had a

12   private conversation about relevance that I know the defense

13   disputes.

14         I really don't want this testimony to come before

15   the jury if there's going to be any issue about whether he

16   has a basis for knowledge.  So if you're not sure he's going

17   to give that testimony, I would rather we do that outside

18   the presence jury.  Please just don't put me in a situation

19   where it turns out he's going to say something different

20   than what you proffered because I think you know that

21   defense doubts whether -- whether he really has that basis.

22   So if there is any doubt about it, I want to do a

23   discussion.

24         MR. MCCONNELL:  There's no doubt about it but I

25   need to ask questions.  And so, the way I was planning on

*Proceedings*                                                      618

1   asking the questions is, I don't know where this fits in,

2   but there's a time when he's talking about, you know, poor

3   performance and I'm going to ask him generally were there

4   other expenses that you were concerned about, did you

5   discuss them with the defendants, what were they.

6              And that's how --

7              THE COURT:  Yes.

8              MR. MCCONNELL:  -- I plan on getting there.

9              THE COURT:  How about were there expenses that you

10  were concerned about or whatever it was going to say.  How

11  did you know about those expenses and then he can tell us.

12             MR. MCCONNELL:  Okay.

13             THE COURT:  Let's talk about an exhibits.

14             MR. COLTON:  Yes, Your Honor.

15             The Government had sent us a long list of exhibits

16  that they plan to potentially admit or attempt to admit

17  through Mr. Jacoby.  An overwhelming majority of those

18  exhibits are either e-mails or e-mails with attachments that

19  are not sent to or from Mr. Schneider, and most are not sent

20  to or from Mr. Gentile.  And the government proffers the

21  notion, citing two cases, that somehow, Mr. Jacoby's state

22  of mind, or the listener that is not an investor or a broker

23  or Mr. Schneider or Mr. Gentile's effect on that listener,

24  is somehow overcomes the hearsay rule.

25             You have a situation here where an overwhelming

*Proceedings*                                                                 619

 1   majority of what they want to put in is not something that

 2   went to Mr. Schneider or Mr. Gentile to the extent that it

 3   affects their state of mind.  And it's not something that

 4   was sent it by one of them reflect their actions.

 5           I think it's very much more prejudicial than

 6   probative and the government cites two cases where not where

 7   it was actually conversations or e-mails surrounding

 8   statements actually made by the defendants.  Not a situation

 9   where they're conversations or e-mail exchanges on which the

10   defendants are simply not on it.

11           THE COURT:  It's hard to have this conversation in

12   the abstract, right?  I mean, a lot of what you're making is

13   a §403-type argument.  You're not arguing that these e-mails

14   are categorically inadmissible because your client wasn't

15   not on it.  So I need to know what exhibits we're talking

16   about.

17           MR. COLTON:  So we can go through them but just to

18   give you a hypothetical example.

19           A person who works at GPB writes an e-mail to

20   another person who works at GPB and makes an assertion of

21   fact about the performance of the fund or something like

22   that.  Mr. Gentile is not copied, Mr. Schneider is not

23   copied.  Mr. Schneider doesn't respond, Mr. Gentile doesn't

24   respond.

25           THE COURT:  It's going to be hard for me to think

*Proceedings*                                                        620

1    about this without knowing what exhibits we are talking

2    about and then I would know the Government's theory was and

3    I would make a response.

4              So what exhibits do you anticipate raising

5    objections to?

6              MR. COLTON:  I'm sorry, it's like 80 percent of

7    the exhibits don't include Mr. Schneider in any way.  So

8    it's very hard that all sort of fall into this category of

9    they don't affect his state of mind because he's not copied,

10   they're not statements of him.

11             THE COURT:  How many exhibits are you introducing

12   through this witness?

13             MR. MCCONNELL:  I don't have the list that I

14   provided counsel, it's several dozen.

15             THE COURT:  Okay.  So I'd like to know what

16   exhibits you object to and then I'm going to get the

17   exhibits in front of me and then we can have a conversation

18   about those exhibits.

19             MR. COLTON:  What we can do is put together a

20   sample list.  I mean, or else we're going to go over 50 or

21   60 which I don't think the Court wants to do.

22             THE COURT:  How many exhibits are there?  They

23   just told me there are a couple dozen exhibits they intend

24   to introduce through this witness.

25             MR. COLTON:  We got a list of 75 or 80.

*Proceedings*                                                           621

1      MR. MCCONNELL:  Then that's how many how many it

2  is, I don't have the list in front of me.

3      I'm sorry, Judge.  Your Honor ruled, we disclosed

4  the exhibits, you know, after court broke and I don't have

5  the e-mail that I sent to them.

6      MR. COLTON:  I can give the Court just an example

7  from a description.  I understand the Court might not rule

8  but maybe move the ball down the field a little bit if it's

9  helpful.

10      THE COURT:  I think the most helpful thing for me

11  to prep me on ruling on these exhibits would to have the

12  exhibits.

13      MR. COLTON:  We'll get them together.

14      THE COURT:  So we're checking on the jury.

15      MR. MCCONNELL:  Can I just ask, Judge, because it

16  does relate to scheduling.

17      Does your Honor anticipate having an extended

18  colloquy and decision on the exhibits before the witness is

19  called to testify because I could see that taking some time.

20  And, again, all of these issues do have a cascading effect

21  on what we're planning next.

22      THE COURT:  Right.

23      MR. MCCONNELL:  We have the witness here and

24  available.  But if things were going to be prolonged, and

25  that's fine if they are, we just need to know we're trying

*Proceedings*                                                    622

1   to juggle lots of different things.

2          THE COURT:  So my preference is to, when we get

3   the jury here, do as much as we possibly can before there

4   are evidentiary issues.

5          One way to do this would be to -- what are the

6   first exhibits you're planning to introduce through this

7   witness and then we can talk about whether there are

8   objections to those.

9          MR. MCCONNELL:  I think the first few exhibits

10  will be some of the marketing decks that he reviewed early

11  in his tenure, the PPMs that he reviewed.  And then I think

12  after that, we start getting into some of the e-mail

13  traffic.

14         THE COURT:  Okay.  So marketing decks and PPMs he

15  reviewed.

16         Are you objecting to those?

17         MR. COLTON:  As a category, those aren't the ones

18  that are of most concern.

19         THE COURT:  Okay.  So the jury is here, and so,

20  let's get started.  And it sounds like we're not going to

21  have a colloquy before those exhibits.  Perhaps if you're

22  getting to the ones that you're anticipating an objection

23  we'll take a break.

24         MR. MCCONNELL:  Your Honor, I don't know which

25  ones are anticipated.  I will say a lot of the defense

*Proceedings*                                                    623

1   exhibits that we received for this witness are of similar

2   character, so I'm a little bit surprise bid this.

3          THE COURT:  I'm just trying to figure out where we

4   should take a break.

5          So do you understand your initial exhibits are

6   marketing decks and PPMs.  We're not going to take a break

7   before that.  Sounds like e-mail traffic they'd like to

8   discuss outside the presence of the jury so we might take a

9   break for that.

10         Let's get the jurors.

11         (A brief pause in the proceedings was held.)

12         MR. AXLEROD:  Your Honor, while we're waiting for

13  the jury and this will be very quick and we're not going to,

14  I don't think, have an extended colloquy but I just wanted

15  to tell your Honor now.

16         With respect to Mr. Lash's testimony and the crime

17  fraud issue, I've consulted with defense counsel; I've also

18  consulted with the company's counsel, and the Government's

19  understanding is that the information involving

20  Mr. Prestiano.  I don't know if you want me to do this at

21  sidebar, I'm happy to, that we intend to elicit, the

22  company's not asserting the privilege over it, which would,

23  in our view, moot the crime fraud issue.

24         THE COURT:  Since it would.

25         MR. AXELROD:  I understand that defense counsel --

*J. Frederick - Cross/Mr. Dearington*                     624

1    defense does not agree with us about this which is perfectly

2    fine what.  We think is the most efficient way to handle it,

3    we'd liked to get him on as soon as possible is for us to

4    submit a letter laying out what we plan to elicit.  And our

5    understanding of the lay of the land and they can, I'm sure,

6    in fairness shoot at it and disagree, and if we need to

7    reply, we will.  Just in terms of order of operations, we

8    think it makes sense for us to get something to your Honor

9    which we'll do as soon as we can.

10            THE COURT:  Sounds good.

11            (A brief pause in the proceedings was held.)

12            COURTROOM DEPUTY:  All rise.

13            (Jury enters courtroom at 10:25 a.m.)

14            THE COURT:  Good morning.  Everyone can be seated.

15    Welcome back.  We got delayed by a transit issue but we are

16    ready to get started and get the witness back on the stand.

17            (Witness takes the witness stand.)

18    **JAY FREDERICK**, called as a witness, having been previously

19    duly sworn, was examined and testified as follows:

20            COURTROOM DEPUTY:  Sir, I want to remind you that

21    you are still under oath.

22            MR. DEARINGTON:  May I proceed.

23            THE COURT:  Go ahead.

24    CROSS-EXAMINATION

25    BY MR. DEARINGTON:

*J. Frederick - Cross/Mr. Dearington*          625

1  Q    Good morning, I am Michael Dearington and I am one of

2  the attorneys that represents Mr. Jeffry Schneider.

3       How are you this morning?

4  A    I'm well, sir, how are you?

5  Q    Doing well, thank you.

6       I discussed a few days ago if you would speak to me

7  what you know about the facts and you politely declined; is

8  that correct?

9  A    You're the gentleman who stopped me in the hallway when

10 I was leaving Tuesday?

11 Q    That's what I'm asking, yes?

12 A    Yes.

13 Q    I can represent to you that was me.

14 A    Yes.

15 Q    And when did the Government first contact you to ask to

16 speak with you about this case?

17 A    Three or four weeks ago.

18 Q    That was the first time?

19 A    Yes.

20 Q    And how many times did you meet with the Government to

21 prepare for your testimony?

22 A    Once or twice a week since then.

23 Q    Once or twice a week?

24 A    Yeah, sounds about right.  Once a week.

25 Q    Okay.

J. Frederick - Cross/Mr. Dearington                626

1   A     Maybe up to twice.

2   Q     Okay.  And I was curious as I was looking through that

3   little glass on the door a few moments ago and I saw you in

4   a moment by yourself and you were talking to yourself.  Were

5   you preparing for your potential testimony?

6   A     I tend to think out loud.

7   Q     So you were practicing some lines?

8   A     Sure.

9   Q     Okay.  Your contacts at Ascendant Capital, they were

10  Mark Engelbrecht and Michael Mann, correct?

11  A     The primary contacts.

12  Q     Not Jeffry Schneider, right?

13  A     I mean, I met Jeffry Schneider, listened to him speak,

14  but my primary contacts when I wasn't in Austin were Michael

15  Mann and Mark Engelbrecht.

16  Q     Right.  And you reviewed a number of e-mails during

17  your testimony, do you recall that?

18  A     Yes, sir.

19  Q     And none of them were sent to or from or copied to

20  Mr. Schneider, isn't that right?

21  A     Not to my recollection.

22  Q     And you never had a phone call with Mr. Schneider?

23  A     He may have been on some of the conference calls but I

24  don't have any specific recollection of being on the phone.

25  Q     You testified about a February 2016 due diligence event

*J. Frederick - Cross/Mr. Dearington*                    627

1    in Austin, Texas that you attended with Jamie Jones; is that

2    right?

3    A    Yes.

4    Q    And when you were speaking with Mr. Cogan, he was

5    asking you, and you confirmed, that that due diligence

6    event, after looking at the agenda, was actually focused on

7    Holdings 2, a different fund from the Automotive Portfolio

8    Fund?

9    A    They discussed the strategy not the Automotive Fund, it

10   was mostly about Holdings 2.  While I was there --

11   Q    Just a yes-or-no if you can just to keep things moving.

12   A    Ask the question again, please.

13   Q    So Mr. Cogan was asking you about the event and he

14   showed you an agenda and the focus was Holdings 2.  That was

15   the fund that was the focus of the presentation you saw,

16   right?

17   A    Yes.

18   Q    Okay.  And Holdings 2 had an automotive element to it,

19   also.  But also some other types of investment

20   opportunities -- IT assistance, things like that, right?

21   A    Yes.

22   Q    It wasn't just an automotive fund?

23   A    Yes, sir.

24   Q    Okay.  And you testified that you were uncertain

25   whether a certain specific things actually related

1  specifically to the Auto Fund versus Holdings 2, do you

2  remember that?

3  A    I inquired about initially if it was wasn't an

4  automotive-only strategy.

5  Q    Right.  And so, that would apply to anything you heard

6  for Mr. Schneider as well, I presume?

7  A    Restate your question.

8  Q    Yes.

9       So you testified that you were uncertain whether

10  certain specific things you heard at that due diligence

11  event were actually specifically related to the Auto Fund

12  because Holdings 2 was the focus of the presentation,

13  correct?

14  A    Holdings 2 was the focus of the presentation.

15  Q    Okay.  And so, you were uncertain whether certain

16  things you heard actually specifically related to the

17  Auto Fund versus Holdings 2.

18       That was your testimony, do you remember that?

19  A    Yes.

20  Q    Okay.  You reviewed the first quarter 2016 Report of

21  Partnership at some point; is that right?

22  A    I imagine so, yes.

23  Q    And that would be for the Auto Fund?

24  A    Yes.

25  Q    If you could please show only the witness, the Court,

J. Frederick - Cross/Mr. Dearington                629

1   and the parties what's been marked as Defense Exhibit MF-7.

2        Okay.  Do you see that document, sir?

3   A    Yes, sir.

4   Q    And does that appear to be the quarterly report from Q1

5   in 2016 for GPB Auto Portfolio?

6   A    Yes, sir.

7   Q    And you reviewed and received that document?

8   A    Yes.

9        MR. DEARINGTON:  I would like to offer Defense

10  Exhibit MF-7 into evidence.

11       MR. MCCONNELL:  No objection.

12       THE COURT:  Admitted.  In evidence.

13       (Defendant's Exhibit MF-7 was marked in evidence.)

14  Q    If you could please publish to the jury.  Okay.

15       And please, if you can, put up an image of Page 7, 007

16  and 009, in a side-by-side.

17       And if you can zoom in, please, on the numbers on page

18  ending nine as well as on page ending seven.

19       Mr. Fredrick, do you see on page ending nine the amount

20  of distributions for Q1 2016, the total there?

21  A    Oh, there it is.  This is very, very fuzzy.  Can you

22  tell me if I'm looking on the left page or the right page.

23  Q    Yes, I'm sorry.  This is page ending nine?

24  A    There's no page numbers.  And it's very grainy.

25  Q    Apologies.  My monitor is not on so I'm also looking at

*J. Frederick - Cross/Mr. Dearington*                630

1    that screen.

2         Okay.  So can you now see the distributions under

3    "total" on Page 009?

4    A    Is it the $2.54 million figure?

5    Q    Yes, that's what I'm asking.  That's what you see next

6    to distributions total for Q1 2016, correct?

7    A    I do.

8    Q    Okay.  And that would be the amount of distributions,

9    according to this report, that went to investors in Q1,

10   2016?

11   A    Yes.

12   Q    And that would be the quarter ending after the

13   February 2016 due diligence event, right?

14   A    Yes.

15   Q    Okay.  And I'd like to look at the left side of your

16   screen.  You can see the total investment income number

17   there and it's about four point -- almost 4.3 million; is

18   that right?

19        THE COURT:  Do you think you can zoom in on where

20   you're looking at, it's impossible to read on the screens.

21        MR. DEARINGTON:  Sure.

22        Michelle, if you just want to use the left side.

23   That's okay, too.

24        Okay.

25   Q    There you can see it's approximately almost 4.3 million

1    in total investment income?

2    A    Yes, sir.

3    Q    That would be the number that's the total amount of

4    cash from investments which would include the portfolio

5    companies coming up to the fund, right?

6    A    Yes.

7    Q    Okay.  And you would agree with me that the 2.5 million

8    in distributions is pretty easily covered or less than the

9    total investment income number, right?

10   A    Yes.

11   Q    And now if we can focus on another metric, net

12   investment income, on Page 007 and that's -- wait till we

13   get there.

14        And that number is 2.56 million, correct?

15   A    Yes.

16   Q    And so, again, the distributions for this quarter were

17   covered, meaning, in this instance, less than the net

18   investment income, correct?

19   A    Correct.

20   Q    And if we could move the focus to the net income line

21   in the bottom-right corner of 007, please.

22        And that number is about 2.56 million; is that right?

23   A    Yes.

24   Q    And so, again, hears another metric that, for this

25   quarter, this document indicates distributions were less

1    than that metric net income, right?

2    A    Right.

3    Q    Okay.  So those are three options of performance

4    metrics you would see in a report like this:  Total

5    investment income, net investment income, and net income;

6    right?

7    A    Right.

8    Q    And those are measures of performance, depending on

9    what you wanted to know, those are options for how to

10   measure performance, right?

11   A    Right.

12   Q    Okay.  So under all three of these reasonable

13   performance metrics, distributions for Q1 2016 were covered;

14   is that right?

15   A    That is right.

16   Q    Okay.  I would like to show you what's already been

17   admitted as Government Exhibit 8188.

18        Do you recall this is an e-mail that you testified

19   about in which you were asked certain questions, so Michael

20   Mann and Mark Engelbrecht of Ascendant and Mark Engelbrecht

21   tried to provide you with certain responses to your

22   questions?

23   A    Yes, sir.

24   Q    I would like to turn your attention to the second page,

25   No. 9.

1       If we could call that out, please.

2       You wrote, "liquidity options," and it appears

3   Mr. Engelbrecht stated, "that investors who have held their

4   units for at least one year may request that we repurchase

5   all of their units.  However, investors do not have a right

6   to demand a return of their capital."

7       Do you see that?

8   A    Yes.

9   Q    And that means that you can always request that there

10  be a redemption of your unit if you're an investor, but

11  GPB Automotive does not have to actually approve the

12  request, right?

13  A    That is correct.

14  Q    And that was also your understanding under the PPM that

15  you reviewed, correct?

16  A    Yes.

17  Q    And so, hypothetically, if GPB suspended redemptions,

18  that doesn't actually change whether you have a right to

19  redeem or not because you do not have an absolute right to

20  redeem, you just have a right to request redemption;

21  correct?

22  A    Well, there is a difference in that you no longer have

23  a right to request.  So it's not exactly the same.

24  Q    Well, you can always request something that isn't going

25  to be granted, right?

J. Frederick - Cross/Mr. Dearington                634

1   A    Yes.

2   Q    Okay.  And you invested for the first time in late

3   2016, correct?

4   A    Correct.

5   Q    Now, after you saw the audited financials for the

6   Auto Fund in May of 2017.  You didn't, in that year,

7   suddenly say, look, I've seen these financials, I would like

8   to request a redemption, did you?

9   A    Instead, I raised the issue with Ascendant Capital

10  representatives.

11  Q    If you could just listen to my question just so that we

12  can keep things moving here.

13       In 2017, after you saw the audited financials for 2016,

14  which would have been May 2017; correct?

15  A    Correct.

16  Q    In 2017, you did not formally request redemption of

17  your unit of Automotive Portfolio, did you?

18  A    No, sir.

19  Q    And, in fact, in the first quarter of 2018, you

20  invested again in Automotive Portfolio, correct?

21  A    I did.

22  Q    Okay.  Let's talk for a moment about distributions.

23       You repeatedly testified about how it was your,

24  "understanding," that distributions would be reduced or

25  suspended if they were not covered by cash flow.

*J. Frederick - Cross/Mr. Dearington*                635

1    Do you recall that?

2  A    As we were led to believe, yes.

3  Q    My question is:  You recall that testimony?

4  A    Yes.

5  Q    Again, if you could respectfully just answer the

6  question that was asked, it would keep things moving more

7  quickly.

8        You testified that you had reviewed hundreds of pages

9  of materials that were the offering documents which is the

10  PPM, the private placement memorandum; the limited

11  partnership agreement, and the description agreement.

12       You reviewed all those?

13  A    Of course.  Yes, sir.

14  Q    And nowhere in your testimony did you point to a single

15  sentence that said distributions will be reduced or

16  suspended if not covered by cash flow.  Something close to

17  that sentence I just said?

18            MR. MCCONNELL:  Objection.

19            THE COURT:  Overruled.

20  A    We want to talk about what was written in the private

21  placement memorandum --

22  Q    Yes or no, sir?

23  A    We should talk about what was written on Page 21 of the

24  private placement memorandum about the source of our

25  distributions being covered by the cash flow dated June 30th

1    of 2016.

2    Q    We'll come back to that, sir.  Don't worry?

3    A    Excellent.

4    Q    So my question to you was:  Did you see in the PPM, the

5    LPA, or the subscription agreement a sentence that said

6    something akin to we will automatically reduced or suspend

7    distributions if they are not completely covered by cash

8    flow?

9    A    No assurance of distributions and that they may be

10   reduced, but not that they would be automatically be

11   reduced.

12   Q    Thank you.

13        So the brochure, the marketing brochure, you testified

14   about; do you recall that?

15   A    Yes.

16   Q    And that's kind of like an, I think you called it, some

17   sort of advertising materials; is that fair?

18   A    Yes.

19   Q    And the brochure stated that it was provided to you,

20   quote, to enable you to determine whether you were

21   interested in receiving additional information about the

22   private placement memorandum for the company.

23        Do you remember that?

24   A    Yes.

25   Q    And it stated it should not be relied upon; do you

*J. Frederick - Cross/Mr. Dearington*                    637

1  remember that?

2  A    Relied upon at all or in some specific context?

3         MR. MCCONNELL:  Your Honor, same objection to the

4  line of questioning about --

5         THE COURT:  Overruled.

6         MR. MCCONNELL:  -- this disclaimer.

7  A    I don't recall a blanket they should not be relied

8  upon.

9  Q    You don't recall a statement that they should not be

10 relied upon in connection with any offer or sale of

11 securities?

12 A    For suitability, yes, the PPM.

13 Q    That's not what I'm asking.

14     I'm asking, do you recall a sentence that said, this

15 material does not constitute an offer to sell or

16 solicitation of an offer to buy any securities and may not

17 be relied upon in connection with any offer or sale of

18 securities?

19         MR. MCCONNELL:  Same objection.

20         THE COURT:  Overruled.

21 A    Yes.

22 Q    You recall that?

23 A    Yes.  That's boilerplate language that's -- yes.

24 Q    Boilerplate.  You understood it?

25 A    Yes, sir, I did.

*J. Frederick - Cross/Mr. Dearington*          638

1  Q    Thank you.

2       Do you recall the PPM telling you that no offering

3  literature or advertising in any form other than the PPM,

4  the LPA, and subscription agreement may be considered?

5  A    Considered at all?

6  Q    I'm asking you, sir.

7  A    Well, could you put it on the screen, please.  It's

8  difficult to work from memory for this many statements.

9  Q    It would be my pleasure.  You can please pull up

10 Exhibit 8258-B.

11      And this appears to be the PPM that you testified about

12 from June 30, 2016, for Auto Fund?

13 A    Yes.

14 Q    And if you could turn your attention, please, to 002,

15 Page 002.

16      MR. MCCONNELL:  Your Honor, same objection to the

17 question.

18      THE COURT:  Overruled.

19 Q    It's a little bit cut off for me, Michelle.  If it's

20 possible to move that over.

21      Do you see that, sir?  The sentence beginning, "no

22 offering literature."

23 A    No offering literature or advertising in any form other

24 than this memorandum and the agreement and documents

25 procured here may be considered to constitute an offering of

1    the Class B units.

2    Q    Right.  And offering meaning what you would be

3    investing in were you to invest in the fund?

4    A    Correct.

5    Q    Thank you.

6         And are you aware, sir, that the PPM stated that it was

7    the only authorized statement of the offering?

8    A    Yes.

9    Q    Okay.  If you can please pull up what's been admitted

10   as Government Exhibit 1438.

11        You recall testifying about this document?

12   A    Yes, sir.

13   Q    And there are little percentages of distributions in

14   this table; is that right?

15   A    Yes, sir.

16   Q    If you could please call out the footnote at the

17   bottom.

18        Can you please read that line, Mr. Fredrick?

19   A    The returns listed are cash distributions paid to

20   investors as a percentage of their gross investment.

21   Q    Okay.  So that sentence says that the percentages here

22   are distributions paid to investors as a percentage of their

23   investment, right?

24   A    Yes.

25   Q    Okay.  And that sentence, stay with me, but that

1    sentence does not use the word "earnings" anywhere, right?

2    A    Correct.

3    Q    And that sentence does not use the word "profits"

4    anywhere?

5    A    Correct.

6    Q    Thank you.

7         Now, we looked at the Q1 2016 Report of Partnership, do

8    you remember that a few moments ago?

9    A    Yes.

10   Q    And, generally speaking, when you were investing, you

11   liked the past track record, so to speak, of the Auto Fund,

12   right?

13   A    Yes.

14   Q    Do you have a document in front you?

15   A    It was here when I sat down.  It's a piece of evidence

16   from yesterday.

17             MR. DEARINGTON:  May I approach, your Honor.

18             THE COURT:  Sure.

19             (Approaching the witness.)

20   Q    Now, you knew the track record or the performance could

21   change, right?

22   A    Yes, of course.

23   Q    It's not guaranteed that past performance equals future

24   performance?

25   A    Yes, sir.

J. Frederick - Cross/Mr. Dearington          641

1    Q    Your clients also knew that the Automotive Portfolio
2    Fund had a limited operating history?
3    A    Yes.
4    Q    This was not like investing in General Electric or Ford
5    Motor Company that's been operating for a long time, some
6    Blue Chip Stock?
7    A    Yes.
8    Q    This was a startup fund that had been running for two
9    years, roughly, by the time you had invested?
10   A    Yes.
11   Q    And you were told repeatedly not to make an investment
12   in the materials you reviewed based on past performance,
13   right?
14   A    Right.
15   Q    And you knew that the dealerships purchased by the fund
16   in the future may have not performed like the dealerships
17   purchased in the past, right?
18   A    Well, we knew the dealerships weren't startup
19   businesses.  We knew that the dealerships were established,
20   cash flow positive businesses.
21   Q    Are you responding to my question from two questions
22   ago?
23   A    No I'm responding to what you just asked.
24   Q    My question was you knew the dealerships --
25   A    We knew the partnership was new.  We knew that the

*J. Frederick - Cross/Mr. Dearington*        642

1  underlying dealerships had track records, had been around

2  for a while.

3  Q    What I'm asking is, you knew that the dealerships

4  purchased by the fund in the future, ones acquired in the

5  future, may not perform, for instance, as well as some of

6  the previously purchased dealerships?

7  A    Yes.

8  Q    Thank you.

9        And, in fact, you were told that future dealerships

10  purchased in the future, could actually cause the fund

11  losses?

12  A    Yes.

13  Q    And you also knew from the materials you reviewed that

14  a dealership may not even produce income for the fund until

15  two years after the fund purchased such a dealership?

16  A    Yes.

17  Q    And you and your clients knew from the materials you

18  reviewed and your diligence that there's a lot of

19  competition in acquiring a dealership, right?

20        MR. MCCONNELL:  Objection.

21        THE COURT:  Overruled.

22  A    Yes.

23  Q    So if another fund or another dealership owner is

24  interested in the same dealership that the Auto Fund is

25  interested in, that would be a type of built-in competition,

1   right?

2   A     Yes.

3   Q     And that's a risk?

4   A     Yes.

5   Q     And then, on another level, once a dealership is

6   acquired, now that dealership has to compete with other

7   dealerships, correct?

8   A     Yes.

9   Q     And that competition, you were told, is also a risk?

10  A     Yes, sir.

11  Q     And your clients did not have to invest in the

12  Automotive Portfolio Fund, fair to say?

13  A     Fair to say, yes.

14  Q     They could have safely put their money in high-grade

15  corporate bonds giving three to five percent almost

16  guaranteed.

17  A     Rates were awfully low at the time, but sure, somewhere

18  in there.

19  Q     Would you like me to refresh your recollection about

20  rates or does three to five percent sound fair?

21  A     Oh, that's fair enough.

22  Q     Okay.  And your clients wanted to get into an

23  investment that you were told was very risky and speculative

24  because there was, in part at least, a great chance of what

25  you agreed was a home run liquidity event, right?  That's

*J. Frederick - Cross/Mr. Dearington*                644

1  what you called it?

2  A    Yes.

3  Q    Okay.

4  A    Which is also what Ascendant called it.

5  Q    Right.  If there is a liquidity event, it could be very

6  successful for everybody?

7  A    Correct, yes, sir.

8  Q    Okay.  Now, you and your most of your clients invested

9  in the Automotive Portfolio Fund after you attended the

10 October of 2016 due diligence event?

11 A    On both sides.  But, again, I think it was mostly

12 after, yes, sir.

13 Q    Right.  It was at least, I can name people, but it was

14 more than half of your investors were after that?

15 A    Yes.

16 Q    If you recall?

17 A    Yes, sir, I do recall.

18 Q    Okay.  And so, that would have been not only you heard

19 what you heard at that event, but also after many of these

20 investments were after you reviewed the 2016 audited

21 financials for the Auto Fund?

22 A    Some may have been but that wasn't available till,

23 when, mid-to-late 2017?

24 Q    I believe you testified, and you can tell me if you

25 know, but May 2017 is when you received the 2016 audited

J. Frederick - Cross/Mr. Dearington                645

1   financials?

2   A    Yes, sir.

3   Q    And you had plenty of investments after May of 2017 in

4   the Auto Fund?

5   A    Yes, sir.

6   Q    Including your yourself investing in, roughly,

7   March 2018 in the Auto Fund, right?

8   A    Yes, sir.

9   Q    So you reviewed the audited financials for 2016 and

10  then you recommended and you, yourself, also invested in the

11  Auto Fund.

12  A    Yes, sir.

13  Q    And you also reviewed reports of partnership, at least

14  some of them, for 2017 prior to when some of your clients

15  invested in the Auto Fund?

16  A    Yes, sir.

17  Q    And do you recall which ones?

18       MR. DEARINGTON:  Well, let me withdraw that

19  question.

20       I'd like to show only the witness what's been

21  marked for identification as Defense Exhibit MF-9.

22  Q    Do you recognize this document, sir?

23  A    Yes, sir.

24  Q    And do you recall receiving this document and reviewing

25  it?

*J. Frederick - Cross/Mr. Dearington*                646

1    A    Yes, sir.

2    Q    And you would have received this in some time, fair to

3    say, about 3rd or 4th quarter 2017, right, because this is

4    the Q2?

5    A    Yes, sir.

6    Q    Okay.

7              MR. DEARINGTON:  I would like to offer into

8    evidence Defense Exhibit MF-9.

9              MR. MCCONNELL:  That's fine.

10             THE COURT:  Admitted.

11             (Defendant's Exhibit MF-9 was marked in evidence.)

12             MR. DEARINGTON:  Can you please publish to the

13   jury.

14             (Exhibit published.)

15   Q    So we don't have to continue this exercise of comparing

16   distributions over and over again, but you would have seen

17   what the distribution number in here is and you would have

18   been able to compare it to the reasonable performance

19   metrics we discussed earlier, right?

20   A    Yes, sir.

21   Q    Okay.  And then Q3 2017 ROP, you would have had that

22   before your investment in March 2018; right?

23   A    Yes.

24             MR. DEARINGTON:  Okay.  I would like to show only

25   the witness, and the Court and parties what's been marked

J. Frederick - Cross/Mr. Dearington          647

1   for identification as Defense Exhibit MF-12.

2            MR. MCCONNELL:  We have no objection to this

3   either.

4            THE COURT:  Admitted.

5            MR. DEARINGTON:  I would like to offer it into

6   evidence.

7            THE COURT:  Admitted.

8            (Defendant's Exhibit MF-12 was marked in

9   evidence.)

10           (Exhibit published.)

11  Q    Same question, Mr. Frederick.

12       You reviewed this document and you would looked have at

13  this documents and you would have been able to look at the

14  distributions and compared them to any of the reasonable

15  performance metrics you saw in this document, right?

16  A    Yes, sir.

17  Q    And if you found any of that information to be

18  important, you likely would have provided it to your

19  investors or prospective investors in the Auto Fund?

20  A    Yes, sir.

21  Q    Okay.  And you invested in Q1 2018, right?

22  A    Unfortunately, yes, sir.

23  Q    And -- just a simple yes or no for now, sir.

24       And you invested in Q1 2018 after reviewing all of

25  these materials, right?

*J. Frederick - Cross/Mr. Dearington*                    648

1   A    Yes, sir.

2   Q    Thank you.  I would like to show you a document that

3   the Government asked you about Government Exhibit 1398.

4        Now, this is a sample account statement for your

5   client, Mr. Jones, that the Government went over with you;

6   is that right?

7   A    Yes, sir.

8   Q    And if you could please zoom in on the top-left corner.

9   All the way to the top of the document where -- perfect.

10       Can you please read the second line?

11  A    Care of Phoenix American Financial Services.

12  Q    And you're aware of that Phoenix American Financial

13  Services, the independent fund administrator?

14  A    Yes, sir, transfer agent.

15  Q    And it's a well-respected fund administrator, are you

16  aware?

17  A    Yes, sir.

18  Q    It's been around for a while?

19  A    Yes, sir.

20           MR. MCCONNELL:  Objection.

21           THE COURT:  Are there any more questions on this

22  fund administrator?

23           MR. DEARINGTON:  Not the fund administrator

24  itself, I'm just providing context.

25           THE COURT:  All right.  Let's go to the next

J. Frederick - Cross/Mr. Dearington                    649

1   question.

2   Q    All right.  You're aware that Phoenix American handled

3   investor relations including distributions, redemptions, and

4   account summaries for the fund?

5            MR. MCCONNELL:  Objection.

6            THE COURT:  What's the relevance?

7            MR. DEARINGTON:  Your Honor, where I'm going with

8   this is where this document actually comes from that the

9   witness testified about and who prepares it, and what was

10  actually delegated by the fund to another entity.

11           MR. MCCONNELL:  Your Honor, the witness has no

12  basis of knowledge for that and, again, the premise of the

13  question is inaccurate.

14           THE COURT:  Let's hear the question.

15           MR. DEARINGTON:  Sure.  Let me ask that question

16  again just to build some foundation.

17  Q    You're aware from the PPM that Phoenix American handled

18  investor relations which included certain matters involving

19  distributions, redemptions, and account summaries?

20  A    Yes, sir.

21  Q    Okay.  And you're aware that -- are you aware whether

22  this is a Phoenix American template?

23           MR. MCCONNELL:  Objection.

24           THE COURT:  Overruled.

25  A    Whether that's a Phoenix American template?  I am not.

*J. Frederick - Cross/Mr. Dearington*          650

1    Q     Okay.  So if this were, hypothetically, a

2    Phoenix American template you were not aware of that?

3    A     Correct.

4    Q     Okay.  I'd like to show the witness what's been

5    admitted into evidence as Government Exhibit 1390.

6          Do you recall testifying about this document?

7    A     Yes, sir.

8    Q     And this would be a distribution statement for

9    Mr. Jones from August 2018; is that right?

10   A     Yes, sir.

11   Q     Okay.  And I think you testified that it was "shocking"

12   when you saw the footnotes to this statement?

13   A     The timing of it was particularly shocking.

14   Q     Shocking?

15   A     The statements as well and the timing, yes, sir.

16   Q     Okay.  And one of the things I think you testified that

17   shocked you was in Footnote 1?  If you could, please, call

18   out Footnote 1 -- where it says in the last sentence,

19   "Current cash distributions are not guaranteed and there's

20   no guarantee that investors will receive a full return of

21   their invested capital," right?

22   A     That's one of the less shocking statements on the page.

23   Q     So you testified it was shocking but now you're saying

24   it's not shocking?

25   A     The whole disclosures are.  The idea that --

J. Frederick - Cross/Mr. Dearington          651

1    Q    Can you just follow my questions, sir?

2    A    Sure.

3    Q    Now, you're saying this is still shocking or not

4    shocking?

5    A    As a whole, yes.  That particular sentence, no.

6    Q    Okay.  And that's because you were told in the PPM and

7    other materials that this is a risky investment and you

8    could lose some or all of your investment?

9    A    Yes, sir.  And the distributions are not guaranteed.

10   Q    Right.  And so, you testified about the line which I

11   think you were trying to get to that says, in part, that

12   distributions have been and may in the future continue to be

13   paid out of available working capital including, but not

14   limited to, investor contributions.

15        That was what you found shocking?

16   A    Again, the timing made it particularly shocking.

17   Q    Okay.  And Phoenix American here isn't saying that all

18   distributions from the fund had been investor capital,

19   correct?

20             MR. MCCONNELL:  Objection.

21             THE COURT:  Sustained as to the Phoenix American.

22   Q    This statement is not saying to you that all GPB

23   distributions from the fund are investor capital, right?

24   A    GPB did not tell us that until December of 2018.

25   Q    That's not any question, sir.  Listen carefully to the

*J. Frederick - Cross/Mr. Dearington*                    652

1   question asked.

2       This statement does not say that all GPB distributions

3   from the fund have been investor capital, right?

4   A    Right.

5   Q    And it does not say what amount, if any, of the

6   distributions from the fund included very much capital;

7   right?

8   A    Right.

9   Q    And it doesn't even say that a large or more than de

10  minimus amount of investor capital may have been returned to

11  distributions, right?

12  A    Right.

13  Q    And, hypothetically, you would agree with me, that if

14  one percent of your distributions included a fraction of

15  that one percent included investor capital and 99

16  point-something-else-percent included cash flow, that

17  wouldn't bother you; right?

18              MR. MCCONNELL:  Objection.

19              THE COURT:  Overruled.

20  A    The timing of this disclosure coming -- oh, yes, sir,

21  I'm going to answer how I please.

22       The timing of this disclosure coming when the

23  distributions were suspended, those together is what made it

24  so shocking.

25  Q    Okay.  Now, I'm going to ask my question again.

J. Frederick - Cross/Mr. Dearington                653

1    A    Please do.

2    Q    The distributions had included 99.5 percent cash flow,

3    hypothetically, and .5 percent in your own dollars coming

4    back to you because they had not been deployed.  That would

5    not bother you or shock you, right?

6    A    No, it would not have bothered or shocked me if that

7    had been the case.

8    Q    Great.  So it matters to you if there was -- it does

9    not matter to you if there was just a you small amount of a

10   distribution that included your own dollars coming back,

11   correct?

12   A    Yes.

13   Q    Okay.  You're a financial advisor and you testified

14   that you know how to read and review and understand

15   financial statements is that fair?

16   A    Yes, sir.

17   Q    And generally, using a financial statement, depending

18   on what's in the statement, you can compare distributions to

19   multiple different performance metrics, right?

20   A    Yes, sir.

21   Q    And examples of those could be included, but not

22   limited to, total investment income, net investment income,

23   net income, EBIDTA, E-B-I-D-T-A, and adjusted EBIDTA, right?

24   A    And you can add cash flow from operations to that.

25   Q    Cash flow from operations?

J. Frederick - Cross/Mr. Dearington          654

1    A    Yes.

2    Q    Now, let's just take one metric remaining in this

3    hypothetical world.

4         If you saw a financial statement that showed

5    distributions that is a particular amount, let's say,

6    $10 million.  And then you saw that net income was a net

7    loss for that same accounting period.  Then would that tell

8    you that the distributions may not have actually been paid

9    out of net income because there was a net loss for that

10   reporting period?

11   A    It would tell you that it may.

12   Q    May.

13        And I'd like to show the witness, the parties, and the

14   Court what has been marked for identification as Defense

15   Exhibit IR.

16        Please look up once you've had a chance to review the

17   cover page.

18   A    Yes, sir.  Can you tell me about the date of this

19   document.

20   Q    Well, if you turn to Page 008?

21   A    It's probably going to be May of 2017.  Now, that I see

22   what the document is.  That's what -- this is very difficult

23   to read.

24   Q    Understood.  Apologies for that, sir.

25        So does this appear to be a letter transmitting at

J. Frederick - Cross/Mr. Dearington                    655

1   least in part, one of the things it's transmitting is the

2   2016 audited financials for the Automotive Portfolio Fund?

3   A    Yes, sir.

4   Q    Okay.  And if you could please turn the witness's,

5   Court, and parties' attention to dash 005.

6        Would this be the audited financials for 2016 for the

7   Automotive Portfolio Fund?

8   A    Yes, sir.

9        MR. DEARINGTON:  I would like to offer Defense

10  Exhibit IR.

11       MR. MCCONNELL:  No objection.

12       THE COURT:  Admitted.

13       (Defendant's Exhibit IR was marked in evidence.)

14       MR. DEARINGTON:  Please publish to the jury.

15       (Exhibit published.)

16  Q    If you could please turn to Page 012.  This would be

17  the -- if you recall the U.S. GAAP version of the

18  financials, right?

19  A    That's not disclosed on the page but if you say so,

20  yes, sir.

21  Q    Okay.  So on Page 012, on the right side, at least

22  being reported here, are distributions of 14.3 million; is

23  that correct?

24  A    Yes.

25  Q    And the net income or loss, or at least reported here

1    are you this accounting period, is 7.1 million?

2    A    Yes, sir.

3    Q    Okay.  And so you must have known or suspected that

4    distributions came from a source other than net income, or

5    you must have believed, let's say that, you must have

6    suspected or believed that the distributions for this

7    accounting period came from a source other than net income.

8         That was possible, right?

9              MR. MCCONNELL:  Objection to the question.

10             MR. DEARINGTON:  I can reframe and distill, your

11   Honor.

12             THE COURT:  Go ahead.

13   Q    Having looked at the distributions and the net income

14   or loss here, you suspected that the distributions for this

15   accounting period may have come from a source other than net

16   income?

17   A    It was deeply concerning which led to follow-up

18   conversations with Ascendant on the topic.

19   Q    Is that a yes?

20   A    It is a yes.

21   Q    Okay.  And one of those sources could have been excess

22   cash flow from prior accounting periods, right?

23   A    Possibly.

24   Q    And it could have come from other sources possibly?

25   A    Possibly.

*J. Frederick - Cross/Mr. Dearington*        657

1    Q    Okay.  Now, I don't want to belabor this point because

2    I know you testified a bit about this.

3         But fair to stay the PPM said at least three times that

4    distributions could include a return of capital?

5    A    Yes.

6    Q    Okay.  And --

7    A    No present plans to do so but could, yes.

8    Q    And let's say those plans changed.  You're aware that

9    there was -- the PPM said there was no duty to update the

10   PPM about that change of plan, right?

11   A    It may.  I don't have it memorized word for word.

12   Q    If you could just turn --

13   A    But I imagine it does.

14   Q    Are you saying you imagine it does?

15   A    Yes, sir.

16   Q    Okay.  If we could show the witness show please publish

17   8258-B.

18        This is the PPM, right?

19   A    Yes, sir.

20   Q    And no present plans means something in the future,

21   right, where --

22   A    In that they hadn't done it in the past.  That's in the

23   same paragraph.

24   Q    So just the question is:  No present plans -- you

25   understood that to mean, for example, that a forward-looking

*J. Frederick - Cross/Mr. Dearington*                          658

1    statement, right?

2    A    Right.

3    Q    Okay.  So turning to Page 4, last sentence of the top

4    paragraph, could you just, once it's on zoom, would you do

5    me the favor of reading the last sentence of the first

6    paragraph?

7    A    "We disclaim in the obligation to update any such

8    factors or announce the results of any revisions to the

9    revisions to any of the," again very fuzzy, "of the

10   forward-looking statements contained herein to reflect

11   future events or both."

12   Q    Thank you.

13            (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. DEARINGTON:

3    Q    I'd like to show only the witness, the parties and the

4    Court what's been marked for identification as Defense Exhibit

5    IIII-M.

6              Do you recognize this document, sir?

7    A    Yes, sir.

8    Q    Does this appear to be the calendar and the portfolio

9    fifth amended and restated PPM dated July 2018?

10   A    Yes, sir.

11             MR. DEARINGTON:  I'd like to offer Defense Exhibit

12   IIII-M into evidence.

13             MR. McCONNELL:  No objection.

14             THE COURT:  You may.

15             (Defense Exhibit IIII-M received in evidence.)

16             MR. DEARINGTON:  If you could please publish to the

17   jury.

18             (Exhibit published.)

19   Q    You received this PPM in July 2018.  Do you recall that?

20   A    Yes, sir.

21             MR. DEARINGTON:  If we can please turn to the page

22   ending -1173.

23             Okay.  I'd like to zoom in on the row that says

24   "Investment Fair Value as of March 31, 2018."

25             You're ahead of me.

Frederick - cross - Dearington                  660

1   Q    Okay.  So that number is almost 415 -- almost 416

2   million; correct?

3   A    Correct.

4   Q    And, so, this document is saying that that's the amount

5   of investment fair value as of March 31, 2018; right?

6   A    Yes.

7   Q    The fair market value of the company's investments?

8   A    Yes, sir.

9   Q    And scrolling down to two rows --

10           MR. McCONNELL:  I'd object.

11           Can we look at the asterisk?

12           MR. DEARINGTON:  I mean, that seems like something --

13           THE COURT:  The objection is overruled.

14           Go ahead.

15           MR. DEARINGTON:  Thank you.

16   Q    Two rows down, do you see "cash on hand as of March 31st,

17   2018?"

18   A    Yes.

19   Q    And that's about 85 million?  Yes or no?

20   A    Yes.

21   Q    Okay, yes or no, if you put together the investment fair

22   value, the number of 450 million -- 415 million and the 85

23   million, you get a little more than 500 million; is that

24   correct?

25   A    412 plus 85?

Frederick - redirect - McConnell               661

1   Q    415.7 --

2   A    Yes, sir.

3            Yes, sir.  Just over 500 million.

4   Q    So the fair market value of the company's investments and

5   the amount of the company's available cash put together at

6   this time is for end of Q1 2018 is just over $500 million; is

7   that correct?

8   A    Yes, sir.

9   Q    And that would be what's still in the fund after five

10  years of distributions had gone out; correct?

11  A    Yes, sir.

12           MR. DEARINGTON:  Just a moment, please.

13           (Pause.)

14           MR. DEARINGTON:  Thank you, Mr. Frederick.  I have

15  nothing further for this witness.

16           THE COURT:  Redirect?

17           MR. McCONNELL:  Yes.

18  REDIRECT EXAMINATION

19  BY MR. McCONNELL:

20  Q    Mr. Frederick, good morning again.

21  A    Good morning, Mr. McConnell.

22  Q    I would like to ask you some follow-up questions based on

23  what you were asked by defense counsel; Okay?

24  A    Yes, sir.

25  Q    You were asked extensively about various risks associated

Frederick - redirect - McConnell                    662

1    with an investment in GPB Automotive Portfolio.

2              Do you remember some of those questions?

3    A    Yes, sir.

4    Q    And I believe you said that a private equity investment

5    like GPB was riskier than stocks or bonds; correct?

6    A    Yes, sir.  Can be; yes, sir.

7    Q    Can you explain to the members of the jury how risky you

8    thought the GPB Automotive Portfolio was, based on your due

9    diligence?

10   A    Yes.  Based on due diligence, the underlying assets,

11   again, being established car dealerships with current profits,

12   not startups.  While private placements have risk and any

13   business can go bankrupt.  And private placement memorandums

14   are risky because you can't control liquidity.  You can

15   request a redemption, but you're not guaranteed to get it.

16   Redemptions can be suspended.  So a big part of the risk is

17   the liquidity.  It adds a certain risk.  And there is

18   certainly a risk in every business that exists.  There is no

19   risks free rate of return, there is no risk free business to

20   investment.

21              So our understanding of the risks were the lack of

22   liquidity and that every business has risks.  We were drawn to

23   the fact that the underlying assets were not some high-flying,

24   super risky, highly-leverage or start-up or something of that

25   nature.

Frederick - redirect - McConnell                    663

1  Q    You were asked about the track record.

2         How did GPB's track record, as it was described to

3  you both in person and in the materials you reviewed, how did

4  that factor into your view of GPB's riskiness?

5         MR. COGAN:  Objection.

6         THE COURT:  Overruled.

7  A    So the track record showing the distributions and being

8  repeatedly told that the distributions were from the operating

9  profits of the entity and that distributions had never been

10 missed that, in fact, special distributions had been made,

11 that track record was -- was appealing.

12 Q    You were asked about some of the things that you signed

13 in order to invest in GPB Automotive?

14 A    Yes.

15 Q    And that included the limited partnership agreement;

16 correct?

17 A    Yes, sir.

18 Q    And it included the private placement memorandum;

19 correct?

20 A    Yes, sir.

21 Q    Was one of the risks associated with an investment in the

22 GPB Automotive Portfolio was that you would be lied to?

23 A    No, sir --

24         MR. COGAN:  Objection.

25 A    -- that was never disclosed.

1          THE COURT:  You can answer.  I'm sorry.

2    A    No, sir.  The fact that we were being lied to about the

3    source of the distributions was never disclosed.

4    Q    Was one of risks you assumed in investing in the

5    Automotive Portfolio that you would be given misleading

6    information?

7          MR. COGAN:  Objection.

8          THE COURT:  I will allow it, but I think you should

9    wrap up this line.

10   A    There is no such thing as an investor so sophisticated

11   that you're allowed to lie to them.

12   Q    You talked about the due diligence that you did in

13   connection with the GPB Automotive Portfolio.

14        Approximately how long did you conduct due

15   diligence?

16   A    About nine months.

17   Q    Why did you look at anything besides the private

18   placement memorandum?

19   A    I'm sorry, ask again.

20   Q    In conducting your due diligence, why look at or consider

21   anything beyond the private placement memorandum?

22   A    You read all available materials.

23   Q    Now, you were asked some hypothetical questions on

24   cross-examination.  I want to ask you some real world

25   questions.

Frederick - redirect - McConnell                665

1  A    Yes.

2  Q    Was there anything in the quarterly financial reports

3  that you received that told you you were getting your own

4  capital back?

5  A    No specific disclosures of that nature, no, sir.

6  Q    Was there any specific disclosure in plain English that

7  told you you might be getting other investors' capital back?

8  A    Oh, no, sir.

9  Q    In the audited financials that you were shown, both on

10 direct and cross-examination, were there any disclosures that

11 you were getting your own capital back or other investors'

12 capital back as part of this monthly distributions?

13 A    No, sir.

14 Q    And in the account statements, anything like that prior

15 to July 2018?

16 A    No, sir.

17 Q    You mentioned on cross-examination that not only the

18 content of those footnotes that we saw in the August account

19 statement, but the timing of it was "shocking" to you.  Can

20 you explain to the members of the jury why?

21 A    Because those disclosures hadn't been there in prior

22 months going back for two years, or nearly two years.  And

23 when the distributions were suspended and the redemptions were

24 suspended, which were very close together in June of 2016 --

25 no, in 2018, rather.  I believe it was June of 2018.  When

1    distributions were suspended -- no, that's not right, that

2    could have been August.   Rephrase.

3            So in June of 2018, GPB and Ascendant Capital

4    finished raising new money.   They stopped accepting new

5    investment money in June of 2018.

6            Shortly thereafter, I believe that's in August of

7    2018, distributions ceased.   Not only did distributions cease,

8    but then suddenly these disclosures show up on our statements.

9    So distributions -- the fund-raising stops.   Shortly

10   thereafter, the distributions stop.   Then the right to even

11   request a redemption stops and then these disclosures come

12   out.   So the reason it was so shocking was, hey, wait a

13   minute, as soon as these guys are finished raising new money,

14   that's when we find out, are those distributions or returns of

15   capital, or may have been.   We would find out for certain in

16   December of 2018 that they were.

17   Q    You've mentioned special distributions before.   How did

18   the fact that special distributions had been paid in the

19   Automotive Portfolio previously impact your view about the

20   source of those monthly distributions?

21   A    I'm sorry, say that again?

22   Q    You mentioned special distributions.   How did the fact

23   that special distributions had previously been given impact

24   your view of the source of those monthly distributions?

25   A    Oh, again, it tells you that the portfolio's earning more

Frederick - redirect - McConnell                667

1    money than it's paying out, so, therefore, it has additional

2    available cash to return to investors as income.

3    Q    I believe it was, well, both defense counsel asked you

4    about sort of different metrics was the word they used in

5    these financials?

6    A    Yes.

7    Q    And you mentioned total investment income, net investment

8    income and net income; right?

9    A    Yes.

10   Q    Those are some things you can look at to try and decipher

11   how the fund is doing; correct?

12   A    Yes.

13   Q    Did GPB ever tell you or Ascendant Capital ever tell you

14   how they calculated the coverage ratio for distributions?

15   A    They didn't disclose their coverage of ratios, so, no.

16        MR. McCONNELL:  If we can look at Government's

17   Exhibit 21 -- well, before we get there.

18   Q    You said that you were concerned, I believe you used the

19   word deeply troubling about some of the numbers that you

20   received?

21   A    Yes, sir.

22   Q    What did you do in response?

23   A    Reached out to my contacts at Ascendant Capital.

24   Q    And were you ever told during those conversations that

25   you were being given your capital or other investors' capital

1    back as part of those monthly distributions?

2    A    Oh, no, sir.  We were repeatedly told that distributions

3    are covered --

4              MR. COGAN:  Continuing objection.

5    A    -- 100 percent, and that if the fund struggled to cover,

6    distributions would be reduced and could be suspended.

7              MR. McCONNELL:  I want to go to the audited 2015

8    financials.  That's Government's Exhibit 2125 in evidence,

9    please.

10   Q    So, Mr. Frederick, these were available to you when you

11   were conducting your due diligence; correct?

12   A    Yes, sir.

13   Q    I want to talk about the performance guaranties.

14             Do you remember the performance guaranty being part

15   of the marketing presentation about the Automotive Portfolio?

16   A    Yes, sir.

17   Q    Again, can you just explain generally to the members of

18   the jury how that was explained to you?

19   A    Yes, sir.  Performance guaranty, as we discussed, just

20   means -- and I think and it's important -- if an investment is

21   made in a dealership, the dealership fails to deliver on

22   expected returns at 813.75 percent, was the wrong number that

23   they put in front of us, that the seller, the previous owner,

24   who had received funds when they sold the business, would have

25   to pay back to the fund dollars to make up for that shortfall.

1          MR. McCONNELL:  So I want to look at -- I think we

2     are going to go to page 15 on the -- I think it's the PDF page

3     number, Ms. Bates.  Not that.

4          If you go slow, I will tell you when to stop.

5     That's it?  Okay.  Go back.

6          MR. McCONNELL:  I'm sorry, your Honor, just give me

7     one second.

8          (Pause.)

9     Q    I'm sorry, it's page 13 of the document.

10         Sir, if we can just blow this up.  First, did you,

11    the document is not too long, but do you recall seeing this

12    when looking at the audited financials?

13    A    Yes.

14    Q    You do?

15    A    Yes.

16    Q    And you would agree that that amount, $1,050,000.00 was

17    approximately a third of the net investment income for the

18    Automotive Portfolio that year?

19    A    Yes, sir.

20    Q    As a financial advisor, is that a significant amount?

21    A    Yes, sir.

22    Q    Would it have been important for you, both as an advisor

23    and as an investor, to know that this performance guaranty

24    that's referenced in the audited financials was not in place

25    ending the year ending December 13, 2015?

1          MR. COGAN:  Objection.

2          THE WITNESS:  Could you say that again?

3   Q    Would it have been important for you, both as an advisor

4   and as an investor, to know that this performance guaranty

5   that's referenced here was not in place for the year-ending

6   December 31, 2015?

7   A    Yes, sir, but that doesn't make sense.

8   Q    If it had been -- if the performance guaranty had had

9   been created in April of 2016 and been backdated, would that

10  have been significant to you as an investor and an adviser?

11         MR. COGAN:  Objection.

12         THE COURT:  Overruled.

13  A    Yes, it would indicate fraud.

14  Q    If it had been paid by someone else, other than the

15  operator, would that have been important to you?

16  A    Yes, as that would also indicate fraud.

17         MR. COGAN:  Objection.

18         Move to strike.

19         THE COURT:  Sustained.

20         Sustained as to the indicate fraud.

21         MR. COGAN:  Move to strike.

22         THE COURT:  Please disregard that part of the

23  witness' testimony.

24         MR. McCONNELL:  One moment, your Honor.

25         (Pause.)

Frederick - recross - Cogan                    671

1      MR. McCONNELL:  I have nothing further.  Thank you.

2      THE COURT:  Anything else?

3      MR. COGAN:  Just very briefly, your Honor.

4  RECROSS EXAMINATION

5  BY MR. COGAN:

6  Q    Good morning, Mr. Frederick.

7  A    Good morning, Mr. Cogan?

8  Q    Cogan.  Yes.

9  A    Good morning Mr. Cogan.

10 Q    So you told us, when you first testified, that if it

11 was -- if someone had told you that some of your capital might

12 be returned with your distributions, you never would have

13 invested in the first place.

14      Do you recall that?

15 A    In context, I was referring to the fact that in December

16 of 2018 we learned that 100 percent of our distributions were

17 considered return to capital.

18 Q    I'm asking you, sir, whether or not you recall saying

19 that had you known before you invested that the distributions

20 would include a return of capital you never would have

21 invested?

22 A    Yes, sir.

23 Q    Okay.  And then you find out over the course of the time

24 that you are investing your client's money into this

25 opportunity that there are financial statements that you find

Frederick - recross - Cogan                            672

1    deeply troubling.

2            Do you recall saying that?

3    A    Yes, sir.

4    Q    And, so, in response to seeing financial statements that

5    are deeply troubling, it's your testimony that you picked up

6    the phone -- these are, by the way, financial statements that

7    are audited; correct?

8    A    Through 2016, yes, sir.

9    Q    The 2016 financial statements that were audited by an

10   independent auditor; correct?

11   A    Yes.

12   Q    You found deeply troubling?

13   A    Right.

14   Q    Because they disclosed the true nature of the financial

15   performance of GPB; right?

16           MR. McCONNELL:  Objection.

17           THE COURT:  Overruled.

18   A    Right.

19   Q    And, so, in response to that, you picked up the phone and

20   called the sales guys from Ascendant?

21   A    Yes.

22   Q    The same guys that you told us in the beginning of your

23   testimony you would often screen the calls from because they

24   were annoying?

25   A    Oh, like -- oh, in general, we would receive lots of

1    marketing calls.

2              At this point, I had established a relationship with

3    these folks.

4    Q    You didn't call Mr. Gentile to ask what was going on?

5    A    We were now allowed to contact GPB directly.

6    Q    So Mr. Gentile told you you weren't allowed to contact

7    him?

8    A    Didn't Gentile own a third of Ascendant Capital?

9    Q    I'm asking you, sir, whether or not you contacted Mr.

10   Gentile to ask him about the financial performance of the GPB

11   or whether you just called the sales guys?

12   A    I did not contact David Gentile about the financial

13   statements.

14   Q    And you never discussed the financial statements that

15   were audited and released to you?  You never discussed those

16   with Mr. Gentile, did you?

17   A    That is correct.

18              MR. COGAN:  I have nothing further.

19              THE COURT:  Anything else?

20              MR. DEARINGTON:  Your Honor, may we have a brief

21   sidebar?

22              THE COURT:  Okay.

23              MR. DEARINGTON:  Thank you, your Honor.

24              (Sidebar held outside of the hearing of the jury.)

25              (Continued on next page.)

Sidebar                                                    674

1          (The following sidebar took place outside the

2   hearing of the jury.)

3          MR. DEARINGTON:  I'm sorry, your Honor.

4          So the witness repeatedly is paraphrasing this

5   December letter that can't be used against my client Mr.

6   Schneider when he says that I was told that all of my

7   distributions were included -- the witness continues to

8   paraphrase the December 2018 letter to say that investor

9   distributions were entirely investor income and that document,

10  the Court has already instructed the jury, can't be used

11  against us.

12         THE COURT:  I thought he was talking about -- it

13  sounded a moment ago he was recounting statements he had heard

14  from Ascendant folks when he called them to ask them about

15  the -- where -- to ask them about what he had seen in the

16  audited financial documents, right?

17         MR. DEARINGTON:  So I think he said that he called

18  Ascendant folks, not our client, and they said something about

19  coverage.  But then he keeps, without saying the December 2018

20  letter, referring to it to say that of those distributions

21  were investor capital.  And that can't be used against us

22  because he's just citing to the letter.

23         THE COURT:  Okay.  So you want an instruction about

24  it?

25         MR. DEARINGTON:  Yes.

Sidebar                                                                675

1          THE COURT:  Do you have a response to that?

2          MR. McCONNELL:  If they want to draw more attention

3   to the letter, that's okay with me.

4          MR. COGAN:  Actually, your Honor, on behalf of Mr.

5   Gentile, respectfully, we would object to another instruction

6   at this point on that.

7          THE COURT:  What's the basis for objecting?

8          MR. COGAN:  On the basis that we've already had one

9   instruction.  I don't think an another instruction is proper

10  on the same exact thing.

11         THE COURT:  Okay.  I'll give the instruction that to

12  the extent that the witness is discussing -- is it the

13  December 2017 letter?

14         MR. McCONNELL:  2018.

15         MR. COGAN:  2018.

16         THE COURT:  -- 2018 letter from Mr. Gentile, that

17  statement should only be considered with respect to Mr.

18  Gentile.

19         MR. McCONNELL:  Your Honor, while we are here, I

20  have nothing else for the witness.

21         THE COURT:  And then I'm going to take a break.

22         MR. McCONNELL:  Okay.

23         (End of sidebar conference.)

24         (Continued on next page.)

25

 1              (In open court.)

 2              THE COURT:  So to the extent that the witness was

 3    discussing a moment ago a December 2018 letter from Mr.

 4    Gentile, I'll just remind you that that statement should be

 5    considered only as evidence with respect to Mr. Gentile and

 6    not with respect to Mr. Schneider.

 7              I think that's it for the --

 8              MR. DEARINGTON:  Nothing further, your Honor.

 9              THE COURT:  All right.  So. Thank you, sir.  You are

10    excused.

11              (Witness excused.)

12              It is a good time for us to take a 10-minute break.

13              THE COURTROOM DEPUTY:  All rise.

14              (Jury exits the courtroom.)

15              THE COURT:  So here's my suggestion.  It sounds like

16    you all don't want to do this in a document-by-document way,

17    so I'm happy to hear from you all in the same general way that

18    the Government addressed these issues, and then I will have

19    the objections and the theories of admissibility in mind.  But

20    I don't intend to take sidebars.  So I will just know what

21    they are and then when I see individual documents, I will --

22              MR. COLTON:  Your Honor, what we can do is pull up a

23    couple of documents for you and have a context.

24              THE COURT:  Sure.

25              MR. COLTON:  I don't know if we can connect back.

Proceedings                                              677

1   I'm going to pick a couple at the beginning of your list.

2            THE COURT:  What we don't have -- we do.  Never

3   mind.  You can pull up a set of documents.

4            MR. MENCHEL:  Your Honor, so the record is clear, I

5   join in these objections.

6            THE COURT:  Yes.

7            MR. COLTON:  Your Honor, up on the screen now is a

8   simple document.  It's the Government's proposed

9   Government Exhibit 6171A, and this purports to be an e-mail

10  from Steven Frangioni to Bill Jacoby.  It is not from Mr.

11  Schneider or Mr. Gentile.  It is not to Mr. Schneider or Mr.

12  Gentile.

13           It's an out-of-court statement by Mr. Frangioni, who

14  is -- who is a person who worked at GPB, who is not alleged to

15  be a co-conspirator, in a document not copied to either Mr.

16  Gentile or Mr. Schneider, and it attaches a document that

17  makes factual assertions for which I believe the Government is

18  seeking to admit them for their truth against Mr. Schneider

19  and Mr. Gentile and I don't see a basis to do that.

20           THE COURT:  So I'll just say -- and I think that

21  this is in the category, the second category in the

22  Government's letter, and that's the category where I'm

23  uncertain of what we're talking about.  So I'm seeing in the

24  Government's letter a discussion of category that they're

25  intending to offer, one is communications to auditors, which

Proceedings                                                        678

1   are offered to explain subsequent conduct of auditors, in

2   light of that information, the effect on the listener.  That I

3   get.  And then the third category is e-mails that the

4   defendants were sent or were copied on and that I get.

5           The second category is kind of vague to me and it

6   seems like here we are talking about the objection Mr. Colton

7   is raising as to a communication in that second category and I

8   don't feel like I have a lot of information to understand

9   why -- I mean, just to understand everything that Mr. Jacoby

10  knew, I'm just not sure that's going to be relevant.  Every

11  piece of information he received, I'm not sure is going to be

12  relevant.  So --

13          MR. McCONNELL:  I don't think every piece of

14  information he received is relevant either, your Honor.  We've

15  streamlined.  But these sorts of e-mails where he is

16  communicating with other members of his accounting team, other

17  employees of GPB in order to assess certain financial issues,

18  the overall health of the fund, these are things which he

19  gains knowledge of and has conversations with the defendants

20  about.  They are also things which prompt him to do particular

21  things as the chief financial officer, again, both with the

22  defendants and with other people at GPB Capital.  So, I think,

23  as we have outlined on the letter, there's a variety of

24  non-hearsay uses for this document, including to provide

25  necessary context for the witness' testimony.

Proceedings                                                      679

1          THE COURT:  So if he is setting up a conversation

2    that he had with Mr. Schneider or with Mr. Gentile, then get

3    it.  If you received this e-mail and it says some fact and

4    then afterwards you talked to Mr. Schneider or Mr. Gentile,

5    then I'm going to let that in.  That does provide context.

6    It's going to be important for the jurors to understand and

7    it's not for the truth.

8          MR. McCONNELL:  All of these e-mails are essentially

9    that, in that they're conversations amongst GPB employees,

10   including Mr. Jacoby, that he's on every one of the e-mails

11   that we are seeking to introduce and as a result he takes

12   certain actions in the course of his employment, including

13   having conversations or sending subsequent e-mails to the

14   defendants.

15         THE COURT:  Okay.  What about that?

16         MR. COLTON:  So there's two major problems here,

17   your Honor, number one is I'd like to show if the Government

18   is actually offering this out-of-court statement by Steven

19   Frangioni, who did not work at or for Mr. Schneider.  And I

20   know it's a little bit different, but he is not a personal,

21   you know, agent of Mr. Gentile, offering these statements for

22   the truth, or are they offering them for this what motivated

23   Mr. Jacoby, and I would like to address both.  But I would

24   like to know what we are talking about and I will address it.

25         THE COURT:  The theory I just articulated was not a

1  for-the-truth theory.

2          Are you offering them for their truth?

3          MR. McCONNELL:  We're not offering them for their

4  truth.  But the attachment to this e-mail -- this is an

5  e-mail --

6          THE COURT:  Okay.  It's not for the truth.

7          MR. COLTON:  So I think this is more prejudicial

8  than probative and not necessary because the witness is going

9  to be on the stand, Mr. Frangioni is on the Government's

10 witness list.  If Mr. Jacoby were to testify I learned or

11 believed that these transfers happened and that's what sparked

12 me to do A, B, or C, that I can understand.  But to let in an

13 e-mail that goes to the jury that has financial data

14 promulgated by someone who is not an agent of Mr. Schneider,

15 wasn't done by Mr. Schneider, has very, very limited utility,

16 and the cases the Government cites for the state of mind of

17 the declarant, Jacoby isn't even the declarant here, but those

18 cases involve communications that are part of a string or

19 involving the actual defendants in the case.  This type of

20 communication is not connected to either of the defendants in

21 the case and it just is papering a record with material that

22 shouldn't come in against two individuals who are not on the

23 communication.  And there is no evidence they adopted the

24 communication.  And they don't need it for a guy to say I took

25 certain actions and here's why.

Proceedings                                                    681

1          THE COURT:  Okay.  The distinction you're drawing

2    between setting this up through a description versus putting

3    in the exhibit is not one that I'm finding that compelling.

4    It seems like the Government is articulating a permissible

5    non-hearsay basis for offering this evidence, and I'm not

6    hearing anything specific about why there would be a

7    substantial risk of unfair prejudice from admitting these

8    exhibits.  So I'm not hearing a basis to exclude them.

9          MR. COLTON:  Your Honor, there are about 40 of these

10   and at some point it becomes dramatically prejudicial to have

11   all this information come in against individuals who are not

12   on the communications, who did not make the communications.

13   And it is clearly done to buttress a witness who hasn't yet

14   been challenged as to why he took certain actions.

15         THE COURT:  But I think it's permissible to admit

16   the evidence for buttressing in the sense of showing that that

17   communication actually occurred, right.  That's permissible --

18   I'm not sure if buttressing is the right word.  But it is

19   permissible to show that this communication actually happened

20   rather than just having him testify about it.  And again, I'm

21   not hearing a substantial risk of unfair prejudice that's

22   going to outweigh that.  I take the point anything can become

23   cumulative at some point, so I'm hopeful that the Government

24   would be mindful of that too.  I'm just not hearing

25   substantial risk.

1          MR. MENCHEL:  May I add something?  So the

2    Government is not offering this document to prove the truth of

3    those transfers?  Is that really their position in this case?

4          MR. McCONNELL:  No.  The underlying spreadsheet in

5    this e-mail is based on the bank records and the QuickBooks,

6    which we expect to be able to lay a business records'

7    foundation for.  But even beyond that, these materials are

8    then discussed with the defendants in some instances with some

9    of the e-mails, that we intend to introduce portions of this

10   particular spreadsheet which show money movements from the

11   investment to the distribution account are directly sent to

12   both of the defendants, in addition to other people at GPB.

13   So there's, again, a variety of permissible bases for

14   admissibility here and a variety of different ways that this

15   is going to come into play.

16          In addition, the -- I'm sorry.  I will sit down.

17          THE COURT:  I guess I'm focused on a particular

18   theory.  If we want to talk about a different theory of

19   admissibility, we can talk about that.  You were saying you

20   wanted these for their truth.  We can talk about that.

21          But my thought is that I'm open to giving an

22   instruction when I admit these exhibits the reasons these are

23   being offered is not for their truth; it is to explain what

24   Mr. Jacoby did to provide context to what Mr. Jacoby --

25          MR. McCONNELL:  And that's fine, your Honor, but I

Proceedings                                                683

1    do expect to be able to lay foundation through this witness

2    that the content -- and, again, just sticking with this

3    particular e-mail -- the content of this spreadsheet is based

4    on the QuickBooks and bank records that were verified and were

5    relied on.

6              THE COURT:  How is he -- this is an e-mail to him.

7    So how is he going to --

8              MR. McCONNELL:  Because that document is something

9    that was accessed by members of the accounting team.  It was

10   saved on the GPB share drive and it was constantly updated

11   when these money movements -- which the testimony will be

12   elicited that the defendant Mr. Gentile approved -- was all

13   kept and updated.

14             THE COURT:  Your hoping at some point to admit these

15   documents for their truth, that this document is an accurate

16   statement of the transfers?

17             MR. McCONNELL:  I think what we're going to

18   anticipate doing, when we put on Mr. Petron, who's going to be

19   a witness who puts in the summary exhibit that are based on

20   the bank records, he will say he looked at this exhibit, he

21   reconciled it to both the QuickBooks and the underlying bank

22   records and that they're accurate.

23             THE COURT:  Are you planning to elicit a foundation

24   for the truthfulness?  Is that what you're trying to tell me?

25             MR. McCONNELL:  I'm not.  But I am going to elicit

Proceedings                                                684

1   from this witness the fact -- you know, what this is and where

2   it comes from, and how, as the chief financial officer, he is

3   aware of how this document was generated, updated, and kept.

4           MR. COLTON:  Two problems, your Honor:  One, this

5   would be the first time in my career that a summary witness is

6   going to authenticate documents.  That's what I just heard.

7   But second, I don't see how this document, whether it --

8   crediting everything that Mr. McConnell said for the purpose

9   of argument, comes in against Mr. Schneider, who didn't work

10  at GPB, and I don't see -- I'll let Mr. Gentile's counsel

11  argue to that.  But now what Mr. McConnell is saying is this

12  is all going to be a document that he personally has

13  completely, totally personal knowledge of is not relying on

14  other people's information, which is belied by the cover

15  e-mail in the first place.

16          Now, we are going back and forth, of course.  But if

17  I understood the Court's ruling or inclination about if it's

18  not for the truth, you will give a curative instruction, but

19  now I'm hearing something different.

20          THE COURT:  I'm kind of confused as to -- I've heard

21  you say that you are fine with my admitting it not for the

22  truth and giving the instruction I was proposing, but then you

23  seem to be saying you want to lay a foundation for that this

24  is an accurate representation of the books and records.

25          MR. McCONNELL:  I'm not looking to lay a foundation

Proceedings                                                          685

1    for purposes of admitting it as a business record, but I am

2    going to elicit from the witness what this document is, how he

3    is familiar with it, how the information in the spreadsheet

4    came to be, and how it was maintained and kept as part of

5    GPB's business within their -- in the accounting department,

6    which he headed.

7              THE COURT:  It sounds like you want to admit it as a

8    business record or something.  These are all foundational

9    business record questions, how the document was created and

10   maintained.

11             MR. McCONNELL:  I'm not going asking to admit it,

12   but I do think of having an understanding of where the

13   material came from is essential for the jury to understand

14   what it is that they're looking at.

15             THE COURT:  I think we should get the jury and I

16   will hear the questions when they are asked.

17             MR. COLTON:  I would just ask the Court to be

18   cognizant of not only the admissibility issue but also some of

19   these documents are very different as they have two

20   defendants, one is on some of them, none is on some of them.

21   So there's going to be some substantial issues, and I

22   apologize for that.  But, of course, we have to do the

23   objections we have to.

24             THE COURT:  Sure.

25             MR. MENCHEL:  Before we bring the jury back.  Can we

1    have a quick bathroom break.

2            THE COURT:  Sure.

3            (Recess taken.)

4            THE COURTROOM DEPUTY:  All rise.

5            (Jury enters.)

6            THE COURT:  The Government can call its next

7    witness.

8            MR. McCONNELL:  Your Honor, the Government calls

9    William Jacoby.

10           THE COURTROOM DEPUTY:  Please raise your right hand.

11           Do you solemnly swear the testimony you will give

12   the Court in this case will be the truth, the whole truth and

13   nothing but the truth so help you God?

14           Do you solemnly swear the testimony you will give

15   the Court in this case will be the truth, the whole truth and

16   nothing but the truth so help you God?

17           THE WITNESS:  I do.

18           THE COURTROOM DEPUTY:  Please state and spell your

19   name for the record.

20           THE WITNESS:  William Jacoby.  W-i-l-l-i-a-m.

21   J-a-c-o-b-y.

22           THE COURTROOM DEPUTY:  Please have a seat.

23           MR. McCONNELL:  May I inquire, Judge?

24   **WILLIAM JACOBY**,

25        called as a witness, having been first duly

1      sworn/affirmed, was examined and testified as follows:

2   DIRECT EXAMINATION

3   BY MR. McCONNELL:

4   Q    Mr. Jacoby, we are still good morning.  How are you?

5   A    All right.

6   Q    Have you ever testified before?

7   A    No.

8   Q    Just try and keep your voice up.

9   A    Okay.

10  Q    Can you tell the members of the jury about your

11  educational background, sir?

12  A    Sure.  An undergraduate degree in economics from

13  University of Vermont.  I have a master's in accounting from

14  Pace University in New York.

15  Q    And tell us a little bit about your professional

16  background.

17  A    Yeah, I graduated in '86.  I worked on Wall Street for a

18  number of banks in the bond trading, fixed income, and credit

19  derivatives, and derivatives operations areas.

20         Then in -- I moved from banking into private

21  investing where I was a CFO for a hedge fund named Arlington

22  Hill.  And then when Arlington Hill went out of business, I

23  worked for another alternative fund platform, that was called

24  Trump Point Partners.  That was an $11 billion fund or group

25  of funds of 50 different funds under management.  We were

Jacoby - direct - McConnell                    688

1   owned by Morgan Stanley.  The financial crisis happened and
2   Morgan Stanley divested from all of that business and closed
3   the division down.
4           I moved from there to Citibank for a time to do the
5   same thing there.
6           And then I ended up being the CFO at GPB Partners.
7   Q    You mentioned CFO both at GPB and during your prior
8   employment.
9           What is a CFO?
10  A    Chief financial officer.
11  Q    And could you tell the members of the jury generally what
12  a chief financial officer does?
13  A    In charge of the accounting for the funds.
14  Q    What does that mean?
15  A    We keep track of the money and keep track of the
16  statements, do the financial statements.  You know, the
17  general support for the accounting.
18  Q    You mentioned that you worked at some hedge funds.  Can
19  you just tell the members of the jury generally what a hedge
20  fund is?
21  A    Yes.  So there's -- the way I would describe it is
22  there's a few different types of private investors that are
23  for institutional investors, not for Main Street investors.
24  So just like in the ice cream shop, there is three basics:
25  There's chocolate, vanilla, and strawberry.  In private

1    investing there's hedge funds, private equity, and private

2    lending.  Those are your basic sort of private investments for

3    institutional investors.

4    Q    When you say institutional investors, what is an

5    institutional investor?

6    A    So institutional investors are like big corporations.  So

7    think of like banks, university endowments, pension funds, a

8    large family trust with, you know, say institutions with

9    hundreds of millions of dollars to invest.

10   Q    You mentioned private equity.  Can you explain to the

11   members of the jury generally what private equity is?

12   A    Yes.  So private equity is an investment vehicle.  It's

13   generally a partnership where these institutional investors

14   will invest their money into a vehicle.  There will be some

15   stated strategy.  Usually, typically with private equity a

16   small number of large institutions will invest, the money will

17   get locked away for a lot of years, because private equity

18   typically invests in startup, growth, non-profitable

19   industries and the money will get locked up for five to ten

20   years.

21          And then at the end of that period, when they're

22   ready to mature the investment, they dissolve the partnership

23   and they give everybody their money back through a waterfall

24   where, you know, the investors will get their money back plus

25   some other parameters and then the manager will get some share

1  of the profits, assuming there are some.

2  Q    You mentioned that at some point you became the chief

3  financial officer for GPB Capital.

4          When did you work for GPB Capital?

5  A    I started in March of 2015 and I ended -- I stopped being

6  the CFO in September of 2016.

7  Q    When you say you stopped being the CFO, what happened?

8  A    They hired a replacement for me and I stayed on for a few

9  months to transition.

10 Q    When you stayed on for a few months, were you reporting

11 to the office or were you remote?

12 A    I agreed to stay on until about halfway through December

13 of that year and then I was available remotely through the

14 audit period.

15 Q    What was your role in GPB Capital during the time you

16 were there?

17 A    I was the chief financial officer.

18 Q    And can you just describe for the members of the jury

19 what your duties and responsibilities were as the chief

20 financial officer of GPB Capital?

21 A    I was the -- so I was in charge of the accounting for the

22 funds.  We did the, you know, we kept track.  -- basically

23 you're keeping track of the money and, you know, preparing

24 financial reports and financial statements.

25 Q    What funds did GPB have at the time you were there?

1  A    There was a fund called GPB Holdings.  That was the first

2  fund.  So GPB Holdings I.  And then there was GPB Automotive,

3  those were the first -- when I started, that's what was there.

4  And they added more on, they added a Holdings II and other

5  funds successfully.

6  Q    How many employees did GPB Capital have when you first

7  started working there?

8  A    It was probably about five to ten.  It was very small,

9  start up growth at that time.

10 Q    And when you left, how many employees did GPB have,

11 approximately?

12 A    I would estimate about 30.

13 Q    And where were GPB's offices located?

14 A    We had -- there was an office in Garden City, Long Island

15 that was a shared office with the accounting firm that Mr.

16 Gentile came from where he was a partner.  So that was a

17 shared office in Long Island.  And then there was an office in

18 Manhattan.  He had a satellite office in Florida as well

19 because he had a house down there as well.  The main offices

20 were Garden City, Long Island and Manhattan.

21 Q    You mentioned Mr. Gentile.  Who is David Gentile.

22 A    He was the CEO of GPB Partners.

23 Q    Did you report to him as the chief financial officer?

24 A    Yes, I did.

25 Q    I want to talk a bit about how you got the job as the

1   chief financial officer at GPB Capital.

2          Can you tell the members of the jury how that came

3   about?

4   A    Sure.  Again, I was recruited by an executive recruiting

5   firm.  They were growing.  They screened a number of

6   candidates.  I was one of them.  I met with an executive there

7   at GPB called Michael Frost.

8          Then after that I met with Mr. David Gentile.

9          Then after that I met with Mr. Jeffry Schneider.

10         So I went through a couple rounds.  I can't remember

11  the total number of rounds of both of them.  But after that I

12  got a job offer and I began working in -- my start date was

13  March 1st.

14  Q    Who was Jeffry Schneider?

15  A    He was the CEO of Ascendant Capital.

16  Q    And what did you understand the relationship to be

17  between GPB and Ascendant Capital?

18  A    Well, Mr. Gentile and Mr. Schneider ran them as one firm,

19  with Ascendant being the marketing firm, the marketing

20  division and GPB being the investment division for the funds.

21  Q    And you said that during the application process you

22  interviewed both with Mr. Gentile and Mr. Schneider; is that

23  correct?

24  A    Correct.

25  Q    How many times did you meet with the two of them before

1  you were offered the job, if you remember?

2  A    I think it was twice.

3  Q    Why were you interviewing with Mr. Schneider if he was

4  the CEO of --

5           MR. COLTON:  Objection.

6           THE COURT:  If he knows.

7  Q    Why were you interviewing with Mr. Schneider if you were

8  applying for a position at GPB?

9  A    Well, they were running the business as partners

10 together.

11 Q    Can you explain to the members of the jury what you

12 understood GPB's business model as a private equity fund to

13 be?

14 A    Yes.  So GPB's funds were acquired as private equity from

15 the masses, so it was different from the private equity that

16 we just talked about a second ago.  It was going to be private

17 equity, but different because it would be available to regular

18 folks and it would pay an eight percent yield and it would be

19 paid in monthly installments and this would be a safe eight

20 percent yield that people could -- regular folks could invest

21 in and get this yield at a time when interest rates were very

22 low.

23 Q    And was there sort of a back-end potential payout as

24 well?

25 A    Well, there was a back-end potential payout, yet the

1    other thing was -- that was marketed was potential for special

2    dividends as well.

3             So there was a point of emphasis that the funds,

4    unlike traditional private equity and private investments,

5    would invest in already mature cash-flowing businesses; right.

6             And so, unlike the previous case that we talked

7    about where they are investing in these money losing

8    operations that hopefully someday succeed, here GPB was going

9    to invest in already profitable companies that were making

10   profits and feeding profits down into the fund, the fund would

11   take that revenue in, pay its expenses and the net profits

12   would be what would be distributed to the investors as

13   dividends.

14   Q    You mentioned the word dividends and yields.  What do

15   those words mean?

16   A    So just like in a bank account, if you deposit 100 bucks,

17   you get eight bucks during the year, that's your yield, that's

18   your eight dollar yield.

19   Q    At GPB, were those called distributions?

20   A    Distributions and dividends are used interchangeably.

21   Q    What was your understanding about the source of those

22   monthly distributions targeted at eight percent that were

23   going to be paid to investors?

24   A    So it was a point of emphasis that the distributions were

25   paid from profits of the companies that we invested in.

1              So in the auto portfolio, for example, we were

2     talking about, the fund would collect deposits from investors,

3     would go out and find a profitable car dealership, buy the

4     dealership, the dealership would send its profits up on a

5     monthly basis and that would be the source of the revenue.

6     And the fund would have some other expenses and then the net

7     income after that would be what could go out as dividends.

8     Q     Now, were those guaranteed?

9     A     No, they were not.

10    Q     Can you explain how those distributions would be

11    calculated and paid out, if they weren't going to be

12    guaranteed any --

13              MR. COLTON:  Objection.  Basis, your Honor.

14              THE COURT:  Lay a foundation.

15    Q     As the chief financial officer and during the course of

16    your interviews with Mr. Gentile and Mr. Schneider, did you

17    become familiar with GPB's business model?

18              MR. MENCHEL:  Objection.  Compound.

19              During the interview or during CFO?

20    Q     First, let's start with the interview.

21              Did you become familiar with GPB's business model?

22    A     Yes.

23    Q     Did that include how GPB paid out its monthly targeted

24    distributions?

25    A     Yes.

1  Q    And did you have conversations with Mr. Gentile and with

2  Mr. Schneider during your interview process about these

3  monthly distributions?

4  A    Yes.

5  Q    And can you explain to the members of the jury what you

6  understood the source of these distributions to be and how

7  they would be made?

8  A    So, just as in the example we were talking before,

9  profits, cash flow from the companies.  So once you bought a

10  company, that that's -- even if, you know, it's a dealership,

11  but that would be called a portfolio network.  So you'd have a

12  portfolio of companies that the fund would own and all those

13  companies would pay their profits up to the funds.  The fund

14  would have some other expenses, so you take the revenue in

15  from the portfolio of companies, pay your expenses, the net is

16  your net investment income, that's the profits that were

17  available for distribution or dividends.

18  Q    And I asked you if those were guarantied and you said no.

19  Can you explain why?

20  A    Well, because you don't know the exact number of your

21  profits every month; right?  So the whole portfolio of

22  companies is going to pay up whatever they actually make and

23  then you're going to take that revenue in and you're going to

24  have some expenses and you're going to have some amount left,

25  that's your profit, but it's not a guaranty; right?

1    Q    And did you discuss with Mr. Gentile and Mr. Schneider

2    about what would happen if the profits were not sufficient to

3    cover the eight percent monthly distribution?

4              MR. COLTON:  Objection to compound and grouping two

5    people together.

6              THE COURT:  Sustained as to compound.

7    Q    During the interview process, did you discuss with either

8    of the defendants?

9              MR. COLTON:  Same objection.

10             THE COURT:  Overruled.

11   A    Yes.

12   Q    And what was your understanding based on -- well, who did

13   you speak to about this?

14   A    Mr. Gentile.

15   Q    And what was your understanding, based on your

16   conversations with Mr. Gentile, about what would happen to

17   those monthly distributions if profits were not up to the

18   required level to pay the eight percent?

19   A    Well, you'd pay less; right?  If there wasn't enough,

20   you'd payout what you had; right?

21             If there is extra, you would collect it and then

22   you'd payout special distributions.

23   Q    So tell the members of the jury what you understood the

24   special distributions to be?

25   A    So the idea was that you would have all these profits

1    come up, you'd collect money and you'd meet your target

2    dividend.

3           If there was extra profits, you'd accumulate them,

4    and then you'd at some point make a decision that you had

5    enough to make an additional distribution on top of the eight

6    percent or whatever else was offered.

7    Q    And again, just sticking to the time period where you're

8    applying for the job and interviewing with Mr. Gentile and Mr.

9    Schneider, how was this structure different than a typical

10   private equity investment that you were familiar with?

11   A    Right.  So that was like what I was saying before is the

12   typical private equity, the institutions will put their money

13   in and you just won't see it for five to ten years.

14          And then at the end, when they wind up the fund,

15   they give everybody their money back, but money just goes to

16   the waterfall at that point to test certain metrics.  And

17   then, you know, a fee gets paid to the manager at the end.

18   Q    So how was this different?

19   A    Well, we were just saying that the profits are flowing up

20   and you're paying out monthly payments to everybody.  That's

21   somewhat unique for a typical private equity -- yeah.

22   Q    So there came a time when you accepted a position?

23   A    Yes, sir.

24   Q    And where did you report to work everyday?

25   A    Mostly Manhattan, but also in Garden City, Long Island.

1    Q    And how often would you interact with Mr. Gentile?

2    A    Probably once a week.  He was, you know, traveling a lot

3    with Mr. Schneider.  So he worked mostly out of the New York

4    office, so we'd see him probably about once a week.

5    Q    And in addition to the times that you would see him and

6    interact with him in person, did you communicate with him in

7    other ways?

8    A    Yes.

9    Q    How?

10   A    On phone, and e-mail and sometimes texts.

11   Q    When you were applying for the job, did you discuss Mr.

12   Gentile's professional background at all?

13   A    Yes.

14   Q    And what did you understand his background to be?

15   A    He was a partner at an accounting firm in Long Island.

16   And he built his GPB, the head -- the private equity

17   firm started off within that building, right.  So he has a

18   strong accounting background.  Then he opened the Manhattan

19   office.  They had that there when I started and they started

20   to grow.

21             (Continued on next page.)

22

23

24

25

Jacoby - direct - McConnell                    700

1   BY MR. McCONNELL:   (Continued.)

2   Q    Did Mr. Gentile's background as an accountant --

3        Well, how describe his management style through your

4   interactions?

5   A    He was very positive, very gregarious, very upbeat.  Also

6   very busy.  But, you know, the firm itself was very much like

7   an accounting firm.  The atmosphere is like an accounting

8   firm.  He was very much into the detail of managing the

9   business as an accountant.  So, you know, a lot of the people

10  that started there, the first people were all accountants from

11  the accounting firm.  So it was an accounting firm type of an

12  atmosphere.

13  Q    I want to ask you some questions good Mr. Schneider and

14  Ascendant Capital.

15       How often would you interact with Mr. Schneider

16  during your time as the chief financial officer?

17  A    In person?  In person -- he traveled a lot and he worked

18  primarily out of the Texas -- the Austin office.  So we would

19  see him once a month, I would say, as he was taking clients

20  through the office; sometimes more, sometimes less.

21       But, you know that's the physical time and then we

22  would interact -- I'd send him weekly updates and management

23  reports.

24  Q    We'll talk about the weekly updates and management

25  reports do you ever go to the Ascendant Capital offices in

Jacoby - direct - McConnell                    701

1    Texas?

2    A    Yes, I did a couple of times.

3    Q    Why as the chief financial officer of GPB would you be

4    going to the Ascendant Capital office in Texas?

5    A    Well, we were running the firm as one entity with

6    Ascendant being a marketing division and GPB being the

7    investment division.  We obviously needed to work together.

8    They needed information from us to prepare the marketing

9    materials that they were communicating out to the brokers and

10   ultimately to the clients.  So we had to work together and

11   coordinate.

12   Q    And how would you describe the Ascendant office?  What

13   did it look like?

14   A    So the Ascendant office was more like a high-pressure

15   sales office, you know, selling a lot of -- guys and girls on

16   the phone, talking constantly, sort of relentless sales.  Kind

17   of a *Wolf of Wall Street* kind of thing.

18              MR. COLTON:  Objection.

19   A    So, like a high-pressure atmosphere.

20              MR. COLTON:  Your Honor, the witness commented about

21   a movie.

22              THE COURT:  Sustain the objection.

23              Disregard any reference to *Wolf of Wall Street*.

24   BY MR. McCONNELL:

25   Q    What did the space look like?

Jacoby - direct - McConnell                    702

1   A     An open trading room like this, but rows of desks a lot

2   of people on the phones, a dog running around, a baseball bat,

3   a football; a lot of, you know, action.

4   Q     And did you have an opportunity to observe Mr. Schneider

5   interact with Ascendant Capital?

6   A     Certainly.

7   Q     And how would you describe to the members of the jury his

8   management style, if you can?

9   A     He was a very hard-driven, sales -- results oriented

10  sales, sales at all costs and if you didn't hit your numbers,

11  you were gone.  So it was succeed or gone kind of an

12  atmosphere.

13  Q     Did you become familiar with Ascendant Alternative

14  Strategies?

15  A     Yes.

16  Q     How did you become familiar with Ascendant Alternative

17  Strategies?

18  A     I believe that was the entity that Mr. Gentile and

19  Mr. Schneider wanted to be the holding company.

20          MR. COLTON:  Objection your Honor.  It's the basis

21  issue here.

22          THE COURT:  If you're testifying about what

23  Mr. Schneider or somebody wanted done, I need a foundation for

24  that first.

25  BY MR. McCONNELL:

Jacoby - direct - McConnell                703

1   Q    How did you come to learn about Ascendant Alternative

2   Strategies?

3   A    I forget exactly how I came to learn about it.  It was

4   another entity.  We set up entities all the time.  It was

5   another entity that was established.  This one was established

6   and put together because the strategy was to consolidate

7   Ascendant Capital and GPB Capital into one holding company and

8   that's why we created that entity.

9   Q    And do you know, based on your role as the chief

10  financial officer and your interaction with the defendants,

11  who owned Ascendant Alternative Strategies?

12              MR. COLTON:  Objection to the timeframe issues and I

13  would like to have voir dire and have Mr. McConnell talk about

14  the timeframe.  I won't say more, but I'm happy to have a

15  sidebar to explain my concern.

16              THE COURT:  Your concern is when did he have this

17  information?

18              MR. COLTON:  If I very briefly can come to sidebar

19  it will expedite this.

20              THE COURT:  All right.

21              (sidebar held outside of the hearing of the jury.)

22              (Continued on next page.)

23

24

25

```
                        Sidebar                      704

 1          (The following sidebar took place outside the
 2   hearing of the jury.)
 3          MR. COLTON:  The witness testified that he ceased
 4   being CFO in the fall of 2016.  Ascendant Alternative
 5   Strategies did not come online until March of 2017.  So any
 6   question of, In your role as CFO, is clearly misleading
 7   because he wasn't the CFO of Ascendant Alternative Strategies
 8   had any functionality in any way.
 9          THE COURT:  All right.  So you're asking him what
10   was Ascendant Alternative Strategies --
11          Can you ask a clean question about what the basis
12   for his knowledge was because it feels like you're asking, at
13   least as I heard it, from your role as CFO --
14          MR. McCONNELL:  I'm trying to do that.  I think the
15   witness's answer, though, is going to provide how he knows
16   that after he answers the question.
17          THE COURT:  How about you ask, do you know what
18   Ascendant Alternative Strategies is, how do you know that.
19          MR. McCONNELL:  Okay.
20          MR. COLTON:  It sounds though -- if I may, your
21   Honor, it feels like that's going to invoke potential hearsay
22   unless the Government is representing it comes directly from
23   one of the defendants.
24          THE COURT:  Do you know what he's going to say?
25          MR. McCONNELL:  No, I don't.  He's working at the
```

Sidebar                                                                        705

1    company.  He's said on the record that this was a holding

2    company that was designed to help combine the GPB and

3    Ascendant operation and I don't know how much --

4             THE COURT:  The questions that would help me rule on

5    this objection is how does he know it and when did he learn

6    it.

7             MR. McCONNELL:  Yes, your Honor.

8             (Sidebar ends.)

9             (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. McCONNELL:   (Continued.)

2    Q    Mr. Jacoby, when did you first learn about Ascendant

3    Alternative Strategies and how did first learn about it?

4    A    I don't remember when.  But Mr. Schneider and Mr. Gentile

5    told me from the day I started the intent was to merge

6    Ascendant Capital and GPB Capital into one holding company.

7    Q    Did you have an opportunity to observe Mr. Schneider and

8    Mr. Gentile interact in running both GPB and Ascendant

9    Capital?

10   A    Yes, I did.

11   Q    Can you describe that to the members of the jury?

12   A    They worked together very closely as -- what they

13   described as equal partners.  I was meant to report equally to

14   both of them.

15   Q    Who told you to report equally to both of them?

16   A    They both did.

17   Q    Did they ever discuss -- I won't say "they."

18        Did Mr. Gentile ever discuss with you how much money

19   they wanted to raise for the funds?

20   A    Yes.

21   Q    And can you tell us about those conversations and when

22   they happened?

23   A    Sure.  Early on, you know, the business was beginning to

24   grow.  Positive growths -- the first target that they

25   expressed was to get to $1 billion in assets under management

Jacoby - direct - McConnell                    707

1  which was a big number and a big goal.  That was the first

2  goal.

3          And then the idea was that if we hit that number,

4  they felt that, meaning Mr. Gentile and Mr. Schneider, felt

5  that once you hit that big of a number, deposits would begin

6  to accelerate and grow to 10 billion.

7  Q    Did you have conversations about these plans with

8  Mr. Schneider as well?

9  A    Yes, both of them, yes.

10  Q    You mentioned Ascendant Capital was sort of the marketing

11  arm of the operation.  Did you ever attend marketing

12  presentations where Mr. Gentile and Mr. Schneider presented to

13  broker/dealers and investment advisors?

14  A    Yes, I did.

15  Q    Approximately how many times?

16  A    A few times.  Only I -- I didn't typically go out with

17  them.  So I only went out into the field a couple of times

18  with them.  But when I was in the New York office, you know,

19  there were -- people, brokers and investment advisors would

20  come to the New York office and I would see them then as well.

21          So two times -- I would say two or three times out

22  with them and the rest of the times in the office.

23  Q    And, just to be clear, when you say "out with them" not

24  in New York?

25  A    At a different location, yes.

Jacoby - direct - McConnell                    708

1    Q    Do you remember any of these in particular?

2    A    There was the Hightower one in Maryland and there were a

3    couple down in Austin as well.

4    Q    Let's stick with the ones that you were at that were not

5    in New York.

6    A    Okay.

7    Q    Did both Mr. Gentile and Mr. Schneider attend at those

8    events?

9    A    Yes.

10   Q    Can you just describe for the members of the jury sort of

11   where they were held and who the audience was?

12   A    So, the audience would be a brokerage firm so the goal

13   would be to get the brokerage firm to say that they liked the

14   product and that they would sell it to their client.  And, so,

15   you would be talking to the people at the brokerage who would

16   be in charge of making that decision as to whether they want

17   to make it available to their brokers or investment advisors

18   to show to their clients.

19   Q    Can you tell the members of the jury what you remember

20   about Mr. Gentile and Mr. Schneider's presentations at those

21   non-New York events?

22              MR. COLTON:  Objection to both compound and

23   timeframe, your Honor.

24              THE COURT:  As to compound, it's sustained.

25   BY MR. McCONNELL:

Jacoby - direct - McConnell                    709

1   Q    When did these events take place generally that you
2   attended?
3   A    In 2015.
4   Q    And do you remember both Mr. Gentile and Mr. Schneider
5   presenting?
6   A    Yes.
7   Q    And how would you describe the presentation?  Were both
8   of them speaking, was one speaking?  How did it work?
9   A    Yeah, the two of them -- they put up a slideshow and the
10  two of them would take turns going through the slides.
11  Q    And what do you remember about the substance of those
12  presentations, the ones that you attended?
13  A    So, the substance was to explain, you know, this funds --
14  these funds were private equity for the masses, yielding 8
15  percent or better, safe, because the payments were going to be
16  paid to you from already profitable companies that we were
17  going to invest in.  Those were the highlights that I
18  remember.
19  Q    Do you recall whether special distributions were brought
20  up?
21  A    Yes.  Special distributions were a point of emphasis for
22  sure.
23  Q    When you say it's a point of emphasis, how were they
24  described?
25  A    Because we were going to invest in these profitable

Jacoby - direct - McConnell                710

1    companies.  We would get extra profits in and when we

2    accumulated enough extra profits that would be an additional

3    dividend.

4    Q    You used the word "dividend" a few times.  Is dividend

5    and distribution the same thing?

6    A    It's the same thing, yeah, right.

7    Q    Now, you also mentioned -- well, before I move on.

8          At these events outside of New York that you

9    attended with the defendants in 2015, did Mr. Gentile say

10   anything about his background as an accountant?

11   A    Yes, he was a very successful accountant.  He was a

12   partner in his accounting firm.  He was a very accomplished

13   accountant.  That was always part of the presentation.  The

14   GPB was built on accounting.  Ascendant was the marketing

15   side.  GPB was focused on accounting, very much like an

16   accounting firm.

17   Q    Can you just explain though how that featured into the

18   presentation, his background?

19   A    So, that featured in as, you know, a complimentary asset

20   to Ascendant.  Ascendant was going to be the great marketing

21   aspect and GPB was the good accounting firm that would be good

22   at vetting -- finding good, profitable companies that had

23   profits.

24   Q    You mentioned that potential -- I'm sorry, withdrawn.

25          -- that broker/dealers and investment advisors would

Jacoby - direct - McConnell                711

1   also come to the New York office; right?

2   A    Yes, yes.

3   Q    And at those presentations, would both of the Defendants

4   be presenting in the same way that you just described?

5   A    Yes.

6            MR. COLTON:  Objection, facts not in evidence.

7            THE COURT:  Overruled, overruled.

8   A    Yes, the same types of presentations, yes.

9   Q    And did you personally communicate with the advisors and

10  broker/dealers as the CFO?

11  A    No.

12  Q    Why not?

13  A    I wasn't part of that marketing, so --

14  Q    Now, did you review any of the written marketing

15  materials that were produced by Ascendant Capital?

16  A    Yes, I did, early on, yes.

17  Q    When you say "early on" when approximately?

18  A    In 2015.

19  Q    What sorts of written marketing materials did you -- did

20  you review?

21  A    Slideshows, due diligence packages and offering

22  materials.  So, like, private placement memorandums and

23  limited partnership agreements.

24  Q    And just tell the members of the jury what a private

25  placement memoranda is and what a limited partnership

Jacoby - direct - McConnell                          712

1    agreement is?

2    A    It's a big, thick legal document that tells the investor

3    about the partnership that they're investing into.

4    Q    And as the CFO why were you looking at these materials?

5    A    Well, I had to educate myself about the funds and this

6    describes a lot of the detail.

7    Q    Why else?

8    A    Well, as part of doing the job, you need to understand

9    how the partnership functions and all the other aspects of the

10   marketing materials and I needed to see if it was accurate and

11   what I should be doing.

12   Q    When you say you wanted to see if it was accurate, what

13   were you looking to see was accurate?

14   A    So performance numbers was one of the first things I

15   wanted to look at as an accountant, right?  That was in the

16   marketing materials and the due diligence packages and then in

17   the offering materials as well, I wanted to see what was in

18   there.

19   Q    You said due diligence packages.  What's a due diligence

20   package?

21   A    So, that's a -- that's a -- a small, I would say, you

22   know, like, Word document with questions and answers that

23   Ascendant would hand to a prospective brokerage that would

24   answer a lot of the brokerage questions, maybe 20 to 30 pages

25   long is my estimate, and it would answer a lot of the

Jacoby - direct - McConnell                    713

1    questions that they always got.

2    Q    Did you ever discuss with Mr. Gentile or Mr. Schneider

3    these marketing materials?

4    A    Yes.

5    Q    Well, I'll start with Mr. Gentile.

6              Based on your conversations with Mr. Gentile, what

7    was your understanding of how these marketing materials were

8    created?

9    A    They were created by Mr. Schneider and at his direction

10   people that worked for him as Ascendant.

11   Q    And did you discuss these marketing materials with

12   Mr. Schneider was well?

13   A    I did, yes.

14   Q    And what did he say how these were generated?

15   A    He said it the way I just said it.  He was in charge of

16   locking down the marketing materials.  He would assign it to

17   people to work on it but he was the last word on those.

18   Q    I want to show you some of the marketing materials, but

19   just generally when you first reviewed these after starting as

20   the chief financial officer, did you know -- what was your

21   response to them?

22   A    Well, primarily my biggest concern was that the

23   performance numbers in there were inaccurate.  They were wrong

24   and they needed to be done properly.

25   Q    What was -- what was wrong or inaccurate about them in

Jacoby - direct - McConnell                          714

1    your opinion?

2    A    They weren't showing the actual performance of the

3    investments.

4    Q    And did you communicate that to the defendants?

5    A    I did.

6    Q    Specifically did you communicate it to Mr. Gentile?

7    A    Yes, I did.

8    Q    What do you remember saying to Mr. Gentile after you

9    reviewed the marketing materials?

10   A    Well, I told him that the performance numbers weren't

11   accurate and he said they were selling at different

12   performance and that's the performance that they were going to

13   use.

14   Q    And what about Mr. Schneider?  Did you have discussions

15   with him about these marketing materials?

16   A    I did.

17   Q    And what was -- what was his response when you told him

18   about these inaccuracies?

19   A    He told me I was being a cock block and that I should

20   stick to accounting and he would stick to the marketing.

21            MR. COLTON:  Objection.  Your Honor, objection.  And

22   can I have a moment with Mr. McConnell which might make this

23   go faster?

24            THE COURT:  Okay.  If you take just a moment.

25            MR. COLTON:  This will be 30 seconds.

Jacoby - direct - McConnell                715

1              (Pause in proceedings.)

2    BY MR. McCONNELL:

3    Q    What did you understand that to mean, sir?

4    A    He didn't want me to be difficult because he needed the

5    performance numbers to be the way that they looked so he could

6    sell the funds.

7    Q    Did he tell you this?

8    A    Yes.

9    Q    I want to show you what is marked for identification as

10   Government Exhibit 7781-C.

11             (Exhibit published to witness, Counsel and Court only.)

12   BY MR. McCONNELL:

13   Q    Mr. Jacoby, do you see that on your screen?

14   A    Yes.

15   Q    If you need us to blow anything up we can try.

16   A    Okay.

17   Q    Tell us what you recognize Government Exhibit 7781-C to

18   be.

19   A    Right, so this is a marketing deck.  This is a slideshow

20   that we were talking about that's income-producing private

21   equity for the Automotive Portfolio.

22   Q    So, is this one of the marketing materials that you

23   reviewed?

24   A    Yeah -- yes.

25   Q    It's dated 2015?

Jacoby - direct - McConnell                    716

1    A     Yes.

2    Q     Do you see that?

3    A     Yes.

4          MR. McCONNELL:  Your Honor, I'm going to offer

5    Government Exhibit 7781-C into evidence.

6          MR. COLTON:  No objection.

7          THE COURT:  Admitted.

8          (Government Exhibit 7781-C received in evidence.)

9          (Exhibit published.)

10   BY MR. McCONNELL:

11   Q     So, Mr. Jacoby, just looking at the first page of the

12   exhibit it says income-producing private equity.  What's

13   income-producing private equity?  Why is that different from

14   regular private equity?

15   A     The traditional private equity doesn't have a flow of

16   income, you know, during the life of the investment.

17   Q     And that was the flow of income in GPB?

18   A     This was -- the flow of income was to be from the profits

19   from the companies that we invested in; so in this case, car

20   dealerships.

21   Q     And you're referring to the monthly distribution?

22   A     That's the monthly distribution, yes.

23         MR. McCONNELL:  So, if we can just scroll down to

24   page four, please.

25   Q     Looking at four it says, "Private equity firm that

Jacoby - direct - McConnell                    717

1  focuses on income-producing middle market operating

2  companies."  Can you explain what that means?

3  A    So income-producing meaning profitable and middle market

4  meaning not too small, medium sized, like car dealerships.

5         MR. McCONNELL:  If we can go to page six.

6  Q    Again, it says "Income-Producing private equity

7  offering."  Do you see that?

8  A    Yes.

9  Q    On the third bullet it says, "Targeted distribution of 8

10 percent annual yield paid monthly."

11        Can you explain to the jury what that means, what

12 that refers to, excuse me?

13 A    That refers to the 8 percent yield that I mentioned

14 earlier that would be paid out in monthly installments.

15        MR. McCONNELL:  And if we can go to page seven.

16 That's the spreadsheet.  If we can zoom in on that Ms. Bates.

17 Thank you.

18 Q    So, Mr. Jacoby, there's a -- there's a row that says

19 "targeted annual distribution."  Can you read what it says

20 there?

21 A    "8 percent paid 100 percent from funds from operations."

22 Q    And what do you understand -- what did you understand

23 that to mean when you reviewed these marketing materials?

24 A    That means that the distribution is being paid 100

25 percent from profits from the companies that we invested in,

Jacoby - direct - McConnell                718

1   and in this case it was meant would be car dealerships.

2   Q    Was that accurate when you read it?

3   A    No.

4        MR. McCONNELL:  If we can go down to page seven,

5   please.  Actually, I'm sorry, if we can Zoom in here,

6   Ms. Bates.

7   Q    The like below it says "2014 distribution."  Do you see

8   that?

9   A    Yes.

10  Q    What does that say?

11  A    It says "11 and a half percent fully covered from

12  operations."

13  Q    And where does that 11 and a half percent number come

14  from?  You've been talking about eight percent target up to

15  this point.

16  A    So as I was describing before, if there were extra

17  profits, the extra profits would be distributed and that's

18  what made it result in 11 and a half percent.

19       MR. McCONNELL:  Ms. Bates, there's a footnote number

20  one next to the 11.5 percent.  If we can zoom in on that

21  footnote, please.

22  Q    I know that's very small, Mr. Jacoby, but if you squint,

23  can you read that please?

24  A    3 percent special distribution was paid in December of

25  2014.  Paid distributions of a half a percent in June and --

Jacoby - direct - McConnell                    719

1    June of 2014 and December of 2013 also announced a one and a

2    half distribution for April of 2015.

3    Q    Now, you talked a little bit about the special

4    distributions before, but can you just explain what these

5    special distributions indicate -- why we're noted in the

6    marketing materials, excuse me?

7    A    They were a point of emphasis in the marketing materials

8    because they were showing that the funds -- the investments

9    were making more profits than the 8 percent advertised.

10   Q    And was that true?

11   A    It was not true.

12        MR. McCONNELL:  If we can go to the next page,

13   please, Ms. Bates.

14   Q    So, Mr. Jacoby, this is a chart that says traditional

15   private equity as compared to GPB.  Do you see the part where

16   it says "Distributions"?

17   A    Yes.

18   Q    And what's the difference there between traditional

19   private equity and GPB?

20   A    That's where they're saying that traditional private

21   equity you would get no cash flows while you invested.  You

22   would only get your money back at the end; whereas in this

23   fund you were going to get cash flows during your investment.

24        MR. McCONNELL:  If we can show the witness

25   Government Exhibit 7820-C, please.

Jacoby - direct - McConnell                    720

1          (Exhibit published to witness, Counsel and Court only.)

2     Q    Mr. Jacoby, do you recognize Government Exhibit 7820-C?

3     A    It looks the same, similar.

4     Q    And is this one of the materials that you reviewed?

5     A    Yes.

6          MR. McCONNELL:  Your Honor, I would offer

7    Government Exhibit 7820-C into evidence.

8          MR. COLTON:  No objection.

9          THE COURT:  Admitted.

10          (Government Exhibit 7820-C received in evidence.)

11          (Exhibit published.)

12   BY MR. McCONNELL:

13   Q    Mr. Jacoby, I don't want to go through this as we went

14   through the last one, but does it contain the same

15   representations about the distributions being fully funded

16   from operations?

17   A    I mean, we haven't flipped through it, but I'm assuming

18   it does.

19          MR. McCONNELL:  Let's flip through it and make sure.

20   If we can go to the sixth page with the chart on it.  There it

21   is.

22   A    Right.  So this is just a different class.  So they had a

23   Class A and a Class B.

24   Q    Can you tell the members of the jury what the difference

25   between Class A and Class B was?

Jacoby - direct - McConnell                    721

1    A    One of them paid extra selling fees up front because they

2    were sold through a broker.  If they were sold through an

3    investment advisor that didn't take that apportion of the

4    commissions, that extra money, enabled you to get an 8.7

5    percent dividend instead of 8 percent.

6    Q    If you were part of the class where your advisor doesn't

7    take a fee, you get a higher distribution rate?

8    A    If you were in the class that didn't have that extra

9    commission to a broker you would got a higher yield, yeah.

10   Q    I would like to show you what's marked for identification

11   as Government Exhibit 7838-E.

12        (Exhibit published to witness, Counsel and Court only.)

13   Q    Do you recognize this, Mr. Jacoby?

14   A    This is -- this is for another fund.  GPB Holdings II.

15   It looks like it's another marketing deck.

16   Q    And does this look like one of the marketing decks that

17   you reviewed?

18   A    I would say yes.

19        MR. McCONNELL:  I would offer Government Exhibit

20   7838-E.

21        MR. COLTON:  No objection.

22        THE COURT:  Admitted.

23        (Government Exhibit 7838-E received in evidence.)

24        MR. McCONNELL:  If we can go to page eight, please.

25   BY MR. McCONNELL:

Jacoby - direct - McConnell                    722

1    Q    I should ask Mr. Jacoby, when you first started at GPB,

2    did the Holdings II fund exist?

3    A    No.

4    Q    When did that come into being?

5    A    During 2015.

6    Q    So just looking at this Government Exhibit 7838-E, what

7    does it say about the targeted annual distribution?

8    A    "8 percent paid 100 percent from funds from operations."

9    Q    And there's also a line for special distributions.  Do

10   you see that?

11   A    Yes.

12   Q    And what does it say there?

13   A    It says, "Paid twice annually if available.  One and a

14   half percent announced, payable for August -- April of '16 for

15   exempt -- for investors that were accepted by December 31,

16   2015.

17   Q    Now, you mentioned that -- well, again, is there anything

18   inaccurate about the information that's on the page here?

19   A    Yeah, the -- the distributions were not paid 100 percent

20   from profits.

21   Q    Where were they being paid from?

22   A    They were using new investors' money or existing

23   investors' deposits to make up the shortfalls.

24   Q    And did you communicate this to Mr. Gentile and

25   Mr. Schneider?

Jacoby - direct - McConnell                        723

1   A     Yes.

2   Q     And what was the response?

3   A     Well, I mean, I was there for, you know, a period of

4   time.  So the response is we talked about it all the time,

5   right, and it depended upon when we were talking about it, but

6   it was always, We expect to catch up shortly or we had new

7   money that I didn't know about or there was new investments

8   coming that we were anticipating.  It was different

9   explanations.

10  Q     Well, let's start from the beginning.  In 2015 you

11  start -- when is the first time you raised this issue with

12  Mr. Gentile?

13  A     April of 2015.

14  Q     And what happened in April of 2015 that prompted you to

15  raise these concerns with Mr. Gentile?

16  A     They were paying a special distribution to people that

17  had gotten in by the previous year.

18  Q     And why was the special distribution something that made

19  you have this discussion?

20  A     The fund didn't have the cash to pay it.  It didn't have

21  profits.  We didn't have net income profits to pay it.  So the

22  only place where it could come from was, you know, new

23  investor deposits or previous deposits, so paying people back

24  the same money they just deposited.

25  Q     Well, what did you say to him?  How did you broach the

Jacoby - direct - McConnell                724

1    subject?

2    A    I said, How are we going to pay out the special

3    distribution if we don't have extra profits.

4    Q    What was his response?

5    A    Don't worry, we have a lot of profits coming in.  It's

6    going to catch up right away.

7    Q    Did you also have conversations with Mr. Schneider about

8    this?

9    A    Yes.

10   Q    And what did he say?

11   A    The same.  The same thing:  I didn't know anything, I

12   needed to watch and learn because, you know, I didn't know

13   anything and I just needed to pay attention and learn.

14   Q    You testified before that the -- the monthly distribution

15   was a target; correct?

16   A    Yeah.

17   Q    And did that rate change at any time you were at GPB?

18   A    No.

19        MR. McCONNELL:  I'd like to show the witness

20   Government Exhibit 4100, please.

21        (Exhibit published to witness, Counsel and Court only.)

22   Q    Mr. Jacoby, do you see Government Exhibit 4100?

23   A    Yes.

24   Q    What is Government Exhibit 4100?

25   A    This is what's called a private placement memorandum.

Jacoby - direct - McConnell                          725

1   This is the thick book that I was telling you about that

2   that's maybe fifty to one hundred pages long.

3   Q    And this is -- this is for which fund?

4   A    This is for the GPB Automotive Fund that invested in car

5   dealerships.

6   Q    And did you review this PPM?

7   A    I did.

8   Q    And did you discuss this PPM with Mr. Gentile?

9   A    Yes.

10  Q    Did you discuss it with Mr. Schneider?

11  A    I did, yes.

12          MR. McCONNELL:  I'd like to offer Government Exhibit

13  4100 into evidence at this time.

14          MR. COLTON:  No objection.

15          THE COURT:  Admitted.

16          (Government Exhibit 4100 into received in evidence.)

17          (Exhibit published.)

18  BY MR. McCONNELL:

19  Q    Government Exhibit 4100 is dated March 6th of 2015;

20  right?

21  A    Yup.

22  Q    How long after you had started was this PPM issued?

23  A    A week.

24  Q    I want to direct your attention to -- I believe it's page

25  12 of the document.

Jacoby - direct - McConnell                    726

1              MR. McCONNELL:  If we can zoom in on the first

2     paragraph of the distributions part?  If you can take the

3     left-hand side -- thank you.  Just the first paragraph,

4     Ms. Bates.  Thank you.

5     Q     So, Mr. Jacoby, I just want to direct your attention to

6     this portion of the PPM.  It's in the heading "Distributions."

7     Do you see that?

8     A     Yup.

9     Q     I won't make you read the whole thing, but does this

10    paragraph say where the monthly 8 percent distributions are

11    going to be sourced from?

12    A     Yes, sir.

13    Q     What does it say?

14    A     It says, "When GPB determines after accounting for

15    reserves, expenses and reinvestments it will make

16    distributions based on cash flow we've received from the

17    dealerships."  So that's the profits.

18    Q     Okay.  What's the next sentence?

19    A     "GPB expects the company to make distributions of cash,

20    if any, to the limited partners beginning three months after

21    their subscription at an annual return rate targeted to be

22    eight percent.

23    Q     Why, as the chief financial officer -- did you know why

24    GPB had to wait three months after the investor subscribed or

25    invested in the fund to start paying that distribution?

Jacoby - direct - McConnell                727

1  A    Yes.  So there was a three-month lag to give GPB time to

2  go out and invest the money; in other words, collect the money

3  and then go buy a car dealership.  So they had three months to

4  buy car dealerships so they could start receiving the profits.

5  Q    What does that have to do with the monthly distribution?

6  A    You need the profits from the car dealerships to pay

7  those distributions.

8  Q    In this paragraph, the last sentence talks about special

9  distributions.  Do you see, sir?

10 A    Yes.

11 Q    Does anything in this paragraph say anything about

12 returning investor capital?

13 A    No.

14 Q    Does anything in this paragraph say anything or indicate

15 anything about paying a distribution with other investor's

16 capital?

17 A    No.

18        MR. McCONNELL:  If we can go down to page 92, which

19 I believe is the limited partnership portion of this.

20 Ms. Bates, if you could zoom in on the distributions paragraph

21 there.  There it is.

22 BY MR. McCONNELL:

23 Q    Mr. Jacoby, what are we looking at here?

24 A    This is part of the limited partnership agreement talking

25 about the distributions.

Jacoby - direct - McConnell                     728

1   Q    And I'd like you to just take a moment to read it to

2   yourself.  I'm not going to make you read it out loud, but let

3   us know after you've had a chance to review that.

4   A    (Reviewing.)

5        Okay.

6   Q    Can you generally summarize what this paragraph says?

7   A    It's a more-detailed explanation of the one we just read

8   before which is that we'll pay out distributions from profits.

9   Q    Does it say returning investor capital as part of that

10  distribution?

11  A    No.

12  Q    Does it say anything about returning any other investor's

13  capital to make that monthly distribution?

14  A    No, no.

15  Q    You mentioned before that you had conversations with

16  Mr. Schneider about this private placement memorandum?

17  A    Yes.

18  Q    And in those conversations, did you come to understand

19  how this PPM got drafted and put together?

20  A    Yes, I did.

21  Q    And tell the members of the jury about that?

22  A    Mr. Schneider wrote it.

23  Q    Now --

24       MR. McCONNELL:  I'm sorry, your Honor.  I apologize,

25  do you know when --

Proceedings                          729

1          THE COURT:  I think is a good time to take a break.

2          We're going to break for lunch now.  We'll take a

3    one-hour break.  Come back the 1:55.

4          THE COURTROOM DEPUTY:  All rise.

5          (Jury exits.)

6          MR. McCONNELL:  Your Honor, can I raise one issue

7    once the witness steps down?

8          THE COURT:  Yes.

9          (Witness steps down.)

10         MR. McCONNELL:  Your Honor, Mr. Colton asked to

11   speak with me during the examination.  We had had a previous

12   discussion where they asked me if I was intending to elicit

13   any of the, frankly, inappropriate and profane nicknames that

14   people called each other at the office.  That's how I

15   understood the questioning and I believe Mr. Colton felt I ran

16   afoul of that by asking that question.  I didn't think there

17   was any overlap there.

18         I apologize if there was any understanding.  I think

19   it's appropriate and responsive testimony.  But there's no

20   other -- nothing else like that that I expect to be elicited

21   during the witness's testimony.

22         THE COURT:  Okay.  Anything else you want to talk

23   about?

24         MR. COLTON:  I want to make sure that the record is

25   clear that now that Mr. McConnell has represented to the Court

Proceedings                                          730

1   that there will be no more eliciting profanity, nicknames,

2   alleged violence or anything else that's going to be

3   potentially coming out of this witness's mouth which is far

4   more prejudicial than probative, and I would ask the Court to

5   instruct that if that's going to happen we get to discuss it

6   in the advance.

7           MR. McCONNELL:  That's 100 percent the

8   understanding.  I didn't think that that was part of the

9   conversation that we had, but we talked about it in detail.  I

10  understand it and it's not going to come up.

11          MR. COLTON:  And, lastly, as this can be

12  prejudicial, if the witness will be so instructed by the

13  Government who is proffering the witness --

14          THE COURT:  I can't catch that.

15          MR. COLTON:  I'm asking what the Government is

16  representing to the witness and ask the Court if they will

17  instruct the witness accordingly.

18          THE COURT:  Will you instruct your witness not to

19  mention profane names?

20          MR. COLTON:  We were told that there would be no

21  references to a Ponzi scheme at the beginning of this case and

22  the *Wolf of Wall Street* just being blurted out.  It's hard for

23  me to believe that witness after witness is instructed not to

24  do this and the witness is blurting out things nonresponsive

25  to questions being asked.

Proceedings                                        731

1            THE COURT:  I am not sure what you're asking me to

2   do.

3            MR. COLTON:  I am asking your Honor to properly

4   instruct the witness consistent with what we understood and

5   agreed to.

6            THE COURT:  I take the Government to have

7   represented earlier that talking to witnesses about in limine

8   rulings.  Just repeat that request that you when you are

9   preparing these witnesses --

10           MR. McCONNELL:  No witness used the term Ponzi

11   scheme because we told them not to do that.  I apologize that

12   he said that.  We've been instructing the witnesses.

13           THE COURT:  There's nothing more than we can be done

14   about this.  *Wolf of Wall Street* didn't sound like something

15   the Government would have anticipated him saying, but I struck

16   that.

17           Anything else you all want to take up before lunch?

18           MR. McCONNELL:  No, your Honor.

19           THE COURT:  I'll see you all at 1:55.

20           (Luncheon recess taken.)

21

22

23

24

25

*Proceedings*                                                    732

                        AFTERNOON SESSION

1

2

3              (In open court.)

4              (Parties present.)

5              (Witness takes the witness stand.)

6              THE COURT:  Just to mention one thing.  Because it

7     seems like we're running behind, I was going to propose to

8     the jury starting next week start at 9:30 and go to 5:00.

9     It will give us at least an hour additional testimony a day

10    and probably they can all live with.

11             Can you all live with that?

12             MR. MCCONNELL:  That's fine.  I know your Honor

13    mentioned when we broke.  I don't remember whether it was

14    Tuesday, your Honor was considering Fridays.  If that's the

15    case, we just we can sort of mark that as a definite once

16    the jury is okay with it.  We'd like to work that into our

17    schedule.

18             THE COURT:  There was one.  I just want to be

19    consistent with what we promised them already and I think

20    next week we may have given them a schedule that has Friday

21    not sitting.  So I think maybe we don't try to renege on

22    that.  But after that, we can start doing Fridays.  I guess

23    the Friday after that is July 5th.  Seems like we gave them

24    a schedule that goes through the rest of the trial so maybe

25    that doesn't hold.  I'm happy to just propose to them we

*W. Jacoby - Direct/Mr. McConnell*                733

1    want to start sitting on Fridays because we're trying to end

2    by when we told you we'd end and if you have any conflict

3    you made plans that around the schedule.

4             COURTROOM DEPUTY:  All rise.

5             (Jury enters courtroom at 2:00 p.m.)

6             THE COURT:  Please be seated.

7             MR. MCCONNELL:  May I continue?

8             THE COURT:  Yes.

9    DIRECT EXAMINATION

10   BY MR. MCCONNELL:

11   (Continuing.)

12   Q    Mr. Jacoby, when we broke, I was asking you about the

13   private placement memorandum dated March 6, 2015.  If we can

14   bring that back up on the screen.

15            MR. MENCHEL:  What exhibit is that?

16            MR. MCCONNELL:  4100.

17            MR. MENCHEL:  Thank you.

18   Q    Mr. Jacoby, after you have had these conversations with

19   the defendants about the marketing materials, did you

20   continue to review marketing materials later in your tenure

21   as chief financial officer?

22   A    No, I was cut out of that process going forward.

23   Q    What do you mean you were cut out of that process?

24   A    It was just controlled by Mr. Schneider and the

25   Ascendant team.

*W. Jacoby - Direct/Mr. McConnell*                    734

1  Q    As chief financial officer, were you aware of fees that

2  GPB charged to investors for investing in funds?

3  A    Yes.

4  Q    How were you aware of those fees?

5  A    The private placement memorandum and all limited

6  partnership agreements.

7  Q    How else?

8  A    I spoke to Mr. Gentile and Mr. Schneider as well.

9  Q    Were the fees --

10       Well, did you have to initiate payment of the fees as

11  part of your accounting responsibilities?

12  A    It was all involved in the accounting and the funding

13  administrator and the accounting team that worked for me

14  there, yes.

15       MR. MCCONNELL:  I'd like to direct your attention

16  to what's in evidence as Government Exhibit 4100, Page 36 on

17  the document.  If you can just blow up the top part of that,

18  yes.  Thank you, Ms. Bates.

19       MR. COLTON:  This is Page 42 of the document?

20       MR. MCCONNELL:  I think it's 36.  42 of the

21  document but the actual pagination is 36.

22  Q    So, Mr. Jacoby, just generally, can you talk about the

23  different fees that were charged to investors when they

24  invested in the fund?

25  A    Okay.  So what you're looking at here, what you've

1  blown up here, is the initial selling fees that were charged

2  upon the deposit.  So when an investor invested their money,

3  these fees would be charged right at that first day and paid

4  to Ascendant and the broker that was part of the deal.

5  Q    And are those typically called "selling fees"?

6  A    Those are the selling fees, yes.

7  Q    Can you just -- that looks like there is four of them

8  that are listed.

9       Can you just describe for the jury in general terms

10  what each one of those relates to?

11  A    Commissions were for the broker and some split with

12  Ascendant.  And then the due diligence placement fee and

13  wholesaling fees were Ascendant fees that would be paid to

14  the people that worked there.

15            MR. MCCONNELL:  Ms. Bates, can we zoom in on the

16  second part of the document, please, just up to that "we

17  will" sentence.

18            No, I'm sorry, up.  Yes.  Just one moment.

19  Q    Mr. Jacoby, is this the part of the PPM, were those

20  up-front fees that you were talking about are listed?

21  A    Yes.

22  Q    And what was the total amount of every dollar invested,

23  how much was taken out in these up-front fees?

24  A    For this class, it's 11 percent.

25  Q    So Ms. Bates, if we can zoom in on the second part of

*W. Jacoby - Direct/Mr. McConnell*                    736

1    the document there starting at the "we will also."  Thank

2    you.

3          So Mr. Jacoby, these are some other fees and expenses

4    that are listed in the private placement memorandum?

5    A    Yes.

6    Q    Could you talk about each one of those in general

7    English language terms?

8    A    Okay.  The organizational expenses were expenses that

9    were to be paid one and a quarter meant to be the start-up

10   costs of getting the fun raised.  That was generally used to

11   pay Mr. Schneider's AMEX.

12             MR. COLTON:  Objection to the generalization.  If

13   he's got some, you know, evidence.

14   A    Specifically, we paid his AMEX with it.

15             THE COURT:  Overruled.

16   A    Then if assistant fee was that was the two percent fee

17   that was charged every year annual through the life of the

18   fund.

19   Q    Can you just explain that to the members of the jury

20   about how that fee was assessed for each investor, that two

21   percent fee?

22   A    Right.  So if you deposited a hundred thousand dollars,

23   it would be two percent of a hundred thousand dollars every

24   year for the life of the fund.

25   Q    And, again, to be clear, when does the fund end?

W. Jacoby - Direct/Mr. McConnell          737

1   A    When the management company decides it's time to mature

2   the fund and give everybody their money back.

3   Q    What do you mean, mature the fund?  What does that

4   mean?

5   A    The end of the investment.  So there's some event that

6   makes the management company say we've now completed this

7   investment and we're going to return everybody their money.

8   Q    What kind of event?

9   A    It would be called a liquidity event where they sold

10  all the assets so now you just had cash at a profit.

11  Q    And so, the managerial assistance fee was assessed

12  every year?

13  A    Yes.  That would be an annual fee every year, yeah.

14         MR. MCCONNELL:  Ms. Bates, if we can go down to

15  the next page, please, and just zoom in on that there.

16  Q    It says acquisition fee.  Tell the members of the jury

17  what acquisition fees are?

18  A    So an acquisition fee is a fee that's paid to a broker.

19  Typically, a broker that would be arranging for the purchase

20  of a business.  That would be the best way I can describe

21  it.  Here, we're telling them that we can pay between one

22  and three quarters and two and three quarters percent of an

23  acquisition fee when we purchase, in this case, the car

24  dealerships to somebody that helped us arrange that

25  purchase.

*W. Jacoby - Direct/Mr. McConnell*                    738

1    Q    And it says, "upon consummation of any acquisition of a

2    dealership, we may pay qualified third-parties."

3    A    Right.

4    Q    "Other than persons holding any financial interest in

5    the dealership for making the opportunity available

6    identifying and restructuring acquisitions for us."

7    A    Right.

8    Q    So that amount of money, the 1.75 to 2.75 percent was

9    based on what?

10   A    Based on the purchase of the dealership.  So if you

11   paid $10 million for the dealership, it would be

12   $2.7 million of the dealership.

13   Q    And based on your duties and responsibilities as the

14   chief financial officer, were you aware of who got paid

15   these acquisition fees?

16   A    Mr. Schneider and Mr. Gentile.

17   Q    Did you have conversations with them about those

18   acquisition fees?

19   A    Yes.

20   Q    Did you, as chief financial officer, have to initiate

21   the wiring of money to pay those fees?

22   A    We wired it to Ascendant.

23   Q    So just generally, Mr. Jacoby, for every dollar that's

24   invested, approximately how much would be taken out in these

25   various fees?

*W. Jacoby - Direct/Mr. McConnell*                739

1   A     So if you add all those up, it's about 16 percent.  And

2   then there's the additional partnership expenses on top of

3   that in addition to that 16 percent.  That, also.

4   Q     What are the partnership expenses?

5   A     That would be any other expenses that were charged to

6   the investors.

7   Q     Like what?

8   A     From the fund.

9         So there were, you know, overhead at GPB Capital.  So

10  payroll, rent and all that.  Then we also had expenses for

11  things like corporate offsite parties, where all the

12  employees would go to hotels at a beach, say, in Clearwater,

13  Florida we did one.  That whole event would be covered, paid

14  for by the investors, by partnership expenses.

15  Q     I want to get back to those expenses, but can you just

16  tell us how you were aware of those expenses given your

17  capacity as the chief financial officer?

18  A     We'd pay the money from the fund to cover those

19  expenses from the investors we charge it and pay it.

20  Q     I actually don't think you answered my question.

21        Approximately how much was taken out in fees for every

22  dollar that was invested?

23  A     So the fees that we discussed, we get up to about

24  16 percent.  And then, when you add on these other

25  extraneous expenses, it would be anywhere from 16 to

W. Jacoby - Direct/Mr. McConnell                740

1   20 percent depending on how much expenses there were.

2   Q    Did you ever discuss the amount of fees, the number of

3   fees, with either of the defendants?

4   A    Yes.

5   Q    Did you discuss it with them together or separately?

6   A    Both.

7   Q    Can you tell us about any conversations that you

8   remember with the defendants about the number and the amount

9   of the fees that the fund was charging?

10  A    Well, with both of them, you know, my concern was that

11  we were draining too much cash from the funds to be able to

12  still make the dividend payments that we had promised to

13  make.

14  Q    Can you just explain that a little bit more.  How does

15  the fees have anything to do with the monthly distribution

16  payments?

17  A    Sure.  So if, for example, if we have a hundred million

18  dollars and we charge $20 million in fees, we are left with

19  80 million to invest.  Yet, we're still meant to make an

20  eight percent payment on the hundred, so now we've only got

21  80.  We need to make eight percent of a hundred with only 80

22  million to invest.  So it makes it harder to get over the

23  hurdle.

24  Q    And when you told the defendants this, what

25  was -- well, what was Mr. Gentile's response?

W. Jacoby - Direct/Mr. McConnell                741

1   A    He doesn't, don't worry, the investments that we are

2   making are so profitable that they're going to make it up

3   and they're going to be able to cover it.

4   Q    And did you have conversations with Mr. Schneider as

5   well about this issue?

6   A    Yes.

7   Q    What did Mr. Schneider respond when you brought this to

8   his attention?

9   A    Similarly, he said I needed to watch and learn; that

10  they had investments that I didn't know about that were

11  going to make a lot of money and that we would catch it up

12  and make up the difference.

13  Q    How often would you have conversations with either of

14  the defendants about the fees and, in your view, its impact

15  on the ability to pay the monthly distribution?

16  A    I mean, we talked about it frequently.

17  Q    Did you ever suggest to them, or was it ever discussed,

18  lowering the fees or reducing the amount of fees?

19  A    No.  Reducing the amount of fees wasn't discussed.

20  Trying to reduce the amount of expenses was discussed, and

21  alternatively, reducing the amount of dividends paid to be

22  in line with how much cash we had was discussed.

23  Q    Are you familiar with something called board stipends?

24  A    Yes.

25  Q    Generally, can you tell the members of the jury what a

*W. Jacoby - Direct/Mr. McConnell*                    742

1    board stipend is?

2    A    So a board stipend would be for people that sit on the

3    board of directors for a company.  So, the one I would use,

4    I like to use, is Disney.  Disney has a board of directors,

5    they get paid for meeting once a quarter and assisting in

6    the management of the company.

7    Q    Were you aware as the chief financial officer about

8    whether or not either of the defendants received board

9    stipends in connection with any of the GPB portfolio

10   companies?

11   A    Yes, Mr. Schneider and Mr. Gentile both received some

12   board stipends from some of the portfolio companies.

13   Q    How did you become aware of that?

14   A    Through my time working there.  The people that were

15   working on the portfolio companies made me aware of the fact

16   that that was happening.

17            MR. COLTON:  Objection.  Move to strike; hearsay.

18            THE COURT:  It does sound like hearsay.

19   Q    Did you ever discuss the board stipends with the

20   defendants --

21   A    Yes.

22   Q    -- as a result?

23   A    Yes, I did.

24   Q    What did you tell the defendants about the board

25   stipends when you learned of them?

W. Jacoby - Direct/Mr. McConnell                  743

1   A    I said that they shouldn't be taking board stipends

2   because it's another fee added on to the cash drain.

3   Q    Can you just explain to the members of the jury how a

4   board stipend would impact the portfolio company, if at all?

5   A    Yes.  So, in the case we're talking about here, we had

6   a couple of car dealerships and then there was another one

7   with technology company that I can't remember.  In each of

8   those cases, there is a portfolio companies owned by the

9   fund.  And if you're paying out, you know, an extra half a

10  million bucks to another person, that's another bunch of

11  money that is going to drain the profits from that portfolio

12  company that can't be paid up to the investors.

13  Q    Were you familiar with two entities DJD 1, and DJD 2?

14  A    Yes.

15  Q    How are you familiar with those two entities?

16  A    They were two car dealerships owned by Mr. Lash and

17  Mr. Gentile that were first invested in by the first fund.

18  Q    Who is Mr. Lash?

19  A    He was another executive that worked on the auto

20  business.

21  Q    An executive for who?

22  A    For GPB.

23  Q    You had mentioned earlier in the day special

24  distributions.  Can you just explain to the members of the

25  jury again what special distributions were and how they

W. Jacoby - Direct/Mr. McConnell                744

1    featured in the marketing of the GPB funds?

2    A    So special distributions are marketed as if the

3    portfolio companies earned extra profits that would flow up

4    to the fund and the fund would accumulate the extra cash and

5    then make an extra special distribution to the vests.

6    Q    And as the chief financial officer, did you have any

7    input on whether and when a special distribution would be

8    paid?

9    A    No, I was overruled on that.

10   Q    Overruled by whom?

11   A    Mr. Gentile and Mr. Schneider.

12   Q    Can you tell us about that in a bit more detail?

13   A    They used special distributions as a marketing tool

14   rather than as an as was described there.  In other words,

15   special distributions were used to tell the Ascendant team

16   that if they could get investors in by a certain date,

17   they'd get an extra payment even though we didn't have the

18   profits to make the extra payment.  So it was used to entice

19   people to deposit their money by a certain date so that they

20   would get an extra payment.  And, in fact, that payment was

21   just returning their own deposit, a portion of their own

22   deposit back to them.

23   Q    Did you communicate your concerns about the special

24   distributions to either of the defendants?

25   A    I did.

1   Q    Who did you speak with about that?

2   A    I spoke with both Mr. Gentile and Mr. Schneider.

3   Q    Did you communicate about the special distributions

4   with anyone else at GPB or Ascendant?

5   A    Yes.  Yes.

6   Q    Who?

7   A    A number of people but I can think of Mr. Sijan,

8   Mr. Marshall, Mr. Frangioni.

9   Q    I'll ask you just who those people are.

10       So, first, you mentioned a Mr. Sijan.  Who is that?

11  A    He was Mr. Schneider's right-hand man, second report,

12  who managed a lot of the operations while Mr. Schneider is

13  traveling a lot.  Mr. Frangioni worked for me in the

14  accounting department.  Mr. Marshall worked for me in the

15  accounting department.  Mr. Anscher, he was the COO.

16  Q    I want to show you what's marked for identification as

17  Government Exhibit 7345, please.

18       Do you recognize this, Mr. Jacoby?

19  A    Yes.

20  Q    What do you recognize this to be?

21  A    This is an e-mail chain between myself and Mr. Sijan.

22  Q    And what's the date on it?

23  A    May 18, 2015.

24  Q    Okay.  You remember participating in this e-mail

25  exchange?

*W. Jacoby - Direct/Mr. McConnell*                746

1  A    I do now, yes.

2           MR. MCCONNELL:  I'd offer Government Exhibit 7345

3  into evidence, please.

4           MR. COLTON:  Your Honor knows the basis.

5           THE COURT:  Can I talk to counsel at sidebar,

6  please.

7           (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                          747

1          (Sidebar held outside the presence of the jury.)

2          THE COURT:  So this is an out-of-court statement

3    being offered to show what?

4          MR. MCCONNELL:  So he's going to say that he was

5    communicating this to Mr. Sijan because he was

6    Mr. Schneider's right-hand man.  The timing of the e-mail is

7    important because it's shortly after he starts and he's

8    already indicating problems with paying these special

9    distributions.

10          THE COURT:  So it's the theory that this is

11    related to Mr. Schneider or what's the -- why is this

12    relevant?

13          MR. MCCONNELL:  Because he's highlighting a

14    concern regarding the special distributions to someone he

15    knows will communicate that to Mr. Schneider.  And the

16    subsequent e-mails say, can you make sure you communicate

17    this with Jeff or I'd like to have a meeting with Jeff about

18    this.

19          MR. COLTON:  Your Honor, that dramatically

20    misstates the record.  The later e-mails that say you need

21    to communicate this to Jeff is not solely about special

22    distributions, it's about the management dashboard that

23    they're going to get to later and this conflating of things

24    just to get rank hearsay, and this is rank hearsay, that's

25    all it is.  And there are plenty of e-mails between

*Sidebar*                                                             748

1    Mr. Jacoby and Mr. Schneider communicating financial

2    results.  That I understand.  This has nothing to do with

3    Mr. Schneider and it and it doesn't even say, Please tell

4    Mr. Schneider.  It doesn't say that all.

5              THE COURT:  Are you going to offer something that

6    shows you relate this to Mr. Schneider because then I get

7    it.

8              MR. MCCONNELL:  Yes, we're kind of building

9    towards it.  And I think it's important because, again,

10   these are all in the context of him executing his duties as

11   the chief financial officer.  And so, by communicating this,

12   he's merely -- we're merely showing an example of what he's

13   already testified about.

14             THE COURT:  Just to complete the thread, he's

15   going to have relayed this information, this e-mail, to

16   Mr. Schneider, or it's going to be in some subsequent

17   communication he raises the some general type of nature

18   concern.

19             MR. MCCONNELL:  It's going to be in an subsequent

20   communication.

21             THE COURT:  Let's move on that communication.

22             (Sidebar discussion concludes.)

23             (Continued on the next page.)

24

25

W. Jacoby - Direct/Mr. McConnell          749

1          (In open court.)

2    EXAMINATION BY

3    MR. MCCONNELL:

4    (Continuing.)

5    Q    Mr. Jacoby, when you communicated concerns about

6    special distributions to Mr. Sijan, why did you mention this

7    to him specifically?

8    A    Because I wanted to make sure that the message was

9    getting through to Mr. Schneider and Mr. Gentile and they

10   were traveling at the time.

11          MR. MCCONNELL:  I'd like to show the witness

12   what's marked for identification as Government Exhibit 7351.

13          Actually, I'm sorry, can we go back to the prior

14   e-mail.  I want to ask two more questions about it.

15          MR. MENCHEL:  Your Honor, the prior e-mail is not

16   in evidence.

17          THE COURT:  Yes, I agree.  So we're not going

18   showing it to the jury.

19          MR. MCCONNELL:  We're showing it to the witness.

20          MR. MENCHEL:  To the --

21          THE COURT:  I'm going to let him ask the question.

22          MR. MCCONNELL:  I'm going to show it to the

23   witness.

24   Q    Mr. Jacoby, and again, if you need to refresh your

25   recollection with the exhibit just let us know?

*W. Jacoby - Direct/Mr. McConnell*          750

1          MR. MENCHEL:  I would object to having the

2     document up there without any --

3          THE COURT:  This is not a refreshing recollection

4     situation?

5     Q    Mr. Jacoby, what specifically about the special

6     distributions do you recall communicating to Mr. Sijan?

7     A    I told them we didn't have enough cash to pay it.

8          MR. MCCONNELL:  If I can show the witness

9     Government Exhibit 7351.

10    Q    Mr. Jacoby, what are we looking at in 7351?

11    A    This is discussion about the distribution reserve and

12    capital rates projection.  And I'm also talking to him about

13    the performance --

14         MR. MENCHEL:  Objection to what he's saying about

15    a document not in evidence.

16    A    I'm talking about -- --

17         MR. MENCHEL:  Objection, your Honor.

18         THE COURT:  When there's an objection, I just need

19    a moment to rule on the objection.

20         All right.  Maybe rather than having him read the

21    document, has he answered your question?  Do you want to ask

22    another question?  You were asking him generally what this

23    document is; is that right?

24         MR. MCCONNELL:  Yes.

25         THE COURT:  Okay.

*W. Jacoby - Direct/Mr. McConnell*                    751

1              So without telling us what's in the communication,

2      what is this document?

3              THE WITNESS:  I worked in conjunction with

4      Mr. Sijan and we discussed the ability to make these special

5      distributions using projections that he provided to me from

6      Mr. Schneider and I had the accounting on the other side.

7              MR. COLTON:  Objection.  That's double hearsay

8      right there.

9              THE COURT:  All right.  I think this is not

10     exactly responsive to the question, so I'm going to strike

11     that.

12             What is your question at this point?

13             MR. MCCONNELL:  What is this document?  What are

14     you looking at?

15             THE COURT:  Without telling us what the words are

16     on the document, what type of communication is it?

17             THE WITNESS:  It's an e-mail chain between myself

18     and Mr. Sijan discussing the lack of money.

19             MR. MENCHEL:  Objection to the description which

20     is getting in the very thing we're objecting to.

21             THE COURT:  Are you going to offer this document?

22             MR. MCCONNELL:  Yes.

23             THE COURT:  Okay.  He's offering the document.

24             MR. COLTON:  Same objection.

25             MR. MENCHEL:  Same objection.

*W. Jacoby - Direct/Mr. McConnell*                   752

1          THE COURT:  Why isn't this the same as the one we

2    just discussed?  Same situation.

3          MR. MCCONNELL:  Because the addressees on the

4    bottom.

5          THE COURT:  Is that what you're offering, or are

6    you offering the e-mail on the top?

7          MR. MCCONNELL:  I'm offering both, your Honor.

8          THE COURT:  All right.  I'm going to sustain the

9    objection as to the first e-mail in this chain which is, I

10   think, of the same general nature as the communication we

11   were discussing a moment ago.

12         MR. COLTON:  And, your Honor, the bottom one

13   should not be admissible against Mr. Schneider and I don't

14   want to say more than that but I can explain based on the

15   witness' testimony.

16         THE COURT:  Are you going to offer this second

17   e-mail.

18         MR. MCCONNELL:  I'm sorry, the second e-mail?

19         THE COURT:  Yes.  So there's 2-E-mails in the

20   chain and I don't know if you -- I think the witness was

21   talking about the first e-mail in the chain.  I don't know

22   if you're intending to offer the second e-mail.  I don't

23   know what it is.

24         MR. MCCONNELL:  I'm going to offer the first

25   e-mail and ask the witness what it's about which I think

*W. Jacoby - Direct/Mr. McConnell*                753

1    will...

2              THE COURT:  Okay.  So go ahead and lay that

3    foundation.

4    EXAMINATION BY

5    MR. MCCONNELL:

6    (Continuing.)

7    Q    So, Mr. Jacoby, just looking at the second e-mail on

8    the page, who did you send that to?

9    A    Mr. Gentile.

10   Q    And who else?

11   A    Mr. Frangioni.

12   Q    Looks like there some Ann Marie Shaw, who is Ann Marie

13   Shaw?

14   A    She was Mr. Gentile's assistant at the time.

15   Q    What is this e-mail that you sent to Mr. Gentile and

16   those other individuals?

17   A    It's distribution reserve and capital raise projections

18   analysis.

19   Q    And why did you send that to Mr. Gentile?

20   A    This was highlighting how we didn't have the cash to

21   pay the special distribution and we didn't have the money to

22   pay it.

23             MR. MCCONNELL:  Your Honor, I'll offer the exhibit

24   into evidence.

25             MR. MENCHEL:  Without the attachment, I object.

*W. Jacoby - Direct/Mr. McConnell*          754

1          THE COURT:  It's admitted.

2          (Government's Exhibit 7351 was marked in

3    evidence.)

4          MR. COLTON:  Your Honor, I ask that this be only

5    admitted with respect to Mr. Gentile.  Mr. Schneider is not

6    on here.  Mr. Frangioni didn't work for Mr. Schneider, he

7    worked for him, Mr. Jacoby.

8          THE COURT:  Well, I don't think this is being

9    offered for the effect on the listener, right?

10          MR. COLTON:  Actually, I don't know.

11          THE COURT:  Is this being offered for its truth or

12    for the effect on the listener?

13          MR. MCCONNELL:  It's a statement to -- can we

14    approach, your Honor, I don't --

15          THE COURT:  Sure.  It's a statement of -- well,

16    okay.

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

*Sidebar*                                                         755

1          (Sidebar held outside the presence of the jury.)

2          MR. MCCONNELL:  Judge, I don't want to say certain

3    things in front of the jury.  I don't want to use words like

4    co-conspirator and things like that so I apologize for

5    coming over here.  It's a statement to one of the

6    defendants, to one co-conspirator during the course of the

7    conspiracy.

8          THE COURT:  Isn't co-conspirator statement a

9    statement of a co-conspirator.

10         MR. MCCONNELL:  Yes, but it's to one of them and

11   it's -- it's to Mr. Gentile.

12         THE COURT:  Yes.  So my question to you is, is

13   this being offered for its truth, or it's being offered for

14   the effect on the listener?  Because it affects whether I

15   need there to be hearsay exception.

16         MR. AXELROD:  One moment, your Honor.

17         (A brief pause in the proceedings was held.)

18         MR. AXELROD:  Your Honor, this is notice to one of

19   the conspirators that the distributions are not fully

20   covered.

21         MR. MCCONNELL:  That they can't afford --

22         MR. AXELROD:  That they can't afford to pay.

23   Notice to one conspirator is relevant to the knowledge of

24   the other conspirator on the theory that those are close

25   people, they're in a conspiratorial relationship, and what

*Sidebar*                                                      756

1   one conspirator knows is important.

2          THE COURT:  Yes, so I think it's not being offered

3   for its truth, it's being offered for the effect on listener

4   so I don't think I need to give some special limiting

5   instruction about that.  You can certainly argue that this

6   is Mr. Gentile and Mr. Schneider heard it.

7          MR. COLTON:  And I would ask what's coming next

8   because if what's coming next is the attachment which is

9   going to be offered for the truth we're back where we

10  started.

11         THE COURT:  I'm no sure it's being offered for its

12  truth, it's the same thing here's what I was telling him.

13         MR. COLTON:  If it's being offered for its truth,

14  I think we should get an instruction that says this is just

15  a chart, that you're not to credit the numbers in the chart,

16  it's just for whatever effect on the listener.

17         MR. MCCONNELL:  I don't have a problem with any

18  instruction, but this is going to be a feature of most of

19  the e-mails that we're seeing.

20         So there are numbers included, there's going to be

21  thing that are mentioned.  I don't think this creates the

22  problem that the defense is objecting to, it's an effect on

23  the listener.

24         THE COURT:  So here's what I propose.  I'm going

25  to give an instruction that you're seeing an e-mail now and

*Sidebar*                                                    757

1    you're going to see some additional e-mails that were sent

2    by this witness to other individuals.  They're being offered

3    to show, they're being offered as relevant to the effect of

4    the e-mails on the recipient.

5              They're not being offered to establish the truth

6    of the underlying financial statements in the e-mails.

7              MR. AXELROD:  To the information that's being

8    provided to the defendants.

9              THE COURT:  Yes.  I'm not going to load it up that

10   way.

11             MR. AXELROD:  Sorry, your Honor.

12             MR. COLTON:  There are going to be e-mails that

13   don't go to either of the alleged co-conspirator defendants.

14   I think that's different because the effect on the listener

15   is not even allegedly in the conspiracy, that's even much

16   further attenuated.

17             THE COURT:  That was kind of like the 2-I said

18   before why don't we need look at e-mails that were sent to

19   just other people.

20             MR. AXELROD:  So, your Honor, it's really a

21   function of two issues.  The first is it's admissible to

22   introduce hearsay to show background and context for what

23   someone did.

24             THE COURT:  What he did?

25             MR. AXELROD:  Yes, which is part of what we're

*Sidebar*                                                          758

1   doing.  He's already testified that he provided this

2   information to the defendant.

3          So showing how he got that information the manner

4   in which that got that information the concerns he was

5   expressing and went immediately to Mr. Sijan and conveys

6   this to the defendants are all relevant for non-hearsay

7   purpose.

8          It's also relevant for its effect, again, on a

9   non-hearsay purpose.  Its effect on him, he's describing

10  what he did with that information.

11         THE COURT:  The e-mails are relevant to show the

12  effect of the e-mails on him?

13         MR. AXELROD:  Well, the e-mails are relevant to

14  show what if he's learning this information and then he's

15  explaining what he did with that information.

16         THE COURT:  Yes.  So I think where I'm going to

17  draw the line is if he wants to say, I talked to a bunch of

18  people, fine.

19         If we want let in communications that went to any

20  of the defendants or that went to somebody and they're

21  saying this is the assistant and please relay it to the

22  defendants for some reason to think the communication was

23  being relayed to the defendants, fine.

24         This is just like e-mails he sent to other people,

25  the substance of what those e-mails were I think we should

*Sidebar*                                                    759

1    keep it out.  So hopefully that's.

2              (Sidebar discussion concludes.)

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

W. Jacoby - Direct/Mr. McConnell          760

1           (In open court.)

2           MR. MCCONNELL:  Sorry, your Honor, I forgot where

3    left off.  I offered the document as redacted?

4           THE COURT:  So this is admitted.

5           (Government's Exhibit 7351 was marked in

6    evidence.)

7           MR. MCCONNELL:  Thank you.

8    EXAMINATION BY

9    MR. MCCONNELL:

10   (Continuing.)

11   Q    Mr. Jacoby, when you communicated your concerns

12   to -- why did you, again, communicate these concerns

13   specifically to Mr. Sijan.

14   A    Because I was told to do so by Mr. Schneider and

15   Mr. Gentile because he was my communication point for them

16   while they were traveling.

17   Q    Let's talk about how the bank accounts for each one of

18   the funds was set up.

19        As the chief financial officer, were you familiar with

20   the bank accounts of each fund?

21   A    Yes.

22   Q    And can you describe for the -- how are you familiar

23   with them?

24   A    We had bank accounts that we reconciled and we inputted

25   the accounting entries into our accounting system which was

W. Jacoby - Direct/Mr. McConnell                761

1   QuickBooks from the bank accounts.

2   Q    When you say what's QuickBooks?

3   A    QuickBooks was the accounting system, software, that we

4   used.

5   Q    And he when you say "reconciled those statements," what

6   does that mean?

7   A    Like balancing your checkbook, right?  Balancing the

8   bank statement to your entries.

9   Q    How did each fund, so Automotive Portfolio, Holdings 1,

10  Holdings 2, how did it have its bank accounts set up?

11  A    So the structure that GPB set up was to have three

12  different bank accounts for each fund -- an investment

13  account, an operations account, and a distribution account.

14  Q    And what, generally, was the purpose of having those

15  three accounts as you understood it?

16  A    It was to make it easier to keep track of the different

17  buckets of money by having different bank accounts that

18  reconciled to the general ledgers of those bank accounts.

19           MR. MCCONNELL:  I'd like to show the witness

20  what's marked as Government Exhibit 6184, please.

21  Q    Mr. Jacoby, without getting into the substance, what

22  generally is depicted in Government Exhibit 6184?

23  A    So the three boxes in the middle are the three accounts

24  I was just describing that were all owned by the fund.

25  Q    And would this help you explain how the funds at GPB

W. Jacoby - Direct/Mr. McConnell                762

1   had their account set up and how money moved?

2   A    Yes.

3            MR. MCCONNELL:  Your Honor, I would offer

4   Government Exhibit 6184 as a Demonstrative Exhibit, please.

5            MR. COLTON:  It's not actually offered.  It's not

6   going into evidence but just being put up, is that what the

7   ask is because I can't tell.

8            THE COURT:  Fair enough, yes.  So the witness can

9   use this as a demonstrative.

10           MR. MCCONNELL:  Can we publish to the jury,

11  please.

12           MR. COLTON:  Your Honor, I request that the Court

13  just explain the difference between a demonstrative and

14  what's coming in.

15           THE COURT:  So this is not a piece of evidence,

16  this is -- doing this on the fly here -- so this is not

17  piece of evidence, it's not going to go back with you to the

18  jury room, it's just something that the witness is using to

19  help explain the witness's testimony which is the evidence

20  here.  So it's just a graphic the witness is using to go

21  along with his testimony.

22           MR. MCCONNELL:  Thank you.

23           (Exhibit published.)

24  Q    So, Mr. Jacoby, looking at Government Exhibit 6184,

25  could you just identify what each of the different boxes are

*W. Jacoby - Direct/Mr. McConnell*                763

1   and explain how money would move through the fund?

2   A    Okay.  So as we were discussing the three bank accounts

3   for the fund are the three blue boxes in the middle.  The

4   box on the left is the fund administrator, that is where

5   people would deposit their money when they were investing.

6        So they would deposit their money into

7   Phoenix American.  Phoenix American would make sure all

8   documentation is in order and pay the up-front selling fees

9   to Ascendant and the broker that was involved.

10       After they paid those up-front selling fees, number one

11  would be where they deposited it into the fund's bank

12  account, investment account.

13  Q    Okay.  And what was the investment account?

14  A    So the investment account was where we took in the

15  remaining amount of money after selling fees to deposits and

16  that is where we accumulated money to buy portfolio

17  companies or make investments.

18            (Continued on the next page.)

19

20

21

22

23

24

25

Jacoby - direct - McConnell                    764

1   DIRECT EXAMINATION

2   BY MR. McCONNELL:  (Continuing)

3   Q    So the investment account was set up to hold the investor

4   money?

5   A    The investor cash to make investments, yes.

6   Q    So what happens with the money in the investment account?

7   What's supposed to happen with the money in the investment

8   account?

9   A    So number two would be invest the money.  In this case,

10  the case -- the example we were talking about is buy a car

11  dealership.  So accumulate enough deposits to buy a car

12  dealership.

13  Q    And it says on the right-hand box portfolio companies.

14  Can you just explain what that means?

15  A    You buy a number of different car dealerships, in this

16  example, that would be the portfolio companies.

17  Q    Okay.

18  A    Right.  Each one is a company.

19  Q    And what does number three indicate on Government 6184?

20  A    So number three indicates the profit, the cash profits

21  from the company getting paid back up to the fund.  This time

22  into the operating account as revenue.

23  Q    And what was the operating account used for?

24  A    The operating account was used to receive revenue and pay

25  expenses.  So it would receive the revenue from the portfolio

Jacoby - direct - McConnell                765

1   companies and pay the fund's expenses, and then the net after

2   that would be the profits left over.  That's No. 4, that would

3   get pushed down into the distribution account for distribution

4   out to the investors.  That's number five.

5   Q    So what was the distribution account set up for?

6   A    To make the dividend payments that we had previously

7   discussed.

8   Q    The monthly payments?

9   A    The monthly payments, yes.

10  Q    Why is there a five there?  Why doesn't it just go from

11  distribution account to all the different investors?

12  A    Phoenix was the interface between the fund and the

13  investors, that's what called a fund administrator.

14  Q    So did you set up this structure of accounts?

15  A    No.  This was set up at inception by Mr. Gentile.

16  Q    How do you know Mr. Gentile set it up?

17  A    He told me.

18  Q    And based on your prior experience, had you ever seen a

19  set up like this before?

20  A    No, but I thought it was ingenious.

21  Q    Why did you think it was ingenious?

22  A    Because it's a good way to keep track of the money using

23  the accounting system we had.

24  Q    Now, in practice, was this how money moved through these

25  various accounts?

Jacoby - direct - McConnell                 766

1   A    Sometimes, but sometimes not.

2   Q    When you say sometimes not, just generally speaking, what

3   do you mean?

4   A    So, in the example that you were asking me about before,

5   when we didn't have enough money to make the dividends

6   payments, there was only one place to get the cash from, and

7   that would be from the investment account at the top.

8   Q    And so what would happen -- how would the money go from

9   the investment account to the distribution account?

10  A    We would have to transfer.  We would have to do a money

11  transfer from that bank account down to the distribution

12  account.

13  Q    Who is "we"?

14  A    The accounting at GPB.

15  Q    And did you have the authority to do that?

16  A    Not without Mr. Gentile's approval.

17  Q    And, again, where was the money in the distribution

18  account supposed to come from?

19  A    Profit, net profit.

20  Q    Was money from the investment account supposed to be used

21  to pay distributions?

22  A    No, not as I understood it.

23  Q    Are you familiar with the term coverage ratio, Mr.

24  Jacoby?

25  A    Yes.

Jacoby - direct - McConnell                    767

1    Q    Can you tell the members of the jury what the term

2    coverage ratio means and how it was used at GPB?

3    A    The way it was used at GPB was in reference to how much

4    of the dividends that was being paid to number five was

5    covered or paid for by the profits.  So if we had, you know,

6    $100 dividends that was paid for with $100 of profits, that

7    would be 100 percent covered, one to one.

8    Q    So if -- well, at GPB, in your position as a chief

9    financial officer, were you aware of how the coverage ratio

10   was calculated at GPB?

11   A    Yes.

12   Q    How was it calculated?

13   A    We would take the net investment income, which is on your

14   diagram here is No. 4, right, after the profits are collected

15   and expenses paid, that would be your net investment income

16   profits.  You take that number -- so in the example I just

17   gave you before, if that was $100 and you paid out 100 on

18   distributions, that would be -- your ratio would be one to one

19   or 100 percent.

20   Q    And if the net investment income for a particular period,

21   let's say, a month or a quarter or a year was less than the

22   amount of distributions that were paid during that period,

23   what would you say?

24   A    That it wouldn't be covered.  It wouldn't be fully

25   covered.  In other words, we may have -- so, in the example

Jacoby - direct - McConnell                    768

1  that we have been using, right, if there was only $70 worth of

2  profit and we paid out a dividend of 100, then it's only 70

3  percent covered.

4  Q    Did the rate that the monthly distributions were paid

5  ever change while you were at GPB?

6  A    No.

7  Q    It always stayed at that eight percent or 8.7 for the

8  other class?

9  A    Yes.

10 Q    Did the coverage ratio ever drop below 100 percent?

11 A    All the time.

12 Q    And when it did, how were the monthly distributions still

13 being paid if the profits were not there to, quote/unquote,

14 cover them?

15 A    Using deposits from new investments that came in from the

16 investment account.

17 Q    How often did you discuss the coverage ratio with the

18 defendants?

19 A    Weekly.

20 Q    Can you talk about the circumstances in which you would

21 have those conversations?

22 A    I produced a weekly report that gave a status update and

23 we would -- I would just give it not just the two defendant

24 but a team of people that all worked at both companies, both

25 Ascendant and GPB, and we would discuss if there were changes

Jacoby - direct - McConnell                    769

1   that needed to be made, if there was information missing, if

2   we wanted to change the report in any ways and it evolved over

3   time.

4   Q    Did Mr. Gentile ever discuss with you why the coverage

5   ratio was so important?  Why did you have to talk about it

6   every beak?

7   A    Because it was a point of emphasis of the marketing of

8   the funds.  That's why we had to make sure that we kept track

9   of it.  There was a point of emphasis that they were seeing,

10  that we were going to be covered.  And we were falling short,

11  so we needed to make sure that we kept track because we needed

12  to know how much we needed to catch up.

13  Q    Did you ever discuss the coverage ratio with Mr.

14  Schneider?

15  A    Yes.

16  Q    How often?

17  A    He was also in the weekly management discussion.

18  Q    When you -- well, when was the first time you told Mr.

19  Gentile that the coverage ratio was below 100 percent and that

20  profits were not supporting the eight percent distribution?

21  A    Well, the first month that we just talked about where it

22  was a special distribution being paid.

23  Q    So that's April 2015?

24  A    Yes.

25  Q    And what was Mr. Gentile's response when you told him

Jacoby - direct - McConnell                    770

1    there wasn't enough?

2    A    He said there was more profits coming that hadn't showed

3    up yet and that we would be catching up shortly.

4    Q    And what did Mr. Schneider say when you informed him of

5    that issue?

6    A    He told me I needed to watch and learn, that these

7    profits were going to be coming.  There was stuff I didn't

8    know and that I would be learning about it in the months to

9    come.

10   Q    When GPB -- well, given the inability of profits to cover

11   the distributions and the payment of the special distribution,

12   did you have a conversation with the defendants about other

13   expenses the fund was incurring?

14   A    Yes.

15   Q    How were you aware of those other expenses?

16   A    There was a number of different ways, but mainly because,

17   you know, if the fund had to actually pay those expenses out,

18   we moved the money, and then there was also expenses that may

19   be paid at the portfolio level that the accounts were

20   important to make and tell me were paid.

21   Q    When you say at the portfolio level, what does that mean?

22   A    At the dealerships.

23   Q    So you had visibility into the accounting at the

24   dealership level as well?

25   A    Some of them.  Some of them.

Jacoby - direct - McConnell                    771

1    Q    And in addition to --

2    A    Not all of them, but some of them.

3    Q    And in addition to looking at the finances and having

4    conversations with people at those dealerships, did you have

5    conversations with the defendant about particular expenses

6    that you were concerned about?

7    A    Yes.

8    Q    Can you tell the members of the jury what some of those

9    expenses were that you talked about with the defendants?

10   A    Okay.  Well, some of those expenses were that -- I think

11   we had previously talked about -- was the board stipends.  So

12   Mr. Schneider and Mr. Gentile were receiving board stipends.

13            There was lease payments.  Some of the car

14   dealerships were paying lease payments to them.

15            There was use of, for example, a Ferrari at a Buick

16   dealership.  That's an expense to the dealership.

17            You know, if there was private jet travel that was

18   charged to the dealership or to the funds directly, those were

19   other drains, in addition to all of the other fees that we had

20   mentioned.

21            So those were all cash drains above and beyond the

22   15 percent of the initial fees that we had talked about

23   before.

24   Q    How were you aware of a Ferrari from the Buick

25   dealership?

Jacoby - direct - McConnell                    772

1   A    Well, I talked to Mr. Lash and Mr. Gentile about that.

2   Q    And what did you say?

3   A    I said, you know, that kind of expense isn't proper to be

4   draining cash from potential profits to the funds who were

5   making special distributions that are already falling short of

6   what we are paying out.

7   Q    Did you document in any way -- when I say you, did you

8   and members of your accounting team document in any way the

9   movements of funds from the investment account to the

10  distribution account to pay those distributions?

11  A    Yes.

12  Q    How did you do that?

13  A    We took the records from the accounting system, which was

14  QuickBooks, and we tracked it carefully.  We didn't do it

15  every day.  We had do it like once a month.

16  Q    When you say you tracked it carefully, what do you mean?

17  A    We would keep a running tab of how much -- how many

18  transfers were made and what the total was.

19  Q    Why did you keep special track of those monies movements?

20  A    Because -- so as I was describing before, you know, if

21  you deposited -- let's just use 100, because it's an easy

22  number.  If you deposit $100 and then you paid out 20, you're

23  left with 80, and then if you are digging a deeper hole by

24  using more of that 80 to make dividend payments, the number's

25  going lower and lower and lower, right.  So you're going from

Jacoby - direct - McConnell                    773

1    100 to 80 to 70, and you're still trying to make this eight
2    percent payment on 100.  So the more you drain it, the more
3    difficult it gets to make that payment.
4    Q    When did you start -- when I say you, again, you and the
5    accounting team -- start keeping track of these movements from
6    the investment account to the distribution account,
7    approximately?
8    A     It was already being done when I got there.  But we
9    continued to improve it and monitor it more carefully.  The
10   larger the hole got, the more carefully we made sure that we
11   tracked it and communicated it.
12   Q     Was it in a spreadsheet?
13   A     We dumped it from the accounting system into a
14   spreadsheet.
15   Q     When you say you dumped it.  What do you mean?
16   A     In QuickBooks, you can pull it into Excel.
17   Q     Do you mean Microsoft Excel spreadsheet?
18   A     Yes.
19   Q     And those QuickBooks, again, those were based on bank
20   transactions that had taken place?
21   A     Yes.
22   Q     And how did you verify that the information in the
23   QuickBooks was accurate?
24   A     QuickBooks was reconciled to the bank accounts.
25   Q     The entries that are in QuickBooks, when did they get

Jacoby - direct - McConnell                    774

1    made in relation to when the actual bank transaction takes

2    place?

3    A    Well, the accounting team would make the entries, you

4    know, on the date that the transfers happened.

5    Q    And are those QuickBooks business records that are made

6    and kept by you and other members of GPB's accounting team?

7    A    Yes.

8    Q    Did you rely on them?

9    A    Yes, we relied on QuickBooks, yes.

10   Q    And did you maintain them in such a way to ensure that

11   they were accurate?

12   A    Yes, they were reconciled to the bank accounts.

13   Q    The spreadsheet that you mentioned that you created or

14   you and the accounting team created to keep track of the money

15   movements from the investment to the distribution account,

16   those were just swept in from the QuickBooks?

17   A    Yes.

18   Q    Was that spreadsheet saved anywhere on GPB's internal

19   server?

20   A    Yeah, the accounting team had a shared drive that we

21   shared, so it was on the company shared drive.

22             MR. McCONNELL:  I would like show witness what's

23   marked for identification for Government Exhibit 6171-A.

24   Q    So, Mr. Jacoby, again, without getting into the sum and

25   substance, what are you looking at here?

Jacoby - direct - McConnell                    775

1    A    This is just an e-mail from Mr. Frangioni, who worked in

2    the accounting department, to me where he's attaching that

3    spreadsheet that you were just asking me about.

4    Q    When you say the spreadsheet I'm asking you about, what

5    spreadsheet?

6    A    It's the spreadsheet that is the showing the transfers

7    from the investment account to the distribution and operating

8    accounts.

9    Q    And you said the spreadsheet was something that you and

10   the members of the accounting team would update?

11   A    Yes.

12        MR. McCONNELL:  Can I show the witness

13   Government Exhibit 6171-B, please.

14   Q    Mr. Jacoby --

15        MR. McCONNELL:  If we can just let the witness

16   scroll through the pages so he can identify it.

17   A    Okay.  I recognize it, yep.

18   Q    What do you recognize it to be?

19   A    This is the running tab that you were discussing with me

20   a minute ago of the total transfers, but it is really tiny.

21        MR. McCONNELL:  Ms. Bates, can we pull up the

22   native, I think it is 6171-C, please.  I think that may help.

23        MR. MENCHEL:  Can we have a sidebar on this, please.

24        THE COURT:  What do you want to talk about?

25        MR. MENCHEL:  Well, all he is doing is walking

Jacoby - direct - McConnell                    776

1  through a document that he hasn't introduced.

2        THE COURT:  I take it you're going to offer it?

3        MR. McCONNELL:  Yes.

4        MR. MENCHEL:  I object.

5        THE COURT:  Let's get to it and then you'll object.

6        MR. MENCHEL:  Okay.

7  Q    Mr. Jacoby, what do you recognize Government Exhibit

8  6171-C to be?

9  A    This is our tracking spreadsheet for the transfers from

10  the investment account to the distribution and operating

11  account.

12  Q    Okay.  And this is the version that was attached to the

13  e-mail?

14  A    Yes.

15  Q    That we just saw?

16  A    Yes.

17  Q    Have you reviewed this just prior to testifying today?

18  A    Yes.

19        MR. McCONNELL:  Your Honor, I would offer both the

20  cover e-mail 6171-A and the native Excel spreadsheet, 6171-C.

21        THE COURT:  You think this is not a business record?

22        MR. MENCHEL:  I don't know.  He hasn't laid a

23  foundation for it.

24        THE COURT:  I was hearing a lot of business record

25  foundation.

Jacoby - voir dire - Menchel                    777

1           MR. COLTON:  One moment, your Honor.

2           MR. MENCHEL:  Would I be permitted to voir dire the

3   witness on this exhibit?

4           THE COURT:  Okay.

5   VOIR DIRE

6   MR. MENCHEL:

7   Q    Mr. Jacoby, this document has some highlights on it.  Do

8   you see that in yellow?

9   A    Yes.

10  Q    Were those originally on the document when it was

11  produced?

12  A    I don't remember when they were put there.  We would

13  highlight things that we were going to discuss and Mr.

14  Frangioni had highlighted those.

15  Q    When?

16  A    2015.

17  Q    So that was done at or near the time of the creation of

18  this document?

19  A    It was a living document that we continually updated, so

20  I can't tell you specifically on these highlights.

21          MR. MENCHEL:  All right.  Thank you.  One second,

22  your Honor.

23  Q    Do you know if this document was the final version of

24  this document?

25  A    How would I know that?

Jacoby - voir dire - Menchel                    778

1   Q    That's what I am asking you.  Are you able to tell me?

2   A    You're showing me a document that looks to me like the

3   work papers that we used to work with.

4   Q    What I am asking you is this an interim document or was

5   this the final version of this document as it was created?

6            MR. McCONNELL:  Your Honor, objection.  The witness

7   said this was the attachment to the e-mail that we saw.

8            THE COURT:  I'll let the witness answer the

9   question, if you can answer the question.

10  A    I mean, it looks to me like the spreadsheet that was

11  attached to that e-mail from everything that I can see.

12           MR. MENCHEL:  Okay.  Thank you, your Honor.

13           MR. COLTON:  Your Honor, I renew the objection.

14           The e-mail he was shown is dated July 2016, the

15  testimony was about its accuracy in 2015.  I don't think the

16  witness is capable to actually say at what point in time this

17  data is actually accurate or not.

18           THE COURT:  This is the QuickBooks that was attached

19  to the e-mail?

20           MR. COLTON:  And the witness' testimony was about a

21  different year of the e-mail.

22           THE COURT:  Let me go back.  Let me look at the

23  testimony.

24           Is this an objection to the highlighting?

25           MR. COLTON:  The -- I'll answer, but I'm going to be

Proceedings                                              779

1    careful.  I understood the witness to testify as to the

2    accuracy in 2015, to something that was a living, breathing

3    document that was sent to him per the e-mail that is being

4    offered a year later.  So the question is whether we have any

5    assurance that this document that was sent in a year after he

6    testified about his problems is actually accurate information.

7            If it was a more limited purpose discussed at

8    sidebar, that's a different issue.

9            MR. McCONNELL:  Your Honor, the document has dates

10   of transactions, has amounts of transactions.  The witness has

11   testified that it is extracted straight from the QuickBooks

12   which are kept in the regular course of business, which are

13   reconciled to the bank records on a regular basis.  This

14   document is attached to the e-mail as of that date.

15           Counsel's concerns go to weight, not admissibility.

16           THE COURT:  Can you go back to the e-mail?

17           All right.  Give me one sec.

18           MR. McCONNELL:  Your Honor, just to the last entry

19   on the spreadsheet is June 29th of 2016, I believe.

20           This is the version of the document that's being

21   transmitted in the e-mail.

22           THE COURT:  I'm just trying to find the portion of

23   the testimony where the witness was laying a foundation for

24   what we were looking at and I haven't found it because I

25   wasn't anticipating a business records issue here, so give me

Proceedings                                                    780

1   a moment to go back to that.

2          I'll allow the exhibit.  The exhibit is admitted.

3          MR. McCONNELL:  Thank you.

4          MR. COLTON:  If we could just be clear which exhibit

5   is being admitted, I think it's A and B but not C.

6          MR. McCONNELL:  We are going to offer A and C

7   because C is the Excel and it's easier to manipulate on the

8   screen.

9          MR. COLTON:  There is --

10          MR. McCONNELL:  It's the native.

11          MR. COLTON:  There is some information in there --

12          THE COURT:  I thought we were looking at the e-mail

13   and attachment to the e-mail and then an Excel document that

14   was just the attachment to the e-mail that was reformatted.

15          MR. McCONNELL:  That's right.

16          THE COURT:  Is that right or not right?

17          MR. COLTON:  So, again, stop me any time you think I

18   should stop.  The document they are seeking to put in goes

19   well beyond any of the funds at issue.

20          THE COURT:  It is the attachment or it's not the

21   attachment?

22          MR. COLTON:  There's two different things.  There is

23   a native.  That's C.  And then there is I guess a static.

24   That's B.  Both of which contain information far beyond what

25   was testified to and far beyond what's at issue in the case.

Proceedings                                        781

1          THE COURT:  I was hoping not to do this, but I will

2    have to excuse you.  Let's take a short break.

3          THE COURTROOM DEPUTY:  All rise.

4          (Jury enters.)

5          THE COURT:  And feel free to take the witness out

6    too.

7          MR. McCONNELL:  Judge, just to be clear, if I am

8    hearing this correctly.

9          MR. COLTON:  Artie, if you could wait for the

10   witness, please.

11         MR. McCONNELL:  The spreadsheet has other tabs,

12   which we're happy -- we are not going to explore them.  We are

13   not going to send them back to the jury.  But first three tabs

14   are automotive, Holdings I and Holdings II.  Those are the

15   ones I want to show.  The reason why I want the native is,

16   frankly, it's much more easy to manipulate on the screen.  The

17   PDF versions are terrible.  We can't see anything on the

18   screens.  I'd really like to use the Excel --

19         THE COURT:  So is the issue there are these other

20   tabs that are part of the native document and you don't want

21   something to go back to the jury, something like that?

22         MR. COLTON:  So one of the objections definitely is

23   that this exhibit needs to be redacted to just the three funds

24   that are even part of the indictment.  So, yes, that's one of

25   the issues.

Proceedings                                      782

1    THE COURT:  All right.  I think this is something

2  that can be done.  We shouldn't be sending back to the jury or

3  showing to the jury the tabs that are extraneous.  So we can

4  do that.

5    MR. COLTON:  We are happy to receive a proposed

6  redacted version from the Government.  The rest of the

7  objections, of course, we are not waiving.

8    To me, again, the e-mail from Mr. Frangioni that's

9  -- seems -- you know, talks about giving purchase to this

10  document, Mr. Frangioni is not an agent of Mr. Schneider.  In

11  fact, the witness testified that Mr. Frangioni worked for the

12  witness, not for either of the defendants.  That was his

13  testimony unprompted.

14    THE COURT:  So it seems like the basis for admitting

15  this kind of shifted or, at least, in my mind understanding

16  has shifted and ultimately it seemed like what you were trying

17  to get in is this spreadsheet which shows these distributions.

18  What is the relevance of the fact that Frangioni sent it to --

19    MR. McCONNELL:  Nothing.  I was just using it as a

20  means to authenticate it.  If I just show him the exhibit

21  without any context, I don't know that we would have other

22  objections.

23    THE COURT:  I think that's fine, right?

24    MR. McCONNELL:  I don't need that e-mail.

25    THE COURT:  All right.  Do you want the e-mail out?

Jacoby - direct - McConnell                783

1   Do you want this to be the exhibit without the e-mail?

2          MR. COLTON:  Yes.  We maintain our objection, but we

3   understand the ruling.

4          THE COURT:  If it's fine with you, we will just

5   admit 6171-B and C, which are the underlying --

6          MR. McCONNELL:  So if we could just use C and we'll

7   prepare a redacted version for the jury, which we will

8   circulate to counsel later.  But for purposes of publication,

9   we are not going near the other tabs on the spreadsheet.

10         (Government's Exhibit 6171-C received in evidence.)

11         THE COURT:  All right.  Let's get jury.

12         (Witness takes stand.)

13         THE COURTROOM DEPUTY:  All rise.

14         (Jury enters.)

15         THE COURT:  Everybody can be seated.  Go ahead.

16         MR. McCONNELL:  Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MR. McCONNELL (Continuing):

19  Q    Mr. Jacoby, I would like to walk through with you the

20  spreadsheet, Government Exhibit 6171-C.

21         MR. McCONNELL:  If we could publish that for the

22  members of the jury.

23  Q    So just looking at this, first, there's -- the three tabs

24  on the bottom say AP -- GPB AP, GPB H, and GPB H-2, what do

25  those refer to?

Jacoby - direct - McConnell                    784

1  A    Those are the funds, GPB Auto Portfolio, GPB Holdings,
2  and GPB Holdings II.
3  Q    So we are clicked on the tab for Automotive Portfolio
4  here; correct?
5  A    Yes.
6  Q    At the top of this section, it says, "Transfer detail."
7  And then there are one, two, three, four, five columns with
8  headers.  Do you see that?
9  A    Yes.  Yes.
10 Q    Can you just walk us through what each of those column
11 headers is?
12 A    So the "date" is the date of the transfer.  The "amount"
13 is the dollar amount of the transfer.  The "from" is from
14 which bank account.  The "to" is to which bank account, and
15 the notes is the entry that comes from the QuickBooks end
16 entry.
17 Q    So when you say the notes come from the QuickBook entry,
18 what do you mean?
19 A    So when the accountant was making the entry in
20 QuickBooks, he had the opportunity to make a comment.
21 Q    So just looking at --
22           MR. McCONNELL:  Ms. Bates, if we can just scroll
23 down so we can see the last date.  I want to get the date
24 range.
25 Q    So the final date is June 30th of 2016?

Jacoby - direct - McConnell                    785

1    A    Right.

2            MR. McCONNELL:  And if we can scroll back up,

3    please.

4            THE WITNESS:  Yes.

5    Q    The first date is August 13th of 2015?

6    A    Yes.

7    Q    So just walk us through the first transaction there,

8    number -- it will be row six on the spreadsheet.

9    A    Yes.  On August 13, 92,000 was transferred from the

10   investment capital distribution account.  The note is to cover

11   September investment distributions.

12   Q    And you had testified previously that for each of these

13   transactions, did you have the authority to do them yourself?

14   A    No.  Mr. Gentile always authorized or confirmed the

15   transfer for Mr. Frangioni.

16   Q    Just looking down at some of the other ones here, looking

17   at row No. 10, on September 11th of 2015, do you see that?

18   A    Yes.

19   Q    What was the transaction that's reflected in that entry?

20   A    That one is 415,064 to cover the September 2015

21   distribution.

22   Q    And just to be clear, when we say 2015 investor

23   distribution, what are we talking about?

24   A    That's the dividend, the monthly dividend.

25   Q    The targeted eight percent?

Jacoby - direct - McConnell                    786

1   A    Yes.  Yes.

2         MR. McCONNELL:  And if we can go down to row 13.

3   Q    What's reflected in this transaction, sir?

4   A    This is another one of those -- 552,203.  And that's it,

5   to cover the October 2015 investment distributions.

6   Q    And was this -- we won't go through every transaction,

7   but was this a recurring issue?

8   A    Yes.

9   Q    And why did you decide -- well, why did the accounting

10  team decide to keep a separate spreadsheet of these if they

11  were already in the QuickBooks?

12  A    Well, I discussed it with Mr. Gentile and Mr. Frangioni

13  and we wanted to make sure that we kept a running tab on this.

14  Q    Why?

15  A    Because as I was describing before, if you are digging

16  this hole and we're anticipating these profits that were going

17  to come in to catch us up, we needed to know if that was

18  realistic or not.

19  Q    There are other transactions here that are from the

20  investment account to the operating account.  Do you see

21  those?

22  A    Yes.

23  Q    Generally, what was the purpose of those transactions?

24  A    Again, the operating account was receiving profits from

25  the portfolio companies.  So in Auto Portfolio, that's

Jacoby - direct - McConnell                    787

1   dealerships, the operating account would have some expenses.

2   If it didn't receive enough revenue or profits yet it had

3   expenses, there was only one place for it to come from and

4   that would be from the investors' deposits.

5   Q    And what were some of the operating expenses, if you can

6   just look at the exhibit, that were being paid with investment

7   account dollars?

8   A    Well.

9   Q    Well, I'll direct your attention to line 20.

10  A    Okay.  That one is from management fees.

11         MR. McCONNELL:  If we can go down to, let's see, row

12  number 29, please.

13  Q    What's reflected in that transaction?

14  A    That's a $1 million dollar transfer from investment to

15  distribution.  That's to cover the December 15th investor

16  distribution.  That was a special one, I think.  We can go

17  back and check.

18  Q    What do you mean a special one?

19  A    I think that was the special distribution for 2015.  I'd

20  have to check that, but.

21  Q    And then row 35, we have 258,000, approximately, to cover

22  the February 2016 investor distribution?

23  A    Yes.

24         MR. McCONNELL:  We can scroll down to the bottom,

25  Ms. Bates.

Jacoby - direct - McConnell                    788

1    Q    So, Mr. Jacoby, most of these numbers in the amount

2    column are in parenthesis.  What does that mean?  Why are they

3    in parenthesis?

4    A    That's a negative number.  That means it's a minus.  It's

5    another way of displaying a negative number.

6    Q    So that it means money coming out?

7    A    Yeah.

8    Q    And if there is no parenthesis, that means money coming

9    in?

10   A    Yeah.  If your bank account is positive 8 million, you

11   have 8 million in there.  If your bank account is 8 million,

12   you spent $8 million on a credit card.

13   Q    So according to Government Exhibit 6171-C, what was the

14   total amount of money that was moved from the investment

15   account to the operating or distributions account in the

16   Automotive Portfolio?

17   A    For that period it was 8,495,238 and 73 cents.

18   Q    And what did members of your team to ensure that number

19   was accurate?

20   A    We reconciled this to the bank accounts.

21   Q    When you shared this information with Mr. Gentile, what

22   was his response?

23   A    He said he was aware of it, but that we had a lot of new

24   deals in the pipeline that were going to come in and make up

25   the shortfall.

1          MR. McCONNELL:  If we can scroll over to the

2    right-hand side of the document, Ms. Bates.  Yes, this

3    section.  I think we got to pull -- yes.  Ms. Bates, we've got

4    some symbols there, if you can make that a little bit bigger.

5    There you go.

6    Q    So, Mr. Jacoby, can you tell us what's on this part of

7    the spreadsheet?

8    A    So in this section -- can you scroll a little bit to the

9    left for me, please.

10          Yeah.  So this is for the Auto Portfolio.  There's a

11   number of car dealerships listed there and what's notated on

12   here is profits that we're still expecting to receive from

13   those car dealerships that hadn't hit the bank account yet.

14   Q    So where did that information come from?

15   A    That came from the accounting team working with the

16   accounting teams at those dealership.

17   Q    And you said that Mr. Gentile would tell you that certain

18   deals were coming.  Is that reflected here?

19   A    Yeah.  There's a comment there that's from Mr. Frangioni

20   why he made the notation.

21   Q    Where is that?

22   A    Where it says, "Per discussions with Bill Jacoby and

23   David Gentile" on the right-hand column.

24   Q    So what are the numbers listed across the bottom there in

25   bold?

Jacoby - direct - McConnell                    790

1    A    So those are the total outstanding receivables that we're

2    still expecting to receive that hadn't hit the bank accounts

3    yet.

4    Q    And there's a number.  It's got the blue highlight.  It's

5    bolded and in the parenthesis.  What is that number?

6    A    Do you see the two million in Column O?

7    Q    Uh-him.

8    A    That's the 2 million in cash not yet received.  That

9    would change the negative 8 million that you asked me about

10   before to the 6 million here.

11   Q    So --

12   A    So it would go from negative eight to negative six.

13   Q    So if you received this 2.1 million, approximately,

14   that's in Column O, the deficits reduce from 8 million to 6

15   million?

16   A    That's right.

17   Q    And that obviously wouldn't be enough to make up all the

18   whole 8 million; right?

19   A    Correct.

20            MR. McCONNELL:  If we can go to the next tab, the

21   GPB H.

22   Q    Mr. Jacoby, just remind us what is GPB H?

23   A    That's the Holdings I fund.  So that's the first fund.

24   Q    And the layout here is the same as the prior tab we just

25   looked at?

Jacoby - direct - McConnell                    791

1   A    Precisely.

2   Q    And just looking at the first entry on September 11,

3   2015, what is reflected there?

4   A    That's a $500,000 transfer from the investment account to

5   the distribution account to cover September 2015 investor

6   distributions.

7   Q    What's the item below that?

8   A    That's 14,603 from the investment account to the

9   distribution account management fees, September 2015.

10  Q    And looking at row 11, please, October 13th of 2015.

11  A    Yeah.  That one says 450,000 investment account to

12  distribution account to cover October's 2015 investment

13  distribution.

14  Q    If we could go down to row 19, please.

15  A    That's 663,500 investment account to distribution account

16  again to cover November 2015 investment distributions.

17  Q    And looking at row 22.

18  A    That one is the same type of a transfer, again, about

19  655,000 even investment to distribution to cover December 2015

20  investment distribution.

21  Q    So we don't need to go through every month.  If we can

22  scroll to the bottom, Ms. Bates.

23          So in the period covered in this version of the

24  spreadsheet, roughly from September 2015 to the end of June

25  2016, what was the total amount of money that was moved from

Jacoby - direct - McConnell                    792

1    the Holdings I investment account to either the operating

2    account or the distributions account?

3    A    In this case it's 10,566,843.

4    Q    And did you discuss specifically Holdings I with Mr.

5    Gentile?

6    A    Yes.

7    Q    And what did he say about Holdings I and all of this

8    money being moved out of the investment account?

9    A    There was a lot of deals and profits in the pipeline that

10   were going to come in to make up the difference.

11   Q    And did that ever happen?

12   A    No.

13   Q    Did that happen in the Automotive Portfolio?

14   A    No.

15        MR. McCONNELL:  Let's just go look at the third tab,

16   Holdings II, please.

17   Q    Mr. Jacoby, the same sort of thing here?

18   A    Exactly.

19        MR. McCONNELL:  If we can just scroll down to the

20   bottom.

21   Q    So from the period covered in this spreadsheet --

22        MR. McCONNELL:  I'm sorry, Ms. Bates, would you mind

23   scrolling up so I can see the top date.

24   Q    So this is October 7th of 2015 down to looks like June

25   22, 2016.  What was the total amount that was moved out of the

Jacoby - direct - McConnell                    793

1  investment account to either the operating or distribution or

2  other indicated accounts?

3  A    In this case it's just $1,326,213.95.

4  Q    And what -- remember the chart, the demonstrative chart

5  that I had up before that showed the three accounts?

6  A    Yes.

7  Q    What were the funds in the investment account for each

8  one of these funds supposed to be used for?

9  A    They were meant to be used to invest the investors' money

10 into portfolio companies.

11 Q    Did you ever discuss with Mr. Gentile and Mr. Schneider

12 reducing the distribution rate?

13 A    Yes.

14 Q    How often would you discuss that with them?

15 A    It was a comment at least weekly on my management

16 updates.

17 Q    And what was Mr. -- we will start with Mr. Gentile.  What

18 was his response when you would raise that issue?

19 A    That we didn't need to do it because we knew that there

20 was soon to be profits catching us up.

21 Q    And how would Mr. Schneider respond when you suggested

22 reducing the distribution rate?

23 A    That we couldn't do it because it would slow down the new

24 deposits coming in, so you had to keep it the same in order to

25 continue to raise money.

Jacoby - direct - McConnell                    794

1    Q    Can you just explain that?

2            What's the connection between the distribution rate

3    and continuing to raise money --

4            MR. COLTON:  Objection.  Foundation.

5    Q    -- as you understood it?

6            THE COURT:  Overruled.

7    A    He said that he needed the distribution rate to remain

8    the same because that's what he was marketing, and if it

9    changed, it would slow down investors' deposit.

10   Q    When you say slow down investors' deposits, what do you

11   mean?

12   A    Meaning less people would be willing to put their money

13   in.

14   Q    Given the money movements that are reflected in this

15   spreadsheet, did you ever discuss with either the defendants

16   reducing the fees for Automotive Portfolio Holdings or

17   Holdings II?

18   A    We couldn't change the fees without a bigger issue.  But

19   we could reduce expenses that were charged.

20

21            (Continued on next page.)

22

23

24

25

Jacoby - direct - McConnell                    795

1    BY MR. McCONNELL:  (Continuing.)

2    Q    Did you send e-mails to the defendants about the money

3    movements from the investment account to the distribution

4    account?

5    A    Yes.

6    Q    I'd like to show you some of those e-mails.

7              MR. McCONNELL:  Government Exhibit 7332 for the

8    witness, please.

9         (Exhibit published to witness, Counsel and Court only.)

10   Q    Mr. Jacoby, if we need to zoom in on particular portions

11   so you can see this, let us know.

12   A    No, the way you had it before is fine.

13   Q    Can you see that, sir?

14   A    Yes.

15   Q    What do you recognize Government Exhibit 7332 to be?

16   A    So, this is an e-mail chain discussing the spreadsheet

17   that we were just looking at, the net investment, income,

18   gross distributions and in this case we were looking at

19   February 2015 and this is Mr. Frangioni's analysis on

20   distributions that were made during the year of 2014.

21   Q    And is this then sent to Mr. Gentile?

22   A    Yes.

23   Q    And there are attachments to this.  Let me show you the

24   attachments before I show you the exhibit.

25   A    Okay.

Jacoby - direct - McConnell                    796

1   Q    If we can look at 7332-A, B and C, please?

2        (Exhibits published to witness, Counsel and Court only.)

3            MR. McCONNELL:  If we can zoom in on C.

4   Q    Well, Mr. -- we don't need to look at the attachments.

5   We can just go back to the main e-mail.

6            I'd like to offer Government Exhibit 7332.

7            MR. COLTON:  Objection, your Honor.  There's no

8   communications here to him at all and it's Mr. Frangioni's --

9            THE COURT:  Pursuant to our discussion earlier, it's

10  admitted.  It's not being offered for the truth of the

11  underlying documents.

12           Do you want me to give an instruction about that?

13           MR. COLTON:  Yes, please.

14           THE COURT:  You're going to see some e-mails

15  including this e-mail that were sent to individuals.  This one

16  was sent to Mr. Gentile.  This e-mail is being offered and

17  some other e-mails are being offered to show that the

18  recipients of the e-mail were told certain things, that they

19  received certain communications.

20           It's not being admitted for the truth of the

21  underlying statements in the e-mails or the attachments.

22           Go ahead.

23           MR. McCONNELL:  Thank you your Honor.

24       (Government Exhibit 7332 received in evidence.)

25           MR. McCONNELL:  So, if we can publish this to the

Jacoby - direct - McConnell                    797

1    members of the jury, please?

2                (Exhibit published.)

3                MR. McCONNELL:  So, just working from the bottom,

4    Ms. Bates, if we can look at the bottom e-mail for

5    Mr. Frangioni.

6    Q    Again, who was Steven Frangioni?

7    A    He worked in the accounting department.

8    Q    He worked under you?

9    A    Yes.

10   Q    It says, "Bill.  Here is my analysis of GPBH.  What's

11   GPBH?"

12   A    Holdings.

13   Q    "Net investment income versus distributions that were

14   made in 2014."

15               Again, how was the coverage ratio calculated at GPB?

16   A    Net investment income divided by distributions.

17   Q    It says, "Please review.  If you do not have any

18   additional questions, I would like to send this over to

19   David."  Do you know who he's referring to when he says David?

20   A    Mr. Gentile.

21   Q    The date on this is February 9, 2015.  When did you start

22   at GPB?

23   A    I officially started on March 1st.

24   Q    So how did you get e-mails?

25   A    I was starting to do some work already.

Jacoby - direct - McConnell                    798

1          MR. McCONNELL:  So if we can go to the next part of

2     the e-mail exchange, Ms. Bates?

3     Q    So, this is Mr. Frangioni e-mailing Mr. Gentile and

4     copying you.  Do you see that?

5     A    Yes.

6     Q    And it says, the last sentence, "The table also shows

7     what our shortfall would be when you compare it to what we

8     distributed."

9          What did you understand that to mean?

10    A    He did, I think -- this is where he's doing a projection

11    saying, you know, if this is the continuing projection, our

12    shortfall will be this.

13    Q    And the shortfall for what?

14    A    Meaning net investment income short of distributions.

15    Q    If we can just go up to the top portion of the e-mail.

16    You're saying "Shall we dial in"?

17    A    Yup.

18    Q    Again, this is before you even started reporting to the

19    office?

20    A    Yes.

21    Q    So you were aware of this situation?

22    A    Yes.

23         MR. McCONNELL:  If I can show the witness only

24    Government Exhibit 7810.

25         (Exhibit published to witness, Counsel and Court only.)

Jacoby - direct - McConnell                    799

1    Q    What do you recognize this to be?

2    A    This is September of 2015 my discussion with

3    Mr. Frangioni and Mr. Sijan.

4    Q    And without saying what was said, was there -- well, just

5    looking at the bottom of the document, is there an expectation

6    that this information is to be passed along to anyone?

7    A    Yes.  We were communicating to Mr. Sijan because we knew

8    that he was going to get in touch with Mr. Schneider's and

9    Mr. Gentile's for us.

10   Q    Does it explicitly say that at the bottom?

11   A    It does, yes.

12        MR. McCONNELL:  Your Honor, I would offer this

13   exhibit at this time.

14        THE COURT:  It is admitted.

15        (Government Exhibit 7810 received in evidence.)

16        MR. McCONNELL:  If we could publish that to the

17   member of the jury, please.

18        (Exhibit published.)

19        MR. McCONNELL:  And if we could just look at the

20   bottom portion of the e-mail, the first chunk.

21   BY MR. McCONNELL:

22   Q    So, how often would you interact personally with

23   Mr. Frangioni, sir?

24   A    Almost every day.

25   Q    And, so, did you discuss these issues with him?

Jacoby - direct - McConnell                                800

1    A    Yes.

2    Q    Why did you discuss this particular e-mail?

3    A    Of course.

4    Q    What was the conversation that precipitated this e-mail

5    from Mr. Frangioni to you?

6    A    He was becoming concerned that --

7            MR. COLTON:  Objection, your Honor.  This is

8    out-of-court testimony for Mr. Frangioni.

9            THE COURT:  One moment.  So, what is -- I take it

10   it's not being argued for the truth of Mr. Frangioni's

11   statements.  It's context as to what happened next?

12           MR. McCONNELL:  The context of the e-mail and when

13   it's forwarded.

14           THE COURT:  I'll allow it.

15   BY MR. McCONNELL:

16   Q    What was the conversation that precipitated this e-mail?

17   A    So, this is him continuing to update, like I was saying

18   before, our tracking of the distribution account shortfall and

19   he's sending it to me because it's -- it's continuing to get

20   larger and he wanted to make a note of that in his e-mail to

21   me.

22   Q    And at the bottom it says, "Please confirm that this has

23   been communicated to Jovan, Jeff, Schneider" in parenthesis

24   "and DG."

25           Again, why is he telling you to communicate this to

Jacoby - direct - McConnell                801

1   them as you understood it?

2   A    Because we knew Mr. Schneider and Mr. Gentile were not

3   available at the time so we were told by them to communicate

4   through Mr. Sijan.

5   Q    When you read to Jovan, Jeff Schneider and DG, what did

6   you understand it to mean?

7   A    Jovan, Mr. Schneider and Mr. Gentile.

8           MR. McCONNELL:  If we can go to the next e-mail,

9   please.

10  Q    So, Mr. Jacoby, not to ruin your speaking voice, but

11  would you mind reading this e-mail?

12  A    "Hi Jovan.  As we discussed previously, we have been

13  forced to use some cash in the fund's investment account due

14  to not receiving some of the pending accounts receivables and

15  in the Automotive Portfolio Fund specifically, it is due to

16  not getting enough cash on the investment amounts.  If some of

17  the deals close and we do collect some accruals that are

18  backdated from July 1 to September 1, we will make up the

19  amounts we used from the investment account's cash.  Let's you

20  and I both you -- that they understand that is the case."

21  Q    So, what do you mean when you say "if some of the deals

22  close and we do collect accruals."  What does that mean?

23  A    So, there were -- there were two deals in this fund that

24  Mr. Gentile had told me and the accounting team that were

25  pending to close -- when I say close, it's like buying a house

Jacoby - direct - McConnell                    802

1    you go and close on your house when you pay for it.

2              On the dealership if we were going to close, the

3    wires in the accounts -- we would get everyone in the room and

4    close.  If those deals closed and we purchased them, part of

5    that closing would be profits that Mr. Gentile told me we

6    would be owed on those closings.

7    Q    And what would those be used to do?

8    A    They would be profits to come in to fill up the

9    shortfalls.

10   Q    What shortfalls?

11   A    The shortfalls that we're discussing here in this e-mail

12   and the tracking spreadsheet.

13   Q    And the movements out of the investment account?

14   A    Yes, yes.

15   Q    And there were two -- well, you end the e-mail saying,

16   "Let's you and I both be sure Jeff and Dave understand that

17   this is the case."

18   A    Yup.

19   Q    What did you mean by that?

20   A    Because my concern was that if the deals didn't close, we

21   had a problem with a big shortfall.

22   Q    And it looks like you attached two spreadsheets here.  If

23   we can see 7810-A, please?

24        (Exhibit published to witness, Counsel and Court only.)

25   Q    So this is 7810-A.  What is this that we're looking at

Jacoby - direct - McConnell                    803

1    here?

2    A    It looks like just transfer amounts from --

3         MR. COLTON:  Your Honor, I ask that it be taken down

4    until the Court actually admits it.

5    BY MR. McCONNELL:

6    Q    This is one of the attachments to the e-mail, sir?

7    A    Yes.

8    Q    And what is this?

9    A    This is showing the shortfalls that we were discussing in

10   that e-mail.

11   Q    Is this a prior version of the Government Exhibit 6171-C

12   that we looked at before?

13   A    So this one is covering the period from August '15 to

14   9/11/15.

15   Q    So it's an earlier version of the one we saw?

16   A    Yeah.

17   Q    And it was made and prepared the same way?

18   A    Yes.

19        MR. McCONNELL:  I would offer Government Exhibit

20   7810-A.

21        MR. COLTON:  My problem is I can't see what the

22   whole exhibit also.  I only see what's on the screen so I

23   can't stipulate to something I can't see.

24        MR. McCONNELL:  I think this is it.

25        MR. COLTON:  On the Government's representation that

Jacoby - direct - McConnell                    804

1   it will just be what's on the screen and pending any other

2   discussions.

3              THE COURT:  Admitted.

4              (Government Exhibit 7810-A received in evidence.)

5              MR. McCONNELL:  If we can show it quickly to the

6   jury.

7              (Exhibit published.)

8   BY MR. McCONNELL:

9   Q    So, Mr. Jacoby, this is the first one, two, three, four,

10  five entries on the prior spreadsheet that we saw.  Is that

11  correct?

12  A    Yes.

13  Q    And which fund does it relate to?

14  A    Auto Portfolio.

15  Q    And between August 13 and September 11, 2015, it got

16  $895,000 moving out of the investment account to either of the

17  distribution or operating accounts?

18  A    Yes.

19             MR. McCONNELL:  Can we look at the other attachment

20  please, Government Exhibit 7810-D.

21         (Exhibit published to witness, Counsel and Court only.)

22  Q    What are we looking at here, Mr. Jacoby?

23             MR. McCONNELL:  Your Honor, if we can show the

24  witness.

25  A    This is the same thing, but this is for the holdings

Jacoby - direct - McConnell                    805

1    fund.

2    Q    When you say "the same thing" this is an earlier

3    iteration of Government Exhibit 6171-C?

4    A    Yes.

5    Q    Made and prepared the same way?

6    A    Yes.

7    Q    It's got the first one, two, three, four transactions

8    listed there?

9    A    Yes.

10             MR. McCONNELL:  I would offer Government Exhibit

11   7810-D.

12             THE COURT:  Admitted.

13             MR. McCONNELL:  Thank you.

14             (Government Exhibit 7810-D received in evidence.)

15             MR. McCONNELL:  If we can publish it to the jury.

16             (Exhibit published.)

17   BY MR. McCONNELL:

18   Q    So, Mr. Jacoby this relates to which fund?

19   A    The one that's up now is GPB Holdings, the first fund.

20   Q    The two spreadsheets you attached to that e-mail were for

21   Holdings and the Automotive Portfolio; right?

22   A    Yes.

23   Q    You had said before that Mr. Gentile had to approve money

24   movements from the investment account to the distribution or

25   operating account?

Jacoby - direct - McConnell                    806

1    A    Correct.

2    Q    And he had to do that before you or another member of the

3    accounting team moved the money?

4    A    Yes.

5    Q    So why did you think it was necessary to --

6            MR. McCONNELL:  If we can put up the original e-mail

7    please.

8    Q    Why did you think it was necessary that he be informed of

9    this and shown this?

10   A    Because the number was getting larger and we were relying

11   on money coming in that hadn't happened yet.

12   Q    I would like to show you Government Exhibit 7405, please.

13           (Exhibit published to witness, Counsel and Court only.)

14   Q    What's this, sir?

15   A    This is Mr. Frangioni sending his analysis to me that I

16   had requested him to send to me prior to my meeting with

17   Mr. Schneider and Mr. Sijan.

18   Q    When you say "his analysis," his analysis of what?

19   A    The transfers from the investment account to the

20   distribution and operating accounts that we had been

21   discussing.

22           MR. McCONNELL:  If we can see 7405-A, please.

23           (Exhibit published to witness, Counsel and Court only.)

24           MR. McCONNELL:  It's one of the attachments.

25   Q    Do you see this, sir?

Jacoby - direct - McConnell                807

1   A    Yes, sir.

2   Q    And what are we looking at here?

3   A    So this is the transfers from the investment account to

4   the distribution account for GPB Holdings for September.  The

5   total is 686,000 and to the right he's showing me the accounts

6   receivable that haven't come in yet.

7            MR. McCONNELL:  If we can see the other attachment,

8   please, I think it's 7405-B.

9        (Exhibit published to witness, Counsel and Court only.)

10  Q    What's 7405-B the other attachment, sir?

11  A    Again this is the transfers that we had been discussing

12  before.  This one is for the Auto Portfolio.  This is the

13  895,966 total.

14           MR. McCONNELL:  Your Honor, I'd offer

15  Government Exhibit 7405, 7405-A and 7405-B into evidence.

16           MR. COLTON:  Same discussion, but also I can't see

17  all of the document because it's a spreadsheet, but on the

18  Government's representation that only limited portions will

19  only actually be offered, no further objection.

20           THE COURT:  Are these being offered as business

21  records or just being offered to show the effect --

22           MR. McCONNELL:  So, these are prior iterations of

23  the spreadsheet that had previously been offered and admitted.

24           THE COURT:  If you want them as business records I

25  think you need to ask a few questions about that.

Jacoby - direct - McConnell                    808

1          MR. McCONNELL:  Okay.

2    BY MR. McCONNELL:

3    Q    Mr. Jacoby, when we looked at the original exhibit,

4    Government Exhibit 6171, we talked about how that information

5    came into being; correct?

6    A    Yes.

7    Q    And is that the same for these two spreadsheets as well?

8    A    Yes, it is.

9    Q    Where is the information that's contained in these

10   spreadsheets from?

11   A    It's from Quickbooks which is reconciled to the bank

12   accounts.

13   Q    And were you and other members of the accounting team

14   under a business duty to make and keep this particular record?

15   A    Yes.

16   Q    And was it part of your regular course of business to

17   make and compile spreadsheets such as this?

18   A    Yes.

19   Q    And were you under a business duty to do so accurately?

20   A    Yes.

21   Q    You mentioned that the information in this spreadsheet

22   comes from the Quickbooks.  Is the entry into the Quickbooks

23   made at or around the time the transaction that's reflected

24   actually took place?

25   A    Yes.

Jacoby - direct - McConnell                     809

1       MR. McCONNELL:  Your Honor, with that foundation, I

2  offer these exhibits as business records.

3       MR. COLTON:  Your Honor, if I may, there's more on

4  these spreadsheets than these numbers.  There's double hearsay

5  about statements of Mike B.

6       THE COURT:  I think we heard where it was from last

7  time.  Go ahead.

8  BY MR. McCONNELL:

9  Q    So, Mr. Jacoby, on the right-hand side of the spreadsheet

10 it says "Receivables."  Where does that information come from?

11 A    That's from Quickbooks.

12 Q    And there are notations on the side there.  What's the

13 significance of those?

14 A    Those are comments on the entries.

15 Q    Where does the information for those comments come from?

16 A    From the entry in the ledger.

17 Q    And, so, the portion that says "receivables" what

18 information is being conveyed there?  How does it relate to

19 the money movements out of the investment account?

20 A    So, we're expecting this money to come in and be

21 deposited into the account to make up the shortfall.

22 Q    And were you directed by Mr. Gentile to put these entries

23 into the spreadsheet?

24 A    He directed us to keep track of this.

25 Q    You used the term "accruals."  Just tell the members of

Jacoby - direct - McConnell                    810

1   the jury what an accrual is.

2   A    So, if you're expected to receive $100,000, you can book

3   an accounts receivable for that $100,000 that the business

4   that owes you that $100,000 -- that would be an accrual or a

5   receivable that you're expecting to receive.

6   Q    And who told you which accruals should be booked for

7   these funds?

8   A    For these dealerships?

9   Q    Yes.

10  A    So, the accounting team would work with the portfolio

11  companies.  In some cases, Mr. Gentile would tell me where we

12  had errors and we would amend them, where he noted that they

13  were errors that we needed to fix; that he knew about that we

14  may not have known about.

15              MR. McCONNELL:  Your Honor, I offer the exhibit.

16              THE COURT:  It is admitted.

17              (Government Exhibits 7405, 7405-A and 7405-B

18  received in evidence.)

19              MR. McCONNELL:  Well, if we can publish it I won't

20  spend too much time on it.  If we can go back to the left-hand

21  side, Ms. Bates.

22  BY MR. McCONNELL:

23  Q    Again, attached to this e-mail was an earlier version of

24  6171-C spreadsheet; correct, Mr. Jacoby?

25  A    Yes.

Jacoby - direct - McConnell                    811

1    Q    And what we're looking at here is for the

2    Automotive Portfolio.  The other attachment was for the

3    Holdings I fund?

4    A    Yes.

5    Q    If we can go back to the e-mail, so it says, "Please

6    review and let me know if you have questions prior to your

7    meeting with Jeff and Jovan.  Did you meet with Jeff and Jovan

8    about this?

9    A    Yes.

10   Q    How often would you meet with Mr. Schneider about this

11   issue?

12   A    I would see Mr. Schneider maybe once a month.

13   Q    And what do you recall his response being or dural a

14   response to being shown this information?

15   A    He said that it was our job to make sure that we kept

16   track of it and made it work out better because he could not

17   handle having a lower distribution rate so we needed to make

18   sure that we got the money to cover the distributions.

19   Q    And what did you say to that?

20   A    I said, I couldn't necessarily do that.  I had to report

21   what was actually happening to them, so.

22           MR. McCONNELL:  If I can show the witness

23   Government Exhibit 7011, please.

24       (Exhibit published to witness, Counsel and Court only.)

25   BY MR. McCONNELL:

Jacoby - direct - McConnell                 812

1   Q    What's this Mr. Jacoby?

2   A    So, this is the same -- similar reconciliation between

3   the distribution accounts, surplus shortfall -- this one is

4   done in October of 2015.

5   Q    And who is sending this e-mail?

6   A    Mr. Frangioni is sending it to myself and Mr. Gentile.

7   Q    Your Honor, I would offer Government Exhibit 7011 into

8   evidence, please.

9            MR. COLTON:  In addition to what we're discussing, I

10  would ask that the note be partially redacted because it

11  doesn't -- in the same theory it's limiting it to the three

12  funds.

13           MR. McCONNELL:  That's fine.

14           THE COURT:  Let's redact it.

15           MR. McCONNELL:  Ms. Bates, could you redact it?  Not

16  the whole thing.  You've got redactions in there.  Thank you.

17           (Government Exhibit 7011, received in evidence.)

18           MR. McCONNELL:  If we can publish this to the jury,

19  please.

20           (Exhibit published.)

21  Q    What's the date on this Mr. Jacoby?

22  A    October 7th.

23  Q    It says Bill/David.  That's you and Mr. Gentile?

24  A    Yes.

25  Q    If you can just read the first paragraph of the e-mail

Jacoby - direct - McConnell                813

1    there.

2    A    "Attached is the latest due to/due from reconciliation

3    for the distribution account showing any surplus or shortfall

4    in the distribution account as of October 7, 2015."

5    Q    And then the bullet there says proposed transfers from

6    fund's investment account to distribution account for the

7    month of October.

8              What does that mean?

9    A    That's him -- he's letting us know that he needs to

10   transfer 1,696,606 to the holdings fund and 1,105,978 for the

11   Auto Portfolio.

12   Q    And those transfers are needed why?

13   A    To make dividend payments to investors.

14   Q    And then below that there's a note in bold.  What does

15   that say?

16   A    It says, "We have the same situation in GPB Holdings II."

17             MR. McCONNELL:  I would like to show the witness

18   Government Exhibit 7409.  Government Exhibit 7410, excuse me.

19        (Exhibit published to witness, Counsel and Court only.) )

20   Q    So, Mr. Jacoby, what are we looking at in this exhibit?

21   A    I am forwarding this to Mr. Sijan.

22   Q    And why did you do that?

23   A    Because I was told to communicate it to him in order to

24   make sure I got it to Mr. Schneider on e-mail.

25   Q    When you say you're forwarding it --

Jacoby - direct - McConnell                814

1    A    The same spreadsheet and e-mail.

2    Q    That's Government Exhibit 7011, that we just looked at?

3    A    Yes, yes.

4          MR. McCONNELL:  I would offer Government Exhibit

5    7410 at this time, your Honor.

6          THE COURT:  It is admitted.

7          MR. COLTON:  Your Honor, just it's the same -- we'll

8    keep our objection but with the redaction issue.

9          THE COURT:  It's been redacted.

10         (Government Exhibit 7410 received in evidence.)

11         MR. McCONNELL:  If we can just publish this.

12         (Exhibit published.)

13   BY MR. McCONNELL:

14   Q    Mr. Jacoby, you're forwarding this to Mr. Sijan?

15   A    Yes.

16   Q    And the attachments, what are the attachments?

17   A    These are the temporary transfers from the investment

18   account to the distribution and operating accounts.

19   Q    Mr. Jacoby, I want to move on to management dashboards.

20   Another exciting subject.

21         What is a management dashboard?

22   A    This was a management tool.  As we were growing quickly

23   that we used to keep track of the performance of the funds and

24   the investments compared to the distributions.

25   Q    And who instructed you to put together these management

Sophie Nolan, RPR - Official Court Reporter

Jacoby - direct - McConnell                    815

1    dashboards?

2    A    Mr. Gentile.

3    Q    And what was the purpose of putting together the

4    management dashboard?  Who was it distributed to?

5    A    It was distributed to Mr. Gentile, Mr. Schneider and

6    various other managers at both Ascendant and GPB.

7    Q    Where did the information that you -- well, who put them

8    together?

9    A    I did -- I did initially, in a.

10   Q    Initially and later on who put them together?

11   A    Well, while I was there, I was doing it.

12   Q    Where did the information that went into the management

13   dashboard come from?

14   A    That came from Quickbooks.

15   Q    Anywhere else?

16   A    I had spreadsheets that I worked with.

17   Q    And how often did you put together and circulate these

18   management dashboards?

19   A    Weekly.

20   Q    You mentioned you distributed them to Mr. Gentile and

21   Mr. Schneider.

22        Why did you distribute them to Mr. Schneider?

23   A    Because he was -- I was directly reporting to both him

24   and Mr. Gentile.

25   Q    When did you start putting these management dashboards

Jacoby - direct - McConnell                    816

1   together?

2   A    We started doing this right when I began working there

3   because the company was growing quickly and we needed to get

4   control on, you know, the rapid growth and have a way to

5   manage it and keep track of what was going on.

6          MR. McCONNELL:  I would like to show you

7   Government Exhibit 7335, please.

8       (Exhibit published to witness, Counsel and Court only.)

9   Q    What do you recognize Government Exhibit 7335 to be, sir?

10  A    This is a first draft of the management report that I was

11  just telling you about and I'm sending it to Mr. Gentile and

12  Mr. Schneider.

13  Q    What's the date?

14  A    February 16, 2015.

15  Q    And how long after you accepted the position

16  approximately did you send this e-mail?

17  A    It must have been very shortly.  I don't remember

18  exactly.

19         MR. McCONNELL:  I would offer Government Exhibit

20  7335.

21         MR. COLTON:  No objection.

22         THE COURT:  Admitted.

23         (Government Exhibit 7335 received in evidence.)

24         (Exhibit published.)

25  BY MR. McCONNELL:

Jacoby - direct - McConnell                817

1    Q    By the way, you mentioned Mr. Gentile's accounting

2    background previously during your testimony.  What sorts of

3    information did Mr. Gentile direct you to put into these

4    management dashboards?

5    A    Well, he and I and the accounting team would track the

6    investments and the expected revenues from the investments as

7    well as all of the expenses and distributions.  So, if he saw

8    anything that was wrong or that he thought was wrong, we would

9    discuss it and I would fix errors that he identified.

10   Q    Okay.  I would like to just show you Government Exhibit

11   7778.

12        (Exhibit published to witness, Counsel and Court only.)

13   Q    Do you recognize this, Mr. Jacoby?

14   A    Yes, yes.

15   Q    What is this?

16   A    This is an e-mail from Mr. Gentile to Mr. Sijan,

17   Mr. Schneider, Mr. Marshall, myself, Mr. Frangioni and

18   Mr. Reed and his assistant, Ms. Shaw.

19   Q    And -- you received this e-mail?

20   A    Yes.

21        MR. McCONNELL:  I would offer Government Exhibit

22   7778 in evidence, your Honor.

23        THE COURT:  It is admitted.

24        (Government Exhibit 7778 received in evidence.)

25        MR. McCONNELL:  And if we could publish that to the

Jacoby - direct - McConnell                    818

1   jury.

2            (Exhibit published.)

3   BY MR. McCONNELL:

4   Q    So we don't have to read this whole thing, Mr. Jacoby,

5   but just generally what sort of information is Mr. Gentile

6   asking for in this e-mail?

7   A    So, he's asking for the team and he's identifying us to

8   do a weekly report for a dividend forecast, cash balances

9   report, a fund performance report, capital raise forecast and

10  budget, meaning how are they projecting their capital raise

11  and a fund allocation report, meaning where are they going to

12  allocate funds to.  Automotive budget to actual profit and

13  loss report.

14           So those are the reports and he's identifying us all

15  to deliver those weekly so that we would be able to discuss

16  it.

17  Q    Now, let's talk about the management -- the management

18  dashboards are reflected in this e-mail.  Is that part of

19  this?

20  A    Yes.

21  Q    Where?

22  A    The dividend forecast and the fund performance report.

23  Q    So, let's just take a look at one of the management

24  dashboards.  I would like to now show you Government Exhibit

25  7355.

Jacoby - direct - McConnell                    819

1          (Exhibit published to witness, Counsel and Court only.)

2    Q    What's this, sir?

3    A    That's -- so that's sent out in June from myself to

4    Mr. Gentile and his assistant saying it's the performance and

5    dividend projection.

6              MR. McCONNELL:  And if we can see Government Exhibit

7    7355-B for the witness, please.

8          (Exhibit published to witness, Counsel and Court only.)

9    Q    What's this, Mr. Jacoby?

10   A    This is that dashboard report that we initially created,

11   yeah.

12   Q    This is the summary page?

13   A    Yeah.

14   Q    Is there another, more-detailed information on subsequent

15   pages?

16   A    Yes, yes.

17             MR. McCONNELL:  Ms. Bates, can we scroll through so

18   the witness can see what's there?

19   BY MR. McCONNELL:

20   Q    Mr. Jacoby, if you need us to stop on anything so you can

21   identify it, that's fine.

22             MR. McCONNELL:  But, Ms. Bates, if you can scroll

23   through.

24   A    I'm familiar with it.  I can't read it, but I have an

25   idea of what these say.

Jacoby - direct - McConnell                820

1    Q    Okay.

2    A    Okay.

3         MR. McCONNELL:  And if we can look at Attachment A

4    of the same Exhibit 7355, please.

5         (Exhibit published to witness, Counsel and Court only.)

6    Q    Mr. Jacoby, Government Exhibit 7355 attachments A and B,

7    is that a good representative of what you would send out every

8    week as parts of your dashboard report?

9    A    Yes, yes.

10        MR. McCONNELL:  Your Honor, I'm going to offer

11   Government Exhibit 7355-A and B.

12        THE COURT:  Admitted.

13        (Government Exhibit 7355-A and B received in

14   evidence.)

15        MR. McCONNELL:  So if we can jump back, Ms. Bates,

16   to Attachment B.

17        (Exhibit published.)

18   Q    We'll zoom in on particular parts, but is this -- what

19   are we looking at here?

20   A    These are just summary-level -- this is a summary-level

21   description of revenue, expenses and distributions.

22   Q    Is the coverage of distributions reflected in this

23   summary report?

24   A    Yes, yes, yes, yes.

25        MR. McCONNELL:  Ms. Bates, if we can zoom in on the

Jacoby - direct - McConnell                    821

1    lower left hand box there.

2    Q    So, Mr. Jacoby, walk us through what's in here -- in this

3    box?

4    A    Okay, so it's telling us that for GPB Holdings it's the

5    fund.  The top section is the revenue.  The middle section

6    that's highlighted is -- the middle section is the expenses in

7    summary level and then the highlight there is the net

8    investment income.  So, revenue, minus expense, net investment

9    income.

10   Q    And how, again, did you calculate coverage of

11   distributions at GPB?

12   A    So, you would take your net investment income and divide

13   it by your distributions which are right below it.

14   Q    So, looking at this for GPB Holdings there's a column

15   that says "2014 YTD," what does that mean?

16   A    Year-to-date because it's in the history.

17   Q    And so looking -- and this net investment income and

18   distributions there, what do we see?

19   A    2,544,000 versus 2,565,579 paid out.  So almost

20   one-to-one, but not quite.

21   Q    And then investment income slightly below the

22   distribution amount?

23   A    Yes, slightly below.

24   Q    The next column is "April 2015"?

25   A    Yes.

Jacoby - direct - McConnell                      822

1   Q    What's the net investment income and distribution income

2   for that month?

3   A    So for that month, the net investment income was

4   1,075,514 and the distributions were 2,313,028.

5   Q    So were distributions covered according to this in April

6   2015?

7   A    No.

8   Q    The column to the far right, 2015 YTD.  Can you compare

9   net investment income to distributions here?

10  A    Sure, sure -- it's -- so, year-to-date at the end of

11  April there so you're only seeing the detail for April.  The

12  entire year for 2015 up through April is 2,029,674 with

13  distributions of 3,663,220.

14  Q    So, again, when these distributions are being paid at an

15  amount greater than net investment income, where is the money

16  coming from?

17  A    Well, right below it you can see the cash balances for

18  the investment distribution and operating account and so the

19  shortfalls being made up by the distribution -- by the

20  investment account being transferred to the distribution

21  account.

22        MR. McCONNELL:  Ms. Bates, can we go to the next

23  square over to the right?

24        (Exhibit published.)

25  Q    So, here is the same square for the automotive fund,

Jacoby - direct - McConnell                    823

1    Mr. Jacoby.  Do you see that?

2    A    Yes.

3    Q    Let's do the same thing just looking at 2014

4    year-to-date.  So that's the prior year.

5              What's the situation for the Automotive Portfolio?

6    A    So, the net investment income was 981,000 which is larger

7    than the distributions made of 792,933.

8    Q    So in the parlance, it's covered?

9    A    In that parlance, it's covered, yes.

10   Q    April -- the next column over, what -- what information

11   is reflected there?

12   A    You have $121,541 versus a distribution of 607,375.  So

13   it's not covered there.

14   Q    And what about the year-to-date up to that point there in

15   2015?

16   A    Year-to-date through that period in 2015 was 466,709 in

17   net investments income and distributions of 901,025.

18   Q    And, so you would send these out over e-mail?

19   A    Yes.

20   Q    And would there be follow-up conversations about these

21   management dashboards after they had be sent out?

22   A    Yes.

23             MR. McCONNELL:  Your Honor, could I -- well, I plan

24   to offer a few more of these.  If there's going to be

25   objections I'll continue on this way, but I don't know if I

Jacoby - direct - McConnell                    824

1    can have a moment to confer with counsel.

2              THE COURT:  Sure.

3              MR. McCONNELL:  Thank you.

4              (Pause in proceedings.)

5              THE COURT:  Are you all doing okay or do we need a

6    break?  Okay, great.

7              MR. McCONNELL:  So, your Honor, I believe there's no

8    objection.  The Government is going to offer the Exhibit 7361,

9    7366 and 7369, which are the e-mails and attached dashboards

10   for the rest of that month, June of 2015.

11             THE COURT:  Admitted.

12             (Government Exhibits 7361, 7366 and 7369 received in

13   evidence.)

14             MR. McCONNELL:  Thank you.

15             And to the extent any redactions are necessary to

16   the cover e-mail, we'll do that before the jury receives them.

17             THE COURT:  Great.

18   BY MR. McCONNELL:

19   Q    Mr. Jacoby, we're not going to go through all the

20   management dashboards for June of 2015, but is it fair to say,

21   though, that -- well, have you reviewed them prior to

22   testifying?

23   A    Yes.

24   Q    And is it fair to say that the coverage situation is

25   essentially the same?

Sophie Nolan, RPR - Official Court Reporter

Jacoby - direct - McConnell                              825

1   A    It's similar.  It fluctuates.

2   Q    And when you spoke with the defendants about the failure

3   to cover distributions as 2015 was progressing and each week

4   of June 2015, what was Mr. Gentile's response to you?

5   A    There was some deals in the pipeline that were going to

6   catch us up to make it covered.

7   Q    I'd like to show you Government Exhibit 7370.

8        (Exhibit published to witness, Counsel and Court only.)

9   Q    Do you see this, sir?

10  A    Yes.

11  Q    What's this?

12  A    I'm sending the weekly update --

13  Q    I'm sorry, we can't get into the substance.  Is this an

14  e-mail?

15  A    Yes.

16  Q    Who did you send it to?

17  A    Mr. Schneider, Mr. Sijan, Mr. Gentile, Mr. Shaw,

18  Mr. Marshall, Mr. Randolph, Mr. Frangioni, Mr. Reed and

19  Mr. Moscato.

20

21             (Continued on the following page.)

22

23

24

25

W. Jacoby - Direct/Mr. McConnell                826

1          MR. MCCONNELL:  Your Honor, I offer 7370 and the

2    attachments in evidence.

3          THE COURT:  Admitted.

4          (Government's Exhibit 7370 was marked in

5    evidence.)

6    Q    If we could publish just the e-mail to the members of

7    the jury, please.

8          So Mr. Jacoby, just read what you wrote to the

9    defendants and the other addressees on the e-mail?

10   A    I was saying, I've represented one potential solution

11   to the coverage problem and the distribution projection.

12   This is pending determining what amounts we can accrue from

13   June.

14   Q    So this was addressing the coverage problem that we

15   just saw in the June management dashboards?

16   A    Yes.

17   Q    Tell the members of the jury what you meant by this

18   e-mail?

19   A    What I mean by this e-mail is it's been communicated to

20   me that we need updates from Mr. Gentile.  That we need

21   updates on the June performance of the portfolio companies

22   here.  And I'm putting those into the projections to say

23   that if we get those, this is what it will look like.

24   Q    And who told you which accruals should be booked?  In

25   other words, who told what you deals should be sort of

W. Jacoby - Direct/Mr. McConnell          827

1   booked in these management dashboards and in financials

2   before they actually occurred?

3   A     That was, in those cases, it was Mr. Gentile.

4   Q     I'd like to -- and did those accruals ever happen?

5   A     It depended.  Some of them did not, some of them did.

6   Q     I'd like to show you Government Exhibit 7371.

7   A     Right.  So this is July of 2015.

8   Q     And who was this an e-mail to?

9   A     This one is to Mr. Sijan, Frangioni, Marshall, and

10  Moscato.

11  Q     And why are you sending this e-mail to those

12  individuals?

13  A     Because I'm saying that we need to get final numbers

14  for the midyear true-ups from the portfolio companies to

15  show how much money they made.

16        MR. MCCONNELL:  And if I can show 7371-A, please.

17        Actually, I'm not going to offer this exhibit so

18  we can take it down.  I'm sorry, Ms. Bates.

19        Let's see Government Exhibit 7381, please.

20  Q     What's this Mr. Jacoby?

21  A     So this is in July.  This is a follow-up on the

22  management report for the June numbers.

23  Q     And why did you communicate this to Mr. Sijan?

24  A     So, here, I had, as I indicate here, I had a discussion

25  with Mr. Gentile.  He told me to make some amendments, which

*W. Jacoby - Direct/Mr. McConnell*                    828

1   I reflected in here, and I was told to send this to

2   Mr. Sijan for communication to Mr. Schneider.

3           MR. MCCONNELL:  I'd offer Government Exhibit 7381,

4   your Honor.

5           THE COURT:  Admitted.

6           (Government's Exhibit 7381 was marked in

7   evidence.)

8   Q    So just now if we can show this to the jury.

9        You say, "I am accruing the maximum we could for

10  Auto Portfolio; yet, we are still looking at showing we are

11  not covering our distribution with profits from operations

12  at June year-to-date."

13       Do you see that?

14  A    Yes.

15  Q    We had just looked at one of the June management

16  dashboards, correct?

17  A    Yes.

18  Q    So what do you mean when you say you are accruing the

19  maximum you can for Auto?

20  A    So we had projected expected profits at the best

21  possible scenario to receive from the dealerships.

22  Q    And you're saying that even accruing the maximum you

23  can, we are not covering our distributions?

24  A    Yeah.  This is saying even in the best case scenario

25  we're not going to cover.

*W. Jacoby - Direct/Mr. McConnell*                        829

1  Q    The next sentence says, "I added some further breakdown
2  DG asked for."
3  A    Mr. Gentile asked for some more detail and I had
4  provided that.
5  Q    Then the next sentence is regarding the lack of
6  covering distribution at midyear.  "This might be okay if we
7  message that we are expecting it to be covered in the next
8  quarter."
9       What do you mean by that?
10  A    Meaning, that we if we have reasonable projection where
11  we're expecting this to catch up, then it might be all
12  right.  But we have to get that information.
13  Q    And then you conclude by saying, "My main concern is
14  that Jeff is not surprised by this."
15      Who is Jeff?
16  A    Mr. Schneider.
17  Q    And why are you saying this in your e-mail?
18  A    Because I wanted to emphasize that it's important
19  because it's a best-case scenario and we might fall short
20  and I didn't want him to miss it and be surprised.
21          MR. MCCONNELL:  I'd like to shoot witness
22  Government Exhibit 7797, please.
23  Q    What's this?
24  A    This is him answering me on that same e-mail chain
25  saying he will show it to Mr. Schneider.

W. Jacoby - Direct/Mr. McConnell                830

1          MR. MCCONNELL:  Let the cat out of the bag.  But,

2     your Honor, I'd ask cover Government Exhibit 7797?

3          MR. COLTON:  Your Honor, I apologize.  This is an

4     assertion by an out-of-court --

5          THE COURT:  It's a fair point.  Isn't this

6     hearsay?

7          MR. MCCONNELL:  The witness' expectation.

8          THE COURT:  Sustained.

9          MR. MCCONNELL:  Okay.

10         If I can show the witness Government Exhibit 7383.

11    Actually, I'm sorry 7385, please.

12    Q    So what's this, Mr. Jacoby?

13    A    This looks like a July 28th update from myself to

14    Mr. Gentile on the June numbers.

15    Q    And there's a management report attached to it?

16    A    Yes.

17         MR. MCCONNELL:  I would offer 7383 and the

18    attachments.

19         THE COURT:  Admitted.

20

21         MR. MCCONNELL:  7385, excuse me.

22         THE COURT:  It's admitted.

23         MR. MCCONNELL:  And the attachments.  Thank you.

24         (Government's Exhibit 7385 was marked in

25    evidence.)

*W. Jacoby - Direct/Mr. McConnell*                831

1   Q    So you're sending this to Mr. Gentile only, correct?

2   A    Yes yes.

3   Q    Normally, you would send the management dashboards to a

4   whole group of people?

5   A    Yes, I do.

6   Q    Were you sending this to just to him?

7   A    We had been working back and forth on it together.

8   Q    And if I can show under the attachment, 7385-A, please?

9        MR. COLTON:  If your Honor, if we could have that

10  taken down, please.

11       THE COURT:  Yes.

12       MR. MCCONNELL:  I thought I admitted the

13  attachment as well.  Sorry.

14       THE COURT:  Okay.

15  Q    Mr. Jacoby, can you look at 7385-A please?

16  A    Is that this spreadsheet that you're showing me?

17  Q    Yes.

18  A    Yes.

19       MR. MCCONNELL:  If you can just click on the

20  summary tab, Ms. Bates.  Can you scroll down.

21  Q    Mr. Jacoby, is this the spreadsheet that you attached

22  to that e-mail?

23  A    Yes.

24       MR. MCCONNELL:  I'd offer it at this time, your

25  Honor.

*W. Jacoby - Direct/Mr. McConnell*                   832

1          THE COURT:  Admitted.

2          (Government's Exhibit 7385 was marked in

3    evidence.)

4          MR. COLTON:  Your Honor, just for the record,

5    there's a lot on here that's beyond.  And so, with the same

6    understanding that the Government will limit it.

7          MR. MCCONNELL:  Yes, absolutely.

8          THE COURT:  Fair enough.

9    Q    So just looking at the summary page, can we just look

10   at the Automotive Portfolio, the second box over, please.

11         Mr. Jacoby, we saw an e-mail where you said even you're

12   accruing maximum but you're still not covered.

13         Is that reflected in this management dashboard for

14   Auto?

15   A    Can I -- I believe so but can I see the blue tab that

16   says GPBHA Fund P&L.  Not that one, there's one further to

17   the right that we're not seeing.

18         You have to -- a tab.  Keep going.  HA, there you go.

19         Yes, can you go a little bit to the right for me and go

20   down.  Yeah, I think so.  Go ahead.  Go up.  You can go back

21   to where you were.

22         Okay.  So what was your question?

23   Q    The question was:  You had mentioned in a prior e-mail

24   that your date, even accruing what you said maximum

25   accruals?

*W. Jacoby - Direct/Mr. McConnell*                    833

1    A    Yes.

2    Q    You still were not going to -- you were still not

3    projecting coverage, is that what's reflected here in this

4    dashboard?

5    A    Yes.

6    Q    Where?

7    A    Where it says the net investment income year-to-date

8    1,000,022 versus the distribution of 1,000,309.

9    Q    And just to be clear, that's net investment income that

10   includes the accruals?

11   A    Yes.

12   Q    And the accruals, is that money that's in the bank

13   account or money you're expecting to receive?

14   A    Expecting to receive.  So it's a mix of cash plus

15   expected receipts.

16            MR. MCCONNELL:  If we can jump to

17   Government Exhibit 7411, please.

18   Q    Mr. Jacoby, do you see this e-mail?

19   A    Yes.

20   Q    This is just the September version of the management

21   dashboard that's going out?

22   A    Yes, this is sent out in October for September

23   month-end.

24            MR. MCCONNELL:  And I would offer

25   Government Exhibit 7411 and the Attachment A in evidence.

W. Jacoby - Direct/Mr. McConnell                834

1          THE COURT:  Admitted.

2          (Government's Exhibit 7411 and Attachment A was

3   marked in evidence.)

4          MR. MCCONNELL:  If we can just scroll down,

5   Ms. Bates, or do we have to go to A?  I think we have to go

6   to A, I'm sorry.

7   Q    So you said, Mr. Jacoby, that in these summary charts,

8   you're including the accruals of things that are supposed to

9   happen, right?

10  A    Yes.

11  Q    If we can go to the detail.

12         Were you familiar with an accrual for Planet Honda

13  around this time?

14  A    Yes.

15  Q    Can you tell the members of the jury what that was

16  about if you remember?

17  A    Well, if you can show it to me but it's -- yeah.  So

18  Planet Honda was a New Jersey dealership owned by a man

19  named Mr. Ciasulli that Mr. Gentile had told me we were

20  going to close on.  And that -- and he gave me the amount

21  that we anticipated receiving in profits on that one.

22         MR. MCCONNELL:  And if we can just scroll down on

23  this.

24  Q    Mr. Jacoby, just if you can look at your monitor and

25  let us know where to stop and blow up where we can see that

*W. Jacoby - Direct/Mr. McConnell*                835

1   Planet Honda accrual?

2   A    You have to go to the Auto Portfolio for that one which

3   would be a couple pages down.  Keep going.  That might be

4   to.  Go back up.  If you can explode that.  That might be

5   it.  Yeah, that's it.

6   Q    So this is not that much easier to read but if we go

7   to --

8   A    Well, you could just highlight to September if that

9   makes it better.  No, all the way over to September.  Right.

10  There you go.

11  Q    So, Mr. Jacoby, where is this Planet Honda accrual that

12  you're taking about reflected in this spreadsheet?

13  A    That's one, two, three -- that's the fifth row down

14  where it says "Planet Honda," and then you see in September

15  I was instructed that we were going to receive $855,524.

16  Q    And you put it in the spreadsheet?

17  A    Yes.

18  Q    When you say you were instructed, who instructed you to

19  put that amount money?

20  A    Mr. Gentile on knowledge of the deal.

21  Q    And did that deal ever actually happen?

22  A    This deal did not, it broke, and we had to remove that

23  before the end of the year.

24        MR. MCCONNELL:  So let's look at

25  Government Exhibit 7681.

W. Jacoby - Direct/Mr. McConnell          836

1   Q     So this is another e-mail of you sending out a

2   management dashboard in January 2016?

3   A     Yes.

4   Q     And Mr. Gentile and Mr. Schneider are two of the

5   recipients of this e-mail?

6   A     Yes.

7         MR. MCCONNELL:  Your Honor, I would offer the

8   e-mail and the attachment.

9         THE COURT:  Admitted.

10        (Government's Exhibit 7681 was marked in

11  evidence.)

12        MR. MCCONNELL:  So if we can go to 7681-A, please.

13  And let's just start with the summary page.

14        Ms. Bates, if you can zoom in on the two, yes, on

15  the bottom there.  Yes, that's it.  Thank you.

16  Q     So, Mr. Jacoby, what was the coverage situation with

17  all the accruals for this management dashboard?

18  A     So, in this version that you're looking at, it's for

19  the Auto Portfolio.  It's 3,220,439 versus a distribution

20  for the year of 4,729,096.

21  Q     And then below that is says "deficit"?

22  A     1,508,657.

23  Q     And then for Holdings, what was the situation for 2015

24  according to this management dashboard?

25  A     It was about one-to-one.  12,247,962 versus 12,345,629.

*W. Jacoby - Direct/Mr. McConnell*                                837

1  Q    And what's the deficit number for Holdings 2 in this

2  management dashboard?

3  A    Only 97,667.

4  Q    So if we can go to?

5        MR. MCCONNELL:  I don't know if it's a separate

6  spreadsheets, Ms. Bates, or if it's just a scroll down.

7        MR. COLTON:  I'm sorry, you asked him Holdings 2.

8  I'm not sure you meant that.

9        MR. MCCONNELL:  I'm sorry, Holdings 1.

10 Q    Holdings 1.

11      If we can go down to the Automotive Portfolio detail.

12 I think this is it.

13      Does this show the Planet Honda accrual being taken off

14 the books?

15 A    It does, yeah.

16 Q    Can you just tell us where to look and we'll zoom in.

17 A    Well, it's see on the left-hand side you'll see one,

18 two, three, four about the fourth row down and you'll see it

19 taken after.  Yeah, that's good.  Well, no keep --

20      MR. MCCONNELL:  You have to keep going to the

21 right, Ms. Bates.

22 A    Yes.

23 Q    There you go.  Is it still very hard to see?

24 A    I see it.

25 Q    Okay.  Where it says September 15th, do you see it?

*W. Jacoby - Direct/Mr. McConnell*                    838

1    A    Yes.

2            MR. MCCONNELL:  Ms. Bates, can you just zoom in on

3    September 15th through year-to-date.  Maybe that'll do the

4    trick.  There we go.

5    Q    So where is it, where is the initial booking of that

6    accrual?

7    A    That's the 856,000 in September.

8    Q    And when you say you had to take it off the books, how

9    is that reflected here?

10   A    Those are the negatives in the following months.

11   Q    When you say negatives, those are the numbers in

12   parenthesis?

13   A    In parenthesis, yes.

14   Q    There are some other numbers in parenthesis for

15   October, November, and December.

16        What's that?

17   A    That was an interfund interest, I think, on that row

18   there.

19   Q    So we just looked at, you know, very generally roughly

20   from sort of June through the end of the year in 2015.

21        Was this generally the pattern that occurred?

22   A    Yes, it was.

23   Q    Now, did the format of these management dashboards ever

24   change?

25   A    Yes.  They evolved constantly over time, yes.

*W. Jacoby - Direct/Mr. McConnell*                      839

1  Q     Why?

2  A     Well, there were a number of reasons, mostly because

3  Mr. Gentile and Mr. Schneider, mostly Mr. Gentile, but they

4  would ask for additional detail and changes.  Also, they

5  frequently were reading it on their phone.  So we had, you

6  know, we made some changes so it would be easier to read on

7  an iPhone.

8  Q     So let's take a look at one of them.

9             MR. MCCONNELL:  Government Exhibit 7682, please.

10            Before we show to the witness, Ms. Bates.  Great.

11 Okay.

12 Q     We'll show you the cover e-mail, Mr. Jacoby, and then

13 we'll just scroll through the document so you can identify

14 it?

15 A     Okay.

16 Q     Do you recognize this?

17 A     February of '16.  Okay, yeah.  So this is working on

18 the year-end numbers for 2015 sent out in February of '16.

19 Q     And is Mr. Gentile and Mr. Schneider --

20 A     Yes.

21 Q     -- on the recipient list?

22 A     Yes.

23            MR. MCCONNELL:  I would offer

24 Government Exhibit 7682.

25            THE COURT:  Admitted.

*W. Jacoby - Direct/Mr. McConnell*          840

1        (Government's Exhibit 7882 was marked in

2   evidence.)

3        THE COURT:  And whenever you want to break further

4   the day.  I defer to you and if we reached a logical

5   stopping point or you want to ask a couple more questions.

6        MR. MCCONNELL:  This and one more exhibit and then

7   we can call it a day.  Thank you.

8        So if we can just scroll down, Ms. Bates, just to

9   look at the new format of these.

10  Q    So starting with the first page.  So this is for the

11  GPB Holdings Fund?

12  A    Yes.

13  Q    If we can zoom in on the detail.  Thank you.

14       This is a little bit easier to read than the ones we

15  were looking at before, correct?

16  A    Yeah, that was the point.

17  Q    So just looking at the bottom part to says

18  coverage/shortfall.

19       What's depicted there?

20  A    So just as we had been discussing all along, now it's

21  showing you the coverage.  It would be not in parenthesis,

22  shortfall would be in parenthesis further each month.

23  Q    So for each month that there's parenthesis, what does

24  that mean?

25  A    It's a shortfall.

W. Jacoby - Direct/Mr. McConnell                841

1  Q    And how many months, according to this dashboard, in
2  2015 was Holdings covered?
3  A    Three of the 12.
4  Q    And what was the total deficit for 2015?
5  A    So that's the 2,619,000.
6  Q    It says 2619K.  What does that mean?
7  A    It's just a rounding for the thousand.
8  Q    So that's $2.6 million?
9  A    Yes.
10 Q    And those distributions were paid?
11 A    Yes.
12 Q    Where did the money come from?
13 A    It came from the investment account.
14        MR. MCCONNELL:  If we can just scroll down to the
15 next page, please, and zoom in on this.
16 Q    So this is the dashboard for the Automotive Portfolio,
17 correct?
18 A    Yes.
19 Q    And this, again, directing your attention to the bottom
20 portion.  It says, coverage/shortfall.
21     What can you tell us about Automotive's distribution
22 coverage ratio from this?
23 A    Yes.  So this is in a fairly severe situation for this
24 fund at this point because the net investment income was
25 1,502,000 to a distribution of 4,000,729.  So it was short

*W. Jacoby - Direct/Mr. McConnell*                    842

1   by 3 million.  So it was only 30 percent covered.

2   Q    And how many months out of the year in 2015 was the

3   Automotive Portfolio actually able to cover its

4   distributions with profits from the portfolio companies?

5   A    Again, it's three.

6         MR. MCCONNELL:  I'd like to show the witness

7   Government Exhibit 7857 -- well, I don't know.

8         Would you your Honor like to break or should I

9   plow through one more.

10         THE COURT:  Just going to be like these three

11   questions, again, let's just do it.

12         MR. MCCONNELL:  Okay.

13   Q    So Government Exhibit 7857.  Do you recognize this,

14   sir?

15   A    Yes.  Yes.

16   Q    And if I can show you 78 -- well, what is it?

17   A    This is a summary page of the three funds:  Holdings,

18   Automotive, and Holdings 2.  On the front page, and I took a

19   picture of it and put it in this e-mail for Mr. Wisenberger.

20   Q    So I can show you 7857-A, please.

21   A    That's it in color.  There you go.

22         MR. MCCONNELL:  I would offer this into evidence.

23         MR. MENCHEL:  The dashboard or the e-mail or both.

24         MR. MCCONNELL:  The dashboard.

25         THE COURT:  Hearing no objection, it's admitted.

*Proceedings*                                              843

1          (Government's Exhibit 7857-A was marked in

2   evidence.)

3   Q    So, Mr. Jacoby, just looking at this, this is another

4   format for the management dashboards?

5   A    Yes.

6   Q    Just looking at the bottom it says "Coverage."  What's

7   that is it?

8   A    This is the coverage number that we've been talking

9   about, net investment income versus distributions.  If the

10  income is less than distributions, you see a red bar.  If

11  the income is greater than distributions, it's blue at the

12  bottom.

13          MR. MCCONNELL:  Thank you.  I think that's a good

14  stopping point, your Honor.

15          THE COURT:  All right.  Great.  So we're done for

16  the day.  I want to raise one scheduling issue with you all.

17          I understand we are running a little bit behind on

18  where the parties expected us to be.  I want to try to do

19  everything I can to finish this trial when we said we were

20  going to finish this trial.

21          So my proposal is that next week we go 9:30 to

22  5:00 instead of 10:00 to 4:30 and that we do sit on Friday,

23  which is the 28th.  If you all have made plans in

24  anticipation of a different schedule, you have something on

25  Friday or whatever, I want to honor that.  So just send me a

*Proceedings*                                                          844

1   note tomorrow and let me know that schedule is in conflict

2   for me because I don't want to do that.  But I do want to

3   try to get us finished with this trial when we told you we'd

4   get finished.

5            So we're back tomorrow at 10:00.  Please try to

6   get in a few minutes early to get through security and

7   transit and all that.  Don't talk to anybody about the case,

8   don't do your own research, don't make up your mind.  See

9   you tomorrow.

10           COURTROOM DEPUTY:  All rise.

11           (Jury exits courtroom at 4:36 p.m.)

12           THE COURT:  Anything you want to talk about?  I'm

13  expecting we'll be with this witness.

14           I will let the witness go, sorry.

15           (Witness leaves the witness stand.)

16           MR. MCCONNELL:  Judge, I have another hour and a

17  half with him.  I would like just, you know, after we break

18  today just to speak with defense counsel because, depending

19  on the length of the cross, obviously not holding them to

20  it, but it will help us plan further next week and I can

21  give the Court and counsel a little bit more clarity.  We've

22  got a lot of moving parts with respect to witness

23  scheduling.

24           THE COURT:  Are you all confident that we're not

25  going to get to another witness based on how long your cross

*Proceedings*                                                845

1    is?

2              MR. MENCHEL:  I am, yes.

3              THE COURT:  Okay.

4              (A brief pause in the proceedings was held.)

5              MR. MCCONNELL:  So, Judge, it sounds like we'll

6    have time to at least begin potentially another witness.

7    Obviously, no promises for Monday.  So we'll just confer,

8    that does help us considerably plan out the week.  I know

9    that the issue regarding Mr. Lash is still pending.  I think

10   we're hoping to resolve that because that will also help

11   move things along we'll plan on that.

12             THE COURT:  You told me, or have I told you, a

13   schedule in terms of that.  You said you wanted to give me

14   an additional letter.

15             MR. AXELROD:  Right.  So, Judge, you put out a

16   bounce that asked the defendants to respond on Monday.

17   We'll give you a letter.  We're either going to do it

18   tonight hopefully or very, very early tomorrow.

19             From there, I don't know how long they want.

20   Obviously, the sooner we resolve this the sooner we can

21   expect -- in fairness, there may be -- we may need to file a

22   reply.

23             THE COURT:  Yes.

24             MR. AXELROD:  I will have to see what they say.

25             THE COURT:  This doesn't seem like that

*Proceedings*                                                      846

1    complicated an issue.  Is the issue whether Mr. Gentile or

2    Mr. Schneider is the holder of this privilege, is that the

3    claim or what is?

4              MR. MENCHEL:  Yes.

5              THE COURT:  Okay.

6              MR. COLTON:  Just to put the full information in

7    the hopper.  There's still a pending motion requesting a

8    hearing on the other Lash-related privilege.

9              THE COURT:  Can I ask one question about that?

10             I wasn't sure how to understand the letter from

11   Mr. Lash's counsel about that.  Is the claim, maybe you know

12   the answer, maybe you don't.  Is the claim that Mr. Lash

13   never reviewed these materials or not?  Because I just

14   wasn't sure the letter is sort of like about e-mail stuff

15   and I wasn't sure wasn't if it was meant to say just, like,

16   he never saw any of this stuff.

17             MR. AXELROD:  I'm sorry, Judge, because you got to

18   bear with me, there have been a few.

19             Are we talking about the Schneider e-mails, or are

20   we talking about other e-mails?  Because I the §502(d)

21   stuff, I would have to check on that.  I know the facts

22   clearly as to the Schneider e-mails if that's the question.

23             THE COURT:  Yes.

24             MR. COLTON:  I think I can clear it up.

25             THE COURT:  Okay.

*Proceedings*                                                   847

1          MR. COLTON:  I'm fairly confident that the letter

2    from Lash's counsel referenced the Schneider e-mail issue.

3    But given that Mr. Lash's counsel for months and months

4    litigated that the information in the §502(d) was critical

5    to his decision-making, I find it hard to believe that he

6    said that neither he nor his client reviewed any of that

7    material after telling the Court over and over it was so

8    critical to his decision-making about his defense so I

9    really think it was the Gmail issue only.

10          THE COURT:  I was confused.  I get that and I saw

11    that in your papers.  On the other hand, it seems like

12    Mr. Lash's counsel was submitting a letter that was

13    intending to say this is all beside the point because nobody

14    looked at the relevant materials.

15          And then you're right, the letter did just allude

16    to the Schneider e-mail stuff which is a subset.  So I

17    didn't know if that was because Mr. Lash's counsel was not

18    being precise in what he was referring to.  He might have

19    misunderstood the scope of materials that were at issue in

20    the motion, or it might have said the wrong thing.  Sounds

21    like we don't really know the answer to that.

22          MR. MCCONNELL:  No, Judge, but I'm sure we can

23    figure it out.

24          THE COURT:  Okay.  It will be helpful to know what

25    the representation there was intended to be.

*Proceedings*                                                        848

1           MR. AXELROD:  Okay.

2           MR. MENCHEL:  Your Honor, can we know tonight who

3    the next witnesses are in the pipeline so we can adequately

4    prepare?

5           THE COURT:  Do you know who the next witness is?

6           MR. MCCONNELL:  Yeah, we're going to tell them as

7    soon as we break.  We have a good idea.

8           THE COURT:  Okay.  So anything else for us to take

9    up?

10          MR. COLTON:  One quick item.

11          When Exhibit 7797 was discussed, and I think

12   Mr. McConnell's comment accurately was that the witness let

13   the cat out of the bag and the phrase "cat out," so he

14   actually ascribed the content of an e-mail that your Honor

15   ruled was inadmissible.  So to the extent he testified about

16   the content of that e-mail, and we can find it by searching

17   for "cat out."

18          THE COURT:  Sure.

19          MR. COLTON:  That we ask that that be stricken.

20          THE COURT:  I was searching for cat, I'm not

21   finding cat.

22          Maybe this is something you all can -- I'm seeing

23   a lot of nodding when you were saying that.  So maybe this

24   is something you all agree and you'll tell me tomorrow what

25   statement should be stricken or do you want to try to do

*Proceedings*                                                    849

1    that now.

2              MS. VORA:  I have that now.

3              "This is him answering me on that same e-mail

4    chain saying he will show it to Mr. Schneider."

5              THE COURT:  Okay.  So I think that's right.  Do

6    you all know what we're talking about?

7              MR. MCCONNELL:  I do.

8              THE COURT:  I should start with that portion of

9    the testimony.

10             MR. MCCONNELL:  Unless your Honor wants to

11   reconsider its ruling.

12             THE COURT:  Anything else for us to cover?  Great

13   so see you all tomorrow.

14             COURTROOM DEPUTY:  All rise.

15             MR. AXELROD:  Do you want to set a schedule for

16   their response to our letter?

17             THE COURT:  Sounds like there is a deadline for

18   them to respond and you just want to put in another letter

19   that's going to --

20             MR. AXELROD:  We can keep Monday, if that's...

21             THE COURT:  Yes, I think so.  I think Monday is

22   good.  So just if there's anything else you want to put in,

23   put it in soon, that will be great.

24             (WHEREUPON, this matter was adjourned to June 21,

25   2024, at 10:00 a.m.)

850

1                            INDEX

2

3   WITNESS:                                           PAGE:

4   JAY FREDERICK

5           CROSS-EXAMINATION

6           BY MR. DEARINGTON........................    624

7           REDIRECT EXAMINATION

8           BY MR. McCONNELL.........................    661

9           RECROSS EXAMINATION

10          BY MR. COGAN.............................    671

11

12  WILLIAM JACOBY

13          DIRECT EXAMINATION

14          BY MR. McCONNELL.........................    687

15          DIRECT EXAMINATION

16          BY MR. MCCONNELL.........................    733

17          VOIR DIRE

18          MR. MENCHEL..............................    777

19          DIRECT EXAMINATION

20          BY MR. McCONNELL (Continuing)...........    783

21

22                          *****

23

24

25

851

1

2                          <u>INDEX OF EXHIBITS</u>

3

4                                                    <u>PAGE:</u>

5    Defendant's Exhibit MF-7 was marked in evidence.....    629

6    Defendant's Exhibit MF-9 was marked in evidence.....    646

7    Defendant's Exhibit MF-12 was marked in evidence....    647

8    Defendant's Exhibit IR was marked in evidence.......    655

9    Defense Exhibit IIII-M was marked in evidence ......    659

10   Government Exhibit 7781-C was marked in evidence ...    716

11   Government Exhibit 7820-C was marked in evidence ...    720

12   Government Exhibit 7838-E was marked in evidence ...    721

13   Government Exhibit 4100 was marked in evidence .....    725

14   Government's Exhibit 7351 was marked in evidence....    754

15   Government's Exhibit 7351 was marked in evidence....    760

16   Government's Exhibit 6171-C was marked in evidence .    783

17   Government Exhibit 7332 was marked in evidence .....    796

18   Government Exhibit 7810 was marked in evidence .....    799

19   Government Exhibit 7810-A was marked in evidence ...    804

20   Government Exhibit 7810-D was marked in evidence ...    805

21   Government Exhibits 7405, 7405-A and 7405-B was

22   marked in evidence ................................    810

23   Government Exhibit 7011 was marked in evidence .....    812

24   Government Exhibit 7410 was marked in evidence .....    814

25   Government Exhibit 7410 was marked in evidence .....    814

852

1   Government Exhibit 7335 was marked in evidence .....    816

2   Government Exhibit 7778 was marked in evidence .....    817

3   Government Exhibit 7355-A and B was marked in

4   evidence ........................................    820

5   Government Exhibits 7361, 7366 and 7369 was marked

6   in evidence .....................................    824

7   Government's Exhibit 7370 was marked in evidence....    826

8   Government's Exhibit 7381 was marked in evidence....    828

9   Government's Exhibit 7385 was marked in evidence....    830

10  Government's Exhibit 7385 was marked in evidence....    832

11  Government's Exhibit 7411 and Attachment A was

12  marked in evidence................................    834

13  Government's Exhibit 7681 was marked in evidence....    836

14  Government's Exhibit 7882 was marked in evidence....    840

15  Government's Exhibit 7857-A was marked in evidence..    843

16

17

18

19

20

21

22

23                              * * * * *

24

25

## $

**$1,050,000.00** [1] - 669:16
**$1,326,213.95** [1] - 793:3
**$10** [2] - 654:6, 738:11
**$100** [4] - 767:6, 767:17, 772:22
**$100,000** [3] - 810:2, 810:3, 810:4
**$11** [1] - 687:24
**$121,541** [1] - 823:12
**$2.54** [1] - 630:4
**$20** [1] - 740:18
**$3,000** [1] - 615:12
**$500** [1] - 661:6
**$500,000** [1] - 791:4
**$70** [1] - 768:1
**$855,524** [1] - 835:15
**$895,000** [1] - 804:16

## '

**'15** [1] - 803:13
**'16** [3] - 722:14, 839:17, 839:18
**'86** [1] - 687:17

## 0

**002** [2] - 638:14, 638:15
**005** [1] - 655:5
**007** [3] - 629:15, 631:12, 631:21
**008** [1] - 654:20
**009** [2] - 629:16, 630:3
**012** [2] - 655:16, 655:21

## 1

**1** [8] - 610:12, 650:17, 650:18, 706:25, 743:13, 787:14, 801:18
**1,000,022** [1] - 833:8
**1,000,309** [1] - 833:8
**1,075,514** [1] - 822:4
**1,105,978** [1] - 813:10
**1,502,000** [1] - 841:25
**1,508,657** [1] - 836:22
**1,696,606** [1] - 813:10
**1.75** [1] - 738:8
**10** [2] - 707:6, 785:17
**10,566,843** [1] - 792:3
**10-minute** [1] - 676:12
**100** [17] - 668:5, 671:16, 694:16, 717:21, 717:24, 722:8, 722:19, 730:7, 767:7, 767:17, 767:19, 768:2, 768:10, 769:19, 772:21, 773:1, 773:2
**10019** [1] - 610:5
**10022** [1] - 609:21
**10:00** [3] - 843:22, 844:5, 849:25
**10:20** [1] - 611:17
**10:25** [1] - 624:13
**11** [7] - 718:11, 718:13, 718:18, 735:24, 791:2, 791:10, 804:15
**11.5** [1] - 718:20
**11201** [1] - 609:15
**1173** [1] - 659:22
**11th** [1] - 785:17

**12** [2] - 725:25, 841:3
**12,247,962** [1] - 836:25
**12,345,629** [1] - 836:25
**13** [5] - 669:9, 669:25, 785:9, 786:2, 804:15
**1301** [1] - 610:4
**1390** [1] - 650:5
**1398** [1] - 648:3
**13th** [2] - 785:5, 791:10
**14,603** [1] - 791:8
**14.3** [1] - 655:22
**1438** [1] - 639:10
**15** [2] - 669:2, 771:22
**15th** [3] - 787:15, 837:25, 838:3
**16** [3] - 739:1, 739:3, 739:24, 739:25, 816:14
**1717** [1] - 610:8
**18** [1] - 745:23
**19** [1] - 791:14
**1:55** [2] - 729:3, 731:19
**1st** [2] - 692:13, 797:23

## 2

**2** [14] - 627:7, 627:10, 627:14, 627:18, 628:1, 628:12, 628:14, 628:17, 743:13, 761:10, 790:8, 837:1, 837:7, 842:18
**2,029,674** [1] - 822:12
**2,313,028** [1] - 822:4
**2,544,000** [1] - 821:19
**2,565,579** [1] - 821:19
**2,619,000** [1] - 841:5
**2-E-mails** [1] - 752:19
**2-I** [1] - 757:17
**2.1** [1] - 790:13
**2.5** [1] - 631:7
**2.56** [2] - 631:14, 631:22
**2.6** [1] - 841:8
**2.7** [1] - 738:12
**2.75** [1] - 738:8
**20** [5] - 609:7, 712:24, 740:1, 772:22, 787:9
**20006** [1] - 610:9
**2013** [1] - 719:1
**2014** [7] - 718:7, 718:25, 719:1, 795:20, 797:14, 821:15, 823:3
**2015** [60] - 668:7, 669:25, 670:6, 690:5, 709:3, 710:9, 711:18, 715:25, 719:2, 722:5, 722:16, 723:10, 723:13, 723:14, 725:19, 733:13, 745:23, 769:23, 777:16, 778:15, 779:2, 785:5, 785:17, 785:20, 785:22, 786:5, 787:19, 791:3, 791:5, 791:9, 791:10, 791:12, 791:16, 791:19, 791:24, 792:24, 795:19, 797:21, 799:2, 804:15, 812:4, 813:4, 816:14, 821:24, 822:6, 822:8, 822:12, 823:15, 823:16, 824:10, 824:20, 825:3, 825:4, 827:7, 836:23, 838:20, 839:18, 841:2, 841:4, 842:2
**2016** [32] - 626:25, 628:20, 629:5, 629:20, 630:6, 630:10, 630:13, 632:13, 634:3, 634:13, 636:1, 638:12, 640:7, 644:10, 644:20, 644:25, 645:9, 655:2, 655:6, 665:24, 670:9, 672:8, 672:9, 690:6, 704:4, 778:14, 779:19, 784:25,

**787:22, 791:25, 792:25, 836:2
**2017** [14] - 615:3, 634:6, 634:13, 634:14, 634:16, 644:23, 644:25, 645:3, 645:14, 646:3, 646:21, 654:21, 675:13, 704:5
**2018** [27] - 634:19, 645:7, 646:22, 647:21, 647:24, 650:9, 651:24, 659:9, 659:19, 659:24, 660:5, 660:17, 661:6, 665:15, 665:25, 666:3, 666:5, 666:7, 666:16, 671:16, 674:8, 674:19, 675:14, 675:15, 675:16, 676:3
**2024** [2] - 609:7, 849:25
**21** [3] - 635:23, 667:17, 849:24
**21-CR-0054(RPK** [1] - 609:3
**21-CR-354** [1] - 611:3
**2125** [1] - 668:8
**22** [2] - 791:17, 792:25
**258,000** [1] - 787:21
**2600** [1] - 610:13
**2619K** [1] - 841:6
**271** [1] - 609:15
**28th** [2] - 830:13, 843:23
**29** [1] - 787:12
**29th** [1] - 779:19
**2:00** [1] - 733:5

## 3

**3** [2] - 718:24, 842:1
**3,220,439** [1] - 836:19
**3,663,220** [1] - 822:13
**30** [5] - 638:12, 691:12, 712:24, 714:25, 842:1
**302s** [1] - 615:15
**30th** [2] - 635:25, 784:25
**31** [4] - 659:24, 660:5, 670:6, 722:15
**31st** [1] - 660:16
**33131** [1] - 610:13
**35** [1] - 787:21
**36** [3] - 734:16, 734:20, 734:21
**3rd** [2] - 610:12, 646:3

## 4

**4** [3] - 658:3, 765:2, 767:14
**4,000,729** [1] - 841:25
**4,729,096** [1] - 836:20
**4.3** [2] - 630:17, 630:25
**40** [1] - 681:9
**4100** [9] - 724:20, 724:22, 724:24, 725:13, 725:16, 725:19, 733:16, 734:16, 851:13
**412** [1] - 660:25
**415** [2] - 660:1, 660:22
**415,064** [1] - 785:20
**415.7** [1] - 661:1
**416** [1] - 660:1
**42** [1] - 734:19, 734:20
**42nd** [1] - 610:4
**450** [1] - 660:22
**450,000** [1] - 791:11
**466,709** [1] - 823:16
**4:30** [1] - 843:22
**4:36** [1] - 844:11
**4th** [1] - 646:3

## 5

**5** [1] - 653:3
**50** [2] - 620:20, 687:25
**500** [2] - 660:23, 661:3
**552,203** [1] - 786:4
**5:00** [2] - 732:8, 843:22
**5th** [1] - 732:23

## 6

**6** [3] - 733:13, 790:10, 790:14
**60** [1] - 620:21
**607,375** [1] - 823:12
**6171** [1] - 808:4
**6171-A** [2] - 774:23, 776:20
**6171-B** [2] - 775:13, 783:5
**6171-C** [10] - 775:22, 776:8, 776:20, 783:10, 783:20, 788:13, 803:11, 805:3, 810:24, 851:16
**6171A** [1] - 677:9
**6184** [5] - 761:20, 761:22, 762:4, 762:24, 764:19
**624** [1] - 850:6
**629** [1] - 851:5
**646** [1] - 851:6
**647** [1] - 851:7
**655** [1] - 851:8
**655,000** [1] - 791:19
**659** [1] - 851:9
**661** [1] - 850:8
**663,500** [1] - 791:15
**671** [1] - 850:10
**686,000** [1] - 807:5
**687** [1] - 850:14
**6th** [1] - 725:19

## 7

**7** [2] - 629:15, 813:4
**7.1** [1] - 656:1
**70** [2] - 768:2, 773:1
**7011** [5] - 811:23, 812:7, 812:17, 814:2, 851:23
**716** [1] - 851:10
**720** [1] - 851:11
**721** [1] - 851:12
**725** [1] - 851:13
**73** [1] - 788:17
**733** [1] - 850:16
**7332** [5] - 795:7, 795:15, 796:6, 796:24, 851:17
**7332-A** [1] - 796:1
**7335** [5] - 816:7, 816:9, 816:20, 816:23, 852:1
**7345** [2] - 745:17, 746:2
**7351** [7] - 749:12, 750:9, 750:10, 754:2, 760:5, 851:14, 851:15
**7355** [3] - 818:25, 820:4, 820:6
**7355-A** [3] - 820:11, 820:13, 852:3
**7355-B** [1] - 819:7
**7361** [3] - 824:8, 824:12, 852:5
**7366** [3] - 824:9, 824:12, 852:5

**7369** [3] - 824:9, 824:12, 852:5
**7370** [4] - 825:7, 826:1, 826:4, 852:7
**7371** [1] - 827:6
**7371-A** [1] - 827:16
**7381** [4] - 827:19, 828:3, 828:6, 852:8
**7383** [2] - 830:10, 830:17
**7385** [6] - 830:11, 830:21, 830:24, 832:2, 852:9, 852:10
**7385-A** [2] - 831:8, 831:15
**7405** [4] - 806:12, 807:15, 810:17, 851:21
**7405-A** [4] - 806:22, 807:15, 810:17, 851:21
**7405-B** [5] - 807:8, 807:10, 807:15, 810:17, 851:21
**7409** [1] - 813:18
**7410** [5] - 813:18, 814:5, 814:10, 851:24, 851:25
**7411** [4] - 833:17, 833:25, 834:2, 852:11
**75** [1] - 620:25
**754** [1] - 851:14
**760** [1] - 851:15
**7681** [3] - 835:25, 836:10, 852:13
**7681-A** [1] - 836:12
**7682** [2] - 839:9, 839:24
**777** [1] - 850:18
**7778** [4] - 817:11, 817:22, 817:24, 852:2
**7781-C** [5] - 715:10, 715:17, 716:5, 716:8, 851:10
**7797** [3] - 829:22, 830:2, 848:11
**78** [1] - 842:16
**7810** [3] - 798:24, 799:15, 851:18
**7810-A** [5] - 802:23, 802:25, 803:20, 804:4, 851:19
**7810-D** [4] - 804:20, 805:11, 805:14, 851:20
**7820-C** [5] - 719:25, 720:2, 720:7, 720:10, 851:11
**783** [2] - 850:20, 851:16
**7838-E** [5] - 721:11, 721:20, 721:23, 722:6, 851:12
**7857** [2] - 842:7, 842:13
**7857-A** [3] - 842:20, 843:1, 852:15
**7882** [2] - 840:1, 852:14
**792,933** [1] - 823:7
**796** [1] - 851:17
**799** [1] - 851:18
**7th** [2] - 792:24, 812:22

## 8

**8** [15] - 709:14, 717:9, 717:13, 717:21, 719:9, 721:5, 722:8, 726:10, 788:10, 788:11, 788:12, 790:9, 790:14, 790:18
**8,495,238** [1] - 788:17
**8.7** [2] - 721:4, 768:7
**80** [8] - 620:6, 620:25, 740:19, 740:21, 772:23, 772:24, 773:1
**800** [1] - 609:20
**804** [1] - 851:19
**805** [1] - 851:20
**810** [1] - 851:22
**812** [1] - 851:23
**813.75** [1] - 668:22
**814** [2] - 851:24, 851:25

**816** [1] - 852:1
**817** [1] - 852:2
**8188** [1] - 632:17
**820** [1] - 852:4
**824** [1] - 852:6
**8258-B** [2] - 638:10, 657:17
**826** [1] - 852:7
**828** [1] - 852:8
**830** [1] - 852:9
**832** [1] - 852:10
**834** [1] - 852:12
**836** [1] - 852:13
**840** [1] - 852:14
**843** [1] - 852:15
**85** [3] - 660:19, 660:22, 660:25
**856,000** [1] - 838:7
**895,966** [1] - 807:13

## 9

**9** [2] - 632:25, 797:21
**9/11/15** [1] - 803:14
**901,025** [1] - 823:17
**92** [1] - 727:18
**92,000** [1] - 785:9
**97,667** [1] - 837:3
**981,000** [1] - 823:6
**99** [1] - 652:15
**99.5** [1] - 653:2
**9:30** [2] - 609:8, 732:8, 843:21

## A

**a.m** [3] - 609:8, 624:13, 849:25
**ability** [2] - 741:15, 751:4
**able** [9] - 646:18, 647:13, 682:6, 683:1, 740:11, 741:3, 778:1, 818:15, 842:3
**absolute** [1] - 633:19
**absolutely** [2] - 613:12, 832:7
**abstract** [1] - 619:12
**accelerate** [1] - 707:6
**accepted** [3] - 698:22, 722:15, 816:15
**accepting** [1] - 666:4
**accessed** [1] - 683:9
**accomplished** [1] - 710:12
**according** [5] - 630:9, 788:13, 822:5, 836:24, 841:1
**accordingly** [1] - 730:17
**account** [90] - 648:4, 649:4, 649:19, 665:14, 665:18, 682:11, 694:16, 761:13, 762:1, 763:12, 763:13, 763:14, 764:3, 764:6, 764:8, 764:22, 764:23, 764:24, 765:3, 765:5, 765:11, 766:7, 766:9, 766:11, 766:12, 766:18, 766:20, 768:16, 772:9, 772:10, 773:6, 774:15, 775:7, 776:10, 776:11, 784:14, 785:10, 786:20, 786:24, 787:1, 787:7, 788:10, 788:11, 788:15, 789:13, 791:4, 791:5, 791:8, 791:9, 791:11, 791:12, 791:15, 792:1, 792:2, 792:8, 793:1, 793:7, 795:3, 795:4, 800:18, 801:13, 802:13, 804:16, 805:24, 805:25, 806:19, 807:3, 807:4, 809:19, 809:21, 813:3, 813:4, 813:6, 814:18, 822:18, 822:20, 822:21, 833:13, 841:13

Case 1:21-cr-00054-RPK-PK   Document 424-1   Filed 07/12/24   Page 247 of 271
PageID #: 14040
(account's - argued)                                                          Page 3

**account's** [1] - 801:19

**accountant** [7] - 700:2, 700:9, 710:10, 710:11, 710:13, 712:15, 784:19

**accountants** [1] - 700:10

**accounting** [58] - 654:7, 656:1, 656:7, 656:15, 656:22, 678:16, 683:9, 685:5, 687:13, 688:13, 688:17, 690:21, 691:15, 699:15, 699:18, 700:7, 700:11, 710:12, 710:14, 710:15, 710:16, 710:21, 714:20, 726:14, 734:11, 734:12, 734:13, 745:14, 745:15, 751:6, 760:25, 761:3, 765:23, 766:14, 770:23, 772:8, 772:13, 773:5, 773:13, 774:3, 774:6, 774:14, 774:20, 775:2, 775:10, 786:9, 789:15, 789:16, 797:7, 801:24, 806:3, 808:13, 810:10, 817:1, 817:5

**accounts** [30] - 760:17, 760:20, 760:24, 761:1, 761:10, 761:12, 761:15, 761:17, 761:18, 761:23, 763:2, 765:14, 765:25, 770:19, 773:24, 774:12, 775:8, 788:20, 790:2, 793:2, 793:5, 801:14, 802:3, 804:17, 806:20, 807:5, 808:12, 810:3, 812:3, 814:18

**accrual** [7] - 810:1, 810:4, 834:12, 835:1, 835:11, 837:13, 838:6

**accruals** [11] - 801:17, 801:22, 809:25, 810:6, 826:24, 827:4, 832:25, 833:10, 833:12, 834:8, 836:17

**accrue** [1] - 826:12

**accruing** [5] - 828:9, 828:18, 828:22, 832:12, 832:24

**accumulate** [3] - 698:3, 744:4, 764:11

**accumulated** [2] - 710:2, 763:16

**accuracy** [2] - 778:15, 779:2

**accurate** [13] - 683:15, 683:22, 684:24, 712:10, 712:12, 712:13, 714:11, 718:2, 773:23, 774:11, 778:17, 779:6, 788:19

**accurately** [2] - 808:19, 848:12

**accusing** [1] - 613:13

**acquired** [3] - 642:4, 643:6, 693:14

**acquiring** [1] - 642:19

**acquisition** [7] - 737:16, 737:17, 737:18, 737:23, 738:1, 738:15, 738:18

**acquisitions** [1] - 738:6

**action** [1] - 702:3

**actions** [4] - 619:4, 679:12, 680:25, 681:14

**actual** [5] - 680:19, 714:2, 734:21, 774:1, 818:12

**add** [4] - 653:24, 682:1, 739:1, 739:24

**added** [4] - 691:4, 743:2, 829:1

**addition** [8] - 682:12, 682:16, 699:5, 739:3, 771:1, 771:3, 771:19, 812:9

**additional** [10] - 636:21, 667:1, 698:5, 710:2, 732:9, 739:2, 757:1, 797:18, 839:4, 845:14

**address** [2] - 679:23, 679:24

**addressed** [1] - 676:18

**addressees** [2] - 752:3, 826:9

**addressing** [1] - 826:14

**adds** [1] - 662:17

**adequately** [1] - 848:3

**adjourned** [1] - 849:24

**adjusted** [1] - 653:23

**administrator** [7] - 648:13, 648:15, 648:22, 648:23, 734:13, 763:4, 765:13

**admissibility** [7] - 611:21, 613:3, 676:19, 682:14, 682:19, 685:18, 779:15

**admissible** [2] - 752:13, 757:21

**admit** [9] - 618:16, 677:18, 681:15, 682:22, 683:14, 685:7, 685:11, 783:5

**admits** [1] - 803:4

**admitted** [39] - 629:12, 632:17, 639:9, 646:10, 647:4, 647:7, 650:5, 655:12, 716:7, 720:9, 721:22, 725:15, 754:1, 754:5, 760:4, 780:2, 780:5, 796:10, 796:20, 799:14, 804:3, 805:12, 807:23, 810:16, 814:6, 816:22, 817:23, 820:12, 824:11, 826:3, 828:5, 830:19, 830:22, 831:12, 832:1, 834:1, 836:9, 839:25, 842:25

**admitting** [5] - 617:9, 681:7, 684:21, 685:1, 782:14

**adopted** [1] - 680:23

**ADRIANA** [1] - 609:22

**Adriana** [1] - 611:9

**advance** [1] - 730:6

**advertised** [1] - 719:9

**advertising** [3] - 636:17, 638:3, 638:23

**adviser** [1] - 670:10

**advisor** [6] - 653:13, 669:20, 669:22, 670:3, 721:3, 721:6

**advisors** [5] - 707:13, 707:19, 708:17, 710:25, 711:9

**affect** [1] - 620:9

**affects** [2] - 619:3, 755:14

**afford** [2] - 755:21, 755:22

**afoul** [1] - 729:16

**aFTERNOON** [1] - 732:1

**afterwards** [1] - 679:4

**agenda** [2] - 627:6, 627:14

**agent** [4] - 648:14, 679:21, 680:14, 782:10

**Agent** [1] - 611:8

**ago** [10] - 625:6, 625:17, 626:3, 640:8, 641:22, 674:13, 676:3, 693:16, 752:11, 775:20

**agree** [6] - 624:1, 631:7, 652:13, 669:16, 749:17, 848:24

**agreed** [3] - 643:25, 690:12, 731:5

**agreement** [8] - 635:11, 636:5, 638:4, 638:24, 663:15, 712:1, 727:24

**agreements** [2] - 711:23, 734:6

**ahead** [9] - 624:23, 656:12, 659:25, 660:14, 753:2, 783:15, 796:22, 809:7, 832:20

**aided** [1] - 610:18

**akin** [1] - 636:6

**al** [1] - 611:3

**alleged** [3] - 677:14, 730:2, 757:13

**allegedly** [1] - 757:15

**allocate** [1] - 818:12

**allocation** [1] - 818:11

**allow** [4] - 617:2, 664:8, 780:2, 800:14

**allowed** [3] - 664:11, 673:5, 673:6

**allude** [1] - 847:15

**almost** [7] - 630:17, 630:25, 643:15, 660:1, 799:24, 821:19

**alternative** [1] - 687:23

**Alternative** [9] - 702:13, 702:16, 703:1, 703:11, 704:4, 704:7, 704:10, 704:18, 706:3

**alternatively** [1] - 741:21

**amend** [1] - 810:12

**amended** [1] - 659:9

**amendments** [1] - 827:25

**AMERICA** [1] - 609:3

**Americas** [1] - 609:8

**AMEX** [2] - 736:11, 736:14

**amount** [32] - 629:19, 630:8, 631:3, 652:5, 652:10, 653:9, 654:5, 660:4, 661:5, 669:16, 669:20, 696:24, 735:22, 738:8, 740:2, 740:8, 741:18, 741:19, 741:20, 741:21, 763:15, 767:22, 784:12, 784:13, 788:1, 788:14, 791:25, 792:25, 821:22, 822:15, 834:20, 835:19

**amounts** [5] - 779:10, 801:16, 801:19, 803:2, 826:12

**analysis** [6] - 753:18, 795:19, 797:10, 806:15, 806:18

**AND** [1] - 609:12

**Ann** [2] - 753:12

**announce** [1] - 658:8

**announced** [2] - 719:1, 722:14

**annoying** [1] - 672:24

**annual** [6] - 717:10, 717:19, 722:7, 726:21, 736:17, 737:13

**annually** [1] - 722:13

**Anscher** [1] - 745:15

**answer** [11] - 635:5, 652:21, 664:1, 704:15, 712:24, 712:25, 778:8, 778:9, 778:25, 846:12, 847:21

**answered** [2] - 739:20, 750:21

**answering** [2] - 829:24, 849:3

**answers** [2] - 704:16, 712:22

**anticipate** [3] - 620:4, 621:17, 683:18

**anticipated** [4] - 617:4, 622:25, 731:15, 834:21

**anticipating** [4] - 622:22, 723:8, 779:25, 786:16

**anticipation** [1] - 843:24

**AP** [2] - 783:24

**APEKSHA** [1] - 610:6

**Apeksha** [1] - 611:12

**apologies** [2] - 629:25, 654:24

**apologize** [6] - 685:22, 728:24, 729:18, 731:11, 755:4, 830:3

**appealing** [1] - 663:11

**appear** [3] - 629:4, 654:25, 659:8

**appearances** [1] - 611:4

**application** [1] - 692:21

**apply** [1] - 628:5

**applying** [3] - 693:8, 698:8, 699:11

**apportion** [1] - 721:3

**approach** [2] - 640:17, 754:14

**Approaching** [1] - 640:19

**appropriate** [1] - 729:19

**approval** [1] - 766:16

**approve** [2] - 633:11, 805:23

**approved** [1] - 683:12

**April** [12] - 670:9, 719:2, 722:14, 723:13, 723:14, 769:23, 821:24, 822:5, 822:11, 822:12, 823:10

**areas** [1] - 687:19

**ARENT** [2] - 610:2, 610:7

**argue** [2] - 684:11, 756:5

**argued** [1] - 800:10

Case 1:21-cr-00054-RPK-PK     Document 424-1     Filed 07/12/24     Page 248 of 271
PageID #: 14041
(arguing - best)                                                        Page 4

**arguing** [1] - 619:13
**argument** [2] - 619:13, 684:9
**Arlington** [2] - 687:21, 687:22
**arm** [1] - 707:11
**arrange** [1] - 737:24
**arranging** [1] - 737:19
**articulated** [1] - 679:25
**articulating** [1] - 681:4
**ARTIE** [1] - 609:16
**Artie** [2] - 611:5, 781:9
**Ascendant** [52] - 626:9, 632:20, 634:9, 644:4, 656:18, 666:3, 667:13, 667:23, 672:20, 673:8, 674:14, 674:18, 692:15, 692:17, 692:19, 700:14, 700:25, 701:4, 701:6, 701:12, 701:14, 702:5, 702:13, 702:16, 703:1, 703:7, 703:11, 704:4, 704:7, 704:10, 704:18, 705:3, 706:2, 706:6, 706:8, 707:10, 710:14, 710:20, 711:15, 712:23, 713:10, 733:25, 735:4, 735:12, 735:13, 738:22, 744:15, 745:4, 763:9, 768:25, 815:6
**ascribed** [1] - 848:14
**aspect** [1] - 710:21
**aspects** [1] - 712:9
**asserting** [1] - 623:22
**assertion** [2] - 619:20, 830:4
**assertions** [1] - 677:17
**assess** [1] - 678:17
**assessed** [2] - 736:20, 737:11
**asset** [1] - 710:19
**assets** [4] - 662:10, 662:23, 706:25, 737:10
**assign** [1] - 713:16
**assistance** [2] - 627:20, 737:11
**Assistant** [1] - 609:18
**assistant** [5] - 736:16, 753:14, 758:21, 817:18, 819:4
**assisting** [1] - 742:5
**associated** [2] - 661:25, 663:21
**assumed** [1] - 664:4
**assuming** [2] - 690:1, 720:17
**assurance** [2] - 636:9, 779:5
**asterisk** [1] - 660:11
**atmosphere** [4] - 700:7, 700:12, 701:19, 702:12
**attached** [11] - 776:12, 778:11, 778:18, 779:14, 802:22, 805:20, 810:23, 813:2, 824:9, 830:15, 831:21
**attaches** [1] - 677:16
**attaching** [1] - 775:2
**attachment** [15] - 680:4, 753:25, 756:8, 778:7, 780:13, 780:14, 780:20, 780:21, 804:19, 807:7, 807:10, 811:2, 831:8, 831:13, 836:8
**Attachment** [5] - 820:3, 820:16, 833:25, 834:2, 852:11
**attachments** [13] - 618:18, 795:23, 795:24, 796:4, 796:21, 803:6, 806:24, 814:16, 820:6, 826:2, 830:18, 830:23
**attempt** [1] - 618:16
**attend** [2] - 707:11, 708:7
**attended** [5] - 627:1, 644:9, 709:2, 709:12, 710:9
**attention** [1] - 632:24, 638:14, 655:5, 675:2, 724:13, 725:24, 726:5, 734:15, 741:8, 787:9, 841:19

**attenuated** [1] - 757:16
**Attorney** [1] - 610:11
**ATTORNEY'S** [1] - 609:14
**Attorneys** [2] - 609:18, 610:7
**attorneys** [3] - 609:19, 610:3, 625:2
**audience** [2] - 708:11, 708:12
**audit** [1] - 690:14
**audited** [15] - 634:5, 634:13, 644:20, 644:25, 645:9, 655:2, 655:6, 665:9, 668:7, 669:12, 669:24, 672:7, 672:9, 673:15, 674:16
**auditor** [1] - 672:10
**auditors** [2] - 677:25, 678:1
**August** [9] - 609:9, 665:18, 666:2, 666:6, 722:14, 785:5, 785:9, 803:13, 804:15
**Austin** [4] - 626:14, 627:1, 700:18, 708:3
**authenticate** [2] - 684:6, 782:20
**authority** [2] - 766:15, 785:13
**authorized** [2] - 639:7, 785:14
**Auto** [12] - 629:5, 784:1, 786:25, 789:10, 804:14, 807:12, 813:11, 828:10, 828:19, 832:14, 835:2, 836:19
**auto** [2] - 695:1, 743:19
**Auto Fund** [14] - 628:1, 628:11, 628:17, 628:23, 634:6, 638:12, 640:11, 642:24, 644:21, 645:4, 645:7, 645:11, 645:15, 647:19
**automatically** [2] - 636:6, 636:10
**automotive** [6] - 627:18, 627:22, 628:4, 781:14, 818:12, 822:25
**Automotive** [36] - 627:7, 627:9, 633:11, 634:17, 634:20, 641:1, 643:12, 644:9, 655:2, 655:7, 662:1, 662:8, 663:13, 663:22, 664:5, 664:13, 666:19, 668:15, 669:18, 691:2, 715:21, 725:4, 761:9, 784:3, 788:16, 792:13, 794:16, 801:15, 805:21, 811:2, 823:5, 832:10, 837:11, 841:16, 842:3, 842:18
**Automotive's** [1] - 841:21
**automotive-only** [1] - 628:4
**available** [14] - 621:24, 644:22, 651:13, 661:5, 664:22, 667:2, 668:10, 690:13, 693:17, 696:17, 708:17, 722:13, 738:5, 801:3
**Avenue** [2] - 610:4, 610:12
**aware** [23] - 613:25, 639:6, 648:12, 648:16, 649:2, 649:17, 649:21, 650:2, 657:8, 684:3, 734:1, 734:4, 738:14, 739:16, 742:7, 742:13, 742:15, 767:9, 770:15, 771:24, 788:23, 798:21
**awfully** [1] - 643:17
**Axelrod** [1] - 611:6
**AXELROD** [16] - 609:17, 623:25, 755:16, 755:18, 755:22, 757:7, 757:11, 757:20, 757:25, 758:13, 845:15, 845:24, 846:17, 848:1, 849:15, 849:20
**AXLEROD** [1] - 623:12

---

## B

**back-end** [2] - 693:23, 693:25
**backdated** [2] - 670:9, 801:18
**background** [10] - 687:11, 687:16,

**attenuated** ... continuing right column:

**699:12, 699:14, 699:18, 700:2, 710:10, 710:18, 757:22, 817:2**
**Badell** [1] - 611:10
**BADELL** [2] - 609:22, 615:21
**bag** [2] - 830:1, 848:13
**balances** [2] - 818:8, 822:17
**balancing** [2] - 761:7
**ball** [1] - 621:8
**bank** [31] - 682:5, 683:4, 683:20, 683:21, 694:16, 760:17, 760:20, 760:24, 761:1, 761:8, 761:10, 761:12, 761:17, 761:18, 763:2, 763:11, 766:11, 773:19, 773:24, 774:1, 774:12, 779:13, 784:14, 788:10, 788:11, 788:20, 789:13, 790:2, 808:11, 833:12
**banking** [1] - 687:20
**bankrupt** [1] - 662:13
**banks** [2] - 687:18, 689:7
**bar** [2] - 613:2, 843:10
**baseball** [1] - 702:2
**based** [22] - 612:14, 613:1, 641:12, 661:22, 662:8, 662:10, 682:5, 683:3, 683:19, 697:12, 697:15, 703:9, 713:6, 726:16, 738:9, 738:10, 738:13, 752:14, 765:18, 773:19, 844:25
**bases** [1] - 682:13
**basic** [1] - 689:2
**basics** [1] - 688:24
**basis** [21] - 613:10, 615:19, 617:8, 617:9, 617:11, 617:16, 617:21, 649:12, 675:7, 675:8, 677:19, 681:5, 681:8, 695:5, 695:13, 702:20, 704:11, 746:4, 779:13, 782:14
**bat** [1] - 702:2
**Bates** [36] - 611:8, 669:3, 717:16, 718:6, 718:19, 719:13, 727:20, 734:18, 735:15, 735:25, 737:14, 775:21, 784:22, 787:25, 789:2, 789:3, 791:22, 792:22, 797:4, 798:2, 810:21, 812:15, 819:17, 819:22, 820:15, 820:25, 822:22, 827:18, 831:20, 834:5, 836:14, 837:6, 837:21, 838:2, 839:10, 840:8
**bates** [1] - 726:4
**bathroom** [1] - 686:1
**beach** [1] - 739:12
**beak** [1] - 769:6
**bear** [1] - 846:18
**became** [1] - 690:2
**become** [6] - 681:22, 695:17, 695:21, 702:13, 702:16, 742:13
**becomes** [1] - 681:10
**becoming** [1] - 800:6
**began** [2] - 692:12, 816:2
**begin** [3] - 613:21, 707:5, 845:6
**beginning** [7] - 638:21, 672:22, 677:1, 706:23, 723:10, 726:20, 730:21
**behalf** [1] - 675:4
**behind** [2] - 732:7, 843:17
**belabor** [2] - 612:24, 657:1
**belied** [1] - 684:14
**below** [10] - 718:7, 768:10, 769:19, 791:7, 813:14, 821:13, 821:21, 821:23, 822:17, 836:21
**beside** [1] - 847:13
**best** [4] - 737:20, 828:20, 828:24, 829:19

(*best-case - charged*)

**best-case** [1] - 829:19
**better** [3] - 709:15, 811:16, 835:9
**between** [13] - 681:2, 692:17, 719:18, 720:25, 737:21, 745:21, 747:25, 751:17, 762:13, 765:12, 794:2, 804:15, 812:2
**beyond** [7] - 664:21, 682:7, 771:21, 780:19, 780:24, 780:25, 832:5
**bid** [1] - 623:2
**big** [7] - 662:16, 689:6, 707:1, 707:5, 712:2, 802:21
**bigger** [3] - 612:21, 789:4, 794:18
**biggest** [1] - 713:22
**Bill** [3] - 677:10, 789:22, 797:10
**Bill/David** [1] - 812:23
**billion** [3] - 687:24, 706:25, 707:6
**BINHAK** [1] - 610:11, 610:14
**Binhak** [1] - 611:13
**bit** [16] - 621:8, 623:2, 638:19, 657:2, 679:20, 687:15, 691:25, 719:3, 740:14, 744:12, 789:4, 789:8, 832:19, 840:14, 843:17, 844:21
**blanket** [1] - 637:7
**block** [1] - 714:19
**blow** [4] - 669:10, 715:15, 734:17, 834:25
**blown** [1] - 735:1
**Blue** [1] - 641:6
**blue** [4] - 763:3, 790:4, 832:15, 843:11
**blurted** [1] - 730:22
**blurting** [1] - 730:24
**board** [13] - 741:23, 742:1, 742:2, 742:3, 742:4, 742:8, 742:12, 742:19, 742:24, 743:1, 743:4, 771:11, 771:12
**boilerplate** [2] - 637:23, 637:24
**bold** [1] - 789:25, 813:14
**bolded** [1] - 790:5
**bond** [1] - 687:18
**bonds** [2] - 643:15, 662:5
**book** [2] - 725:1, 810:2
**booked** [5] - 615:8, 615:12, 810:6, 826:24, 827:1
**booking** [1] - 838:5
**books** [5] - 613:7, 615:22, 684:24, 837:14, 838:8
**bother** [2] - 652:17, 653:5
**bothered** [1] - 653:6
**bottom** [21] - 612:20, 631:21, 639:17, 752:4, 752:12, 783:24, 787:24, 789:24, 791:22, 792:20, 797:3, 797:4, 799:5, 799:10, 799:20, 800:22, 836:15, 840:17, 841:19, 843:6, 843:12
**bottom-right** [1] - 631:21
**bought** [1] - 696:9
**bounce** [1] - 845:16
**box** [5] - 763:4, 764:13, 821:1, 821:3, 832:10
**boxes** [3] - 761:23, 762:25, 763:3
**break** [16] - 622:23, 623:4, 623:6, 623:9, 675:21, 676:12, 686:1, 729:1, 729:2, 729:3, 781:2, 824:6, 840:3, 842:8, 844:17, 848:7
**breakdown** [1] - 829:1
**breathing** [1] - 779:2
**brief** [5] - 623:11, 624:11, 673:20, 755:17, 845:4
**briefly** [2] - 671:3, 703:18

**bring** [2] - 685:25, 733:14
**broach** [1] - 723:25
**broached** [1] - 612:16
**brochure** [3] - 636:13, 636:19
**broke** [4] - 621:4, 732:13, 733:12, 835:22
**broker** [8] - 618:22, 721:2, 721:9, 735:4, 735:11, 737:18, 737:19, 763:9
**broker/dealers** [3] - 707:13, 710:25, 711:10
**brokerage** [5] - 708:12, 708:13, 708:15, 712:23, 712:24
**brokers** [3] - 701:9, 707:19, 708:17
**Brooklyn** [2] - 609:5, 609:15
**brought** [2] - 709:19, 741:7
**buckets** [1] - 761:17
**BUCKLEY** [1] - 609:21
**Buckley** [1] - 611:9
**bucks** [3] - 694:16, 694:17, 743:10
**budget** [2] - 818:10, 818:12
**Buick** [2] - 771:15, 771:24
**build** [1] - 649:16
**building** [2] - 699:17, 748:8
**built** [3] - 642:25, 699:16, 710:14
**built-in** [1] - 642:25
**bullet** [2] - 717:9, 813:5
**bunch** [2] - 743:10, 758:17
**business** [32] - 662:13, 662:18, 662:19, 662:22, 668:24, 682:6, 685:1, 685:5, 685:8, 685:9, 687:22, 688:2, 693:9, 693:12, 695:17, 695:21, 700:9, 706:23, 737:20, 743:20, 774:5, 776:21, 776:24, 779:12, 779:25, 807:20, 807:24, 808:14, 808:16, 808:19, 809:2, 810:3
**businesses** [3] - 641:19, 641:20, 694:5
**busy** [1] - 700:6
**buttress** [1] - 681:13
**buttressing** [2] - 681:16, 681:18
**buy** [8] - 637:16, 695:3, 727:3, 727:4, 763:16, 764:10, 764:11, 764:15
**buying** [1] - 801:25

# C

**Cadman** [1] - 609:15
**calculate** [1] - 821:10
**calculated** [5] - 667:14, 695:11, 767:10, 767:12, 797:15
**calendar** [1] - 659:8
**candidates** [1] - 692:6
**capable** [1] - 778:16
**capacity** [1] - 739:17
**capital** [30] - 633:6, 650:21, 651:13, 651:18, 651:23, 652:3, 652:6, 652:10, 652:15, 657:4, 665:4, 665:7, 665:11, 665:12, 666:15, 667:25, 671:11, 671:17, 671:20, 674:21, 727:12, 727:16, 728:9, 728:13, 750:12, 753:17, 785:10, 818:9, 818:10
**Capital** [27] - 626:9, 634:9, 666:3, 667:13, 667:23, 673:8, 678:22, 690:3, 690:4, 690:15, 690:20, 691:6, 692:1, 692:15, 692:17, 700:14, 700:25, 701:4, 702:5, 703:7, 706:6, 706:9, 707:10, 711:15, 739:9

**car** [18] - 662:11, 695:3, 716:19, 717:4, 718:1, 725:4, 727:3, 727:4, 727:6, 737:23, 743:6, 743:16, 764:10, 764:11, 764:15, 771:13, 789:11, 789:13
**card** [1] - 788:12
**care** [1] - 648:11
**career** [1] - 684:5
**careful** [1] - 779:1
**carefully** [5] - 651:25, 772:14, 772:16, 773:9, 773:10
**cascading** [1] - 621:20
**case** [25] - 625:16, 653:7, 680:19, 680:21, 682:3, 686:12, 686:15, 694:6, 716:19, 718:1, 730:21, 732:15, 737:23, 743:5, 764:9, 764:10, 780:25, 792:3, 793:3, 795:18, 801:20, 802:17, 828:24, 829:19, 844:7
**cases** [7] - 618:21, 619:6, 680:16, 680:18, 743:8, 810:11, 827:3
**cash** [42] - 631:4, 634:25, 635:16, 635:25, 636:7, 639:19, 641:20, 650:19, 652:16, 653:2, 653:24, 653:25, 656:22, 660:16, 661:5, 667:2, 694:5, 696:9, 719:21, 719:23, 723:20, 726:16, 726:19, 737:10, 740:11, 741:22, 743:2, 744:4, 750:7, 753:20, 764:5, 764:20, 766:6, 771:21, 772:4, 790:8, 801:13, 801:16, 801:19, 818:8, 822:17, 833:14
**cash-flowing** [1] - 694:5
**cat** [6] - 830:1, 848:13, 848:17, 848:20, 848:21
**catch** [8] - 723:6, 724:6, 730:14, 741:11, 769:12, 786:17, 825:6, 829:11
**catching** [2] - 770:3, 793:20
**categorically** [1] - 619:14
**category** [9] - 620:8, 622:17, 677:21, 677:22, 677:24, 678:3, 678:5, 678:7
**cease** [1] - 666:7
**ceased** [2] - 666:7, 704:3
**cents** [1] - 788:17
**CEO** [3] - 691:22, 692:15, 693:4
**certain** [19] - 627:25, 628:10, 628:15, 632:19, 632:21, 649:18, 662:17, 666:15, 678:17, 679:12, 680:25, 681:14, 698:16, 744:16, 744:19, 755:2, 789:17, 796:18, 796:19
**certainly** [4] - 612:11, 662:18, 702:6, 756:5
**CFO** [14] - 615:24, 687:21, 688:6, 688:7, 688:9, 690:6, 690:7, 695:19, 704:4, 704:6, 704:7, 704:13, 711:10, 712:4
**chain** [8] - 745:21, 751:17, 752:9, 752:20, 752:21, 795:16, 829:24, 849:4
**challenged** [1] - 681:14
**chance** [3] - 643:24, 654:16, 728:3
**change** [8] - 633:18, 640:21, 657:10, 724:17, 768:5, 769:2, 790:9, 794:18, 838:24
**changed** [2] - 657:8, 794:9
**changes** [3] - 768:25, 839:4, 839:6
**character** [1] - 623:2
**charge** [6] - 688:13, 690:21, 708:16, 713:15, 739:19, 740:18
**charged** [9] - 615:9, 734:2, 734:23, 735:1, 735:3, 736:17, 739:5, 771:18, 794:19

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 250 of 271
PageID #: 14043
(charging - contact)                                                      Page 6

**charging** [1] - 740:9
**chart** [6] - 719:14, 720:20, 756:15, 793:4
**charts** [1] - 834:7
**check** [3] - 787:17, 787:20, 846:21
**checkbook** [1] - 761:7
**checking** [1] - 621:14
**chief** [25] - 678:21, 684:2, 688:10, 688:12, 690:2, 690:17, 690:19, 691:23, 692:1, 695:15, 700:16, 701:3, 703:9, 713:20, 726:23, 733:21, 734:1, 738:14, 738:20, 739:17, 742:7, 744:6, 748:11, 760:19, 767:8
**Chip** [1] - 641:6
**chocolate** [1] - 688:25
**chunk** [1] - 799:20
**Ciasulli** [1] - 834:19
**circulate** [2] - 783:8, 815:17
**circumstances** [1] - 768:20
**cites** [2] - 619:6, 680:16
**Citibank** [1] - 688:4
**citing** [2] - 618:21, 674:22
**City** [3] - 691:14, 691:20, 698:25
**claim** [3] - 846:3, 846:11, 846:12
**clarity** [1] - 844:21
**class** [8] - 615:11, 720:22, 721:6, 721:8, 735:24, 768:8
**Class** [5] - 639:1, 720:23, 720:25
**clean** [1] - 704:11
**clear** [9] - 677:4, 707:23, 729:25, 736:25, 780:4, 781:7, 785:22, 833:9, 846:24
**clearly** [3] - 681:13, 704:6, 846:22
**Clearwater** [1] - 739:12
**click** [1] - 831:19
**clicked** [1] - 784:3
**client** [7] - 611:10, 619:14, 648:5, 674:5, 674:18, 708:14, 847:6
**client's** [1] - 671:24
**clients** [9] - 641:1, 642:17, 643:11, 643:22, 644:8, 645:14, 700:19, 701:10, 708:18
**close** [12] - 635:16, 665:24, 755:24, 801:17, 801:22, 801:25, 802:1, 802:2, 802:4, 802:20, 834:20
**closed** [2] - 688:2, 802:4
**closely** [1] - 706:12
**closing** [1] - 802:5
**closings** [1] - 802:6
**co** [6] - 677:15, 755:4, 755:6, 755:8, 755:9, 757:13
**co-conspirator** [6] - 677:15, 755:4, 755:6, 755:8, 755:9, 757:13
**cock** [1] - 714:19
**Cogan** [6] - 611:9, 627:4, 627:13, 671:7, 671:8, 671:9
**COGAN** [16] - 609:23, 611:9, 663:5, 663:24, 664:7, 668:4, 670:1, 670:11, 670:17, 670:21, 671:3, 671:5, 673:18, 675:4, 675:8, 675:15
**COGAN............................** [1] - 850:10
**cognizant** [1] - 685:18
**collect** [6] - 695:2, 697:21, 698:1, 727:2, 801:17, 801:22
**collected** [1] - 767:14
**colloquy** [3] - 621:18, 622:21, 623:14
**color** [1] - 842:21

**Colton** [5] - 611:12, 612:1, 678:6, 729:10, 729:15
**COLTON** [91] - 610:5, 611:12, 618:14, 619:17, 620:6, 620:19, 620:25, 621:6, 621:13, 622:17, 676:22, 676:25, 677:7, 679:16, 680:7, 681:9, 684:4, 685:17, 693:5, 695:13, 697:4, 697:9, 701:18, 701:20, 702:20, 703:12, 703:18, 704:3, 704:20, 708:22, 711:6, 714:21, 714:25, 716:6, 720:8, 721:21, 725:14, 729:24, 730:11, 730:15, 730:20, 731:3, 734:19, 736:12, 742:17, 746:4, 747:19, 751:7, 751:24, 752:12, 754:4, 754:10, 756:7, 756:13, 757:12, 762:5, 762:12, 777:1, 778:13, 778:20, 778:25, 780:4, 780:9, 780:11, 780:17, 780:22, 781:9, 781:22, 782:5, 783:2, 794:4, 796:7, 796:13, 800:7, 803:3, 803:21, 803:25, 807:16, 809:3, 812:9, 814:7, 816:21, 830:3, 831:9, 832:4, 837:7, 846:6, 846:24, 847:1, 848:10, 848:19
**Column** [2] - 790:6, 790:14
**column** [7] - 784:10, 788:2, 789:23, 821:14, 821:24, 822:8, 823:10
**columns** [1] - 784:7
**combine** [1] - 705:2
**coming** [20] - 631:5, 652:20, 652:22, 653:3, 653:10, 723:8, 724:5, 730:3, 755:5, 756:7, 756:8, 762:14, 770:2, 770:7, 788:6, 788:8, 789:18, 793:24, 806:11, 822:16
**comment** [4] - 612:23, 784:20, 789:19, 793:15, 848:12
**commented** [1] - 701:20
**comments** [2] - 809:14, 809:15
**commercial** [1] - 615:9
**commission** [1] - 721:9
**commissions** [2] - 721:4, 735:11
**communicate** [15] - 699:6, 711:9, 714:4, 714:6, 722:24, 744:23, 745:3, 747:15, 747:16, 747:21, 760:12, 800:25, 801:3, 813:23, 827:23
**communicated** [4] - 749:5, 760:11, 773:11, 800:23, 826:19
**communicating** [7] - 678:16, 701:9, 747:5, 748:1, 748:11, 750:6, 799:7
**communication** [15] - 678:7, 680:20, 680:23, 680:24, 681:17, 681:19, 748:17, 748:20, 748:21, 751:1, 751:16, 752:10, 758:22, 760:15, 828:2
**communications** [7] - 677:25, 680:18, 681:12, 758:19, 796:8, 796:19
**companies** [31] - 612:20, 631:5, 694:9, 694:25, 696:9, 696:12, 696:13, 696:15, 696:22, 709:16, 710:1, 710:22, 716:19, 717:2, 717:25, 742:10, 742:12, 742:15, 743:8, 744:3, 763:17, 764:13, 764:16, 765:1, 768:24, 786:25, 793:10, 810:11, 826:21, 827:14, 842:4
**Company** [1] - 641:5
**company** [23] - 615:4, 615:5, 615:8, 615:24, 636:22, 696:10, 702:19, 703:7, 705:1, 705:2, 706:6, 726:19, 737:1, 737:6, 742:3, 742:6, 743:4, 743:7, 743:12, 764:18, 764:21, 774:21, 816:3
**company's** [2] - 623:18, 623:22, 660:7,

661:4, 661:5
**compare** [4] - 646:18, 653:18, 798:7, 822:8
**compared** [3] - 647:14, 719:15, 814:24
**comparing** [1] - 646:15
**compelling** [1] - 681:3
**compete** [1] - 643:6
**competition** [3] - 642:19, 642:25, 643:9
**compile** [1] - 808:17
**complete** [1] - 748:14
**completed** [1] - 737:6
**completely** [2] - 636:7, 684:13
**complicated** [1] - 846:1
**complimentary** [1] - 710:19
**compound** [5] - 695:18, 697:4, 697:6, 708:22, 708:24
**Computer** [1] - 610:18
**Computer-aided** [1] - 610:18
**computerized** [1] - 610:18
**concern** [9] - 622:18, 703:15, 703:16, 713:22, 740:10, 747:14, 748:18, 802:20, 829:13
**concerned** [5] - 618:4, 618:10, 667:18, 771:6, 800:6
**concerning** [1] - 656:17
**concerns** [7] - 723:15, 744:23, 749:5, 758:4, 760:11, 760:12, 779:15
**conclude** [1] - 829:13
**concludes** [3] - 616:2, 748:22, 759:2
**conduct** [2] - 664:14, 678:1
**conducting** [2] - 664:20, 668:11
**confer** [2] - 824:1, 845:7
**conference** [2] - 626:23, 675:23
**conferred** [1] - 612:1
**confident** [2] - 844:24, 847:1
**confirm** [1] - 800:22
**confirmed** [2] - 627:5, 785:14
**conflating** [1] - 747:23
**conflict** [2] - 733:2, 844:1
**confused** [2] - 684:20, 847:10
**conjunction** [1] - 751:3
**connect** [1] - 676:25
**connected** [1] - 680:20
**connection** [5] - 637:10, 637:17, 664:13, 742:9, 794:2
**consider** [1] - 664:20
**considerably** [1] - 845:8
**considered** [6] - 638:4, 638:5, 638:25, 671:17, 675:17, 676:5
**considering** [1] - 732:14
**consistent** [2] - 731:4, 732:19
**consolidate** [1] - 703:6
**conspiracy** [2] - 755:7, 757:15
**conspirator** [9] - 677:15, 755:4, 755:6, 755:8, 755:9, 755:23, 755:24, 756:1, 757:13
**conspiratorial** [1] - 755:25
**conspirators** [1] - 755:19
**constantly** [3] - 683:10, 701:16, 838:25
**constitute** [2] - 637:15, 638:25
**consultant** [1] - 615:4
**consulted** [2] - 623:17, 623:18
**consummation** [1] - 738:1
**contact** [4] - 625:15, 673:5, 673:6, 673:12

contacted [1] - 673:9
contacts [4] - 626:9, 626:11, 626:14, 667:23
contain [2] - 720:14, 780:24
contained [2] - 658:10, 808:9
content [5] - 665:18, 683:2, 683:3, 848:14, 848:16
context [12] - 637:2, 648:24, 671:15, 676:23, 678:25, 679:5, 682:24, 748:10, 757:22, 782:21, 800:11, 800:12
continually [1] - 777:19
continue [6] - 646:15, 651:12, 733:7, 733:20, 793:25, 823:25
continued [6] - 614:2, 700:1, 706:1, 746:7, 754:17, 773:9
Continued [13] - 610:1, 616:3, 658:13, 673:25, 675:24, 699:21, 703:22, 705:9, 748:23, 759:3, 763:18, 794:21, 825:21
continues [1] - 674:7
continuing [7] - 668:4, 764:2, 794:3, 795:1, 798:11, 800:17, 800:19
Continuing [5] - 733:11, 749:4, 753:6, 760:10, 783:18
Continuing).......... [1] - 850:20
contributions [1] - 651:14
control [2] - 662:14, 816:4
controlled [1] - 733:24
conversation [8] - 617:12, 619:11, 620:17, 679:1, 730:9, 770:12, 800:4, 800:16
conversations [27] - 612:14, 613:2, 613:6, 619:7, 619:9, 656:18, 667:24, 678:19, 679:9, 679:13, 696:1, 697:16, 706:21, 707:7, 713:6, 724:7, 728:15, 728:18, 733:18, 738:17, 740:7, 741:4, 741:13, 768:21, 771:4, 771:5, 823:20
conveyed [1] - 809:18
conveys [1] - 758:5
COO [1] - 745:15
coordinate [1] - 701:11
copied [6] - 619:22, 619:23, 620:9, 626:19, 677:15, 678:4
copying [1] - 798:4
corner [2] - 631:21, 648:8
corporate [2] - 643:15, 739:11
corporations [1] - 689:6
Correct [1] - 790:19
correct [49] - 625:8, 626:10, 628:13, 630:6, 631:14, 631:18, 631:19, 633:13, 633:15, 633:21, 634:3, 634:4, 634:14, 634:15, 634:20, 639:4, 640:2, 640:5, 643:7, 644:7, 650:3, 651:19, 653:11, 655:23, 660:2, 660:3, 660:24, 661:7, 661:10, 662:5, 663:16, 663:19, 667:11, 668:11, 672:7, 672:10, 673:17, 692:23, 692:24, 724:15, 784:4, 804:11, 806:1, 808:5, 810:24, 828:16, 831:1, 840:15, 841:17
correctly [1] - 781:8
cost [1] - 615:12
costs [2] - 702:10, 736:10
counsel [20] - 611:4, 611:7, 611:14, 620:14, 623:17, 623:18, 623:25, 661:23, 667:3, 684:10, 746:5, 783:8, 824:1, 844:18, 844:21, 846:11, 847:2, 847:3, 847:12, 847:17

Counsel [20] - 715:11, 720:1, 721:12, 724:21, 795:9, 796:2, 798:25, 802:24, 804:21, 806:13, 806:23, 807:9, 811:24, 813:19, 816:8, 817:12, 819:1, 819:8, 820:5, 825:8
counsel's [1] - 779:15
couple [10] - 620:23, 676:23, 677:1, 692:10, 701:2, 707:17, 708:3, 743:6, 835:3, 840:5
course [12] - 635:13, 640:22, 671:23, 679:12, 684:16, 685:22, 695:15, 755:6, 779:12, 782:7, 800:3, 808:16
Court [41] - 610:15, 610:15, 620:21, 621:6, 621:7, 628:25, 646:25, 654:14, 655:5, 659:4, 674:10, 685:17, 686:12, 686:15, 715:11, 720:1, 721:12, 724:21, 729:25, 730:4, 730:16, 762:12, 795:9, 796:2, 798:25, 802:24, 803:4, 804:21, 806:13, 806:23, 807:9, 811:24, 813:19, 816:8, 817:12, 819:1, 819:8, 820:5, 825:8, 844:21, 847:7
court [13] - 611:1, 612:16, 617:1, 621:4, 676:1, 677:13, 679:18, 732:3, 747:2, 749:1, 760:1, 800:8, 830:4
Court's [1] - 684:17
Courthouse [1] - 609:5
courtroom [4] - 624:13, 676:14, 733:5, 844:11
cover [26] - 654:17, 668:5, 684:14, 697:3, 739:18, 741:3, 768:14, 770:10, 776:20, 785:10, 785:20, 786:5, 787:15, 787:21, 791:5, 791:12, 791:16, 791:19, 811:18, 824:16, 825:3, 828:25, 830:2, 839:12, 842:3, 849:12
coverage [22] - 667:14, 667:15, 674:19, 766:23, 767:2, 767:9, 768:10, 768:17, 769:4, 769:13, 769:19, 797:15, 820:22, 821:10, 824:24, 826:11, 826:14, 833:3, 836:16, 840:21, 841:22, 843:8
Coverage [1] - 843:6
coverage/shortfall [2] - 840:18, 841:20
covered [28] - 631:8, 631:17, 632:13, 634:25, 635:16, 635:25, 636:7, 668:3, 718:11, 739:13, 755:20, 767:5, 767:7, 767:24, 767:25, 768:3, 769:10, 791:23, 792:21, 822:5, 823:8, 823:9, 823:13, 825:6, 829:7, 832:12, 841:2, 842:1
covering [4] - 803:13, 828:11, 828:23, 829:6
cream [1] - 688:24
created [9] - 670:9, 685:9, 703:8, 713:8, 713:9, 774:13, 774:14, 778:5, 819:10
creates [1] - 756:21
creating [1] - 612:21
creation [1] - 777:17
credit [3] - 687:18, 756:15, 788:12
crediting [1] - 684:8
crime [2] - 623:16, 623:23
crisis [1] - 688:1
critical [2] - 847:4, 847:8
cross [6] - 617:4, 664:24, 665:10, 665:17, 844:19, 844:25
CROSS [3] - 624:24, 659:1, 850:5
cross-examination [4] - 617:4, 664:24, 665:10, 665:17
CROSS-EXAMINATION [3] - 624:24,

659:1, 850:5
cumulative [1] - 681:23
curative [1] - 684:18
curious [1] - 626:2
Current [1] - 650:19
current [1] - 662:11
cut [3] - 638:19, 733:22, 733:23

# D

dash [1] - 655:5
dashboard [17] - 747:22, 814:21, 815:4, 815:13, 819:10, 820:8, 832:13, 833:4, 833:21, 836:2, 836:17, 836:24, 837:2, 841:1, 841:16, 842:23, 842:24
dashboards [16] - 814:19, 815:1, 815:18, 815:25, 817:4, 818:18, 818:24, 823:21, 824:9, 824:20, 826:15, 827:1, 828:16, 831:3, 838:23, 843:4
data [2] - 680:13, 778:17
date [26] - 654:18, 692:12, 744:16, 744:19, 745:22, 774:4, 779:14, 784:12, 784:23, 784:25, 785:5, 792:23, 797:21, 812:21, 816:13, 821:16, 822:10, 823:4, 823:14, 823:16, 828:12, 832:24, 833:7, 838:3
dated [6] - 635:25, 659:9, 715:25, 725:19, 733:13, 778:14
dates [1] - 779:9
Dave [1] - 802:16
DAVID [1] - 609:8
David [8] - 609:20, 611:10, 673:12, 691:21, 692:8, 789:23, 797:19
days [1] - 625:6
DC [1] - 610:9
de [1] - 652:9
deadline [1] - 849:17
deal [4] - 735:4, 835:20, 835:21, 835:22
dealership [29] - 642:14, 642:15, 642:19, 642:23, 642:24, 643:5, 643:6, 668:21, 695:3, 695:4, 696:10, 727:3, 738:2, 738:5, 738:10, 738:11, 738:12, 764:11, 764:12, 770:24, 771:16, 771:18, 771:25, 789:16, 802:2, 834:18
dealerships [30] - 641:15, 641:16, 641:18, 641:19, 641:24, 642:1, 642:3, 642:6, 642:9, 643:7, 662:11, 716:20, 717:4, 718:1, 725:5, 726:17, 727:4, 727:6, 737:24, 743:6, 743:16, 764:15, 770:22, 771:4, 771:14, 787:1, 789:11, 789:13, 810:8, 828:21
deals [10] - 788:24, 789:18, 792:9, 801:17, 801:21, 801:23, 802:4, 802:20, 825:5, 826:25
Dearington [2] - 611:13, 625:1
DEARINGTON [31] - 610:9, 624:22, 624:25, 629:9, 630:21, 640:17, 645:18, 646:7, 646:12, 646:24, 647:5, 648:23, 649:7, 649:15, 655:9, 655:14, 656:10, 659:2, 659:11, 659:16, 659:21, 660:12, 660:15, 661:12, 661:14, 673:20, 673:23, 674:3, 674:17, 674:25, 676:8
DEARINGTON..................... [1] - 850:6
December [17] - 651:24, 666:16, 669:25, 670:6, 671:15, 674:5, 674:8, 674:19,

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 252 of 271
PageID #: 14045
(decide - distributions)                                                    Page 8

675:13, 676:3, 690:12, 718:24, 719:1, 722:15, 787:15, 791:19, 838:15

**decide** [2] - 786:9, 786:10

**decides** [1] - 737:1

**decipher** [1] - 667:10

**decision** [5] - 621:18, 698:4, 708:16, 847:5, 847:8

**decision-making** [2] - 847:5, 847:8

**deck** [2] - 715:19, 721:15

**decks** [4] - 622:10, 622:14, 623:6, 721:16

**declarant** [2] - 680:17

**declined** [1] - 625:7

**deeper** [1] - 772:23

**deeply** [5] - 656:17, 667:19, 672:1, 672:5, 672:12

**defendant** [1] - 768:23

**Defendant's Exhibit** [8] - 629:13, 646:11, 647:8, 655:13, 851:5, 851:6, 851:7, 851:8

**defendants** [47] - 609:9, 612:14, 612:18, 613:2, 613:8, 618:5, 619:8, 619:10, 678:4, 678:19, 678:22, 679:14, 680:19, 680:20, 682:8, 682:12, 685:20, 697:8, 703:10, 704:23, 710:9, 714:4, 733:19, 740:3, 740:8, 740:24, 741:14, 742:8, 742:20, 742:24, 744:24, 755:6, 757:8, 757:13, 758:6, 758:20, 758:22, 758:23, 768:18, 770:12, 771:9, 782:12, 794:15, 795:2, 825:2, 826:9, 845:16

**Defendants** [1] - 711:3

**defense** [14] - 613:18, 617:4, 617:10, 617:12, 617:21, 622:25, 623:17, 623:25, 624:1, 661:23, 667:3, 756:22, 844:18, 847:8

**Defense** [11] - 629:1, 629:9, 645:21, 646:8, 647:1, 654:14, 655:9, 659:4, 659:11, 659:15, 851:9

**defer** [2] - 611:25, 840:4

**deficit** [3] - 836:21, 837:1, 841:4

**deficits** [1] - 790:14

**definite** [1] - 732:15

**definitely** [1] - 781:22

**degree** [1] - 687:12

**delayed** [1] - 624:15

**delegated** [1] - 649:10

**deliver** [2] - 668:21, 818:15

**demand** [1] - 633:6

**Demonstrative** [1] - 762:4

**demonstrative** [3] - 762:9, 762:13, 793:4

**department** [5] - 685:5, 745:14, 745:15, 775:2, 797:7

**depended** [2] - 723:5, 827:5

**depicted** [2] - 761:22, 840:19

**deployed** [1] - 653:4

**deposit** [9] - 694:16, 735:2, 744:19, 744:21, 744:22, 763:5, 763:6, 772:22, 794:9

**deposited** [5] - 723:24, 736:22, 763:11, 772:21, 809:21

**deposits** [11] - 695:2, 707:5, 722:23, 723:23, 763:15, 764:11, 768:15, 787:4, 793:24, 794:10

**DEPUTY** [14] - 611:2, 624:12, 624:20, 676:13, 686:4, 686:10, 686:18, 686:22,

729:4, 733:4, 781:3, 783:13, 844:10, 849:14

**derivatives** [1] - 687:19

**describe** [11] - 688:21, 690:18, 700:3, 701:12, 702:7, 706:11, 708:10, 709:7, 735:9, 737:20, 760:22

**described** [6] - 612:15, 663:2, 706:13, 709:24, 711:4, 744:14

**describes** [1] - 712:6

**describing** [5] - 718:16, 758:9, 761:24, 772:20, 786:15

**description** [5] - 621:7, 635:11, 681:2, 751:19, 820:21

**designed** [1] - 705:2

**desks** [1] - 702:1

**detail** [11] - 700:8, 712:6, 730:9, 744:12, 784:6, 822:11, 829:3, 834:11, 837:11, 839:4, 840:13

**detailed** [2] - 728:7, 819:14

**determine** [1] - 636:20

**determines** [1] - 726:14

**determining** [1] - 826:12

**DG** [3] - 800:24, 801:5, 829:2

**diagram** [1] - 767:14

**dial** [1] - 798:16

**difference** [6] - 633:22, 719:18, 720:24, 741:12, 762:13, 792:10

**different** [17] - 617:19, 622:1, 627:7, 653:19, 667:4, 679:20, 682:14, 682:18, 684:19, 685:19, 687:25, 688:22, 693:15, 693:17, 698:9, 698:18, 707:25, 714:11, 716:13, 720:22, 723:8, 734:23, 757:14, 761:12, 761:16, 761:17, 762:25, 764:15, 765:11, 770:16, 778:21, 779:8, 780:22, 843:24

**difficult** [4] - 638:8, 654:22, 715:4, 773:3

**digging** [2] - 772:23, 786:15

**diligence** [17] - 626:25, 627:5, 628:10, 630:13, 642:18, 644:10, 662:9, 662:10, 664:12, 664:15, 664:20, 668:11, 711:21, 712:16, 712:19, 735:12

**DIRE** [2] - 777:5, 850:17

**dire** [7] - 612:2, 612:9, 613:15, 615:18, 617:5, 703:13, 777:2

**DIRECT** [7] - 687:2, 733:9, 764:1, 783:17, 850:13, 850:15, 850:19

**direct** [6] - 665:10, 725:24, 726:5, 734:15, 787:9, 817:3

**directed** [2] - 809:22, 809:24

**directing** [1] - 841:19

**direction** [1] - 713:9

**directly** [5] - 673:5, 682:11, 704:22, 771:18, 815:23

**directors** [2] - 742:3, 742:4

**disagree** [1] - 624:6

**disclaim** [1] - 658:7

**disclaimer** [1] - 637:6

**disclose** [1] - 667:15

**disclosed** [5] - 621:3, 655:19, 663:25, 664:3, 672:14

**disclosure** [3] - 652:20, 652:22, 665:6

**disclosures** [6] - 650:25, 665:5, 665:10, 665:21, 666:8, 666:11

**discuss** [28] - 618:5, 623:8, 697:1, 697:7, 699:11, 706:17, 706:18, 713:2, 713:11, 725:8, 725:10, 730:5, 740:2,

740:5, 742:19, 768:17, 768:25, 769:4, 769:13, 777:13, 792:4, 793:11, 793:14, 794:15, 799:25, 800:2, 817:9, 818:15

**discussed** [20] - 613:8, 625:6, 627:9, 646:19, 668:19, 673:14, 673:15, 682:8, 739:23, 741:17, 741:19, 741:20, 741:22, 751:4, 752:2, 765:7, 779:7, 786:12, 801:12, 848:11

**discusses** [1] - 617:3

**discussing** [13] - 675:12, 676:3, 751:18, 752:11, 763:2, 775:19, 795:16, 802:11, 803:9, 806:21, 807:11, 812:9, 840:20

**discussion** [13] - 616:2, 617:23, 677:24, 723:19, 729:12, 748:22, 750:11, 759:2, 769:17, 796:9, 799:2, 807:16, 827:24

**discussions** [3] - 714:14, 789:22, 804:2

**Disney** [2] - 742:4

**displaying** [1] - 788:5

**disputes** [1] - 617:13

**disputing** [1] - 617:10

**disregard** [2] - 670:22, 701:23

**dissolve** [1] - 689:22

**distill** [1] - 656:10

**distinction** [1] - 681:1

**distribute** [1] - 815:22

**distributed** [6] - 694:12, 718:17, 798:8, 815:4, 815:5, 815:20

**distribution** [94] - 646:17, 650:8, 653:10, 682:11, 696:17, 697:3, 698:5, 710:5, 716:21, 716:22, 717:9, 717:19, 717:24, 718:7, 718:24, 719:2, 721:7, 722:7, 723:16, 723:18, 724:3, 724:14, 726:25, 727:5, 727:15, 728:10, 728:13, 740:15, 741:15, 744:5, 744:7, 750:11, 753:17, 753:21, 761:13, 765:3, 765:5, 765:11, 766:9, 766:11, 766:17, 769:20, 769:22, 770:11, 772:10, 773:6, 774:15, 775:7, 776:10, 785:10, 785:21, 785:23, 787:15, 787:16, 787:19, 787:22, 791:5, 791:9, 791:12, 791:13, 791:15, 791:19, 791:20, 793:1, 793:12, 793:22, 794:2, 794:7, 795:3, 800:18, 804:17, 805:24, 806:20, 807:4, 811:17, 812:3, 813:3, 813:4, 813:6, 814:18, 821:22, 822:1, 822:18, 822:19, 822:20, 823:12, 826:11, 828:11, 829:6, 833:8, 836:19, 841:21, 841:25

**Distributions** [2] - 719:16, 726:6

**distributions** [156] - 612:22, 629:20, 630:2, 630:6, 630:8, 631:8, 631:16, 631:25, 632:13, 634:22, 634:24, 635:15, 635:25, 636:7, 636:9, 639:13, 639:19, 639:22, 646:16, 647:14, 649:3, 649:19, 650:19, 651:9, 651:12, 651:18, 651:23, 652:2, 652:6, 652:11, 652:14, 652:23, 653:2, 653:18, 654:5, 654:8, 655:22, 656:4, 656:6, 656:13, 656:14, 657:4, 661:10, 663:7, 663:8, 663:9, 663:10, 664:3, 665:12, 665:23, 666:1, 666:7, 666:9, 666:10, 666:14, 666:17, 666:18, 666:20, 666:22, 666:23, 666:24, 667:14, 668:1, 668:2, 668:6, 671:12, 671:16, 671:19, 674:7, 674:9, 674:20, 694:19, 694:20, 694:22, 694:24, 695:10, 695:24, 696:3, 696:6, 697:17, 697:22, 697:24, 709:19, 709:21, 718:25, 719:4, 719:5,

720:15, 722:9, 722:19, 726:2, 726:10, 726:16, 726:19, 727:7, 727:9, 727:20, 727:25, 728:8, 743:24, 743:25, 744:2, 744:13, 744:15, 744:24, 745:3, 747:9, 747:14, 747:22, 749:6, 750:6, 751:5, 755:19, 766:21, 767:18, 767:22, 768:4, 768:12, 770:11, 772:5, 772:10, 782:17, 785:11, 786:5, 788:15, 791:6, 791:16, 792:2, 795:18, 795:20, 797:13, 797:16, 798:14, 811:18, 814:24, 817:7, 820:21, 820:22, 821:11, 821:13, 821:18, 822:4, 822:5, 822:9, 822:13, 822:14, 823:7, 823:17, 825:3, 828:23, 841:10, 842:4, 843:9, 843:10, 843:11

**District** [1] - 609:14
**divested** [1] - 688:2
**divide** [1] - 821:12
**divided** [1] - 797:16
**dividend** [15] - 698:2, 710:3, 710:4, 721:5, 740:12, 765:6, 768:2, 772:24, 785:24, 813:13, 818:8, 818:22, 819:5
**dividends** [10] - 694:2, 694:13, 694:14, 694:20, 695:7, 696:17, 741:21, 766:5, 767:4, 767:6
**division** [5] - 688:3, 692:20, 701:6, 701:7
**DJD** [2] - 743:13
**Docket** [1] - 611:3
**document** [77] - 629:2, 629:7, 631:25, 639:11, 640:14, 645:22, 645:24, 647:12, 647:15, 648:2, 648:9, 649:8, 650:6, 654:19, 654:22, 659:6, 660:4, 669:9, 669:11, 674:9, 676:16, 677:8, 677:15, 677:16, 678:24, 682:2, 683:8, 683:15, 684:3, 684:7, 684:12, 685:2, 685:9, 712:2, 712:22, 725:25, 734:17, 734:19, 734:21, 735:16, 736:1, 750:2, 750:15, 750:21, 750:23, 751:2, 751:13, 751:16, 751:21, 751:23, 760:3, 772:7, 772:8, 776:1, 777:7, 777:10, 777:18, 777:19, 777:23, 777:24, 778:2, 778:4, 778:5, 779:3, 779:5, 779:9, 779:14, 779:20, 780:13, 780:18, 781:20, 782:10, 789:2, 799:5, 807:17, 839:13

**document-by-document** [1] - 676:16
**documentation** [1] - 763:8
**documents** [1] - 635:9, 638:24, 647:13, 674:16, 676:21, 676:23, 677:3, 683:15, 684:6, 685:19, 796:11
**dog** [1] - 702:2
**dollar** [6] - 694:18, 735:22, 738:23, 739:22, 784:13, 787:14
**dollars** [8] - 653:3, 653:10, 668:25, 689:9, 736:22, 736:23, 740:18, 787:7
**done** [12] - 612:12, 657:22, 680:15, 681:13, 702:23, 713:24, 731:13, 773:8, 777:17, 782:2, 812:4, 843:15
**door** [1] - 626:3
**double** [2] - 751:7, 809:4
**doubt** [2] - 617:22, 617:24
**doubts** [1] - 617:21
**down** [43] - 621:8, 640:15, 660:9, 660:16, 682:16, 688:3, 691:19, 694:10, 708:3, 713:16, 716:23, 718:4, 727:18, 729:7, 729:9, 737:14, 765:3, 766:11, 784:23, 785:16, 786:2, 787:11, 787:24,

791:14, 792:19, 792:24, 793:23, 794:9, 794:10, 803:3, 827:18, 831:10, 831:20, 832:20, 834:4, 834:22, 835:3, 835:13, 837:6, 837:11, 837:18, 840:8, 841:14
**dozen** [2] - 620:14, 620:23
**draft** [1] - 816:10
**drafted** [1] - 728:19
**drain** [3] - 743:2, 743:11, 773:2
**draining** [2] - 740:11, 772:4
**drains** [2] - 771:19, 771:21
**dramatically** [2] - 681:10, 747:19
**draw** [2] - 675:2, 758:17
**drawing** [1] - 681:1
**drawn** [1] - 662:22
**drive** [3] - 683:10, 774:20, 774:21
**driven** [1] - 702:9
**drop** [1] - 768:10
**due** [19] - 626:25, 627:5, 628:10, 630:13, 644:10, 662:8, 662:10, 664:12, 664:14, 664:20, 668:11, 711:21, 712:16, 712:19, 735:12, 801:13, 801:15, 813:2
**duly** [2] - 624:19, 686:25
**dumped** [2] - 773:13, 773:15
**dural** [1] - 811:13
**during** [21] - 626:16, 667:24, 688:7, 690:15, 692:21, 694:17, 695:15, 695:19, 696:2, 697:7, 700:16, 716:16, 719:23, 722:5, 729:11, 729:21, 755:6, 767:22, 795:20, 817:2
**duties** [3] - 690:19, 738:13, 748:10
**duty** [3] - 657:9, 808:14, 808:19

## E

**E-mail** [1] - 610:17
**e-mail** [112] - 619:9, 619:19, 621:5, 622:12, 623:7, 632:18, 677:9, 679:3, 680:4, 680:5, 680:13, 682:5, 683:3, 683:6, 684:15, 699:10, 745:21, 745:24, 747:6, 748:15, 749:14, 749:15, 751:17, 752:6, 752:9, 752:17, 752:18, 752:21, 752:22, 752:25, 753:7, 753:15, 756:25, 775:1, 776:13, 776:20, 778:7, 778:11, 778:14, 778:19, 778:21, 779:3, 779:14, 779:16, 779:21, 780:12, 780:13, 780:14, 782:8, 782:24, 782:25, 783:1, 795:16, 796:5, 796:15, 796:16, 796:18, 797:4, 798:2, 798:15, 799:20, 800:2, 800:4, 800:12, 800:16, 800:20, 801:8, 801:11, 802:11, 802:15, 803:6, 803:10, 805:20, 806:6, 810:23, 811:5, 812:5, 812:25, 813:24, 814:1, 816:16, 817:16, 817:19, 818:6, 818:18, 823:18, 824:16, 825:14, 826:6, 826:9, 826:18, 826:19, 827:8, 827:11, 829:17, 829:24, 831:22, 832:11, 832:23, 833:18, 836:1, 836:5, 836:8, 839:12, 842:19, 842:23, 846:14, 847:2, 847:16, 848:14, 848:16, 849:3
**e-mailing** [1] - 798:3
**e-mails** [35] - 618:18, 619:7, 619:13, 626:16, 678:3, 678:15, 679:8, 679:10, 679:13, 682:9, 747:16, 747:20, 747:25, 756:19, 757:1, 757:4, 757:6, 757:12, 757:18, 758:11, 758:12, 758:13, 758:24, 758:25, 795:2, 795:6, 796:14, 796:17, 796:21, 797:24, 824:9, 846:19, 846:20,

846:22
**early** [6] - 622:10, 706:23, 711:16, 711:17, 844:6, 845:18
**earned** [1] - 744:3
**earning** [1] - 666:25
**earnings** [1] - 640:1
**easier** [5] - 761:16, 780:7, 835:6, 839:6, 840:14
**easily** [1] - 631:8
**East** [1] - 609:15
**Eastern** [1] - 609:14
**easy** [2] - 772:21, 781:16
**EBIDTA** [3] - 653:23
**economics** [1] - 687:12
**educate** [1] - 712:5
**educational** [1] - 687:11
**effect** [15] - 618:23, 621:20, 678:2, 754:9, 754:12, 755:14, 756:3, 756:16, 756:22, 757:3, 757:14, 758:8, 758:9, 758:12, 807:21
**efficient** [1] - 624:2
**eight** [18] - 693:18, 693:19, 694:17, 694:18, 694:22, 697:3, 697:18, 698:5, 718:14, 721:24, 726:22, 740:20, 740:21, 768:7, 769:20, 773:1, 785:25, 790:12
**either** [17] - 618:18, 647:3, 677:15, 678:14, 680:20, 697:7, 740:3, 741:13, 742:8, 744:24, 757:13, 782:12, 792:1, 793:1, 794:15, 804:16, 845:17
**Electric** [1] - 641:4
**element** [1] - 627:18
**elicit** [6] - 623:21, 624:4, 683:23, 683:25, 685:2, 729:12
**elicited** [2] - 683:12, 729:20
**eliciting** [1] - 730:1
**emphasis** [7] - 694:3, 694:24, 709:21, 709:23, 719:7, 769:7, 769:9
**emphasize** [1] - 829:18
**employees** [5] - 678:17, 679:9, 691:6, 691:10, 739:12
**employment** [2] - 679:12, 688:8
**enable** [1] - 636:20
**enabled** [1] - 721:4
**End** [1] - 675:23
**end** [19] - 661:6, 689:21, 693:23, 693:25, 698:14, 698:17, 719:22, 733:1, 733:2, 736:25, 737:5, 784:15, 791:24, 802:15, 822:10, 833:23, 835:23, 838:20, 839:18
**ended** [2] - 688:6, 690:5
**ending** [9] - 629:18, 629:19, 629:23, 630:12, 659:22, 669:25, 670:5
**endowments** [1] - 689:7
**ends** [1] - 705:8
**Engelbrecht** [5] - 626:10, 626:15, 632:20, 633:3
**English** [2] - 665:6, 736:7
**ensure** [2] - 774:10, 788:18
**enters** [5] - 624:13, 686:5, 733:5, 781:4, 783:14
**entice** [1] - 744:18
**entire** [1] - 822:12
**entirely** [1] - 674:9
**entities** [4] - 615:6, 703:4, 743:13, 743:15
**entity** [7] - 649:10, 663:9, 701:5, 702:18, 703:4, 703:5, 703:8

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 254 of 271
PageID #: 14047
(entries - fact)                                                    Page 70

entries [7] - 760:25, 761:8, 773:25, 774:3, 804:10, 809:14, 809:22

entry [9] - 779:18, 784:15, 784:16, 784:17, 784:19, 785:19, 791:2, 808:22, 809:16

equal [1] - 706:13

equally [2] - 706:13, 706:15

equals [1] - 640:23

equity [27] - 662:4, 689:1, 689:10, 689:11, 689:12, 689:15, 689:17, 693:12, 693:14, 693:15, 693:17, 694:4, 698:10, 698:12, 698:21, 699:16, 709:14, 715:21, 716:12, 716:13, 716:14, 716:15, 716:25, 717:6, 719:15, 719:19, 719:21

errors [3] - 810:12, 810:13, 817:9

ESQ [13] - 609:16, 609:16, 609:17, 609:17, 609:21, 609:22, 609:22, 609:23, 610:5, 610:6, 610:9, 610:10, 610:14

essential [1] - 685:13

essentially [2] - 679:8, 824:25

establish [3] - 613:16, 615:19, 757:5

established [5] - 641:19, 662:11, 673:2, 703:5

estimate [2] - 691:12, 712:25

et [1] - 611:2

event [13] - 626:25, 627:6, 627:13, 628:11, 630:13, 643:25, 644:5, 644:10, 644:19, 737:5, 737:8, 737:9, 739:13

events [5] - 658:11, 708:8, 708:21, 709:1, 710:8

everyday [1] - 698:24

evidence [83] - 615:16, 629:10, 629:12, 629:13, 640:15, 646:8, 646:11, 647:6, 647:9, 650:5, 655:13, 659:12, 659:15, 668:8, 676:5, 680:23, 681:5, 681:16, 711:6, 716:5, 716:8, 720:7, 720:10, 721:23, 725:13, 725:16, 734:16, 736:13, 746:3, 749:16, 750:15, 753:24, 754:3, 760:6, 762:6, 762:15, 762:17, 762:19, 783:10, 796:24, 799:15, 804:4, 805:14, 807:15, 810:18, 812:8, 812:17, 814:10, 816:23, 817:22, 817:24, 820:14, 824:13, 826:2, 826:5, 828:7, 830:25, 832:3, 833:25, 834:3, 836:11, 840:2, 842:22, 843:2, 851:9, 851:10, 851:11, 851:12, 851:13, 851:16, 851:17, 851:18, 851:19, 851:20, 851:22, 851:23, 851:24, 851:25, 852:1, 852:2, 852:4, 852:6, 852:15

evidence.. [9] - 851:7, 851:14, 851:15, 852:7, 852:8, 852:9, 852:10, 852:13, 852:14

evidence... [2] - 851:5, 851:6

evidence..... [1] - 851:8

evidence................................ [1] - 852:12

evidentiary [1] - 622:4

evolved [2] - 769:2, 838:25

ex [3] - 612:12, 613:9, 613:18

exact [2] - 675:10, 696:20

exactly [6] - 613:20, 633:23, 703:3, 751:10, 792:18, 816:18

EXAMINATION [17] - 624:24, 659:1, 661:18, 671:4, 687:2, 733:9, 749:2, 753:4, 760:8, 764:1, 783:17, 850:5, 850:7, 850:9, 850:13, 850:15, 850:19

examination [5] - 617:4, 664:24, 665:10,

665:17, 729:11

examined [2] - 624:19, 687:1

example [13] - 619:18, 621:6, 657:25, 695:1, 696:8, 740:17, 748:12, 764:10, 764:16, 766:4, 767:16, 767:25, 771:15

examples [1] - 653:21

Excel [6] - 773:16, 773:17, 776:20, 780:7, 780:13, 781:18

excellent [1] - 636:3

exception [1] - 755:15

excess [1] - 656:21

exchange [2] - 745:25, 798:2

exchanges [1] - 619:9

exciting [1] - 814:20

exclude [1] - 681:8

excuse [5] - 717:12, 719:6, 781:2, 813:18, 830:21

excused [2] - 676:10, 676:11

executing [1] - 748:10

executive [4] - 692:4, 692:6, 743:19, 743:21

exempt [1] - 722:15

exercise [1] - 646:15

Exhibit [178] - 629:1, 629:10, 632:17, 638:10, 639:10, 645:21, 646:8, 646:14, 647:1, 647:10, 648:3, 650:5, 654:15, 655:10, 655:15, 659:4, 659:11, 659:15, 659:18, 667:17, 668:8, 677:9, 715:10, 715:11, 715:17, 716:5, 716:8, 716:9, 719:25, 720:1, 720:2, 720:7, 720:10, 720:11, 721:11, 721:12, 721:19, 721:23, 722:6, 724:20, 724:21, 724:22, 724:24, 725:12, 725:16, 725:17, 725:19, 734:16, 745:17, 746:2, 749:12, 750:9, 754:2, 760:5, 761:20, 761:22, 762:4, 762:23, 762:24, 774:23, 775:13, 776:7, 783:10, 783:20, 788:13, 795:7, 795:9, 795:15, 796:6, 796:24, 797:2, 798:24, 798:25, 799:15, 799:18, 802:24, 803:11, 803:19, 804:4, 804:7, 804:20, 804:21, 805:3, 805:10, 805:14, 805:16, 806:12, 806:13, 806:23, 807:9, 807:15, 808:4, 811:23, 811:24, 812:7, 812:17, 812:20, 813:18, 813:19, 814:2, 814:4, 814:10, 814:12, 816:7, 816:8, 816:9, 816:19, 816:23, 816:24, 817:10, 817:12, 817:21, 817:24, 818:2, 818:24, 819:1, 819:6, 819:8, 820:4, 820:5, 820:6, 820:11, 820:13, 820:17, 822:24, 824:8, 825:7, 825:8, 826:4, 827:6, 827:19, 828:3, 828:6, 829:22, 830:2, 830:10, 830:24, 832:2, 833:17, 833:25, 834:2, 835:25, 836:10, 839:9, 839:24, 840:1, 842:7, 842:13, 843:1, 848:11, 851:9, 851:10, 851:11, 851:12, 851:13, 851:14, 851:15, 851:16, 851:17, 851:18, 851:19, 851:20, 851:23, 851:24, 851:25, 852:1, 852:2, 852:3, 852:7, 852:8, 852:9, 852:10, 852:11, 852:13, 852:14, 852:15

exhibit [22] - 681:3, 683:19, 683:20, 716:12, 733:15, 749:25, 753:23, 777:3, 780:2, 780:4, 781:23, 782:20, 783:1, 787:6, 795:24, 799:13, 803:22, 808:3, 810:15, 827:17, 840:6

exhibit I [1] - 813:20

Exhibits [5] - 796:2, 810:17, 824:12,

851:21, 852:5

EXHIBITS [1] - 851:2

exhibits [27] - 611:23, 611:25, 618:13, 618:15, 618:18, 619:15, 620:1, 620:4, 620:7, 620:11, 620:16, 620:17, 620:18, 620:22, 620:23, 621:4, 621:11, 621:12, 621:18, 622:6, 622:9, 622:21, 623:1, 623:5, 681:8, 682:22, 809:2

exist [1] - 722:2

existing [1] - 722:22

exists [1] - 662:18

exits [3] - 676:14, 729:5, 844:11

expect [5] - 682:6, 683:1, 723:6, 729:20, 845:21

expectation [2] - 799:5, 830:7

expected [7] - 611:17, 668:22, 810:2, 817:6, 828:20, 833:15, 843:18

expecting [9] - 789:12, 790:2, 809:20, 810:5, 829:7, 829:11, 833:13, 833:14, 844:13

expects [1] - 726:19

expedite [1] - 703:19

expense [3] - 771:16, 772:3, 821:8

expenses [45] - 612:17, 615:7, 615:8, 615:22, 615:23, 618:4, 618:9, 618:11, 694:11, 695:6, 696:14, 696:15, 696:24, 726:15, 736:3, 736:8, 739:2, 739:4, 739:5, 739:10, 739:14, 739:15, 739:16, 739:19, 739:25, 740:1, 741:20, 764:25, 765:1, 767:15, 770:13, 770:15, 770:17, 770:18, 771:5, 771:9, 771:10, 787:1, 787:3, 787:5, 794:19, 817:7, 820:21, 821:6

experience [1] - 765:18

explain [27] - 662:7, 665:20, 668:17, 678:1, 682:23, 689:10, 693:11, 695:10, 696:5, 696:19, 703:15, 709:13, 710:17, 717:2, 717:11, 719:4, 736:19, 740:14, 743:3, 743:24, 752:14, 761:25, 762:13, 762:19, 763:1, 764:14, 794:1

explained [1] - 668:18

explaining [1] - 758:15

explanation [1] - 728:7

explanations [1] - 723:9

explicitly [1] - 799:10

explode [1] - 835:4

explore [2] - 612:4, 781:12

expose [1] - 613:11

expressed [1] - 706:25

expressing [1] - 758:5

extended [2] - 621:17, 623:14

extensively [1] - 661:25

extent [5] - 619:2, 675:12, 676:2, 824:15, 848:15

extra [17] - 697:21, 698:3, 710:1, 710:2, 718:16, 718:17, 721:1, 721:4, 721:8, 724:3, 743:9, 744:3, 744:4, 744:5, 744:17, 744:18, 744:20

extracted [1] - 779:11

extraneous [2] - 739:25, 782:3

## F

Facsimile [1] - 610:16

fact [15] - 619:21, 634:19, 642:9, 662:23,

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 255 of 271
PageID #: 14048
(factor - fund)    Page 11

663:10, 664:2, 666:18, 666:22, 671:15,
679:3, 684:1, 742:15, 744:20, 782:11,
782:18

**factor** [1] - 663:4
**factors** [1] - 658:8
**facts** [3] - 625:7, 711:6, 846:21
**factual** [1] - 677:17
**fails** [1] - 668:21
**failure** [1] - 825:2
**fair** [18] - 612:23, 636:17, 643:12,
643:13, 643:20, 643:21, 646:2, 653:15,
657:3, 660:5, 660:7, 660:21, 661:4,
762:8, 824:20, 824:24, 830:5, 832:8
**Fair** [1] - 659:24
**fairly** [2] - 841:23, 847:1
**fairness** [2] - 624:6, 845:21
**fall** [3] - 620:8, 704:4, 829:19
**falling** [2] - 769:10, 772:5
**falls** [1] - 615:15
**familiar** [14] - 685:3, 695:17, 695:21,
698:10, 702:13, 702:16, 741:23, 743:13,
743:15, 760:19, 760:22, 766:23, 819:24,
834:12
**family** [1] - 689:8
**far** [4] - 730:3, 780:24, 780:25, 822:8
**faster** [1] - 714:23
**favor** [1] - 658:5
**feature** [1] - 756:18
**featured** [3] - 710:17, 710:19, 744:1
**February** [8] - 626:25, 630:13, 787:22,
795:19, 797:21, 816:14, 839:17, 839:18
**fee** [14] - 698:17, 721:7, 735:12, 736:16,
736:20, 736:21, 737:11, 737:13, 737:16,
737:18, 737:23, 743:2
**feeding** [1] - 694:10
**fees** [41] - 612:25, 721:1, 734:1, 734:4,
734:9, 734:10, 734:23, 735:1, 735:3,
735:5, 735:6, 735:13, 735:20, 735:23,
736:3, 737:17, 738:15, 738:18, 738:21,
738:25, 739:21, 739:23, 740:2, 740:3,
740:9, 740:15, 740:18, 741:14, 741:18,
741:19, 763:8, 763:10, 763:15, 771:19,
771:22, 787:10, 791:9, 794:16, 794:18
**felt** [3] - 707:4, 729:15
**Ferrari** [5] - 612:3, 612:6, 613:5, 771:15,
771:24
**Ferraris** [1] - 617:7
**few** [15] - 611:16, 611:18, 622:9, 625:6,
626:3, 640:8, 688:22, 690:8, 690:10,
707:16, 710:4, 807:25, 823:24, 846:4,
846:18
**field** [2] - 621:8, 707:17
**fifth** [2] - 659:9, 835:13
**fifty** [1] - 725:2
**figure** [3] - 623:3, 630:4, 847:23
**file** [1] - 845:21
**fill** [1] - 802:8
**final** [4] - 777:23, 778:5, 784:25, 827:13
**finances** [1] - 771:3
**Financial** [2] - 648:11, 648:12
**financial** [49] - 653:13, 653:15, 653:17,
654:4, 665:2, 669:20, 671:25, 672:4,
672:6, 672:9, 672:14, 673:10, 673:12,
673:14, 674:16, 678:17, 678:21, 680:13,
684:2, 688:1, 688:10, 688:12, 688:16,
690:3, 690:17, 690:20, 690:24, 691:23,

692:1, 695:15, 700:16, 701:3, 703:10,
713:20, 726:23, 733:21, 734:1, 738:4,
738:14, 738:20, 739:17, 742:7, 744:6,
748:1, 748:11, 757:6, 760:19, 767:9
**financials** [15] - 634:5, 634:7, 634:13,
644:21, 645:1, 645:9, 655:2, 655:6,
655:18, 665:9, 667:5, 668:8, 669:12,
669:24, 827:1
**fine** [13] - 621:25, 624:2, 646:9, 682:25,
684:21, 732:12, 758:18, 758:23, 782:23,
783:4, 795:12, 812:13, 819:21
**finish** [2] - 843:19, 843:20
**finished** [4] - 666:4, 666:13, 844:3,
844:4
**firm** [18] - 691:15, 692:5, 692:18,
692:19, 699:15, 699:17, 700:6, 700:7,
700:8, 700:11, 701:5, 708:12, 708:13,
710:12, 710:16, 710:21, 716:25
**first** [57] - 615:2, 615:10, 615:11, 622:6,
622:9, 625:15, 625:18, 628:20, 634:2,
634:19, 658:5, 669:10, 671:10, 671:13,
684:5, 684:15, 686:25, 691:1, 691:3,
691:6, 695:20, 700:10, 702:24, 706:2,
706:3, 706:24, 707:1, 712:14, 713:19,
716:11, 722:1, 723:11, 726:1, 726:3,
735:3, 743:17, 745:10, 752:9, 752:21,
752:24, 757:21, 769:18, 769:21, 781:13,
783:23, 785:5, 785:7, 790:23, 791:2,
799:20, 804:9, 805:7, 805:19, 812:25,
816:10, 840:10
**fits** [1] - 618:1
**five** [11] - 643:15, 643:20, 661:9, 689:19,
691:8, 698:13, 765:4, 765:10, 767:4,
784:7, 804:10
**fix** [2] - 810:13, 817:9
**fixed** [1] - 687:18
**flight** [1] - 615:24
**flip** [1] - 720:19
**flipped** [1] - 720:17
**Floor** [1] - 610:4
**Florida** [3] - 610:13, 691:18, 739:13
**flow** [16] - 634:25, 635:16, 635:25,
636:8, 641:20, 652:16, 653:2, 653:24,
653:25, 656:22, 696:9, 716:15, 716:17,
716:18, 726:16, 744:3
**flowing** [2] - 694:5, 698:19
**flows** [2] - 719:21, 719:23
**fluctuates** [1] - 825:1
**fly** [1] - 762:16
**flying** [2] - 615:10, 662:23
**focus** [6] - 627:14, 627:15, 628:12,
628:14, 631:11, 631:20
**focused** [3] - 627:6, 682:17, 710:15
**focuses** [1] - 717:1
**folks** [5] - 673:3, 674:14, 674:18,
693:18, 693:20
**follow** [5] - 651:1, 656:17, 661:22,
823:20, 827:21
**follow-up** [4] - 656:17, 661:22, 823:20,
827:21
**following** [4] - 674:1, 704:1, 825:21,
838:10
**follows** [2] - 624:19, 687:1
**football** [1] - 702:3
**footnote** [3] - 639:16, 718:19, 718:21
**Footnote** [2] - 650:17, 650:18

**footnotes** [2] - 650:12, 665:18
**for-the-truth** [1] - 680:1
**forced** [1] - 801:13
**Ford** [1] - 641:4
**forecast** [3] - 818:8, 818:9, 818:22
**forget** [1] - 703:3
**forgot** [1] - 760:2
**form** [2] - 638:3, 638:23
**formally** [1] - 634:16
**format** [3] - 838:23, 840:9, 843:4
**forth** [2] - 684:16, 831:7
**forward** [3] - 657:25, 658:10, 733:22
**forward-looking** [2] - 657:25, 658:10
**forwarded** [1] - 800:13
**forwarding** [3] - 813:21, 813:25, 814:14
**foundation** [16] - 612:4, 613:12, 617:6,
649:16, 682:7, 683:1, 683:23, 684:23,
684:25, 695:14, 702:23, 753:3, 776:23,
776:25, 779:23, 809:1
**Foundation** [1] - 794:4
**foundational** [1] - 685:8
**four** [9] - 625:17, 630:17, 716:24,
716:25, 735:7, 784:7, 804:9, 805:7,
837:18
**fourth** [1] - 837:18
**FOX** [2] - 610:2, 610:7
**fraction** [1] - 652:14
**Frangioni** [28] - 677:10, 677:13, 679:19,
680:9, 745:8, 745:13, 753:11, 754:6,
775:1, 777:14, 782:8, 782:10, 782:11,
782:18, 785:15, 786:12, 789:19, 797:6,
798:3, 799:3, 799:23, 800:5, 800:8,
806:15, 812:6, 817:17, 825:18, 827:9
**frangioni** [1] - 797:5
**Frangioni's** [1] - 800:10
**frangioni's** [2] - 795:19, 796:8
**frankly** [2] - 729:13, 781:16
**fraud** [5] - 623:17, 623:23, 670:13,
670:16, 670:20
**FREDERICK** [1] - 624:18, 850:4
**Frederick** [5] - 647:11, 661:14, 661:20,
668:10, 671:6
**Fredrick** [2] - 629:19, 639:18
**free** [2] - 662:19, 781:5
**frequently** [2] - 741:16, 839:5
**Friday** [4] - 732:20, 732:23, 843:22,
843:25
**Fridays** [3] - 732:14, 732:22, 733:1
**front** [11] - 620:17, 621:2, 640:14,
668:23, 721:1, 735:20, 735:23, 755:3,
763:8, 763:10, 842:18
**Frost** [1] - 692:7
**full** [2] - 650:20, 846:6
**fully** [4] - 718:11, 720:15, 755:19,
767:24
**fun** [1] - 736:10
**function** [1] - 757:21
**functionality** [1] - 704:8
**functions** [1] - 712:9
**fund** [92] - 612:17, 612:19, 615:13,
619:21, 627:7, 627:15, 627:22, 631:5,
639:3, 641:8, 641:15, 642:4, 642:10,
642:14, 642:15, 642:23, 648:13, 648:15,
648:22, 648:23, 649:4, 649:10, 651:18,
651:23, 652:3, 652:6, 661:9, 666:9,
667:11, 668:5, 668:25, 678:18, 687:21,

687:23, 687:24, 688:20, 691:1, 691:2, 693:12, 694:10, 695:2, 695:6, 696:12, 696:13, 698:14, 719:23, 721:14, 722:2, 723:20, 725:3, 726:25, 734:24, 736:18, 736:24, 736:25, 737:2, 737:3, 739:8, 739:18, 740:9, 743:9, 743:17, 744:4, 760:20, 761:9, 761:12, 761:24, 763:1, 763:3, 763:4, 764:21, 765:12, 765:13, 770:13, 770:17, 790:23, 801:23, 804:13, 805:1, 805:18, 805:19, 811:3, 813:10, 818:9, 818:11, 818:22, 821:5, 822:25, 841:24

**Fund** [11] - 627:8, 627:9, 641:2, 643:12, 644:9, 655:2, 655:7, 725:4, 801:15, 832:16, 840:11

**fund's** [5] - 615:14, 763:11, 765:1, 801:13, 813:6

**fund-raising** [1] - 666:9

**funded** [1] - 720:15

**funding** [1] - 734:12

**funds** [41] - 668:24, 687:25, 688:13, 688:18, 689:1, 689:7, 690:22, 690:25, 691:5, 692:20, 693:14, 694:3, 696:13, 706:19, 709:13, 709:14, 712:5, 715:6, 717:21, 719:8, 722:8, 734:2, 740:11, 744:1, 760:18, 761:25, 769:8, 771:18, 772:4, 772:9, 780:19, 781:23, 784:1, 793:7, 793:8, 810:7, 812:12, 814:23, 818:12, 842:17

**future** [9] - 640:23, 641:16, 642:4, 642:5, 642:9, 642:10, 651:12, 657:20, 658:11

**fuzzy** [2] - 629:21, 658:9

---

## G

**GAAP** [1] - 655:17

**gains** [1] - 678:19

**Garden** [3] - 691:14, 691:20, 698:25

**General** [1] - 641:4

**general** [8] - 672:25, 676:17, 688:17, 735:9, 736:6, 748:17, 752:10, 761:18

**generalization** [1] - 736:12

**generally** [23] - 618:3, 640:10, 653:17, 668:17, 688:11, 688:19, 689:11, 689:13, 709:1, 713:19, 728:6, 734:22, 736:10, 738:23, 741:25, 750:22, 761:14, 761:22, 766:2, 786:23, 818:5, 838:19, 838:21

**generated** [2] - 684:3, 713:14

**gentile** [3] - 702:18, 801:2, 802:5

**GENTILE** [1] - 609:8

**Gentile** [120] - 609:20, 611:2, 611:11, 615:6, 618:20, 619:2, 619:22, 619:23, 673:4, 673:6, 673:8, 673:10, 673:12, 673:16, 675:5, 675:16, 675:18, 676:4, 676:5, 677:11, 677:12, 677:16, 677:19, 679:2, 679:4, 679:21, 683:12, 691:16, 691:21, 692:8, 692:18, 692:22, 695:16, 696:1, 697:1, 697:14, 697:16, 698:8, 699:1, 706:4, 706:8, 706:18, 707:4, 707:12, 708:7, 708:20, 709:4, 710:9, 713:2, 713:5, 713:6, 714:6, 714:8, 722:24, 723:12, 723:15, 725:8, 734:8, 738:16, 742:11, 743:17, 744:11, 745:2, 749:9, 753:9, 753:15, 753:19, 754:5, 755:11, 756:6, 760:15, 765:15, 765:16,

769:4, 769:19, 771:12, 772:1, 785:14, 786:12, 788:21, 789:17, 789:23, 792:5, 793:11, 793:17, 795:21, 796:16, 797:20, 798:3, 801:7, 801:24, 805:23, 809:22, 810:11, 812:6, 812:23, 815:2, 815:5, 815:20, 815:24, 816:11, 817:3, 817:16, 818:5, 819:4, 825:17, 826:20, 827:3, 827:25, 829:3, 830:14, 831:1, 834:19, 835:20, 836:4, 839:3, 839:19, 846:1

**gentile's** [3] - 700:2, 817:1, 825:4

**Gentile's** [8] - 618:23, 684:10, 699:12, 740:25, 753:14, 766:16, 769:25, 799:9

**gentleman** [1] - 625:9

**girls** [1] - 701:15

**given** [9] - 612:25, 664:5, 666:23, 667:25, 732:20, 739:16, 770:10, 794:14, 847:3

**glass** [1] - 626:3

**Glenn** [1] - 611:12

**GLENN** [1] - 610:5

**Gmail** [1] - 847:9

**goal** [3] - 707:1, 707:2, 708:12

**God** [2] - 686:13, 686:16

**Government** [130] - 609:14, 611:19, 618:15, 625:15, 625:20, 632:17, 639:10, 648:3, 648:5, 650:5, 676:18, 677:9, 677:17, 679:17, 680:16, 681:4, 681:23, 682:2, 686:6, 686:8, 704:22, 715:10, 715:17, 716:5, 716:8, 719:25, 720:2, 720:7, 720:10, 721:11, 721:19, 721:23, 722:6, 724:20, 724:22, 724:24, 725:12, 725:16, 725:19, 730:13, 730:15, 731:6, 731:15, 734:16, 745:17, 746:2, 749:12, 750:9, 761:20, 761:22, 762:4, 762:24, 764:19, 774:23, 775:13, 776:7, 782:6, 783:20, 788:13, 795:7, 795:15, 796:6, 796:24, 798:24, 799:15, 803:11, 803:19, 804:4, 804:20, 805:3, 805:10, 805:14, 806:12, 807:15, 808:4, 810:17, 811:23, 812:7, 812:17, 813:18, 814:2, 814:4, 814:10, 816:7, 816:9, 816:19, 816:23, 817:10, 817:21, 817:24, 818:24, 819:6, 820:6, 820:11, 820:13, 824:8, 824:12, 825:7, 827:6, 827:19, 828:3, 829:22, 830:2, 830:10, 832:6, 833:17, 833:25, 835:25, 839:9, 839:24, 842:7, 842:13, 851:10, 851:11, 851:12, 851:13, 851:17, 851:18, 851:19, 851:20, 851:21, 851:23, 851:24, 851:25, 852:1, 852:2, 852:3, 852:5

**government** [2] - 618:20, 619:6

**Government's** [32] - 620:2, 623:18, 667:16, 668:8, 677:8, 677:22, 677:24, 680:9, 754:2, 760:5, 783:10, 803:25, 807:18, 826:4, 828:6, 830:24, 832:2, 834:2, 836:10, 840:1, 843:1, 851:14, 851:15, 851:16, 852:7, 852:8, 852:9, 852:10, 852:11, 852:13, 852:14, 852:15

**GPB** [102] - 619:19, 619:20, 629:5, 633:11, 633:17, 651:22, 651:24, 652:2, 662:1, 662:5, 662:8, 663:13, 663:22, 664:13, 666:3, 667:13, 672:15, 673:5, 673:10, 677:14, 678:17, 678:22, 679:9, 682:12, 683:10, 684:10, 688:6, 688:7, 690:3, 690:4, 690:15, 690:20, 690:25, 691:1, 691:2, 691:6, 691:10, 691:22,

692:1, 692:7, 692:17, 692:20, 693:8, 694:8, 694:19, 695:23, 699:16, 701:3, 701:6, 703:7, 705:2, 706:6, 706:8, 710:14, 710:15, 710:21, 716:17, 719:15, 719:19, 721:14, 722:1, 724:17, 725:4, 726:14, 726:19, 726:24, 727:1, 734:2, 739:9, 742:9, 743:22, 744:1, 745:4, 761:11, 761:25, 766:14, 767:2, 767:3, 767:8, 767:10, 768:5, 768:25, 770:10, 783:24, 784:1, 784:2, 790:21, 790:22, 797:15, 797:22, 805:19, 807:4, 813:16, 815:6, 821:4, 821:11, 821:14, 840:11

**GPB's** [10] - 663:2, 663:4, 685:5, 691:13, 693:12, 693:14, 695:17, 695:21, 774:6, 774:18

**GPBH** [2] - 797:10, 797:11

**GPBHA** [1] - 832:16

**grade** [1] - 643:14

**graduated** [1] - 687:17

**grainy** [1] - 629:24

**granted** [1] - 633:25

**graphic** [1] - 762:20

**great** [6] - 643:24, 653:8, 710:20, 824:6, 824:17, 839:10, 843:15, 849:12, 849:23

**greater** [2] - 822:15, 843:11

**gregarious** [1] - 700:5

**gross** [2] - 639:20, 795:18

**group** [2] - 687:24, 831:4

**grouping** [1] - 697:4

**grow** [3] - 699:20, 706:24, 707:6

**growing** [3] - 692:5, 814:22, 816:3

**growth** [3] - 689:18, 691:9, 816:4

**growths** [1] - 706:24

**guarantee** [1] - 650:20

**guaranteed** [7] - 640:23, 643:16, 650:19, 651:9, 662:15, 695:8, 695:12

**guarantied** [1] - 696:18

**guaranties** [1] - 668:13

**guaranty** [6] - 668:14, 668:19, 669:23, 670:4, 670:8, 696:25

**guess** [3] - 682:17, 732:22, 780:23

**guy** [1] - 680:24

**guys** [5] - 666:13, 672:20, 672:22, 673:11, 701:15

---

## H

**H-2** [1] - 783:24

**HA** [1] - 832:18

**half** [9] - 644:14, 718:11, 718:13, 718:18, 718:25, 719:2, 722:14, 743:9, 844:17

**halfway** [1] - 690:12

**hallway** [1] - 625:9

**hand** [14] - 660:16, 686:10, 712:23, 726:3, 745:11, 747:6, 764:13, 789:2, 789:23, 809:9, 810:20, 821:1, 837:17, 847:11

**handle** [2] - 624:2, 811:17

**handled** [2] - 649:2, 649:17

**happy** [6] - 623:21, 676:17, 703:14, 732:25, 781:12, 782:5

**hard** [7] - 619:11, 619:25, 620:8, 702:9, 730:22, 837:23, 847:5

**hard-driven** [1] - 702:9

---

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 257 of 271
PageID #: 14050
*(harder - initial)*                                                      Page 13

**harder** [1] - 740:22
**head** [1] - 699:16
**headed** [1] - 685:6
**headers** [2] - 784:8, 784:11
**heading** [1] - 726:6
**health** [1] - 678:18
**hear** [3] - 649:14, 676:17, 685:16
**heard** [11] - 628:5, 628:10, 628:16, 644:18, 644:19, 674:13, 684:6, 684:20, 704:13, 756:6, 809:6
**hearing** [13] - 673:24, 674:2, 681:6, 681:8, 681:21, 681:24, 684:19, 703:21, 704:2, 776:24, 781:8, 842:25, 846:8
**hears** [1] - 631:24
**hearsay** [15] - 618:24, 678:24, 681:5, 704:21, 742:17, 742:18, 747:24, 751:7, 755:15, 757:22, 758:6, 758:9, 809:4, 830:6
**hedge** [4] - 687:21, 688:18, 688:19, 689:1
**held** [11] - 615:1, 623:11, 624:11, 633:3, 673:24, 703:21, 708:11, 747:1, 755:1, 755:17, 845:4
**help** [10] - 686:13, 686:16, 705:2, 705:4, 761:25, 762:19, 775:22, 844:20, 845:8, 845:10
**helped** [1] - 737:24
**helpful** [3] - 621:9, 621:10, 847:24
**herein** [1] - 658:10
**hi** [1] - 801:12
**high** [4] - 643:14, 662:23, 701:14, 701:19
**high-flying** [1] - 662:23
**high-grade** [1] - 643:14
**high-pressure** [2] - 701:14, 701:19
**higher** [2] - 721:7, 721:9
**highlight** [4] - 777:13, 790:4, 821:7, 835:8
**highlighted** [2] - 777:14, 821:6
**highlighting** [3] - 747:13, 753:20, 778:24
**highlights** [3] - 709:17, 777:7, 777:20
**highly** [2] - 612:6, 662:24
**highly-leverage** [1] - 662:24
**Hightower** [1] - 708:2
**Hill** [2] - 687:22
**hired** [1] - 690:8
**history** [2] - 641:2, 821:16
**hit** [5] - 702:10, 707:3, 707:5, 789:13, 790:2
**hold** [2] - 732:25, 764:3
**holder** [1] - 846:2
**holding** [6] - 702:19, 703:7, 705:1, 706:6, 738:4, 844:19
**Holdings** [39] - 627:7, 627:10, 627:14, 627:18, 628:1, 628:12, 628:14, 628:17, 691:1, 691:2, 691:4, 721:14, 722:2, 761:10, 781:14, 784:1, 784:2, 790:23, 792:1, 792:4, 792:7, 792:16, 794:16, 794:17, 805:19, 805:21, 807:4, 811:3, 813:16, 821:4, 821:14, 836:23, 837:1, 837:7, 840:11, 841:2, 842:17, 842:18
**holdings** [3] - 797:12, 804:25, 813:10
**Holdings 1** [3] - 761:9, 837:9, 837:10
**hole** [4] - 612:21, 772:23, 773:10, 786:16

**home** [1] - 643:25
**Honda** [1] - 834:12, 834:18, 835:1, 835:11, 835:14, 837:13
**Honor** [106] - 611:5, 612:15, 613:10, 615:2, 618:14, 621:3, 621:17, 622:24, 623:12, 623:15, 624:8, 637:3, 638:16, 640:17, 649:7, 649:11, 656:11, 669:6, 670:24, 671:3, 673:20, 673:23, 674:3, 675:4, 675:19, 676:8, 676:22, 677:4, 677:7, 678:14, 679:17, 681:9, 682:25, 684:4, 686:8, 695:13, 701:20, 702:20, 704:21, 705:7, 708:23, 714:21, 716:4, 720:6, 728:24, 729:6, 729:10, 731:3, 731:18, 732:12, 732:14, 746:4, 747:19, 749:15, 750:17, 752:7, 752:12, 753:23, 754:4, 754:14, 755:16, 755:18, 757:11, 757:20, 760:2, 762:3, 762:12, 776:19, 777:1, 777:22, 778:6, 778:12, 778:13, 779:9, 779:18, 783:16, 796:7, 796:23, 799:12, 800:7, 803:3, 804:23, 807:14, 809:1, 809:3, 810:15, 812:7, 814:5, 814:7, 817:22, 820:10, 823:23, 824:7, 826:1, 828:4, 830:2, 830:3, 831:9, 831:25, 832:4, 836:7, 842:8, 843:14, 848:2, 848:14, 849:10
**honor** [1] - 843:25
**Honor's** [1] - 612:25
**HONORABLE** [1] - 609:11
**hopeful** [1] - 681:23
**hopefully** [3] - 694:8, 759:1, 845:18
**hoping** [3] - 683:14, 781:1, 845:10
**hopper** [1] - 846:7
**hotels** [1] - 739:12
**hour** [3] - 729:3, 732:9, 844:16
**house** [3] - 691:19, 801:25, 802:1
**hundred** [6] - 725:2, 736:22, 736:23, 740:17, 740:20, 740:21
**hundreds** [2] - 635:8, 689:9
**hurdle** [1] - 740:23
**hypothetical** [3] - 619:18, 654:3, 664:23
**hypothetically** [4] - 633:17, 650:1, 652:13, 653:3

# I

**ice** [1] - 688:24
**idea** [6] - 615:14, 650:25, 697:25, 707:3, 819:25, 848:7
**identification** [9] - 645:21, 647:1, 654:14, 659:4, 715:9, 721:10, 745:16, 749:12, 774:23
**identified** [1] - 817:9
**identify** [4] - 762:25, 775:16, 819:21, 839:13
**identifying** [3] - 738:6, 818:7, 818:14
**II** [8] - 691:4, 721:14, 722:2, 781:14, 784:2, 792:16, 794:17, 813:16
**IIII** [4] - 659:5, 659:12, 659:15, 851:9
**IIII-M** [4] - 659:5, 659:12, 659:15, 851:9
**image** [1] - 629:15
**imagine** [3] - 628:22, 657:13, 657:14
**immediately** [1] - 758:5
**impact** [3] - 666:19, 666:23, 741:14, 743:4
**impacting** [1] - 612:19

**important** [12] - 647:18, 668:20, 669:22, 670:3, 670:15, 679:6, 747:7, 748:9, 756:1, 769:5, 770:20, 829:18
**impossible** [1] - 630:20
**improve** [1] - 773:9
**inability** [1] - 770:10
**inaccuracies** [1] - 714:18
**inaccurate** [4] - 649:13, 713:23, 713:25, 722:18
**inadmissible** [2] - 619:14, 848:15
**inappropriate** [1] - 729:13
**inception** [1] - 765:15
**inclination** [1] - 684:17
**include** [5] - 620:7, 631:4, 657:4, 671:20, 695:23
**included** [12] - 649:18, 652:6, 652:14, 652:15, 652:16, 653:2, 653:10, 653:21, 663:15, 663:18, 674:7, 756:20
**includes** [1] - 833:10
**including** [8] - 645:6, 649:3, 651:13, 678:24, 679:10, 679:12, 796:15, 834:8
**income** [64] - 630:16, 631:1, 631:9, 631:12, 631:18, 631:20, 632:1, 632:5, 642:14, 653:22, 653:23, 654:6, 654:9, 655:25, 656:4, 656:7, 656:13, 656:16, 667:2, 667:7, 667:8, 669:17, 674:9, 687:18, 695:7, 696:16, 715:20, 716:12, 716:13, 716:16, 716:17, 716:18, 717:1, 717:3, 723:21, 767:13, 767:15, 767:20, 795:17, 797:13, 797:16, 798:14, 821:8, 821:9, 821:12, 821:17, 821:21, 822:1, 822:3, 822:9, 822:15, 823:6, 823:17, 833:7, 833:9, 841:24, 843:9, 843:10, 843:11
**Income** [1] - 717:6
**income-producing** [5] - 715:20, 716:12, 716:13, 717:1, 717:3
**Income-Producing** [1] - 717:6
**incurring** [1] - 770:13
**independent** [2] - 648:13, 672:10
**iNDEX** [1] - 851:2
**INDEX** [1] - 850:1
**indicate** [7] - 670:13, 670:16, 670:20, 719:5, 727:14, 764:19, 827:24
**indicated** [1] - 793:2
**indicates** [2] - 631:25, 764:20
**indicating** [2] - 611:22, 747:8
**indictment** [1] - 781:24
**individual** [1] - 676:21
**individuals** [6] - 680:22, 681:11, 753:16, 757:2, 796:15, 827:12
**industries** [1] - 689:19
**inflammatory** [1] - 612:7
**information** [46] - 623:19, 636:21, 647:17, 664:6, 678:2, 678:8, 678:11, 678:14, 681:11, 684:14, 685:3, 701:8, 703:17, 722:18, 748:15, 757:7, 758:2, 758:3, 758:4, 758:10, 758:14, 758:15, 769:1, 773:22, 779:6, 780:11, 780:24, 788:21, 789:14, 799:6, 808:4, 808:9, 808:21, 809:10, 809:15, 809:18, 811:14, 815:7, 815:12, 817:3, 818:5, 819:14, 823:10, 829:12, 846:6, 847:4
**informed** [2] - 770:4, 806:8
**ingenious** [2] - 765:20, 765:21
**initial** [4] - 623:5, 735:1, 771:22, 838:5

**initiate** [2] - 734:10, 738:20
**input** [1] - 744:7
**inputted** [1] - 760:24
**inquire** [1] - 686:23
**inquired** [1] - 628:3
**installments** [2] - 693:19, 717:14
**instance** [2] - 631:17, 642:5
**instances** [1] - 682:8
**instead** [3] - 634:9, 721:5, 843:22
**institutional** [6] - 688:23, 689:3, 689:4, 689:5, 689:6, 689:13
**institutions** [3] - 689:8, 689:16, 698:12
**instruct** [4] - 730:5, 730:17, 730:18, 731:4
**instructed** [7] - 674:10, 730:12, 730:23, 814:25, 835:15, 835:18
**instructing** [1] - 731:12
**instruction** [13] - 674:23, 675:5, 675:9, 675:11, 682:22, 684:18, 684:22, 756:5, 756:14, 756:18, 756:25, 796:12
**intend** [4] - 620:23, 623:21, 676:20, 682:9
**intended** [1] - 847:25
**intending** [5] - 611:20, 677:25, 729:12, 752:22, 847:13
**intent** [1] - 706:5
**interact** [7] - 699:1, 699:6, 700:15, 700:22, 702:5, 706:8, 799:22
**interaction** [1] - 703:10
**interactions** [1] - 700:4
**interchangeably** [1] - 694:20
**interest** [3] - 693:21, 738:4, 838:17
**interested** [3] - 636:21, 642:24, 642:25
**interface** [1] - 765:12
**interfund** [1] - 838:17
**interim** [1] - 778:4
**internal** [1] - 774:18
**interview** [4] - 695:19, 695:20, 696:2, 697:7
**interviewed** [1] - 692:22
**interviewing** [3] - 693:3, 693:7, 698:8
**interviews** [1] - 695:16
**introduce** [5] - 620:24, 622:6, 679:11, 682:9, 757:22
**introduced** [1] - 776:1
**introducing** [1] - 620:11
**introduction** [1] - 612:6
**invest** [16] - 639:3, 643:11, 663:13, 689:9, 689:14, 689:16, 693:20, 694:5, 694:9, 709:17, 709:25, 727:2, 740:19, 740:22, 764:9, 793:9
**invested** [24] - 634:2, 634:20, 641:9, 644:8, 645:10, 645:15, 647:21, 647:24, 650:21, 671:13, 671:19, 671:21, 694:25, 716:19, 717:25, 719:21, 725:4, 726:25, 734:24, 735:2, 735:22, 738:24, 739:22, 743:17
**investing** [3] - 639:3, 640:10, 641:4, 645:6, 664:4, 671:24, 687:21, 689:1, 694:7, 712:3, 734:2, 763:5
**investment** [115] - 627:19, 630:16, 631:1, 631:9, 631:12, 631:18, 632:5, 639:20, 639:23, 641:11, 643:23, 646:22, 651:7, 651:8, 653:22, 660:5, 660:21, 662:1, 662:4, 662:20, 663:21, 666:5, 667:7, 668:20, 669:17, 682:11, 689:12,

689:22, 692:20, 696:16, 698:10, 701:7, 707:13, 707:19, 708:17, 710:25, 716:16, 719:23, 721:3, 737:5, 737:7, 761:12, 763:12, 763:13, 763:14, 764:3, 764:6, 764:7, 766:7, 766:9, 766:20, 767:13, 767:15, 767:20, 768:16, 772:9, 773:6, 774:15, 775:7, 776:10, 785:10, 785:11, 786:5, 786:20, 787:6, 787:14, 788:14, 791:4, 791:8, 791:11, 791:12, 791:15, 791:16, 791:19, 791:20, 792:1, 792:8, 793:1, 793:7, 795:3, 795:17, 797:13, 797:16, 798:14, 801:13, 801:16, 801:19, 802:13, 804:16, 805:24, 806:19, 807:3, 809:19, 813:6, 814:17, 821:8, 821:12, 821:17, 821:21, 822:1, 822:3, 822:9, 822:15, 822:18, 822:20, 823:6, 833:7, 833:9, 841:13, 841:24, 843:9
**Investment** [1] - 659:24
**investments** [19] - 631:4, 644:20, 645:3, 660:7, 661:4, 689:2, 694:4, 714:3, 719:8, 723:7, 741:1, 741:10, 763:17, 764:5, 768:15, 814:24, 817:6, 823:17
**investor** [31] - 618:22, 633:10, 649:3, 649:18, 651:14, 651:18, 651:23, 652:3, 652:10, 652:15, 664:10, 669:23, 670:4, 670:10, 674:8, 674:9, 674:21, 689:5, 712:2, 723:23, 726:24, 727:12, 728:9, 735:2, 736:20, 764:3, 764:5, 785:22, 787:15, 787:22, 791:5
**investor's** [2] - 727:15, 728:12
**investors** [34] - 612:21, 630:9, 633:3, 633:5, 639:20, 639:22, 644:14, 647:19, 650:20, 667:2, 688:22, 688:23, 689:3, 689:4, 689:6, 689:13, 689:24, 694:12, 694:23, 695:2, 722:15, 734:2, 734:23, 739:6, 739:14, 739:19, 743:12, 744:16, 765:4, 765:11, 765:13, 813:13
**investors'** [9] - 665:7, 665:11, 667:25, 722:22, 722:23, 787:4, 793:9, 794:9, 794:10
**invests** [1] - 689:18
**invoke** [1] - 704:21
**involve** [1] - 680:18
**involved** [2] - 734:12, 763:9
**involving** [3] - 623:19, 649:18, 680:19
**iPhone** [1] - 839:7
**IR** [4] - 654:15, 655:10, 655:13, 851:8
**Island** [5] - 691:14, 691:17, 691:20, 698:25, 699:15
**issue** [30] - 612:2, 612:16, 617:15, 623:17, 623:23, 624:15, 634:9, 685:18, 702:21, 723:11, 729:6, 741:5, 770:5, 779:8, 779:25, 780:19, 780:25, 781:19, 786:7, 793:18, 794:18, 811:11, 814:8, 843:16, 845:9, 846:1, 847:2, 847:9, 847:19
**issued** [1] - 725:22
**issues** [10] - 611:18, 621:20, 622:4, 676:18, 678:17, 685:21, 703:12, 757:21, 781:25, 799:25
**IT** [1] - 627:20
**item** [2] - 791:7, 848:10
**iteration** [1] - 805:3
**iterations** [1] - 807:22
**itself** [2] - 648:24, 700:6

# J

**j-a-c-o-b-y** [1] - 686:21
**Jacoby** [91] - 611:18, 612:2, 615:3, 615:23, 618:17, 677:10, 678:9, 679:10, 679:23, 680:10, 680:17, 682:24, 686:9, 686:20, 687:4, 706:2, 715:13, 716:11, 717:18, 718:22, 719:14, 720:2, 720:13, 721:13, 722:1, 724:22, 726:5, 727:23, 733:12, 733:18, 734:22, 735:19, 736:3, 738:23, 745:18, 748:1, 749:5, 749:24, 750:5, 750:10, 753:7, 754:7, 760:11, 761:21, 762:24, 766:24, 774:24, 775:14, 776:7, 777:7, 783:19, 788:1, 789:6, 789:22, 790:22, 792:17, 795:10, 801:10, 804:9, 804:22, 805:18, 808:3, 809:9, 810:24, 812:1, 812:21, 813:20, 814:14, 814:19, 817:13, 818:4, 819:9, 819:20, 820:6, 821:2, 823:1, 824:19, 826:8, 827:20, 830:12, 831:15, 831:21, 832:11, 833:18, 834:7, 834:24, 835:11, 836:16, 839:12, 843:3
**JACOBY** [2] - 686:24, 850:12
**Jacoby's** [1] - 618:21
**JAMES** [1] - 610:11
**Jamie** [1] - 627:1
**January** [2] - 615:3, 836:2
**JAY** [2] - 624:18, 850:4
**Jeff** [12] - 747:17, 747:21, 800:23, 801:5, 802:16, 811:7, 829:14, 829:15
**JEFFRY** [1] - 609:8
**Jeffry** [8] - 610:3, 610:8, 610:12, 625:2, 626:12, 626:13, 692:9, 692:14
**Jennifer** [1] - 611:8
**Jersey** [1] - 834:18
**JESSICA** [1] - 609:16
**Jessica** [1] - 611:6
**jet** [2] - 612:6, 771:17
**jets** [2] - 613:5, 617:7
**job** [7] - 691:25, 692:12, 693:1, 698:8, 699:11, 712:8, 811:15
**John** [1] - 611:9
**join** [1] - 677:5
**joining** [1] - 611:7
**JONATHAN** [1] - 609:23
**Jones** [1] - 627:1
**Jovan** [5] - 800:23, 801:5, 801:12, 811:7
**jovan** [1] - 801:7
**Judge** [9] - 612:11, 621:3, 621:15, 686:23, 781:7, 845:5, 845:15, 846:17, 847:22
**judge** [3] - 613:21, 755:2, 844:16
**juggle** [1] - 622:1
**July** [9] - 659:9, 659:19, 665:15, 732:23, 778:14, 801:18, 827:7, 827:21, 830:13
**jump** [2] - 820:15, 833:16
**June** [26] - 609:7, 635:25, 638:12, 665:24, 665:25, 666:3, 666:5, 718:25, 719:1, 779:19, 784:25, 791:24, 792:24, 819:3, 824:10, 824:20, 825:4, 826:13, 826:15, 826:21, 827:22, 828:12, 828:15, 830:14, 838:20, 849:24
**juror** [2] - 611:15, 611:16
**jurors** [2] - 623:10, 679:6
**Jury** [5] - 624:13, 676:14, 729:5, 733:5,

844:11

**jury** [82] - 612:5, 612:9, 613:15, 615:1, 617:15, 617:18, 621:14, 622:3, 622:19, 623:8, 623:13, 629:14, 646:13, 655:14, 659:17, 662:7, 665:20, 668:18, 673:24, 674:2, 674:10, 680:13, 685:13, 685:15, 685:25, 686:5, 687:10, 688:11, 688:19, 689:11, 690:18, 692:2, 693:11, 696:5, 697:23, 702:7, 703:21, 704:2, 706:11, 708:10, 708:19, 711:24, 717:11, 720:24, 728:21, 732:8, 732:16, 735:9, 736:19, 737:16, 741:25, 743:3, 743:25, 747:1, 749:18, 755:1, 755:3, 762:10, 762:18, 767:1, 771:8, 781:4, 781:13, 781:21, 782:2, 782:3, 783:7, 783:11, 783:14, 783:22, 797:1, 799:17, 804:6, 805:15, 810:1, 812:18, 818:1, 824:16, 826:7, 826:17, 828:8, 834:15

## K

**KATE** [1] - 609:17
**keep** [24] - 627:11, 634:12, 635:6, 687:8, 688:15, 759:1, 761:16, 765:22, 772:17, 772:19, 774:14, 786:10, 793:24, 808:14, 809:24, 814:8, 814:23, 816:5, 832:18, 835:3, 837:19, 837:20, 849:20
**keeping** [2] - 690:23, 773:5
**keeps** [1] - 674:19
**kept** [10] - 683:13, 684:3, 685:4, 690:22, 769:8, 769:11, 774:6, 779:12, 786:13, 811:15
**KIM** [1] - 609:19
**kind** [11] - 636:16, 678:5, 684:20, 701:16, 701:17, 702:11, 737:8, 748:8, 757:17, 772:3, 782:15
**knowing** [1] - 620:1
**knowledge** [11] - 612:14, 613:1, 615:16, 617:8, 617:16, 649:12, 678:19, 684:13, 704:12, 755:23, 835:20
**known** [3] - 656:3, 671:19, 810:14
**knows** [7] - 613:5, 613:7, 693:6, 704:15, 746:4, 747:15, 756:1
**KOBRE** [1] - 609:19
**KOVNER** [1] - 609:11

## L

**lack** [3] - 662:21, 751:18, 829:5
**lag** [1] - 727:1
**laid** [1] - 776:22
**land** [1] - 624:5
**language** [2] - 637:23, 736:7
**large** [3] - 652:9, 689:8, 689:16
**larger** [4] - 773:10, 800:20, 806:10, 823:6
**lash** [5] - 743:16, 743:18, 772:1, 845:9, 846:12
**Lash** [2] - 615:7, 846:8
**lash's** [1] - 623:16
**Lash's** [5] - 846:11, 847:2, 847:3, 847:12, 847:17
**Lash-related** [1] - 846:8
**last** [11] - 612:16, 650:18, 658:3, 658:5, 713:17, 720:14, 727:8, 779:18, 784:23,

798:6, 809:6
**lastly** [1] - 730:11
**late** [3] - 611:17, 634:2, 644:23
**latest** [1] - 813:2
**Laura** [1] - 611:12
**LAURA** [1] - 610:10
**LAW** [1] - 610:11
**lay** [8] - 617:6, 624:5, 682:6, 683:1, 684:23, 684:25, 695:14, 753:2
**laying** [2] - 624:4, 779:23
**layout** [1] - 790:24
**learn** [9] - 703:1, 703:3, 705:5, 706:2, 706:3, 724:12, 724:13, 741:9, 770:6
**learned** [3] - 671:16, 680:10, 742:25
**learning** [2] - 758:14, 770:8
**lease** [2] - 771:13, 771:14
**least** [14] - 613:1, 633:4, 643:24, 644:13, 645:13, 655:1, 655:21, 655:25, 657:3, 704:13, 732:9, 782:15, 793:15, 845:6
**leaves** [1] - 844:15
**leaving** [1] - 625:10
**led** [2] - 635:2, 656:17
**ledger** [1] - 809:16
**ledgers** [1] - 761:18
**left** [16] - 629:22, 630:15, 630:22, 648:8, 691:10, 696:24, 726:3, 740:18, 760:3, 763:4, 765:2, 772:23, 789:9, 810:20, 821:1, 837:17
**left-hand** [3] - 726:3, 810:20, 837:17
**legal** [1] - 712:2
**lending** [1] - 689:2
**length** [1] - 844:19
**less** [9] - 631:8, 631:17, 631:25, 650:22, 697:19, 700:20, 767:21, 794:12, 843:10
**letter** [24] - 611:19, 611:21, 624:4, 654:25, 674:5, 674:8, 674:20, 674:22, 675:3, 675:13, 675:16, 676:3, 677:22, 677:24, 678:23, 845:14, 845:17, 846:10, 846:14, 847:1, 847:12, 847:15, 849:16, 849:18
**letting** [1] - 813:9
**level** [9] - 612:19, 643:5, 697:18, 770:19, 770:21, 770:24, 820:20, 821:7
**leverage** [1] - 662:24
**lie** [1] - 664:11
**lied** [2] - 663:22, 664:2
**life** [3] - 716:16, 736:17, 736:24
**light** [1] - 678:2
**likely** [1] - 647:18
**limine** [1] - 731:7
**limit** [1] - 832:6
**limited** [14] - 635:10, 641:2, 651:14, 653:22, 663:15, 680:15, 711:23, 711:25, 726:20, 727:19, 727:24, 734:5, 779:7, 807:18
**limiting** [2] - 756:4, 812:11
**line** [12] - 612:20, 612:24, 631:20, 637:4, 639:18, 648:10, 651:10, 664:9, 722:9, 741:22, 758:17, 787:9
**lines** [1] - 626:7
**liquidity** [7] - 633:2, 643:25, 644:5, 662:14, 662:17, 662:22, 737:9
**list** [8] - 618:15, 620:13, 620:20, 620:25, 621:2, 677:1, 680:10, 839:21
**listed** [7] - 639:19, 735:8, 735:20, 736:4, 789:11, 789:24, 805:8

**listen** [1] - 634:11, 651:25
**listened** [1] - 626:13
**listener** [10] - 618:22, 618:23, 678:2, 754:9, 754:12, 755:14, 756:3, 756:16, 756:23, 757:14
**literature** [3] - 638:3, 638:22, 638:23
**litigated** [1] - 847:4
**live** [2] - 732:10, 732:11
**living** [2] - 777:19, 779:2
**LLP** [3] - 609:19, 610:2, 610:7
**load** [1] - 757:9
**located** [1] - 691:13
**location** [1] - 707:25
**locked** [2] - 689:17, 689:19
**locking** [1] - 713:16
**lodge** [1] - 613:22
**logical** [1] - 840:4
**logs** [1] - 615:24
**look** [34] - 615:11, 630:15, 634:7, 647:13, 654:16, 660:11, 664:17, 664:20, 667:10, 667:16, 669:1, 701:13, 701:25, 712:15, 721:16, 757:18, 778:22, 787:6, 792:15, 796:1, 796:4, 797:4, 799:19, 804:19, 818:23, 820:3, 826:23, 831:15, 832:9, 834:24, 835:24, 837:16, 839:8, 840:9
**looked** [12] - 640:7, 647:12, 656:13, 683:20, 715:5, 790:25, 803:12, 808:3, 814:2, 828:15, 838:19, 847:14
**looking** [52] - 613:7, 626:2, 627:6, 629:22, 629:25, 630:20, 657:25, 658:10, 669:12, 684:25, 685:14, 712:4, 712:13, 716:11, 716:25, 722:6, 727:23, 734:25, 750:10, 751:14, 753:7, 762:24, 771:3, 774:25, 779:24, 780:12, 783:23, 784:21, 785:16, 791:2, 791:10, 791:17, 795:17, 795:18, 799:5, 802:25, 804:22, 807:2, 811:1, 813:20, 820:19, 821:14, 821:17, 823:3, 828:10, 832:9, 836:18, 840:15, 840:17, 843:3, 843:6
**looks** [10] - 720:3, 721:15, 735:7, 753:12, 778:2, 778:10, 792:24, 802:22, 803:2, 830:13
**lose** [1] - 651:8
**losing** [1] - 694:7
**loss** [5] - 654:7, 654:9, 655:25, 656:14, 818:13
**losses** [1] - 642:11
**loud** [2] - 626:6, 728:2
**low** [2] - 643:17, 693:22
**lower** [5] - 772:25, 811:17, 821:1
**lowering** [1] - 741:18
**LPA** [2] - 636:5, 638:4
**lunch** [2] - 729:2, 731:17
**Luncheon** [1] - 731:20

## M

**Madison** [1] - 611:8
**mail** [113] - 610:17, 619:9, 619:19, 621:5, 622:12, 623:7, 632:18, 677:9, 679:3, 680:4, 680:5, 680:13, 682:5, 683:3, 683:6, 684:15, 699:10, 745:21, 745:24, 747:6, 748:15, 749:14, 749:15, 751:17, 752:6, 752:9, 752:17, 752:18,

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 260 of 271
PageID #: 14053
(mailing - members)                                                      Page 16

752:21, 752:22, 752:25, 753:7, 753:15, 756:25, 775:1, 776:13, 776:20, 778:7, 778:11, 778:14, 778:19, 778:21, 779:3, 779:14, 779:16, 779:21, 780:12, 780:13, 780:14, 782:8, 782:24, 782:25, 783:1, 795:16, 796:5, 796:15, 796:16, 796:18, 797:4, 798:2, 798:15, 799:20, 800:2, 800:4, 800:12, 800:16, 800:20, 801:8, 801:11, 802:11, 802:15, 803:6, 803:10, 805:20, 806:6, 810:23, 811:5, 812:5, 812:25, 813:24, 814:1, 816:16, 817:16, 817:19, 818:6, 818:18, 823:18, 824:16, 825:14, 826:6, 826:9, 826:18, 826:19, 827:8, 827:11, 829:17, 829:24, 831:22, 832:11, 832:23, 833:18, 836:1, 836:5, 836:8, 839:12, 842:19, 842:23, 846:14, 847:2, 847:16, 848:14, 848:16, 849:3

**mailing** [1] - 798:3

**mails** [35] - 618:18, 619:7, 619:13, 626:16, 678:3, 678:15, 679:8, 679:10, 679:13, 682:9, 747:16, 747:20, 747:25, 756:19, 757:1, 757:4, 757:6, 757:12, 757:18, 758:11, 758:12, 758:13, 758:24, 758:25, 795:2, 795:6, 796:14, 796:17, 796:21, 797:24, 824:9, 846:19, 846:20, 846:22

**main** [3] - 691:19, 796:5, 829:13

**Main Street** [1] - 688:23

**maintain** [2] - 774:10, 783:2

**maintained** [2] - 685:4, 685:10

**major** [1] - 679:16

**majority** [2] - 618:17, 619:1

**man** [3] - 745:11, 747:6, 834:18

**manage** [1] - 816:5

**managed** [1] - 745:12

**management** [43] - 687:25, 700:3, 700:22, 700:24, 702:8, 706:25, 737:1, 737:6, 742:6, 747:22, 769:17, 787:10, 791:9, 793:15, 814:19, 814:21, 814:22, 814:25, 815:4, 815:12, 815:18, 815:25, 816:10, 817:4, 818:17, 818:23, 823:21, 824:20, 826:15, 827:1, 827:22, 828:15, 830:15, 831:3, 832:13, 833:20, 836:2, 836:17, 836:24, 837:2, 838:23, 843:4

**manager** [2] - 689:25, 698:17

**managerial** [1] - 737:11

**managers** [1] - 815:6

**managing** [1] - 700:8

**Manhattan** [4] - 691:18, 691:20, 698:25, 699:18

**manipulate** [2] - 780:7, 781:16

**Mann** [3] - 626:10, 626:15, 632:20

**manner** [1] - 758:3

**March** [11] - 645:7, 646:22, 659:24, 660:5, 660:16, 690:5, 692:13, 704:5, 725:19, 733:13, 797:23

**Marie** [2] - 753:12

**mark** [1] - 732:15

**Mark** [4] - 626:10, 626:15, 632:20

**marked** [57] - 629:1, 629:13, 645:21, 646:11, 646:25, 647:8, 654:14, 655:13, 659:4, 715:9, 721:10, 745:16, 749:12, 754:2, 760:5, 761:20, 774:23, 826:4, 828:6, 830:24, 832:2, 834:3, 836:10, 840:1, 843:1, 851:5, 851:6, 851:7, 851:8, 851:9, 851:10, 851:11, 851:12, 851:13,

851:14, 851:15, 851:16, 851:17, 851:18, 851:19, 851:20, 851:22, 851:23, 851:24, 851:25, 852:1, 852:2, 852:3, 852:5, 852:7, 852:8, 852:9, 852:10, 852:12, 852:13, 852:14, 852:15

**market** [4] - 660:7, 661:4, 717:1, 717:3

**marketed** [2] - 694:1, 744:2

**marketing** [40] - 622:10, 622:14, 623:6, 636:13, 668:15, 673:1, 692:19, 701:6, 701:8, 707:10, 707:11, 710:14, 710:20, 711:13, 711:14, 711:19, 712:10, 712:16, 713:3, 713:7, 713:11, 713:16, 713:18, 714:9, 714:15, 714:20, 715:19, 715:22, 717:23, 719:6, 719:7, 721:15, 721:16, 733:19, 733:20, 744:1, 744:13, 769:7, 794:8

**Marshall** [5] - 745:8, 745:14, 817:17, 825:18, 827:9

**Maryland** [1] - 708:2

**masses** [2] - 693:15, 709:14

**master's** [1] - 687:13

**material** [4] - 637:15, 680:21, 685:13, 847:7

**materials** [35] - 635:9, 636:17, 641:12, 642:13, 642:17, 647:25, 651:7, 663:3, 664:22, 682:7, 701:9, 711:15, 711:19, 711:22, 712:4, 712:10, 712:16, 712:17, 713:3, 713:7, 713:11, 713:16, 713:18, 714:9, 714:15, 715:22, 717:23, 719:6, 719:7, 720:4, 733:19, 733:20, 846:13, 847:14, 847:19

**MATHEWS** [1] - 609:17

**Matt** [1] - 611:10

**matter** [2] - 653:9, 849:24

**matters** [2] - 649:18, 653:8

**MATTHEW** [1] - 609:22

**mature** [4] - 689:22, 694:5, 737:1, 737:3

**maximum** [4] - 828:9, 828:19, 828:22, 832:12, 832:24

**McConnell** [176] - 611:6, 613:13, 615:21, 659:13, 660:10, 661:17, 661:19, 661:21, 667:16, 668:7, 669:1, 669:6, 670:24, 671:1, 672:16, 675:2, 675:14, 675:19, 675:22, 678:13, 679:8, 680:3, 682:4, 682:25, 683:8, 683:17, 683:25, 684:8, 684:11, 684:25, 685:11, 686:8, 686:23, 687:3, 700:1, 701:24, 702:25, 703:13, 704:14, 704:19, 704:25, 705:7, 706:1, 708:25, 714:22, 715:2, 715:12, 716:4, 716:10, 716:23, 717:5, 717:15, 718:4, 718:19, 719:12, 719:24, 720:6, 720:12, 720:19, 721:19, 721:24, 721:25, 724:19, 725:12, 725:18, 726:1, 727:18, 727:22, 728:24, 729:6, 729:10, 729:25, 730:7, 731:10, 731:18, 764:2, 774:22, 775:12, 775:15, 775:21, 776:3, 776:19, 778:6, 779:9, 779:18, 780:3, 780:6, 780:10, 780:15, 781:7, 781:11, 782:19, 782:24, 783:6, 783:16, 783:18, 783:21, 784:22, 785:2, 786:2, 787:11, 787:24, 789:1, 790:20, 792:15, 792:19, 792:22, 795:1, 795:7, 796:3, 796:23, 796:25, 797:3, 798:1, 798:23, 799:12, 799:16, 799:19, 799:21, 800:12, 800:15, 801:8, 803:5, 803:19, 803:24, 804:5, 804:8, 804:19, 804:23, 805:10, 805:13, 805:15,

805:17, 806:6, 806:22, 806:24, 807:7, 807:14, 807:22, 808:1, 808:2, 809:1, 809:8, 810:15, 810:19, 810:22, 811:22, 811:25, 812:13, 812:15, 812:18, 813:17, 814:4, 814:11, 814:13, 816:6, 816:19, 816:25, 817:21, 817:25, 818:3, 819:6, 819:17, 819:19, 819:22, 820:3, 820:10, 820:15, 820:25, 822:22, 823:23, 824:3, 824:7, 824:14, 824:18, 850:20

**MCCONNELL** [111] - 609:16, 611:5, 612:10, 613:6, 613:19, 613:21, 617:24, 618:8, 618:12, 620:13, 621:1, 621:15, 621:23, 622:9, 622:24, 629:11, 635:18, 637:3, 637:6, 637:19, 638:16, 642:20, 646:9, 647:2, 648:20, 649:5, 649:11, 649:23, 651:20, 652:18, 655:11, 656:9, 732:12, 733:7, 733:10, 733:16, 734:15, 734:20, 735:15, 737:14, 746:2, 747:4, 747:13, 748:8, 748:19, 749:3, 749:11, 749:19, 749:22, 750:8, 750:24, 751:13, 751:22, 752:3, 752:7, 752:18, 752:24, 753:5, 753:23, 754:13, 755:2, 755:10, 755:21, 756:17, 760:2, 760:7, 760:9, 761:19, 762:3, 762:10, 762:22, 826:1, 827:16, 828:3, 829:21, 830:1, 830:7, 830:9, 830:17, 830:21, 830:23, 831:12, 831:19, 831:24, 832:7, 833:16, 833:24, 834:4, 834:22, 835:24, 836:7, 836:12, 837:5, 837:9, 837:20, 838:2, 839:9, 839:23, 840:6, 841:14, 842:6, 842:12, 842:22, 842:24, 843:13, 844:16, 845:5, 847:22, 848:6, 849:7, 849:10

**McConnell's** [1] - 848:12

**McCONNELL........................** [2] - 850:8, 850:14

**MCCONNELL........................** [1] - 850:16

**mean** [39] - 619:12, 620:20, 626:13, 657:25, 660:12, 678:9, 688:14, 694:15, 715:3, 717:23, 720:17, 723:3, 733:23, 737:3, 737:4, 741:16, 761:6, 766:3, 770:21, 772:16, 773:15, 773:17, 778:10, 784:18, 787:18, 788:2, 794:11, 798:9, 801:6, 801:21, 801:22, 802:19, 813:8, 821:15, 826:19, 828:18, 829:9, 840:24, 841:6

**meaning** [10] - 631:17, 639:2, 707:4, 717:3, 717:4, 794:12, 798:14, 818:10, 818:11, 829:10

**means** [12] - 633:9, 657:20, 668:20, 717:2, 717:11, 717:24, 764:14, 767:2, 782:20, 788:4, 788:6, 788:8

**meant** [8] - 706:13, 718:1, 736:9, 740:19, 793:9, 826:17, 837:8, 846:15

**measure** [1] - 632:10

**measures** [1] - 632:8

**medium** [1] - 717:4

**meet** [5] - 625:20, 692:25, 698:1, 811:7, 811:10

**meeting** [4] - 742:5, 747:17, 806:16, 811:7

**member** [2] - 799:17, 806:2

**members** [39] - 662:7, 665:20, 668:17, 678:16, 683:9, 687:10, 688:11, 688:19, 689:11, 690:18, 692:2, 693:11, 696:5, 697:23, 702:7, 706:11, 708:10, 708:19,

711:24, 720:24, 728:21, 736:19, 737:16,
741:25, 743:3, 743:24, 767:1, 771:8,
772:8, 774:6, 775:10, 783:22, 788:18,
797:1, 808:13, 809:25, 826:6, 826:17,
834:15

**memoranda** [1] - 711:25
**memorandum** [13] - 635:10, 635:21,
635:24, 636:22, 638:24, 663:18, 664:18,
664:21, 724:25, 728:16, 733:13, 734:5,
736:4
**memorandums** [2] - 662:13, 711:22
**memorized** [1] - 657:11
**memory** [1] - 638:8
**MENCHEL** [31] - 609:22, 611:25, 613:9,
615:2, 677:4, 682:1, 685:25, 695:18,
733:15, 733:17, 749:15, 749:20, 750:1,
750:14, 750:17, 751:19, 751:25, 753:25,
775:23, 775:25, 776:4, 776:6, 776:22,
777:2, 777:6, 777:21, 778:12, 842:23,
845:2, 846:4, 848:2
**Menchel** [2] - 611:10, 611:22
**MENCHEL** ........................... [1] -
850:18
**mention** [3] - 730:19, 732:6, 749:6
**mentioned** [26] - 665:17, 666:17,
666:22, 667:7, 688:7, 688:18, 689:10,
690:2, 691:21, 694:14, 707:10, 710:7,
710:24, 717:13, 722:17, 728:15, 732:13,
743:23, 745:10, 756:21, 771:20, 774:13,
808:21, 815:20, 817:1, 832:23
**merely** [2] - 748:12
**merge** [1] - 706:5
**message** [2] - 749:8, 829:7
**met** [4] - 626:13, 692:6, 692:8, 692:9
**metric** [4] - 631:11, 631:24, 632:1, 654:2
**metrics** [7] - 632:4, 632:13, 646:19,
647:15, 653:19, 667:4, 698:16
**MF-12** [3] - 647:1, 647:8, 851:7
**MF-7** [4] - 629:1, 629:10, 629:13, 851:5
**MF-9** [4] - 645:21, 646:8, 646:11, 851:6
**Miami** [1] - 610:13
**Michael** [6] - 611:13, 625:1, 626:10,
626:14, 632:19, 692:7
**MICHAEL** [1] - 610:9
**Michelle** [2] - 630:22, 638:19
**Microsoft** [1] - 773:17
**mid** [1] - 644:23
**mid-to-late** [1] - 644:23
**middle** [8] - 612:12, 613:24, 717:1,
717:3, 761:23, 763:3, 821:5, 821:6
**midyear** [2] - 827:14, 829:6
**might** [12] - 621:7, 623:8, 665:7, 671:11,
714:22, 829:6, 829:11, 829:19, 835:3,
835:4, 847:18, 847:20
**Mike** [1] - 809:5
**million** [39] - 630:4, 630:17, 630:25,
631:7, 631:14, 631:22, 654:6, 655:22,
656:1, 660:2, 660:19, 660:22, 660:23,
661:3, 661:6, 738:11, 738:12, 740:17,
740:18, 740:19, 740:22, 743:10, 787:14,
788:10, 788:11, 788:12, 790:6, 790:8,
790:9, 790:10, 790:13, 790:14, 790:15,
790:18, 841:8, 842:1
**millions** [1] - 689:9
**mind** [10] - 618:22, 619:3, 620:9,
676:19, 677:3, 680:16, 782:15, 792:22,

801:11, 844:8
**mindful** [1] - 681:24
**minimus** [1] - 652:10
**minus** [2] - 788:4, 821:8
**minute** [2] - 666:13, 775:20
**minutes** [3] - 611:16, 611:18, 844:6
**misleading** [2] - 664:5, 704:6
**miss** [1] - 829:20
**missed** [1] - 663:10
**missing** [1] - 769:1
**misstates** [1] - 747:20
**misunderstood** [1] - 847:19
**mix** [1] - 833:14
**model** [3] - 693:12, 695:17, 695:21
**moment** [17] - 626:4, 634:22, 661:12,
670:24, 674:13, 676:3, 714:22, 714:24,
728:1, 735:18, 750:19, 752:11, 755:16,
777:1, 780:1, 800:9, 824:1
**moments** [2] - 626:3, 640:8
**Monday** [4] - 845:7, 845:16, 849:20,
849:21
**money** [82] - 643:14, 666:4, 666:5,
666:13, 667:1, 671:24, 682:10, 683:11,
688:15, 689:14, 689:16, 689:19, 689:23,
689:24, 690:23, 694:7, 698:1, 698:12,
698:15, 706:18, 719:22, 721:4, 722:22,
723:7, 723:24, 727:2, 735:2, 737:2,
737:7, 738:8, 738:21, 739:18, 741:11,
743:11, 744:19, 751:18, 753:21, 761:17,
762:1, 763:1, 763:5, 763:6, 763:15,
763:16, 764:4, 764:6, 764:7, 764:9,
765:22, 765:24, 766:5, 766:8, 766:10,
766:17, 766:20, 770:18, 774:14, 788:6,
788:8, 788:14, 791:25, 792:8, 793:9,
793:25, 794:3, 794:12, 794:14, 795:2,
805:23, 806:3, 806:11, 809:19, 809:20,
811:18, 822:15, 827:15, 833:12, 833:13,
835:19, 841:12
**monies** [1] - 772:19
**monitor** [3] - 629:25, 773:9, 834:24
**month** [15] - 696:21, 700:19, 727:1,
767:21, 769:21, 772:15, 791:21, 811:12,
813:7, 822:2, 822:3, 824:10, 833:23,
840:22, 840:23
**month-end** [1] - 833:23
**monthly** [27] - 665:12, 666:20, 666:24,
668:1, 693:19, 694:22, 695:5, 695:23,
696:3, 697:3, 697:17, 698:20, 716:21,
716:22, 717:10, 717:14, 724:14, 726:10,
727:5, 728:13, 740:15, 741:15, 765:8,
765:9, 768:4, 768:12, 785:24
**months** [13] - 664:16, 665:22, 690:9,
690:10, 726:20, 726:24, 727:3, 770:8,
838:10, 841:1, 842:2, 847:3
**moot** [1] - 623:23
**more-detailed** [2] - 728:7, 819:14
**Morgan Stanley** [2] - 688:1, 688:2
**morning** [10] - 611:5, 624:14, 625:1,
625:3, 661:20, 661:21, 671:6, 671:7,
671:9, 687:4
**Moscato** [2] - 825:19, 827:10
**most** [7] - 618:19, 621:10, 622:18,
624:2, 644:8, 756:18, 788:1
**mostly** [6] - 627:10, 644:11, 698:25,
699:3, 839:2, 839:3
**motion** [2] - 846:7, 847:20

**motivated** [1] - 679:22
**motive** [1] - 612:25
**Motor** [1] - 641:5
**mouth** [1] - 730:3
**move** [11] - 621:8, 631:20, 638:20,
670:18, 670:21, 710:7, 742:17, 748:21,
763:1, 814:19, 845:11
**moved** [10] - 687:20, 688:4, 762:1,
765:24, 770:18, 788:14, 791:25, 792:8,
792:25, 806:3
**movements** [11] - 682:10, 683:11,
772:9, 772:19, 773:5, 774:15, 794:14,
795:3, 802:13, 805:24, 809:19
**movie** [1] - 701:21
**moving** [5] - 627:11, 634:12, 635:6,
804:16, 844:22
**Mr. Jones** [2] - 648:5, 650:9
**Mr. Schneider** [86] - 611:13, 615:7,
618:19, 618:23, 619:22, 619:23, 620:7,
626:22, 628:6, 674:5, 677:10, 677:16,
677:18, 679:2, 679:19, 680:14, 680:15,
684:9, 692:18, 692:22, 693:3, 693:7,
695:16, 696:2, 697:1, 698:8, 699:3,
700:13, 700:15, 702:4, 702:19, 702:23,
706:4, 706:7, 707:4, 707:8, 707:12,
708:7, 709:4, 713:2, 713:9, 713:12,
714:14, 722:25, 724:7, 725:10, 728:16,
728:22, 733:24, 734:8, 738:16, 741:4,
741:7, 742:11, 744:11, 745:2, 745:12,
748:1, 748:3, 748:4, 751:6, 752:13,
754:5, 754:6, 756:6, 760:14, 769:13,
770:4, 771:12, 782:10, 793:11, 793:21,
801:2, 801:7, 806:17, 811:10, 811:12,
815:5, 815:21, 816:12, 817:17, 829:16,
836:4, 839:3, 839:19, 846:2
**MS** [2] - 615:21, 849:2
**multiple** [1] - 653:19

# N

**name** [2] - 644:13, 686:19
**named** [2] - 687:21, 834:19
**names** [1] - 730:19
**native** [6] - 775:22, 776:20, 780:10,
780:23, 781:15, 781:20
**nature** [5] - 662:25, 665:5, 672:14,
748:17, 752:10
**near** [2] - 777:17, 783:9
**nearly** [1] - 665:22
**necessarily** [1] - 811:20
**necessary** [7] - 612:10, 613:23, 678:25,
680:8, 806:5, 806:8, 824:15
**need** [28] - 617:25, 619:15, 621:25,
624:6, 680:24, 702:23, 712:8, 715:15,
727:6, 740:21, 747:20, 749:24, 750:18,
755:15, 756:4, 757:18, 782:24, 791:21,
793:19, 795:10, 796:4, 807:25, 819:20,
824:5, 826:20, 827:13, 845:21
**needed** [10] - 701:7, 701:8, 712:10,
713:24, 715:4, 724:12, 724:13, 741:9,
769:1, 769:11, 769:12, 770:6, 786:17,
794:7, 810:13, 811:17, 813:12, 816:3
**needs** [2] - 781:23, 813:9
**negative** [5] - 788:4, 788:5, 790:9,
790:12

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 262 of 271
PageID #: 14055
*(negatives - opinion)*                                                    *Page 18*

**negatives** [2] - 838:10, 838:11

**net** [48] - 631:11, 631:17, 631:20, 632:1, 632:5, 653:22, 653:23, 654:6, 654:9, 655:25, 656:4, 656:7, 656:13, 656:15, 667:7, 667:8, 669:17, 694:11, 695:6, 696:15, 696:16, 723:21, 765:1, 766:19, 767:13, 767:15, 767:20, 795:17, 797:13, 797:16, 798:14, 821:7, 821:8, 821:12, 821:17, 822:1, 822:3, 822:9, 822:15, 823:6, 823:17, 833:7, 833:9, 841:24, 843:9

**network** [1] - 696:11

**never** [11] - 626:22, 663:9, 663:25, 664:3, 671:12, 671:20, 673:14, 673:15, 677:2, 846:13, 846:16

**new** [12] - 641:25, 666:4, 666:13, 722:22, 723:6, 723:7, 723:22, 768:15, 788:23, 793:23, 840:9

**New** [13] - 609:5, 609:14, 609:15, 609:21, 610:5, 687:14, 707:24, 708:5, 708:21, 710:8, 834:18

**next** [41] - 614:2, 616:3, 621:21, 630:5, 648:25, 658:13, 673:25, 675:24, 686:6, 699:21, 703:22, 705:9, 718:20, 719:12, 726:18, 732:8, 732:20, 737:15, 746:7, 748:23, 754:17, 756:7, 756:8, 759:3, 763:18, 790:20, 794:21, 798:1, 800:11, 801:8, 821:24, 822:22, 823:10, 829:1, 829:5, 829:7, 841:15, 843:21, 844:20, 848:3, 848:5

**NICHOLAS** [1] - 609:17

**Nick** [1] - 611:6

**nicknames** [2] - 729:13, 730:1

**nine** [4] - 629:18, 629:19, 629:23, 664:16

**nobody** [1] - 847:13

**non** [6] - 678:24, 681:5, 689:18, 708:21, 758:6, 758:9

**non-hearsay** [4] - 678:24, 681:5, 758:6, 758:9

**non-New** [1] - 708:21

**non-profitable** [1] - 689:18

**none** [2] - 626:19, 685:20

**nonresponsive** [1] - 730:24

**normally** [1] - 831:3

**notated** [1] - 789:11

**notation** [1] - 789:20

**notations** [1] - 809:12

**note** [5] - 785:10, 800:20, 812:10, 813:14, 844:1

**noted** [2] - 719:5, 810:12

**notes** [2] - 784:15, 784:17

**nothing** [11] - 661:15, 671:1, 673:18, 675:20, 676:8, 686:13, 686:16, 729:20, 731:13, 748:2, 782:19

**notice** [2] - 755:18, 755:23

**notion** [1] - 618:21

**November** [2] - 791:16, 838:15

**nowhere** [1] - 635:14

**number** [47] - 626:16, 630:16, 631:3, 631:9, 631:14, 631:22, 646:17, 660:1, 660:22, 668:22, 669:3, 679:17, 687:18, 689:16, 692:5, 692:11, 696:20, 707:1, 707:3, 707:5, 718:13, 718:19, 740:2, 740:8, 745:7, 763:10, 764:9, 764:15, 764:19, 764:20, 765:4, 767:4, 767:16,

770:16, 772:22, 785:8, 787:12, 788:4, 788:5, 788:18, 789:11, 790:4, 790:5, 806:10, 837:1, 839:2, 843:8

**number's** [1] - 772:24

**numbers** [19] - 629:17, 629:24, 667:19, 702:10, 712:14, 713:23, 714:10, 715:5, 756:15, 756:20, 788:1, 789:24, 809:4, 827:13, 827:22, 830:14, 838:11, 838:14, 839:18

**NW** [1] - 610:8

---

# O

**oath** [1] - 624:21

**object** [7] - 620:16, 660:10, 675:5, 750:1, 753:25, 776:4, 776:5

**objecting** [4] - 622:16, 675:7, 751:20, 756:22

**objection** [62] - 613:22, 622:22, 629:11, 635:18, 637:3, 637:19, 638:16, 642:20, 647:2, 648:20, 649:5, 649:23, 651:20, 652:18, 655:11, 656:9, 659:13, 660:13, 663:5, 663:24, 664:7, 668:4, 670:1, 670:11, 670:17, 672:16, 678:6, 693:5, 695:13, 695:18, 697:4, 697:9, 701:18, 701:22, 703:12, 705:5, 714:21, 716:6, 720:8, 721:21, 725:14, 736:12, 742:17, 750:14, 750:17, 750:18, 750:19, 751:7, 751:19, 751:24, 751:25, 752:9, 778:6, 778:13, 778:24, 783:2, 794:4, 807:19, 814:8, 816:21, 824:8, 842:25

**Objection** [6] - 702:20, 708:22, 711:6, 714:21, 796:7, 800:7

**objections** [10] - 611:22, 620:5, 622:8, 676:19, 677:5, 685:23, 781:22, 782:7, 782:22, 823:25

**obligation** [1] - 658:7

**observe** [2] - 702:4, 706:7

**obviously** [6] - 617:6, 701:7, 790:17, 844:19, 845:7, 845:20

**occurred** [3] - 681:17, 827:2, 838:21

**October** [10] - 644:10, 786:5, 791:10, 792:24, 812:4, 812:22, 813:4, 813:7, 833:22, 838:15

**October's** [1] - 791:12

**offer** [50] - 611:20, 629:9, 637:10, 637:15, 637:16, 637:17, 646:7, 647:5, 655:9, 659:11, 677:25, 692:12, 716:4, 720:6, 721:19, 725:12, 746:2, 748:5, 751:21, 752:16, 752:22, 752:24, 753:23, 762:3, 776:2, 776:19, 780:6, 796:6, 799:12, 803:19, 805:10, 807:14, 809:2, 810:15, 812:7, 814:4, 816:19, 817:21, 820:10, 823:24, 824:8, 826:1, 827:17, 828:3, 830:17, 831:24, 833:24, 836:7, 839:23, 842:22

**offered** [27] - 678:1, 682:23, 693:1, 698:6, 747:3, 754:9, 754:11, 755:13, 756:2, 756:3, 756:9, 756:11, 756:13, 757:2, 757:3, 757:5, 760:3, 762:5, 779:4, 796:10, 796:16, 796:17, 807:19, 807:20, 807:21, 807:23

**offering** [21] - 635:9, 638:2, 638:22, 638:23, 638:25, 639:2, 639:7, 679:18, 679:21, 679:22, 680:2, 680:3, 681:5, 682:2, 711:21, 712:17, 717:7, 751:23,

752:5, 752:6, 752:7

**OFFICE** [2] - 609:14, 610:11

**office** [16] - 690:11, 691:14, 691:15, 691:17, 691:18, 699:19, 700:18, 700:20, 701:4, 701:12, 701:14, 701:15, 707:22, 729:14, 798:19

**officer** [25] - 678:21, 684:2, 688:10, 688:12, 690:3, 690:17, 690:20, 691:23, 692:1, 695:15, 700:16, 701:3, 703:10, 713:20, 726:23, 733:21, 734:1, 738:14, 738:20, 739:17, 742:7, 744:6, 748:11, 760:19, 767:9

**offices** [3] - 691:13, 691:19, 700:25

**Official** [1] - 610:15

**officially** [1] - 797:23

**offsite** [1] - 739:11

**often** [10] - 672:23, 699:1, 700:15, 741:13, 768:17, 769:16, 793:14, 799:22, 811:10, 815:17

**once** [16] - 625:22, 625:23, 625:24, 643:5, 654:16, 658:4, 696:9, 699:2, 699:4, 700:19, 707:5, 729:7, 732:15, 742:5, 772:15, 811:12

**one** [117] - 619:4, 622:5, 625:1, 633:4, 650:16, 650:22, 652:14, 652:15, 654:2, 655:1, 656:21, 663:21, 664:4, 669:7, 670:24, 675:8, 677:25, 679:10, 679:17, 681:3, 684:4, 685:20, 692:6, 692:18, 701:5, 703:5, 703:7, 704:23, 706:6, 708:2, 709:8, 712:14, 715:22, 718:20, 719:1, 720:4, 720:14, 721:1, 721:16, 722:13, 725:2, 728:7, 729:3, 729:6, 732:6, 732:18, 735:10, 735:18, 736:6, 736:9, 737:21, 739:13, 742:3, 743:6, 752:1, 752:12, 755:5, 755:6, 755:10, 755:16, 755:18, 755:23, 756:1, 760:17, 763:10, 764:18, 766:6, 767:7, 767:18, 777:1, 777:21, 779:17, 781:22, 781:24, 784:7, 785:20, 786:4, 787:3, 787:10, 787:16, 787:18, 791:11, 791:18, 793:8, 796:15, 800:9, 803:6, 803:13, 803:15, 804:9, 805:7, 805:19, 806:24, 807:12, 812:3, 818:23, 821:20, 826:10, 827:9, 828:15, 832:16, 834:21, 835:2, 835:13, 836:25, 837:17, 839:8, 840:6, 842:9, 843:16, 846:9, 848:10

**one-hour** [1] - 729:3

**one-to-one** [2] - 821:20, 836:25

**ones** [10] - 622:17, 622:22, 622:25, 642:4, 645:17, 708:4, 709:12, 781:15, 785:16, 840:14

**online** [1] - 704:5

**open** [8] - 611:1, 617:1, 676:1, 682:21, 702:1, 732:3, 749:1, 760:1

**opened** [1] - 699:18

**operating** [21] - 641:2, 641:5, 663:8, 717:1, 764:22, 764:23, 764:24, 775:7, 776:10, 786:20, 786:24, 787:1, 787:5, 788:15, 792:1, 793:1, 804:17, 805:25, 806:20, 814:18, 822:18

**operation** [2] - 705:3, 707:11

**operations** [12] - 624:7, 653:24, 653:25, 687:19, 694:8, 717:21, 718:12, 720:16, 722:8, 745:12, 761:13, 828:11

**operator** [1] - 670:15

**opinion** [1] - 714:1

**opportunities** [1] - 627:20
**opportunity** [5] - 671:25, 702:4, 706:7, 738:5, 784:20
**options** [3] - 632:3, 632:9, 633:2
**order** [7] - 615:22, 624:7, 663:13, 678:17, 763:8, 793:24, 813:23
**organizational** - 736:8
**oriented** [1] - 702:9
**original** [2] - 806:6, 808:3
**originally** [1] - 777:10
**out-of-court** [5] - 677:13, 679:18, 747:2, 800:8, 830:4
**outlined** [1] - 678:23
**outside** [13] - 612:5, 612:9, 613:15, 615:1, 617:17, 623:8, 673:24, 674:1, 703:21, 704:1, 710:8, 747:1, 755:1
**outstanding** [1] - 790:1
**outweigh** [1] - 681:22
**overall** [1] - 678:18
**overcomes** [1] - 618:24
**overhead** [1] - 739:9
**overlap** [1] - 729:17
**overruled** [5] - 660:13, 711:7, 744:9, 744:10
**Overruled** [1] - 635:19, 637:5, 637:20, 638:18, 642:21, 649:24, 652:19, 663:6, 670:12, 672:17, 697:10, 736:15, 794:6
**overwhelming** [2] - 618:17, 618:25
**owed** [1] - 802:6
**owes** [1] - 810:4
**own** [10] - 615:15, 653:3, 653:10, 665:3, 665:11, 673:8, 696:12, 744:21, 844:8
**owned** [7] - 615:6, 688:1, 703:11, 743:8, 743:16, 761:24, 834:18
**owner** [2] - 642:23, 668:23

---

**P**

---

**P&L** [1] - 832:16
**p.m** [2] - 733:5, 844:11
**Pace** [1] - 687:14
**package** [1] - 712:20
**packages** [3] - 711:21, 712:16, 712:19
**Page** [11] - 629:15, 630:3, 631:12, 635:23, 638:15, 654:20, 655:16, 655:21, 658:3, 734:16, 734:19
**PAGE** [2] - 850:3, 851:4
**page** [50] - 614:2, 616:3, 629:17, 629:18, 629:19, 629:22, 629:23, 629:24, 632:24, 650:22, 654:17, 655:19, 658:13, 659:21, 669:2, 669:9, 673:25, 675:24, 699:21, 703:22, 705:9, 716:11, 716:24, 717:5, 717:15, 718:4, 719:12, 720:20, 721:24, 722:18, 725:24, 727:18, 737:15, 746:7, 748:23, 753:8, 754:17, 759:3, 763:18, 794:21, 819:12, 825:21, 832:9, 836:13, 840:10, 841:15, 842:17, 842:18
**pages** [6] - 635:8, 712:24, 725:2, 775:16, 819:15, 835:3
**pagination** [1] - 734:21
**Paid** [1] - 722:13
**paid** [55] - 615:14, 639:19, 639:22, 651:13, 654:8, 666:18, 670:14, 693:19, 694:23, 694:25, 695:11, 695:23, 698:17, 709:16, 717:10, 717:14, 717:21, 717:24,

**718:24, 718:25, 721:1, 722:8, 722:19, 722:21, 735:3, 735:13, 736:9, 736:14, 737:18, 738:11, 738:14, 739:13, 741:21, 742:5, 743:12, 744:8, 763:10, 764:21, 767:4, 767:5, 767:6, 767:15, 767:17, 767:22, 768:2, 768:4, 768:13, 769:22, 770:19, 770:20, 772:22, 787:6, 821:19, 822:14, 841:10**
**papering** [1] - 680:21
**papers** [2] - 778:3, 847:11
**paragraph** [12] - 657:23, 658:4, 658:6, 726:2, 726:3, 726:10, 727:8, 727:11, 727:14, 727:20, 728:6, 812:25
**Paralegal** [1] - 611:7
**parameters** [1] - 689:25
**paraphrase** [1] - 674:8
**paraphrasing** [1] - 674:4
**parenthesis** [11] - 788:2, 788:3, 788:8, 790:5, 800:23, 838:12, 838:13, 838:14, 840:21, 840:22, 840:23
**parlance** [2] - 823:8, 823:9
**part** [36] - 613:1, 617:2, 643:24, 651:11, 655:1, 662:16, 665:12, 668:1, 668:14, 670:22, 680:18, 685:4, 710:13, 711:13, 712:8, 719:15, 721:6, 726:2, 727:24, 728:9, 730:8, 734:11, 734:17, 735:4, 735:16, 735:19, 735:25, 757:25, 781:20, 781:24, 789:6, 798:1, 802:4, 808:16, 818:18, 840:17
**parte** [3] - 612:12, 613:9, 613:18
**partially** [1] - 812:10
**participating** [1] - 745:24
**particular** [13] - 651:5, 654:5, 678:20, 682:10, 682:17, 683:3, 708:1, 767:20, 771:5, 795:10, 800:2, 808:14, 820:18
**particularly** [2] - 650:13, 651:16
**parties** [8] - 629:1, 646:25, 654:13, 659:3, 732:4, 738:2, 739:11, 843:18
**parties'** [1] - 655:5
**partner** [3] - 691:16, 699:15, 710:12
**partners** [3] - 693:9, 706:13, 726:20
**Partners** [3] - 687:24, 688:6, 691:22
**Partnership** [2] - 628:21, 640:7
**partnership** [16] - 635:11, 641:25, 645:13, 663:15, 689:13, 689:22, 711:23, 711:25, 712:3, 712:9, 727:19, 727:24, 734:6, 739:2, 739:4, 739:14
**parts** [3] - 820:8, 820:18, 844:22
**passed** [1] - 799:6
**past** [5] - 640:11, 640:23, 641:12, 641:17, 657:22
**pattern** [1] - 838:21
**Pause** [2] - 661:13, 669:8, 670:25, 824:4
**pause** [5] - 623:11, 624:11, 715:1, 755:17, 845:4
**pay** [33] - 612:21, 668:25, 693:18, 694:11, 696:13, 696:15, 696:22, 697:18, 697:19, 723:20, 723:21, 724:2, 724:13, 727:6, 728:8, 736:11, 737:21, 738:2, 738:21, 739:18, 739:19, 741:15, 750:7, 753:21, 753:22, 755:22, 763:8, 764:24, 765:1, 766:21, 770:17, 772:10, 802:1
**payable** [1] - 722:14
**paying** [10] - 667:1, 698:20, 723:16, 723:23, 726:25, 727:15, 743:9, 747:8, 771:14, 772:6

**payment** [9] - 734:10, 740:20, 744:17, 744:18, 744:20, 770:11, 773:2, 773:3
**payments** [12] - 698:20, 709:15, 740:12, 740:16, 765:6, 765:8, 765:9, 766:6, 771:13, 771:14, 772:24, 813:13
**payout** [4] - 693:23, 693:25, 697:20, 697:22
**payroll** [1] - 739:10
**PDF** [2] - 669:2, 781:17
**pending** [6] - 801:14, 801:25, 804:1, 826:12, 845:9, 846:7
**pension** [1] - 689:7
**people** [30] - 644:13, 678:22, 682:12, 693:20, 697:5, 700:9, 700:10, 702:2, 707:19, 708:15, 713:10, 713:17, 723:16, 723:23, 729:14, 735:14, 742:2, 742:14, 744:19, 745:7, 745:9, 755:25, 757:19, 758:18, 758:24, 763:5, 768:24, 771:4, 794:12, 831:4
**people's** [1] - 684:14
**per** [1] - 779:3
**Per** [1] - 789:22
**percent** [60] - 620:6, 643:15, 643:20, 652:14, 652:15, 652:16, 653:2, 653:3, 668:5, 668:22, 671:16, 693:18, 693:20, 694:22, 697:3, 697:18, 698:6, 709:15, 717:10, 717:13, 717:21, 717:25, 718:11, 718:13, 718:14, 718:18, 718:20, 718:24, 718:25, 719:9, 721:5, 722:8, 722:14, 722:19, 726:10, 726:22, 730:7, 735:24, 736:16, 736:21, 736:23, 737:22, 738:8, 739:1, 739:3, 739:24, 740:1, 740:20, 740:21, 767:7, 767:19, 768:3, 768:7, 768:10, 769:19, 769:20, 771:22, 773:2, 785:25, 842:1
**percentage** [2] - 639:20, 639:22
**percentages** [2] - 639:13, 639:21
**perfect** [1] - 648:9
**perfectly** [1] - 624:1
**perform** [1] - 642:5
**performance** [34] - 618:3, 619:21, 632:3, 632:8, 632:10, 632:13, 640:20, 640:23, 640:24, 641:12, 646:18, 647:15, 653:19, 668:13, 668:14, 668:19, 669:23, 670:4, 670:8, 672:15, 673:10, 712:14, 713:23, 714:2, 714:10, 714:12, 715:5, 750:13, 814:23, 818:9, 818:22, 819:4, 826:21
**performed** [1] - 641:16
**performing** [1] - 612:18
**perhaps** [1] - 622:21
**period** [16] - 654:7, 654:10, 656:1, 656:7, 656:15, 689:21, 690:14, 698:7, 723:3, 767:20, 767:22, 788:17, 791:23, 792:21, 803:13, 823:16
**periods** [1] - 656:22
**permissible** [5] - 681:4, 681:15, 681:17, 681:19, 682:13
**permitted** [1] - 777:2
**person** [8] - 619:19, 619:20, 663:3, 677:14, 699:6, 700:17, 743:10
**personal** [4] - 612:13, 613:1, 679:20, 684:13
**personally** [3] - 684:12, 711:9, 799:22
**persons** [1] - 738:4
**Petron** [1] - 683:18

**Phoenix** [1] - 765:12

**Phoenix American** [11] - 648:11, 648:12, 649:2, 649:17, 649:22, 649:25, 650:2, 651:17, 651:21, 763:7

**phone** [7] - 626:22, 626:24, 672:6, 672:19, 699:10, 701:16, 839:5

**phones** [1] - 702:2

**phrase** [1] - 848:13

**physical** [1] - 700:21

**pick** [1] - 677:1

**picked** [2] - 672:5, 672:19

**picture** [1] - 842:19

**piece** [5] - 640:15, 678:11, 678:13, 762:15, 762:17

**pipeline** [4] - 788:24, 792:9, 825:5, 848:3

**place** [13] - 669:24, 670:5, 671:13, 674:1, 684:15, 704:1, 709:1, 723:22, 766:6, 773:20, 774:2, 787:3, 808:24

**placement** [16] - 635:10, 635:21, 635:24, 636:22, 662:13, 663:18, 664:18, 664:21, 711:22, 711:25, 724:25, 728:16, 733:13, 734:5, 735:12, 736:4

**placements** [1] - 662:12

**plain** [1] - 665:6

**plan** [8] - 618:8, 618:16, 624:4, 657:10, 823:23, 844:20, 845:8, 845:11

**planes** [2] - 612:2, 615:14

**Planet** [6] - 834:12, 834:18, 835:1, 835:11, 835:14, 837:13

**planning** [4] - 617:25, 621:21, 622:6, 683:23

**plans** [7] - 657:7, 657:8, 657:20, 657:24, 707:7, 733:3, 843:23

**platform** [1] - 687:23

**play** [1] - 682:15

**Plaza** [1] - 609:15

**pleasure** [1] - 638:9

**plenty** [2] - 645:3, 747:25

**PLLC** [1] - 610:11

**plow** [1] - 842:9

**plus** [3] - 660:25, 689:24, 833:14

**point** [33] - 612:24, 628:21, 630:17, 635:14, 652:16, 657:1, 673:2, 675:6, 681:10, 681:22, 681:23, 683:14, 690:2, 694:3, 694:24, 698:4, 698:16, 709:21, 709:23, 718:15, 719:7, 751:12, 760:15, 769:7, 769:9, 778:16, 823:14, 830:5, 840:5, 840:16, 841:24, 843:14, 847:13

**Point** [1] - 687:24

**point-something-else-percent** [1] - 652:16

**politely** [1] - 625:7

**Ponzi** [2] - 730:21, 731:10

**poor** [1] - 618:2

**portfolio** [27] - 612:20, 631:4, 659:8, 695:1, 696:11, 696:12, 696:15, 696:21, 742:9, 742:12, 742:15, 743:4, 743:8, 743:11, 744:3, 763:16, 764:13, 764:16, 764:25, 770:19, 770:21, 786:25, 793:10, 810:10, 826:21, 827:14, 842:4

**Portfolio** [40] - 627:7, 629:5, 634:17, 634:20, 641:1, 643:12, 644:9, 655:2, 655:7, 662:1, 662:8, 663:22, 664:5, 664:13, 666:19, 668:15, 669:18, 715:21, 761:9, 784:1, 784:3, 786:25, 788:16,
789:10, 792:13, 794:16, 801:15, 804:14, 805:21, 807:12, 811:2, 813:11, 823:5, 828:10, 832:10, 835:2, 836:19, 837:11, 841:16, 842:3

**portfolio's** [1] - 666:25

**portion** [9] - 726:6, 727:19, 744:21, 779:22, 798:15, 799:20, 809:17, 841:20, 849:8

**portions** [3] - 682:9, 795:10, 807:18

**position** [5] - 682:3, 693:8, 698:22, 767:8, 816:15

**positive** [4] - 641:20, 700:5, 706:24, 788:10

**possible** [4] - 624:3, 638:20, 656:8, 828:21

**possibly** [4] - 622:3, 656:23, 656:24, 656:25

**potential** [8] - 626:5, 693:23, 693:25, 694:1, 704:21, 710:24, 772:4, 826:10

**potentially** [3] - 618:16, 730:3, 845:6

**PPM** [22] - 633:14, 635:10, 636:4, 637:12, 638:2, 638:3, 638:11, 639:6, 649:17, 651:6, 657:3, 657:9, 657:10, 657:18, 659:9, 659:19, 725:6, 725:8, 725:22, 726:6, 728:19, 735:19

**PPMs** [3] - 622:11, 622:14, 623:6

**practice** [1] - 765:24

**practicing** [1] - 626:7

**precipitated** [2] - 800:4, 800:16

**precise** [1] - 847:18

**precisely** [1] - 791:1

**preference** [1] - 622:2

**prejudice** [2] - 681:7, 681:21

**prejudicial** [5] - 619:5, 680:7, 681:10, 730:4, 730:12

**premise** [1] - 649:12

**prep** [1] - 621:11

**prepare** [4] - 625:21, 701:8, 783:7, 848:4

**prepared** [2] - 803:17, 805:5

**prepares** [1] - 649:9

**preparing** [3] - 626:5, 690:23, 731:9

**presence** [8] - 612:5, 612:9, 613:15, 615:1, 617:18, 623:8, 747:1, 755:1

**present** [4] - 657:7, 657:20, 657:24, 732:4

**presentation** [7] - 627:15, 628:12, 628:14, 668:15, 709:7, 710:13, 710:18

**presentations** [5] - 707:12, 708:20, 709:12, 711:3, 711:8

**presented** [1] - 707:12

**presenting** [2] - 709:5, 711:4

**pressure** [2] - 701:14, 701:19

**Prestiano** [1] - 623:20

**presume** [1] - 628:6

**pretty** [1] - 631:8

**previous** [5] - 668:23, 694:6, 723:17, 723:23, 729:11

**previously** [10] - 624:18, 642:6, 666:19, 666:23, 765:6, 771:11, 785:12, 801:12, 807:23, 817:2

**primarily** [2] - 700:18, 713:22

**primary** [2] - 626:11, 626:14

**Private** [1] - 716:25

**private** [52] - 613:5, 617:7, 617:12, 635:10, 635:20, 635:24, 636:22, 662:4,
662:12, 662:13, 663:18, 664:17, 664:21, 687:20, 688:22, 688:25, 689:1, 689:2, 689:10, 689:11, 689:12, 689:15, 689:17, 693:12, 693:14, 693:15, 693:16, 694:4, 698:10, 698:12, 698:21, 699:16, 709:14, 711:22, 711:24, 715:20, 716:12, 716:13, 716:14, 716:15, 717:6, 719:15, 719:19, 719:20, 724:25, 728:16, 733:13, 734:5, 736:4, 771:17

**privilege** [3] - 623:22, 846:2, 846:8

**probative** [3] - 619:6, 680:8, 730:4

**problem** [6] - 756:17, 756:22, 802:21, 803:21, 826:11, 826:14

**problems** [4] - 679:16, 684:4, 747:8, 779:6

**proceed** [1] - 624:22

**proceedings** [6] - 623:11, 624:11, 715:1, 755:17, 824:4, 845:4

**Proceedings** [1] - 610:18

**process** [5] - 692:21, 696:2, 697:7, 733:22, 733:23

**procured** [1] - 638:25

**produce** [1] - 642:14

**produced** [4] - 610:18, 711:15, 768:22, 777:11

**producing** [5] - 715:20, 716:12, 716:13, 717:1, 717:3

**Producing** [1] - 717:6

**product** [1] - 708:14

**profane** [2] - 729:13, 730:19

**profanity** [1] - 730:1

**professional** [2] - 687:15, 699:12

**proffer** [2] - 613:9, 613:18

**proffered** [2] - 617:8, 617:20

**proffering** [1] - 730:13

**proffers** [1] - 618:20

**profit** [7] - 696:25, 737:10, 764:20, 766:19, 768:2, 818:12

**profitable** [8] - 689:18, 694:9, 695:3, 709:16, 709:25, 710:22, 717:3, 741:2

**profits** [62] - 640:3, 662:11, 663:9, 690:1, 694:10, 694:11, 694:25, 695:4, 696:9, 696:13, 696:16, 696:21, 697:2, 697:17, 697:25, 698:3, 698:19, 710:1, 710:2, 710:23, 716:18, 717:25, 718:17, 719:9, 722:20, 723:21, 724:3, 724:5, 726:17, 727:4, 727:6, 728:8, 743:11, 744:3, 744:18, 764:20, 765:2, 767:5, 767:6, 767:14, 767:16, 768:13, 769:20, 770:2, 770:7, 770:10, 772:4, 786:16, 786:24, 787:2, 789:12, 792:9, 793:20, 802:5, 802:8, 828:11, 828:20, 834:21, 842:4

**progressing** [1] - 825:3

**projected** [1] - 828:20

**projecting** [2] - 818:10, 833:3

**projection** [6] - 750:12, 798:10, 798:11, 819:5, 826:11, 829:10

**projections** [3] - 751:5, 753:17, 826:22

**prolonged** [1] - 621:24

**promised** [2] - 732:19, 740:12

**promises** [1] - 845:7

**prompt** [1] - 678:20

**prompted** [1] - 723:14

**promulgated** [1] - 680:14

**proper** [3] - 613:23, 675:9, 772:3

**properly** [2] - 713:24, 731:3
**proposal** [1] - 843:21
**propose** [3] - 732:7, 732:25, 756:24
**proposed** [3] - 677:8, 782:5, 813:5
**proposing** [1] - 684:22
**prospective** [2] - 647:19, 712:23
**prove** [1] - 682:2
**provide** [5] - 632:21, 678:24, 679:5, 682:24, 704:15
**provided** [7] - 620:14, 636:19, 647:18, 751:5, 757:8, 758:1, 829:4
**providing** [1] - 648:24
**publication** [1] - 783:8
**publish** [15] - 629:14, 646:12, 655:14, 657:16, 659:16, 762:10, 783:21, 796:25, 799:16, 805:15, 810:19, 812:18, 814:11, 817:25, 826:6
**published** [38] - 646:14, 647:10, 655:15, 659:18, 715:11, 716:9, 720:1, 720:11, 721:12, 724:21, 725:17, 762:23, 795:9, 796:2, 797:2, 798:25, 799:18, 802:24, 804:7, 804:21, 805:16, 806:13, 806:23, 807:9, 811:24, 812:20, 813:19, 814:12, 816:8, 816:24, 817:12, 818:2, 819:1, 819:8, 820:5, 820:17, 822:24, 825:8
**pull** [7] - 638:9, 639:9, 676:22, 677:3, 773:16, 775:21, 789:3
**purchase** [5] - 737:19, 737:23, 737:25, 738:10, 782:9
**purchased** [10] - 615:3, 615:5, 615:6, 641:15, 641:17, 642:4, 642:6, 642:10, 642:15, 802:4
**purports** [1] - 677:9
**purpose** [7] - 684:8, 758:7, 758:9, 761:14, 779:7, 786:23, 815:3
**purposes** [2] - 685:1, 783:8
**pursuant** [1] - 796:9
**pushed** [1] - 765:3
**put** [33] - 617:18, 619:1, 620:19, 629:15, 638:7, 643:14, 660:21, 661:5, 668:23, 683:18, 698:12, 703:6, 709:9, 728:19, 762:6, 777:12, 780:18, 794:12, 806:6, 809:22, 814:25, 815:7, 815:10, 815:17, 817:3, 835:16, 835:19, 842:19, 845:15, 846:6, 849:18, 849:22, 849:23
**puts** [1] - 683:19
**putting** [4] - 681:2, 815:3, 815:25, 826:22

## Q

**Q1** [9] - 629:4, 629:20, 630:6, 630:9, 632:13, 640:7, 647:21, 647:24, 661:6
**Q2** [1] - 646:4
**Q3** [1] - 646:21
**qualified** [1] - 738:2
**quarter** [10] - 628:20, 630:12, 631:16, 631:25, 634:19, 646:3, 736:9, 742:5, 767:21, 829:8
**quarterly** [2] - 629:4, 665:2
**quarters** [2] - 737:22
**questioning** [2] - 637:4, 729:15
**questions** [25] - 617:25, 618:1, 632:19, 632:22, 641:21, 648:21, 651:1, 661:22, 662:2, 664:23, 664:25, 685:9, 685:16,

700:13, 705:4, 712:22, 712:24, 713:1, 730:25, 749:14, 797:18, 807:25, 811:6, 840:5, 842:11
**quick** [3] - 623:13, 686:1, 848:10
**QuickBook** [1] - 784:17
**Quickbooks** [25] - 682:5, 683:4, 683:21, 761:1, 761:2, 761:3, 772:14, 773:16, 773:19, 773:23, 773:24, 773:25, 774:5, 774:9, 774:16, 778:18, 779:11, 784:15, 784:20, 786:11, 808:11, 808:22, 809:11, 815:14
**quickly** [4] - 635:7, 804:5, 814:22, 816:3
**quite** [1] - 821:20
**quote** [1] - 636:20
**quote/unquote** [1] - 768:13

## R

**RACHEL** [1] - 609:11
**raise** [11] - 686:10, 706:19, 723:15, 729:6, 753:17, 793:18, 793:25, 794:3, 818:9, 818:10, 843:16
**raised** [4] - 612:18, 634:9, 723:11, 736:10
**raises** [1] - 748:17
**raising** [5] - 620:4, 666:4, 666:9, 666:13, 678:7
**ran** [2] - 692:18, 729:15
**Randolph** [1] - 825:18
**range** [1] - 784:24
**rank** [2] - 747:24
**rapid** [1] - 816:4
**rate** [11] - 615:11, 662:19, 721:7, 724:17, 726:21, 768:4, 793:12, 793:22, 794:2, 794:7, 811:17
**rates** [5] - 615:9, 643:17, 643:20, 693:21, 750:12
**rather** [5] - 617:17, 665:25, 681:20, 744:14, 750:20
**ratio** [12] - 667:14, 766:23, 767:2, 767:9, 767:18, 768:10, 768:17, 769:5, 769:13, 769:19, 797:15, 841:22
**ratios** [1] - 667:15
**reached** [2] - 667:23, 840:4
**read** [22] - 630:20, 639:18, 648:10, 653:14, 654:23, 664:22, 717:19, 718:2, 718:23, 726:9, 728:1, 728:2, 728:7, 750:20, 801:5, 812:25, 818:4, 819:24, 826:8, 835:6, 839:6, 840:14
**reading** [3] - 658:5, 801:11, 839:5
**ready** [2] - 624:16, 689:22
**real** [1] - 664:24
**realistic** [1] - 786:18
**really** [8] - 617:14, 617:21, 682:3, 757:20, 775:20, 781:18, 847:9, 847:21
**reason** [3] - 666:12, 758:22, 781:15
**reasonable** [4] - 632:12, 646:18, 647:14, 829:10
**reasons** [2] - 682:22, 839:2
**receipts** [1] - 833:15
**receivable** [3] - 807:6, 810:3, 810:5
**receivables** [3] - 790:1, 801:14, 809:17
**Receivables** [1] - 809:10
**receive** [19] - 650:20, 672:25, 764:24, 764:25, 782:5, 787:2, 789:12, 790:17,

810:2, 810:5, 828:21, 833:13, 833:14, 835:15
**received** [35] - 623:1, 629:7, 644:25, 646:2, 659:15, 659:19, 665:3, 667:20, 668:24, 678:11, 678:14, 679:3, 716:8, 720:10, 721:23, 725:16, 726:16, 742:8, 742:11, 783:10, 790:8, 790:13, 796:19, 796:24, 799:15, 804:4, 805:14, 810:18, 812:17, 814:10, 816:23, 817:19, 817:24, 820:13, 824:12
**receives** [1] - 824:16
**receiving** [7] - 636:21, 645:24, 727:4, 771:12, 786:24, 801:14, 834:21
**recess** [1] - 731:20
**Recess** [1] - 686:3
**recipient** [2] - 757:4, 839:21
**recipients** [2] - 796:18, 836:5
**recognize** [16] - 645:22, 659:6, 715:17, 720:2, 721:13, 745:18, 745:20, 775:17, 775:18, 776:7, 795:15, 799:1, 816:9, 817:13, 839:16, 842:13
**recollection** [5] - 626:21, 626:24, 643:19, 749:25, 750:3
**recommended** [1] - 645:10
**reconciled** [9] - 683:21, 760:24, 761:5, 761:18, 773:24, 774:12, 779:13, 788:20, 808:11
**reconciliation** [2] - 812:2, 813:2
**reconsider** [1] - 849:11
**record** [20] - 611:4, 640:11, 640:20, 663:1, 663:2, 663:7, 663:11, 677:4, 680:21, 685:1, 685:8, 685:9, 686:19, 705:1, 729:24, 747:20, 776:21, 776:24, 808:14, 832:4
**recorded** [1] - 610:18
**records** [13] - 642:1, 682:5, 683:4, 683:20, 683:22, 684:24, 772:13, 774:5, 779:13, 779:25, 807:21, 807:24, 809:2
**records'** [1] - 682:6
**recounting** [1] - 674:13
**RECROSS** [2] - 671:4, 850:9
**recruited** [1] - 692:4
**recruiting** [1] - 692:4
**recurring** [1] - 786:7
**red** [1] - 843:10
**redact** [2] - 812:14, 812:15
**redacted** [6] - 760:3, 781:23, 782:6, 783:7, 812:10, 814:9
**redaction** [1] - 814:8
**redactions** [2] - 812:16, 824:15
**redeem** [2] - 633:19, 633:20
**redemption** [6] - 633:10, 633:20, 634:8, 634:16, 662:15, 666:11
**redemptions** [5] - 633:17, 649:3, 649:19, 662:16, 665:23
**redirect** [1] - 661:16
**REDIRECT** [2] - 661:18, 850:7
**reduce** [3] - 741:20, 790:14, 794:19
**reduced** [6] - 634:24, 635:15, 636:6, 636:10, 636:11, 668:6
**reducing** [6] - 741:18, 741:19, 741:21, 793:12, 793:22, 794:16
**reed** [2] - 817:18, 825:18
**refer** [1] - 783:25
**reference** [2] - 701:23, 767:3
**referenced** [3] - 669:24, 670:5, 847:2

**references** [1] - 730:21
**referring** [5] - 671:15, 674:20, 716:21, 797:19, 847:18
**refers** [2] - 717:12, 717:13
**reflect** [2] - 619:4, 658:10
**reflected** [15] - 785:19, 786:3, 787:13, 789:18, 791:3, 794:14, 808:23, 818:18, 820:22, 823:11, 828:1, 832:13, 833:3, 835:12, 838:9
**reformatted** [1] - 780:14
**reframe** [1] - 656:10
**refresh** [2] - 643:19, 749:24
**refreshing** [1] - 750:3
**regarding** [4] - 611:18, 747:14, 829:5, 845:9
**regular** [6] - 693:17, 693:20, 716:14, 779:12, 779:13, 808:16
**reinvestments** [1] - 726:15
**relate** [4] - 621:16, 748:6, 804:13, 809:18
**related** [5] - 627:25, 628:11, 628:16, 747:11, 846:8
**relates** [2] - 735:10, 805:18
**relation** [1] - 774:1
**relations** [2] - 649:3, 649:18
**relationship** [3] - 673:2, 692:16, 755:25
**relay** [1] - 758:21
**relayed** [2] - 748:15, 758:23
**released** [1] - 673:15
**relentless** [1] - 701:16
**relevance** [3] - 617:12, 649:6, 782:18
**relevant** [11] - 678:10, 678:12, 678:14, 747:12, 755:23, 757:3, 758:6, 758:8, 758:11, 758:13, 847:14
**relied** [7] - 636:25, 637:2, 637:7, 637:10, 637:17, 683:5, 774:9
**rely** [1] - 774:8
**relying** [2] - 684:13, 806:10
**remain** [1] - 794:7
**remaining** [2] - 654:2, 763:15
**remember** [24] - 628:2, 628:18, 636:23, 637:1, 640:8, 662:2, 668:14, 692:10, 693:1, 706:4, 708:1, 708:19, 709:4, 709:11, 709:18, 714:8, 732:13, 740:8, 743:7, 745:24, 777:12, 793:4, 816:17, 834:16
**remind** [3] - 624:20, 676:4, 790:22
**remote** [1] - 690:11
**remotely** [1] - 690:13
**remove** [1] - 835:22
**renege** [1] - 732:21
**renew** [1] - 778:13
**rent** [1] - 739:10
**repeat** [1] - 731:8
**repeatedly** [5] - 634:23, 641:11, 663:8, 668:2, 674:4
**rephrase** [1] - 666:2
**replacement** [1] - 690:8
**reply** [2] - 624:7, 845:22
**Report** [2] - 628:20, 640:7
**report** [23] - 629:4, 630:9, 632:4, 691:23, 698:24, 706:13, 706:15, 745:11, 768:22, 769:2, 811:20, 816:10, 818:8, 818:9, 818:11, 818:13, 818:22, 819:10, 820:8, 820:23, 827:22, 830:15
**reported** [2] - 655:22, 655:25

**Reporter** [2] - 610:15, 610:15
**reporting** [4] - 654:10, 690:10, 798:18, 815:23
**reports** [6] - 645:13, 665:2, 690:24, 700:23, 700:25, 818:14
**represent** [1] - 625:13
**representation** [4] - 684:24, 803:25, 807:18, 847:25
**representations** [1] - 720:15
**representative** [1] - 820:7
**representatives** [1] - 634:10
**represented** [3] - 729:25, 731:7, 826:10
**representing** [2] - 704:22, 730:16
**represents** [1] - 625:2
**repurchase** [1] - 633:4
**request** [12] - 633:4, 633:9, 633:12, 633:20, 633:23, 633:24, 634:8, 634:16, 662:15, 666:11, 731:8, 762:12
**requested** [1] - 806:16
**requesting** [1] - 846:7
**required** [1] - 697:18
**research** [1] - 844:8
**reserve** [2] - 750:11, 753:17
**reserves** [1] - 726:15
**resolve** [2] - 845:10, 845:20
**respect** [6] - 623:16, 675:17, 676:5, 676:6, 754:5, 844:22
**respected** [1] - 648:15
**respectfully** [2] - 675:5, 675:5
**respond** [7] - 613:24, 619:23, 619:24, 741:7, 793:21, 845:16, 849:18
**responding** [2] - 641:21, 641:23
**response** [18] - 620:3, 667:22, 672:4, 672:19, 675:1, 713:21, 714:17, 723:2, 723:4, 724:4, 740:25, 769:25, 788:22, 793:18, 811:13, 811:14, 825:4, 849:16
**responses** [1] - 632:21
**responsibilities** [3] - 690:19, 734:11, 738:13
**responsive** [2] - 729:19, 751:10
**rest** [4] - 707:22, 732:24, 782:6, 824:10
**restate** [1] - 628:7
**restated** [1] - 659:9
**restructuring** [1] - 738:6
**result** [3] - 679:11, 718:18, 742:22
**results** [3] - 658:8, 702:9, 748:2
**return** [9] - 633:6, 650:20, 657:4, 662:19, 667:2, 671:17, 671:20, 726:21, 737:7
**returned** [2] - 652:10, 671:12
**returning** [4] - 727:12, 728:9, 728:12, 744:21
**returns** [3] - 639:19, 666:14, 668:22
**revenue** [1] - 694:11, 695:5, 696:14, 696:23, 764:22, 764:24, 764:25, 787:2, 820:21, 821:5, 821:8
**revenues** [1] - 817:6
**review** [9] - 653:14, 654:16, 711:14, 711:20, 725:6, 728:3, 733:20, 797:17, 811:6
**reviewed** [28] - 615:22, 622:10, 622:11, 622:15, 626:16, 628:20, 629:7, 633:15, 635:8, 635:12, 641:12, 642:13, 642:18, 644:20, 645:9, 645:13, 647:12, 663:3, 713:19, 714:9, 715:23, 717:23, 720:4, 721:17, 776:17, 824:21, 846:13, 847:6

**reviewing** [2] - 645:24, 647:24
**Reviewing** [1] - 728:4
**revisions** [2] - 658:8, 658:9
**Riecker** [1] - 611:8
**right-hand** [6] - 745:11, 747:6, 764:13, 789:2, 789:23, 809:9
**rise** [9] - 624:12, 676:13, 686:4, 729:4, 733:4, 781:3, 783:13, 844:10, 849:14
**risk** [10] - 643:3, 643:9, 662:12, 662:16, 662:17, 662:18, 662:19, 681:7, 681:21, 681:25
**riskier** [1] - 662:5
**riskiness** [1] - 663:4
**risks** [6] - 661:25, 662:19, 662:21, 662:22, 663:21, 664:4
**risky** [5] - 643:23, 651:7, 662:7, 662:14, 662:24
**RIVIERE** [2] - 609:22, 615:21
**Riviere** [1] - 611:10
**RIVIERE-BADELL** [2] - 609:22, 615:21
**Riviere-Badell** [1] - 611:10
**role** [4] - 690:15, 703:9, 704:6, 704:13
**room** [3] - 702:1, 762:18, 802:3
**ROP** [1] - 646:21
**roughly** [4] - 641:9, 645:6, 791:24, 838:19
**rounding** [1] - 841:7
**rounds** [2] - 692:10, 692:11
**row** [13] - 659:23, 717:18, 785:8, 785:17, 786:2, 787:11, 787:21, 791:10, 791:14, 791:17, 835:13, 837:18, 838:17
**rows** [3] - 660:9, 660:16, 702:1
**ruin** [1] - 801:10
**rule** [4] - 618:24, 621:7, 705:4, 750:19
**ruled** [2] - 621:3, 848:15
**ruling** [5] - 612:25, 621:11, 684:17, 783:3, 849:11
**rulings** [1] - 731:8
**run** [1] - 643:25
**running** [11] - 611:16, 641:8, 693:9, 701:5, 702:2, 706:8, 732:7, 772:17, 775:19, 786:13, 843:17

## S

**safe** [2] - 693:19, 709:15
**safely** [1] - 643:14
**sale** [2] - 637:10, 637:17
**sales** [7] - 672:20, 673:11, 701:15, 701:16, 702:9, 702:10
**sample** [2] - 620:20, 648:4
**sat** [1] - 640:15
**satellite** [1] - 691:18
**saved** [2] - 683:10, 774:18
**saw** [16] - 626:3, 627:15, 634:5, 634:13, 647:15, 650:12, 654:4, 654:6, 665:18, 776:15, 778:7, 803:15, 804:10, 817:7, 826:15, 832:11, 846:16, 847:10
**scenario** [3] - 828:21, 828:24, 829:19
**schedule** [8] - 732:17, 732:20, 732:24, 733:3, 843:24, 844:1, 845:13, 849:15
**scheduling** [3] - 621:16, 843:16, 844:23
**scheme** [2] - 730:21, 731:11
**SCHIFF** [2] - 610:2, 610:7
**SCHNEIDER** [1] - 609:8

**Schneider** [30] - 610:3, 610:8, 610:12, 619:2, 625:2, 626:12, 626:13, 626:20, 676:6, 677:11, 679:4, 692:9, 692:14, 747:11, 747:15, 748:6, 748:16, 749:9, 800:23, 801:5, 813:24, 815:22, 825:17, 828:2, 829:25, 846:19, 846:22, 847:2, 847:16, 849:4

**Schneider's** [4] - 708:20, 736:11, 745:11, 747:6

**schneider's** [1] - 799:8

**scope** [1] - 847:19

**screen** [11] - 630:1, 630:16, 638:7, 672:23, 677:7, 715:13, 733:14, 780:8, 781:16, 803:22, 804:1

**screened** [1] - 692:5

**screens** [2] - 630:20, 781:18

**scroll** [18] - 716:23, 775:16, 784:22, 785:2, 787:24, 789:1, 789:8, 791:22, 792:19, 819:17, 819:22, 831:20, 834:4, 834:22, 837:6, 839:13, 840:8, 841:14

**scrolling** [2] - 660:9, 792:23

**SE** [1] - 610:12

**seal** [1] - 617:3

**Sean** [1] - 611:9

**SEAN** [1] - 609:21

**searching** [2] - 848:16, 848:20

**seat** [1] - 686:22

**seated** [3] - 624:14, 733:6, 783:15

**sec** [1] - 779:17

**second** [17] - 632:24, 648:10, 669:7, 677:21, 678:5, 678:7, 684:7, 693:16, 735:16, 735:25, 745:11, 752:16, 752:18, 752:22, 753:7, 777:21, 832:10

**secondly** [1] - 615:5

**seconds** [1] - 714:25

**section** [6] - 784:6, 789:3, 789:8, 821:5, 821:6

**securities** [3] - 637:11, 637:16, 637:18

**security** [1] - 844:6

**see** [85] - 613:2, 613:24, 615:22, 621:19, 629:2, 629:19, 630:2, 630:5, 630:16, 630:25, 632:4, 633:7, 636:4, 638:21, 654:21, 660:16, 676:21, 677:19, 684:7, 684:10, 698:13, 699:4, 699:5, 700:19, 707:20, 712:10, 712:12, 712:13, 712:17, 715:13, 716:2, 717:7, 718:7, 719:15, 722:10, 724:22, 726:7, 727:9, 731:19, 757:1, 777:8, 778:11, 781:17, 784:8, 784:23, 785:17, 786:20, 787:11, 790:6, 792:23, 795:11, 795:13, 796:14, 798:4, 802:23, 803:21, 803:22, 803:23, 806:22, 806:25, 807:7, 807:16, 811:12, 819:6, 819:18, 821:18, 822:17, 823:1, 825:9, 827:19, 828:13, 832:15, 833:18, 834:25, 835:14, 837:17, 837:18, 837:23, 837:24, 837:25, 843:10, 844:8, 845:24, 849:13

**seeing** [9] - 669:11, 672:4, 677:23, 756:19, 756:25, 769:9, 822:11, 832:17, 848:22

**seeking** [3] - 677:18, 679:11, 780:18

**seem** [2] - 684:23, 845:25

**sell** [3] - 637:15, 708:14, 715:6

**seller** [1] - 668:23

**selling** [9] - 701:15, 714:11, 721:1, 735:1, 735:5, 735:6, 763:8, 763:10, 763:15

**send** [15] - 695:4, 700:22, 753:8, 753:19, 781:13, 795:2, 797:18, 806:16, 816:16, 820:7, 823:18, 825:16, 828:1, 831:3, 843:25

**sending** [12] - 679:13, 782:2, 800:19, 806:15, 812:5, 812:6, 816:11, 825:12, 827:11, 831:1, 831:6, 836:1

**sense** [3] - 624:8, 670:7, 681:16

**sent** [22] - 618:15, 618:19, 619:4, 621:5, 626:19, 678:4, 682:11, 753:15, 757:1, 757:18, 758:24, 779:3, 779:5, 782:18, 795:21, 796:15, 796:16, 819:3, 823:21, 833:22, 839:18

**sentence** [19] - 635:15, 635:17, 636:5, 637:14, 638:21, 639:21, 639:25, 640:1, 640:3, 650:18, 651:5, 658:3, 658:5, 726:18, 727:8, 735:17, 798:6, 829:1, 829:5

**separate** [2] - 786:10, 837:5

**separately** [1] - 740:5

**September** [2] - 690:6, 785:11, 785:17, 785:20, 791:2, 791:5, 791:9, 791:24, 799:2, 801:18, 804:15, 807:4, 833:20, 833:22, 835:8, 835:9, 835:14, 837:25, 838:3, 838:7

**series** [1] - 612:17

**server** [1] - 774:19

**Services** [2] - 648:11, 648:13

**SESSION** [1] - 732:1

**set** [13] - 677:3, 703:4, 760:18, 761:10, 761:11, 762:1, 764:3, 765:5, 765:14, 765:15, 765:16, 765:19, 849:15

**setting** [2] - 679:1, 681:2

**seven** [3] - 629:18, 717:15, 718:4

**several** [1] - 620:14

**severe** [1] - 841:23

**Shall** [1] - 798:16

**share** [2] - 683:10, 689:25

**shared** [6] - 691:15, 691:17, 774:20, 774:21, 788:21

**Shaw** [4] - 753:12, 753:13, 817:18, 825:17

**shifted** [2] - 782:15, 782:16

**shock** [1] - 653:5

**shocked** [2] - 650:17, 653:6

**shocking** [5] - 650:11, 650:13, 650:14, 650:22, 650:23, 650:24, 651:3, 651:4, 651:15, 651:16, 652:24, 665:19, 666:12

**shoot** [2] - 624:6, 829:21

**shop** [1] - 688:24

**short** [6] - 769:10, 772:5, 781:2, 798:14, 829:19, 841:25

**shortfall** [12] - 668:25, 788:25, 798:7, 798:12, 798:13, 800:18, 802:21, 809:21, 812:3, 813:3, 840:22, 840:25

**shortfalls** [6] - 722:23, 802:9, 802:10, 802:11, 803:9, 822:19

**shortly** [6] - 666:6, 666:9, 723:6, 747:7, 770:3, 816:17

**show** [65] - 615:25, 628:25, 632:16, 645:20, 646:24, 648:2, 650:4, 654:13, 657:16, 659:3, 666:8, 679:17, 681:19, 682:10, 708:18, 713:18, 715:9, 719:24, 721:10, 724:19, 745:16, 747:3, 749:11, 749:22, 750:8, 757:3, 757:22, 758:11, 758:14, 761:19, 774:22, 775:12, 781:15,

**showed** [4] - 627:14, 654:4, 770:2, 793:5

**showing** [17] - 663:7, 681:16, 714:2, 719:8, 748:12, 749:18, 749:19, 758:3, 775:6, 778:2, 782:3, 803:9, 807:5, 813:3, 828:10, 831:16, 840:21

**shown** [4] - 665:9, 778:14, 806:9, 811:14

**shows** [3] - 748:6, 782:17, 798:6

**side** [13] - 629:16, 630:15, 630:22, 655:21, 710:15, 726:3, 751:6, 789:2, 809:9, 809:12, 810:21, 837:17

**side-by-side** [1] - 629:16

**sidebar** [18] - 613:17, 623:21, 673:21, 673:24, 674:1, 675:23, 703:15, 703:18, 703:21, 704:1, 705:8, 746:5, 747:1, 748:22, 755:1, 759:2, 775:23, 779:8

**Sidebar** [2] - 615:1, 616:2

**sidebars** [1] - 676:20

**sides** [1] - 644:11

**signed** [1] - 663:12

**significance** [1] - 809:13

**significant** [2] - 669:20, 670:10

**Sijan** [19] - 745:7, 745:10, 745:21, 747:5, 749:6, 750:6, 751:4, 751:18, 758:5, 760:13, 799:7, 801:4, 806:17, 813:21, 814:14, 817:16, 827:9, 827:23, 828:2

**sijan** [2] - 799:3, 825:17

**similar** [4] - 623:1, 720:3, 812:2, 825:1

**similarly** [1] - 741:9

**simple** [2] - 647:23, 677:8

**simply** [2] - 615:15, 619:10

**single** [1] - 635:14

**sit** [3] - 682:16, 742:2, 843:22

**sitting** [2] - 732:21, 733:1

**situation** [12] - 617:18, 618:25, 619:8, 750:4, 752:2, 798:21, 813:16, 823:5, 824:24, 836:16, 836:23, 841:23

**six** [3] - 717:5, 785:8, 790:12

**sixth** [1] - 720:20

**sized** [1] - 717:4

**slides** [1] - 709:10

**slideshow** [2] - 709:9, 715:19

**slideshows** [1] - 711:21

**slightly** [2] - 821:21, 821:23

**slow** [4] - 669:4, 793:23, 794:9, 794:10

**small** [6] - 653:9, 689:16, 691:8, 712:21, 717:4, 718:22

**software** [1] - 761:3

**sold** [4] - 668:24, 721:2, 737:9

**solely** [1] - 747:21

**solemnly** [2] - 686:11, 686:14

**solicitation** [1] - 637:16

**solution** [1] - 826:10

**someday** [1] - 694:8

**someone** [5] - 670:14, 671:11, 680:14, 747:14, 757:23

**sometimes** [6] - 699:10, 700:20, 766:1, 766:2

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 268 of 271
PageID #: 14061
(somewhat    symbols)    Page 24

somewhat [1] - 698:21
somewhere [1] - 643:17
soon [6] - 624:3, 624:9, 666:13, 793:20, 848:7, 849:23
sooner [2] - 845:20
sophisticated [1] - 664:10
sorry [28] - 620:6, 621:3, 629:23, 664:1, 664:19, 666:21, 669:6, 669:9, 674:3, 682:16, 710:24, 718:5, 728:24, 735:18, 749:13, 752:18, 757:11, 760:2, 792:22, 825:13, 827:18, 830:11, 831:13, 834:6, 837:7, 837:9, 844:14, 846:17
sort [14] - 620:8, 636:17, 667:4, 689:2, 693:23, 701:16, 707:10, 708:10, 732:15, 792:17, 818:5, 826:25, 838:20, 846:14
sorts [3] - 678:15, 711:19, 817:2
sound [3] - 643:20, 731:14, 742:18
sounded [1] - 674:13
sounds [10] - 622:20, 623:7, 624:10, 625:24, 676:15, 685:7, 704:20, 845:5, 847:20, 849:17
source [10] - 635:24, 656:4, 656:7, 656:15, 664:3, 666:20, 666:24, 694:21, 695:5, 696:6
sourced [1] - 726:11
sources [2] - 656:21, 656:24
space [1] - 701:25
sparked [1] - 680:11
speaking [6] - 627:4, 640:10, 709:8, 766:2, 801:10
special [42] - 663:10, 666:17, 666:18, 666:22, 666:23, 694:1, 697:22, 697:24, 709:19, 709:21, 718:24, 719:3, 719:5, 722:9, 723:16, 723:18, 724:2, 727:8, 743:23, 743:25, 744:2, 744:5, 744:7, 744:13, 744:15, 744:23, 745:3, 747:8, 747:14, 747:21, 749:6, 750:5, 751:4, 753:21, 756:4, 769:22, 770:11, 772:5, 772:19, 787:16, 787:18, 787:19
Special [1] - 611:8
Specialist [1] - 611:8
specific [7] - 626:24, 627:25, 628:10, 637:2, 665:5, 665:6, 681:6
specifically [11] - 628:1, 628:11, 628:16, 714:6, 736:14, 749:7, 750:5, 760:13, 777:20, 792:4, 801:15
speculating [1] - 615:17
speculative [1] - 643:23
spell [1] - 686:18
spend [1] - 810:20
spent [1] - 788:12
split [1] - 735:11
spreadsheet [43] - 682:4, 682:10, 683:3, 685:3, 717:16, 773:12, 773:14, 773:17, 774:13, 774:18, 775:3, 775:4, 775:5, 775:6, 775:9, 776:9, 776:20, 778:10, 779:19, 781:11, 782:17, 783:9, 783:20, 785:8, 786:10, 789:7, 791:24, 792:17, 794:15, 795:16, 802:12, 804:10, 807:17, 807:23, 808:21, 809:9, 809:23, 810:24, 814:1, 831:16, 831:21, 835:12, 835:16
spreadsheets [8] - 802:22, 805:20, 808:7, 808:10, 808:17, 809:4, 815:16, 837:6
square [2] - 822:23, 822:25
squint [1] - 718:22

stand [6] - 624:16, 624:17, 680:9, 732:5, 783:12, 844:15
start [21] - 622:12, 662:24, 691:9, 692:12, 695:20, 713:5, 723:10, 723:11, 726:25, 727:4, 732:8, 732:22, 733:1, 736:9, 773:4, 773:5, 793:17, 797:21, 815:25, 836:13, 849:8
start-up [2] - 662:24, 736:9
started [16] - 622:20, 624:16, 690:5, 691:3, 691:7, 699:17, 699:19, 700:10, 706:5, 722:1, 725:22, 756:10, 797:23, 798:18, 816:2
starting [5] - 713:19, 732:8, 736:1, 797:25, 840:10
starts [1] - 747:7
startup [3] - 641:8, 641:18, 689:18
startups [1] - 662:12
state [6] - 611:4, 618:21, 619:3, 620:9, 680:16, 686:18
statement [26] - 615:20, 637:9, 639:7, 648:4, 650:8, 650:12, 651:22, 652:2, 653:17, 653:18, 654:4, 658:1, 665:19, 675:17, 676:4, 677:13, 679:18, 683:16, 747:2, 754:13, 754:15, 755:5, 755:8, 755:9, 761:8, 848:25
statements [28] - 611:20, 617:7, 617:9, 619:8, 620:10, 638:8, 650:15, 650:22, 653:15, 658:10, 665:14, 666:8, 671:25, 672:4, 672:6, 672:9, 673:13, 673:14, 674:13, 679:21, 688:16, 690:24, 757:6, 761:5, 796:21, 800:11, 809:5
static [1] - 780:23
status [1] - 768:22
stay [3] - 639:25, 657:3, 690:12
stayed [3] - 690:8, 690:10, 768:7
stenography [1] - 610:18
STEPHEN [2] - 610:11, 610:14
steps [2] - 729:7, 729:9
Steven [4] - 611:13, 677:10, 679:18, 797:6
stick [3] - 708:4, 714:20
sticking [2] - 683:2, 698:7
still [18] - 611:15, 624:21, 651:3, 661:9, 687:4, 740:12, 740:19, 768:12, 773:1, 789:12, 790:2, 828:10, 832:12, 833:2, 837:23, 845:9, 846:7
stipend [3] - 742:1, 742:2, 743:4
stipends [8] - 741:23, 742:9, 742:12, 742:19, 742:25, 743:1, 771:11, 771:12
stipulate [1] - 803:23
Stock [1] - 641:6
stocks [1] - 662:5
stop [6] - 666:10, 669:4, 780:17, 780:18, 819:20, 834:25
stopped [4] - 625:9, 666:4, 690:5, 690:7
stopping [2] - 840:5, 843:14
stops [2] - 666:9, 666:11
straight [1] - 779:11
Strategies [9] - 702:14, 702:17, 703:2, 703:11, 704:5, 704:7, 704:10, 704:18, 706:3
strategy [4] - 627:9, 628:4, 689:15, 703:6
strawberry [1] - 688:25
streamlined [1] - 678:15
Street [6] - 610:8, 687:17, 701:17,

701:23, 730:22, 731:14
stricken [2] - 848:19, 848:25
strike [4] - 670:18, 670:21, 742:17, 751:10
string [1] - 680:18
strong [1] - 699:18
struck [1] - 731:15
structure [3] - 698:9, 761:11, 765:14
struggled [1] - 668:5
stuff [6] - 613:14, 770:7, 846:14, 846:16, 846:21, 847:16
style [2] - 700:3, 702:8
subject [2] - 724:1, 814:20
submit [1] - 624:4
submitting [1] - 847:12
subscribed [1] - 726:24
subscription [3] - 636:5, 638:4, 726:21
subsequent [6] - 678:1, 679:13, 747:16, 748:16, 748:19, 819:14
subset [1] - 847:16
substance [6] - 709:11, 709:13, 758:25, 761:21, 774:25, 825:13
substantial [4] - 681:7, 681:21, 681:25, 685:21
succeed [2] - 694:8, 702:11
successful [2] - 644:6, 710:11
successfully [1] - 691:5
suddenly [2] - 634:7, 666:8
sufficient [1] - 697:2
suggest [1] - 741:17
suggested [1] - 793:21
suggesting [1] - 613:18
suggestion [1] - 676:15
suitability [1] - 637:12
Suite [1] - 610:13
sum [1] - 774:24
summaries [2] - 649:4, 649:19
summarize [1] - 728:6
summary [12] - 683:19, 684:5, 819:12, 820:20, 820:23, 821:7, 831:20, 832:9, 834:7, 836:13, 842:17
summary-level [2] - 820:20
super [1] - 662:24
support [1] - 688:17
supporting [1] - 769:20
supposed [5] - 764:7, 766:18, 766:20, 793:8, 834:8
surplus [2] - 812:3, 813:3
surprise [1] - 623:2
surprised [2] - 829:14, 829:20
surrounding [1] - 619:7
suspected [3] - 656:3, 656:6, 656:14
suspend [1] - 636:6
suspended [9] - 633:17, 634:25, 635:16, 652:23, 662:16, 665:23, 665:24, 666:1, 668:6
sustain [2] - 701:22, 752:8
Sustained [2] - 670:19, 697:6
sustained [4] - 651:21, 670:20, 708:24, 830:8
swear [2] - 686:11, 686:14
sweeped [1] - 774:16
sworn [1] - 624:19
sworn/affirmed [1] - 687:1
symbols [1] - 789:4

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 269 of 271
PageID #: 14062
(system - typically)                                                        Page 25

**system** [5] - 760:25, 761:3, 765:23, 772:13, 773:13

# T

**tab** [10] - 772:17, 775:19, 784:3, 786:13, 790:20, 790:24, 792:15, 831:20, 832:15, 832:18

**table** [4] - 611:7, 611:14, 639:14, 798:6

**tabs** [2] - 781:11, 781:13, 781:20, 782:3, 783:9, 783:23

**talks** [2] - 727:8, 782:9

**target** [4] - 698:1, 706:24, 718:14, 724:15

**Targeted** [1] - 717:9

**targeted** [6] - 694:22, 695:23, 717:19, 722:7, 726:21, 785:25

**team** [22] - 678:16, 683:9, 733:25, 734:13, 744:15, 768:24, 772:8, 773:5, 774:3, 774:6, 774:14, 774:20, 775:10, 786:10, 788:18, 789:15, 801:24, 806:3, 808:13, 810:10, 817:5, 818:7

**teams** [1] - 789:16

**technology** [1] - 743:7

**Telephone** [1] - 610:16

**template** [3] - 649:22, 649:25, 650:2

**temporary** [1] - 814:17

**ten** [3] - 689:19, 691:8, 698:13

**tend** [1] - 626:6

**tenure** [2] - 622:11, 733:20

**term** [4] - 731:10, 766:23, 767:1, 809:25

**terms** [4] - 624:7, 735:9, 736:7, 845:13

**terrible** [1] - 781:17

**test** [1] - 698:16

**testified** [30] - 624:19, 626:25, 627:24, 628:9, 632:18, 634:23, 635:8, 636:13, 638:11, 644:24, 649:9, 650:11, 650:16, 650:23, 651:10, 653:13, 657:2, 671:10, 687:1, 687:6, 704:3, 724:14, 748:13, 758:1, 779:6, 779:11, 780:25, 782:11, 785:12, 848:15

**testify** [4] - 621:19, 680:10, 681:20, 779:1

**testifying** [5] - 639:11, 650:6, 702:22, 776:17, 824:22

**testimony** [31] - 612:4, 617:14, 617:17, 623:16, 625:21, 626:5, 626:17, 628:18, 635:3, 635:14, 670:23, 672:5, 672:23, 678:25, 683:11, 686:11, 686:14, 729:19, 729:21, 732:9, 752:15, 762:19, 762:21, 778:15, 778:20, 778:23, 779:23, 782:13, 800:8, 817:2, 849:9

**Texas** [4] - 627:1, 700:18, 701:1, 701:4

**texts** [1] - 699:10

**that'll** [1] - 838:3

**that's..** [1] - 849:20

**the defendant** [8] - 609:19, 609:19, 610:3, 610:7, 610:11, 683:12, 758:2, 771:5

**the New York office** [4] - 699:3, 707:18, 707:20, 711:1

**the times** [2] - 699:5, 707:22

**theories** [1] - 676:19

**theory** [9] - 611:21, 620:2, 679:25, 680:1, 682:18, 747:10, 755:24, 812:11

**thereafter** [2] - 666:6, 666:10

**therefore** [1] - 667:1

**thick** [2] - 712:2, 725:1

**third** [6] - 669:17, 673:8, 678:3, 717:9, 738:2, 792:15

**Third Avenue** [1] - 609:20

**third-parties** [1] - 738:2

**thousand** [3] - 736:22, 736:23, 841:7

**thread** [1] - 748:14

**three** [36] - 625:17, 632:3, 632:12, 643:15, 643:20, 657:3, 688:24, 707:21, 726:20, 726:24, 727:1, 727:3, 737:22, 761:11, 761:15, 761:23, 763:2, 763:3, 764:19, 764:20, 781:13, 781:23, 783:23, 784:7, 793:5, 804:9, 805:7, 812:11, 835:13, 837:18, 841:3, 842:5, 842:10, 842:17

**three-month** [1] - 727:1

**Thursday** [1] - 609:7

**ticket** [1] - 615:11

**timeframe** [3] - 703:12, 703:14, 708:23

**timing** [7] - 650:13, 650:15, 651:16, 652:20, 652:22, 665:19, 747:6

**tiny** [1] - 775:20

**to/due** [1] - 813:2

**today** [2] - 776:17, 844:18

**together** [21] - 620:19, 621:13, 652:23, 660:21, 661:5, 665:24, 693:10, 697:5, 701:7, 701:10, 703:6, 706:12, 728:19, 740:5, 814:25, 815:3, 815:8, 815:10, 815:17, 816:1, 831:7

**tomorrow** [6] - 844:1, 844:5, 844:9, 845:18, 848:24, 849:13

**tonight** [2] - 845:18, 848:2

**took** [8] - 674:1, 680:24, 681:14, 704:1, 763:14, 772:13, 808:24, 842:18

**tool** [2] - 744:13, 814:22

**top** [12] - 648:8, 648:9, 658:3, 698:5, 734:17, 739:2, 752:6, 766:7, 784:6, 792:23, 798:15, 821:5

**top-left** [1] - 648:8

**topic** [1] - 656:18

**total** [21] - 629:20, 630:3, 630:6, 630:16, 631:1, 631:3, 631:9, 632:4, 653:22, 667:7, 692:11, 735:22, 772:18, 775:20, 788:14, 790:1, 791:25, 792:25, 807:5, 807:13, 841:4

**totally** [1] - 684:13

**touch** [1] - 799:8

**towards** [1] - 748:9

**track** [23] - 640:11, 640:20, 642:1, 663:1, 663:2, 663:7, 663:11, 688:15, 690:22, 690:23, 761:16, 765:22, 769:8, 769:11, 772:19, 773:5, 774:14, 809:24, 811:16, 814:23, 816:5, 817:5

**tracked** [3] - 772:14, 772:16, 773:11

**tracking** [3] - 776:9, 800:18, 802:12

**trading** [2] - 687:18, 702:1

**traditional** [5] - 694:4, 716:15, 719:14, 719:18, 719:20

**traffic** [2] - 622:13, 623:7

**transaction** [7] - 774:1, 785:7, 785:19, 786:3, 786:6, 787:13, 808:23

**transactions** [7] - 773:20, 779:10, 785:13, 786:19, 786:23, 805:7

**TRANSCRIPT** [1] - 609:11

**Transcript** [1] - 610:18

**transcript** [1] - 617:3

**Transcription** [1] - 610:18

**transfer** [11] - 648:14, 766:10, 766:11, 784:12, 784:13, 785:15, 787:14, 791:4, 791:18, 803:2, 813:10

**Transfer** [1] - 784:6

**transferred** [2] - 785:9, 822:20

**transfers** [14] - 680:11, 682:3, 683:16, 772:18, 774:4, 775:6, 775:20, 776:9, 806:19, 807:3, 807:11, 813:5, 813:12, 814:17

**transit** [2] - 624:15, 844:7

**transition** [1] - 690:9

**transmitted** [1] - 779:21

**transmitting** [2] - 654:25, 655:1

**travel** [2] - 615:9, 771:17

**traveled** [1] - 700:17

**traveling** [4] - 699:2, 745:13, 749:10, 760:16

**trial** [6] - 612:12, 613:24, 732:24, 843:19, 843:20, 844:3

**trick** [1] - 838:4

**tried** [1] - 632:21

**troubling** [4] - 667:19, 672:1, 672:5, 672:12

**true** [4] - 672:14, 719:10, 719:11, 827:14

**true-ups** [1] - 827:14

**Trump** [1] - 687:24

**trust** [1] - 689:8

**truth** [29] - 677:18, 679:7, 679:22, 680:1, 680:2, 680:4, 680:6, 682:2, 682:20, 682:23, 683:15, 684:18, 684:22, 686:12, 686:13, 686:15, 686:16, 754:11, 755:13, 756:3, 756:9, 756:12, 756:13, 757:5, 796:10, 796:20, 800:10

**truthfulness** [1] - 683:24

**try** [8] - 667:10, 687:8, 715:15, 732:21, 843:18, 844:3, 844:5, 848:25

**trying** [10] - 621:25, 623:3, 651:11, 683:24, 704:14, 733:1, 741:20, 773:1, 779:22, 782:16

**Tuesday** [2] - 625:10, 732:14

**turn** [7] - 632:24, 638:14, 654:20, 655:4, 655:16, 657:12, 659:21

**turning** [1] - 658:3

**turns** [2] - 617:19, 709:10

**twice** [5] - 625:22, 625:23, 626:1, 693:2, 722:13

**two** [44] - 618:21, 619:6, 641:8, 641:21, 642:15, 660:9, 660:16, 665:22, 679:16, 680:22, 684:4, 685:19, 692:25, 697:4, 707:21, 709:9, 709:10, 736:16, 736:20, 736:23, 737:22, 743:13, 743:15, 743:16, 749:14, 757:21, 764:9, 768:23, 780:22, 784:7, 790:6, 801:23, 802:15, 802:22, 804:9, 805:7, 805:20, 808:7, 835:13, 836:4, 836:14, 837:18

**type** [6] - 642:25, 680:19, 700:11, 748:17, 751:16, 791:18

**types** [2] - 627:19, 688:22, 711:8

**typical** [3] - 698:9, 698:12, 698:21

**typically** [5] - 689:15, 689:18, 707:16, 735:5, 737:19

## U

**U.S** [1] - 655:17
**uh-him** [1] - 790:7
**ultimately** [2] - 701:10, 782:16
**uncertain** [4] - 627:24, 628:9, 628:15, 677:23
**under** [11] - 617:3, 624:21, 630:2, 632:12, 633:14, 687:25, 706:25, 797:8, 808:14, 808:19, 831:8
**undergraduate** [1] - 687:12
**underlying** [9] - 642:1, 662:10, 662:23, 682:4, 683:21, 757:6, 783:5, 796:11, 796:21
**understood** [14] - 637:24, 654:24, 657:25, 684:17, 693:12, 696:6, 697:23, 729:15, 731:4, 761:15, 766:22, 779:1, 794:5, 801:1
**unfair** [2] - 681:7, 681:21
**unfortunately** [1] - 647:22
**unique** [1] - 698:21
**unit** [2] - 633:10, 634:17
**United States** [8] - 609:1, 609:3, 609:5, 609:12, 609:14, 609:18, 611:2, 611:7
**units** [3] - 633:4, 633:5, 639:1
**university** [1] - 689:7
**University** [2] - 687:13, 687:14
**unless** [2] - 704:22, 849:10
**unlike** [2] - 694:4, 694:6
**unprompted** [1] - 782:13
**up** [105] - 613:14, 626:1, 629:15, 631:5, 638:9, 639:9, 654:16, 656:17, 661:22, 662:24, 664:9, 666:8, 668:25, 669:10, 672:5, 672:19, 676:22, 677:3, 677:7, 679:1, 681:2, 687:8, 688:6, 689:19, 691:9, 695:4, 696:13, 696:22, 697:17, 698:1, 698:14, 698:19, 703:4, 709:9, 709:20, 715:15, 718:14, 721:1, 722:23, 723:6, 724:6, 730:10, 731:17, 733:14, 734:17, 735:1, 735:16, 735:18, 735:20, 735:23, 736:9, 739:1, 739:23, 741:2, 741:11, 741:12, 743:12, 744:3, 750:2, 757:9, 760:18, 761:10, 761:11, 762:1, 762:6, 763:8, 763:10, 764:3, 764:21, 765:5, 765:14, 765:15, 765:16, 765:19, 769:12, 770:3, 775:21, 785:2, 786:17, 788:24, 790:17, 792:10, 792:23, 793:5, 793:20, 798:15, 801:18, 802:8, 805:19, 806:6, 809:21, 822:12, 822:19, 823:14, 823:20, 825:6, 827:21, 829:11, 832:20, 834:25, 835:4, 844:8, 846:24, 848:9
**up-front** [4] - 735:20, 735:23, 763:8, 763:10
**upbeat** [1] - 700:5
**update** [7] - 657:9, 658:7, 768:22, 775:10, 800:17, 825:12, 830:13
**updated** [4] - 683:10, 683:13, 684:3, 777:19
**updates** [5] - 700:22, 700:24, 793:16, 826:20, 826:21
**ups** [1] - 827:14
**uses** [1] - 678:24
**utility** [1] - 680:15

## V

**vague** [1] - 678:5
**Value** [1] - 659:24
**value** [4] - 660:5, 660:7, 660:22, 661:4
**vanilla** [1] - 688:25
**variety** [3] - 678:23, 682:13, 682:14
**various** [4] - 661:25, 738:25, 765:25, 815:6
**vehicle** [2] - 689:12, 689:14
**verified** [1] - 683:4
**verify** [1] - 773:22
**Vermont** [1] - 687:13
**version** [13] - 655:17, 776:12, 777:23, 778:5, 779:20, 782:6, 783:7, 791:23, 803:11, 803:15, 810:23, 833:20, 836:18
**versions** [1] - 781:17
**versus** [10] - 628:1, 628:17, 681:2, 797:13, 821:19, 823:12, 833:8, 836:19, 836:25, 843:9
**vests** [1] - 744:5
**vetting** [1] - 710:22
**view** [5] - 623:23, 663:4, 666:19, 666:24, 741:14
**violence** [1] - 730:2
**visibility** [1] - 770:23
**voice** [2] - 687:8, 801:10
**voir** [7] - 612:2, 612:8, 613:14, 615:18, 617:5, 703:13, 777:2
**VOIR** [2] - 777:5, 850:17
**Vora** [1] - 611:12
**VORA** [2] - 610:6, 849:2

## W

**w-i-l-l-i-a-m** [1] - 686:20
**wait** [4] - 631:12, 666:12, 726:24, 781:9
**waiting** [2] - 611:15, 623:12
**waiving** [1] - 782:7
**walk** [4] - 783:19, 784:10, 785:7, 821:2
**walking** [1] - 775:25
**Wall** [5] - 687:17, 701:17, 701:23, 730:22, 731:14
**wants** [4] - 613:18, 620:21, 758:17, 849:10
**Washington** [1] - 610:9
**watch** [3] - 724:12, 741:9, 770:6
**waterfall** [2] - 689:23, 698:16
**ways** [4] - 682:14, 699:7, 769:2, 770:16
**week** [13] - 625:22, 625:23, 625:24, 699:2, 699:4, 725:23, 732:8, 732:20, 820:8, 825:3, 843:21, 844:20, 845:8
**weekly** [10] - 700:22, 700:24, 768:19, 768:22, 769:17, 793:15, 815:19, 818:8, 818:15, 825:12
**weeks** [1] - 625:17
**WEIGEL** [1] - 609:16
**Weigel** [1] - 611:6
**weight** [1] - 779:15
**welcome** [1] - 624:15
**well-respected** [1] - 648:15
**whereas** [1] - 719:22
**whole** [12] - 650:25, 651:5, 686:12, 686:15, 696:21, 726:9, 739:13, 790:18,

803:22, 812:16, 818:4, 831:4
**wholesaling** [1] - 735:13
**will..** [1] - 753:1
**WILLIAM** [2] - 686:24, 850:12
**William** [3] - 611:18, 686:9, 686:20
**willing** [1] - 794:12
**wind** [1] - 698:14
**wired** [1] - 738:22
**wires** [1] - 802:3
**wiring** [1] - 738:21
**wisenberger** [1] - 842:19
**withdraw** [1] - 645:18
**withdrawn** [1] - 710:24
**witness** [123] - 611:20, 612:3, 612:13, 613:14, 617:4, 617:5, 620:12, 620:24, 621:18, 621:23, 622:7, 623:1, 624:16, 624:17, 624:18, 628:25, 640:19, 645:20, 646:25, 649:9, 649:11, 650:4, 654:13, 657:16, 659:3, 661:15, 674:4, 674:7, 675:12, 675:20, 676:2, 676:11, 680:8, 680:10, 681:13, 683:1, 683:19, 684:1, 684:5, 685:2, 686:7, 686:25, 701:20, 704:3, 715:11, 719:24, 720:1, 721:12, 724:19, 724:21, 729:7, 730:12, 730:13, 730:16, 730:17, 730:18, 730:23, 730:24, 731:4, 731:10, 732:5, 749:11, 749:19, 749:23, 750:8, 752:20, 752:25, 757:2, 761:19, 762:8, 762:18, 762:20, 774:22, 775:12, 775:15, 777:3, 778:6, 778:8, 778:16, 779:1, 779:10, 779:23, 781:5, 781:10, 782:11, 782:12, 783:12, 795:8, 795:9, 796:2, 798:23, 798:25, 802:24, 804:21, 804:24, 806:13, 806:23, 807:9, 811:22, 811:24, 813:17, 813:19, 816:8, 817:12, 819:1, 819:7, 819:8, 819:18, 820:5, 825:8, 829:21, 830:10, 839:10, 842:6, 844:13, 844:14, 844:15, 844:22, 844:25, 845:6, 848:5, 848:12
**Witness** [4] - 624:17, 729:9, 732:5, 844:15
**witness'** [5] - 670:23, 678:25, 752:15, 778:20, 830:7
**witness's** [5] - 655:4, 704:15, 729:21, 730:3, 762:19
**witnesses** [5] - 613:1, 731:7, 731:9, 731:12, 848:3
**Wolf** [4] - 701:17, 701:23, 730:22, 731:14
**Word** [1] - 712:22
**word** [10] - 640:1, 640:3, 657:11, 667:4, 667:19, 681:18, 694:14, 710:4, 713:17
**words** [8] - 615:10, 694:15, 727:2, 744:14, 751:15, 755:3, 767:25, 826:25
**works** [2] - 619:19, 619:20
**world** [2] - 654:3, 664:24
**worry** [2] - 636:2, 724:5, 741:1
**worth** [1] - 768:1
**wrap** [1] - 664:9
**writes** [1] - 619:19
**written** [4] - 635:20, 635:23, 711:14, 711:19
**wrote** [3] - 633:2, 728:22, 826:8

Case 1:21-cr-00054-RPK-PK    Document 424-1    Filed 07/12/24    Page 271 of 271
PageID #: 14064
*(year - §502(d)*                                                    *Page 27*

## Y

**year** [32] - 633:4, 634:6, 669:18, 669:25, 670:5, 690:13, 694:17, 723:17, 736:17, 736:24, 737:12, 737:13, 767:21, 778:21, 779:4, 779:5, 795:20, 821:16, 822:10, 822:12, 823:4, 823:14, 823:16, 828:12, 833:7, 835:23, 836:20, 838:3, 838:20, 839:18, 842:2
**year-end** [1] - 839:18
**year-ending** [1] - 670:5
**year-to-date** [8] - 821:16, 822:10, 823:4, 823:14, 823:16, 828:12, 833:7, 838:3
**years** [8] - 641:9, 642:15, 661:10, 665:22, 689:17, 689:20, 698:13
**yellow** [1] - 777:8
**yes-or-no** [1] - 627:11
**yesterday** [1] - 640:16
**yield** [8] - 693:18, 693:20, 693:21, 694:17, 694:18, 717:10, 717:13, 721:9
**yielding** [1] - 709:14
**yields** [1] - 694:14
**York** [12] - 609:5, 609:14, 609:15, 609:21, 610:5, 687:14, 707:24, 708:5, 708:21, 710:8
**yourself** [6] - 626:4, 645:6, 645:10, 728:2, 785:13
**YTD** [2] - 821:15, 822:8
**yup** [4] - 725:21, 726:8, 798:17, 802:18

## Z

**ZELL** [1] - 610:10
**Zell** [1] - 611:13
**Zoom** [1] - 718:5
**zoom** [21] - 629:17, 630:19, 648:8, 658:4, 659:23, 717:16, 718:20, 726:1, 727:20, 735:15, 735:25, 737:15, 795:10, 796:3, 820:18, 820:25, 836:14, 837:16, 838:2, 840:13, 841:15

## §

**§403-type** [1] - 619:13
**§502(d** [2] - 846:20, 847:4