# KOBRE & KIM

800 Third Avenue
New York, New York 10022
www.kobrekim.com
Tel +1 212 488 1200

July 16, 2024

**BY ECF**

The Honorable Rachel P. Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *United States v. Gentile, et al.,*
              21 Cr. 054 (RPK) (PK)

Dear Judge Kovner:

      We write respectfully on behalf of Defendant David Gentile, joined by Defendant Jeffry Schneider, to move *in limine* to permit cross examination of Government witnesses regarding the role and function of broker-dealers, registered investment advisors ("RIAs"), and investment advisors in connection with the offering and marketing of the GPB funds. As discussed in more detail below, the Government's examination of its witnesses—including at least Jeffrey Lash, Anthony LaGilia, and Macrina Kgil—squarely has put at issue Defendants' specific intent and *mens rea* and, thus, has opened the door to this testimony, which previously had been precluded, in order to permit Defendants to confront and refute the unfair inference the Government has asked the jury to draw from such testimony. To do otherwise would unfairly prejudice Defendants by permitting the Government to use the Court's pre-trial ruling, *see* Dkt. No. 370 (the "Order"), as both a sword and a shield.

      In the Order, the Court previously precluded Defendants from introducing evidence of the type of investigation that broker-dealers, RIAs, and investment advisors are legally required to undertake on behalf of their investor-clients as not relevant to Defendants' state of mind. *See* Order at 4 (citing Rule 403). Nonetheless, the Government has repeatedly elicited testimony to attempt to support its allegation that Defendants intentionally obscured or did not directly highlight modifications to risk disclosures and cautionary language contained within offering documents and marketing materials ultimately provided to investors and potential investors. Such testimony clearly is designed to cause the jury to draw the improper and incorrect inference that Defendants' purported failure to highlight certain changes to these disclosures was for individual investors and was motivated by or consistent with Defendants' alleged intent to deceive and defraud. As such, Defendants respectfully submit that the Court should permit Defendants to elicit testimony about

**Americas** (New York, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**APAC** (Hong Kong, Seoul, Shanghai), **Caribbean** (BVI, Cayman Islands), **EMEA** (Cyprus, Dubai, London, Tel Aviv)

Kobre & Kim refers to Kobre & Kim llp, a New York Limited Liability Partnership.

Hon. Rachel P. Kovner, U.S.D.J.
July 16, 2024
Page 2

the role, function, and obligations of these third-party intermediaries as it establishes that a reasonable person in Defendants' position would reasonably believe and expect that these materials would be vetted carefully before they were transmitted to investors for their own consideration of the offering.

### I.     Applicable Law

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"Evidentiary rulings made *in limine* especially where, as here, they are animated solely on a Rule 403 analysis, are not immutable." *United States v. Aguilar*, No. 1:20-CR-390 (ENV), 2024 WL 759973, at *1 (E.D.N.Y. Feb. 22, 2024). Indeed, "some twist in argument or in the unfolding of evidence might upset the delicate balance between the probative and the prejudicial." *Id.* *See also Weyant v. Okst*, 182 F.3d 902, at *2 (2d Cir. 1999) (summary order) (finding no abuse of discretion where trial court reassessed Rule 403 balance based on opening statements at trial and found admissible evidence previously excluded *in limine*); *United States v. Wade*, 512 F. App'x 11, 14 n.1 (2d Cir. 2013) (summary order) ("[A] pretrial evidentiary ruling is not a 'straightjacket' that cannot be revisited in appropriate instances.").

"The rule of 'opening the door,' or 'curative admissibility,' gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence." *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir.1993), *cert. denied*, 511 U.S. 1042 (1994); *see United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992). Thus, that doctrine focuses generally on a party's interjection of improper evidence and permits a court to reassess the Rule 403 balance where there is no longer a substantial risk of prejudice. *Weyant v. Okst*, 182 F.3d 902 (2d Cir. 1999).

### II.    Argument

#### A.     The Court Should Permit Cross Examination of Witnesses Regarding Financial Professionals' Due Diligence Obligations as Relevant to Defendants' Intent.

In a pretrial ruling, the Court ordered that "to the extent these due-diligence obligations have any indirect relevance bearing on the defendants' *mens rea* when making alleged misrepresentations, the probative value of this evidence would be substantially outweighed by the risk of confusion and of unfair prejudice." Order at 4. Shielded by this ruling, the Government repeatedly has elicited testimony from several key witnesses that Defendants intentionally sought to conceal or otherwise obscure from investors changes to these disclaimers for the GPB funds as evidence of the alleged disclosure fraud. For instance, the Government elicited testimony from Mr. Lash, the former Director of GPB Automotive Retail turned Government cooperator, about an

Hon. Rachel P. Kovner, U.S.D.J.
July 16, 2024
Page 3

alleged conversation between Mr. Gentile, Mr. Schneider, Mr. Roger Anscher, and Mr. James Prestiano regarding purported changes to disclosure language in the PPMs relating to the source of distributions. In that alleged conversation, Mr. Lash claimed that Defendants discussed inserting language that distributions had included a return of capital into the PPMs "without causing too much of a stir," *i.e.*, without the investors noticing the addition of this language:

> Q: So now approximately 2016, where – you overhear a conversation. Where were you in the GPB offices?
>
> A: I had come in and it was, kind of, an open forum. It had a conference room, kind of, a kitchen if you're coming in on the right-hand side, but it was, kind of, an open forum where, you know, a lot of people, kind of, work out in the open. . . . ***I believe it was David Gentile, Jeff Schneider, Roger and, I believe, maybe Mr. Prestiano.***
>
> Q: And were you in the kitchen at that point?
>
> A: I was around sitting in front of it.
>
> Q: Do you recall what they were talking about?
>
> A: Yeah. ***They were talking about a -- the gist of the conversation was how to get something into – I believe it was the PPM without causing too much of a stir; that the investor was getting part of their capital basically back as part of their dollars that they were receiving.***
>
> Q: Who was doing most of the talking?
>
> A: I believe it was Mr. Gentile.
>
> Q: Was Mr. Schneider speaking as well?
>
> A: He was.
>
> Q: Do you recall what Mr. Schneider said?
>
> A: They were just trying to go through how to -- steps on getting it in and asking Roger, kind of, how it would disclose within the document. . . .
>
> THE COURT: Did you overhear causing a stir or that was your description?
>
> THE WITNESS: That's what I heard.
>
> BY MR. AXELROD:
>
> Q: ***What did you understand that to mean?***
>
> A: ***That it was something that they didn't want the investors to see that it had already started transpiring.***

Tr. 3075:8-3077:5 (emphasis added).

Similarly, the Government questioned Anthony LaGiglia, a broker-dealer whose clients invested in the GPB Automotive Portfolio fund, about changes in marketing materials regarding the source of GPB's distributions to investors. In so doing, the Government specifically inquired into whether GPB or Ascendant alerted Mr. LaGiglia to those changes or if he otherwise noticed:

Hon. Rachel P. Kovner, U.S.D.J.
July 16, 2024
Page 4

> Q: Mr. LaGiglia, this slide is comparing GPB to traditional private equity; is that correct?
>
> A: Yes.
>
> Q: We looked at an earlier chart that was similar; is that right?
>
> A: Yes. It says [distributions] "primarily based off cash flow from portfolio companies targeted at eight percent."
>
> Q: And the last document we looked at, it didn't say the word "primarily"?
>
> A: It did not.
>
> Q: It just said "based off cash flow," is that right?
>
> A: Yes, it seems to have changed.
>
> *Q: Did you notice this change at the time?*
>
> *A: I didn't.*
>
> *Q: Did anyone at GPB or Ascendant alert you to this change?*
>
> *A: No.*

Tr. 3679:15-3680:5 (emphasis added).

> Q: Directing your attention to where it says, "Targeting Annual Distribution 8.7 percent," looking at the last sentence in this box it says, "Distributions may be paid from invested capital which may negatively impact the value of the portfolio's investments and could be more, less, or none at all." Do you see that?
>
> A: I do.
>
> Q: Do you remember seeing this language before you recommended the investment to your clients?
>
> A: This is a change in language in the marketing materials.
>
> Q: And do you remember seeing it before you recommended the investment?
>
> A: No.
>
> Q: We walked through a number of other marketing materials. Did you see this language in any of those other marketing materials?
>
> A: No. It's changed over the period of time.
>
> *Q: Did anyone at GPB or Ascendant highlight this information for you?*
>
> *A: No.*

Tr. 3684:6-25 (emphasis added).

And, during the Government's examination of Ms. Macrina Kgil, GPB's Chief Financial Officer, the Government also repeatedly emphasized purported "variances" or "changes" made by GPB and Ascendant to disclosures relating to distributions and coverage ratio without allegedly highlighting those changes to investors:

Hon. Rachel P. Kovner, U.S.D.J.
July 16, 2024
Page 5

> Q: This is a Statement of Operations, I think you mentioned?
>
> A: Yes.
>
> Q: So what are we looking at here?
>
> A: This is showing the income from investments, and then the regular fund expenses. And then at the bottom there is the unrealized gain or losses on investments. And then at the end there is the – a net income number. Below that in the box there is a "Key Highlights" section of distributions and a coverage ratio.
>
> Q: What information is conveyed here?
>
> A: It's showing the distribution amount for that time period. So, the first one is Q1, second one is Q2, third is Q3… So, I usually ask my accounting team to look at – if there is a change from a quarter over a quarter, to explain what the difference is. And so, these are just comments and explanations of what happened and why there is an increase or why there is a decrease.
>
> Q: Okay, and let's focus, again, at the bottom of the page, the "Key Highlights," please.
>
> A: Uh-huh.
>
> ***Q: To your knowledge, was this box included in the financial statements that went out to investors?***
>
> ***A: I don't believe so.***

Tr. 2168:3– 2170:1 (emphasis added).

> Q: Ms. Kgil, what does this show?
>
> A: This is a similar variance explanation to Holdings II that we looked at. So, it's – if there is a change from Q2 or – to Q3 on any income or expense number and it's a large change, the team writes up what are the reasons for the change.
>
> ***Q: And referring to the bottom box again, the "Key Highlights," do you know whether that information was provided to investors as part of the Q3 2016 financials for Holdings I?***
>
> ***A: I – I – I don't – I don't believe so. I don't know.***

Tr. 2173:12-21 (emphasis added).

    This testimony belies the Government's pretrial claim that it was "entirely unclear" how disclaimers in the offering documents and marketing materials "could be relevant to the defendants' intent." Dkt. No. 348 at 4, n.2. To the contrary, the Government directly—and repeatedly— has injected Defendants' alleged specific intent and *mens rea* regarding changes made to the source of distributions in the offering documents and marketing materials into this case through multiple witnesses. Having now put this issue front and center, the Government has opened the door to cross-examination regarding how information about investor distributions that was sent to broker-dealers, RIAs, and other professional investment advisors—who had a legal

obligation on behalf of their clients to review and understand that information—negates the inference that Defendants had an intent to defraud.

Broker-dealers and RIAs were the intermediate step between the offering documents and marketing materials prepared and marketed by GPB and Ascendant, on the one hand, and investors, on the other. Any reasonable person in Defendants' position would both understand and expect that changes to disclosure language would be closely vetted by broker-dealers, RIAs, and investment advisors before transmitting such information to investors for their own review and consideration of the offering. Thus, the gatekeeper function served by financial professionals is ripe for cross examination to rebut the implication that the Government has repeatedly asked the jury to draw, *i.e.*, that Defendants sought to hide, conceal, or otherwise obscure changes to disclosure language from those parties because Defendants themselves did not highlight the specific changes or modifications (even though the changes were broadly disseminated in written documents). Probing these due diligence obligations is highly relevant to Defendants' alleged intent to mislead investors because any reasonable person (including Defendants) could rely on these facts when they came to the understanding that changes to the offering documents were accurate (which bears on their lack of intent to defraud anyone), and the probative value of such evidence would substantially outweigh the risk of confusion and unfair prejudice.

To be clear, Defendants do not seek to impugn financial professionals or attack their credibility based on an alleged failure to perform due diligence or other legally required functions, nor do Defendants intend to blame the broker-dealers, RIAs, professional financial advisors, or the purported investor-victims in this case for not identifying or understanding changes to the disclosure language at issue in this case. Instead, Defendants' line of cross examination is designed solely to shed light upon the lack of *mens rea* and intent of a person similarly situated to Defendants, which the Government has put squarely at issue in this case. At bottom, the Government cannot elicit testimony of this nature while at the same time arguing that Defendants should be deprived of offering relevant and admissible evidence that undermines the inference the Government no doubt will ask the jury to draw from this testimony.

### III.     Conclusion

For the reasons set forth above, the Court should permit cross examination of Government witnesses regarding evidence of the type of investigation that broker-dealers, RIAs, and investment advisors are legally required to undertake as relevant to Defendants' *mens rea*. *See, e.g.*, *Weyant*, 1999 WL 491866 at *2 (affirming district court's reassessment of Rule 403 balance in light of "defense counsel's inappropriate opening statement and conclud[ing] that there was no longer a substantial risk of prejudice that would be unfair.").

Hon. Rachel P. Kovner, U.S.D.J.
July 16, 2024
Page 7

Respectfully submitted,

*/s/ Sean S. Buckley*
Sean S. Buckley
Matthew Menchel
Adriana Riviere-Badell
Jonathan D. Cogan
Benjamin F. Cooper

*Counsel for Defendant David Gentile*