

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:JKW/NMA/KM                          *271 Cadman Plaza East*
F. #2018R01064                          *Brooklyn, New York 11201*

February 21, 2025

<u>By ECF</u>

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. David Gentile
      <u>Criminal Docket No. 21-54 (RPK)</u>

Dear Judge Kovner:

   The government respectfully submits this letter in advance of the sentencing of defendant David Gentile, which is scheduled for April 4, 2025. For the reasons stated below, the government recommends a sentence of 15 years' imprisonment. Such a sentence is necessary to account for the defendant's central leadership role in a sophisticated and years-long scheme to defraud thousands of GPB's retail investors, to deter the defendant—who even now has expressed no remorse and minimizes his own culpability—and to deter other investment managers from committing similar frauds in the future.

I. Background

   Following an eight-week trial, the jury convicted David Gentile and Jeffry Schneider on all counts. Gentile was convicted of securities fraud, conspiracy to commit wire fraud, and substantive securities fraud and wire fraud. The evidence at trial was overwhelming and included: victims who spoke personally to the defendants, multiple GPB insiders who described how the defendants tightly controlled everything at GPB and Ascendant and how GPB employees warned the defendants they were lying to investors, and from the defendants' co-conspirator, Jeffrey Lash, who detailed how he and the defendants executed a scheme to falsely inflate GPB's financial results. This testimony was corroborated by an extensive documentary record including "dashboard" and performance reports showing that the defendants knew GPB was using investor money to pay distributions, marketing materials illustrating the fraud and the defendants' deception, and contemporaneous emails and text messages cataloging the performance guarantee fraud involving Lash. It took the jury just five hours to return a guilty verdict.

A.    The GPB Funds

In 2013, the defendant founded GPB, alongside his partners (and eventual co-conspirators) Jeffry Schneider and Jeffrey Lash.  See PSR ¶ 1.  Gentile brought the three men together to build GPB.  See Trial Tr. ("Tr.") 2997–98 (Lash).  Gentile was an experienced accountant; Schneider was a salesman who knew how to raise money; and Lash managed car dealerships.

Gentile and Schneider laid the foundational building blocks for the fund.  See Tr. 3000 (Lash) ("David was really in charge of accounting.  He was an accountant.  Structuring the deal with Jeff of how, kind of, everything was going to work and Jeff was going to do raising capital and -- kind of working with David on the legal and structure stuff as well[.]").  He worked "hand-in-hand" with Schneider to put together the GPB pitch.  Tr. 3008–09.

GPB focused on income-producing private equity.  PSR ¶ 8.  The idea was to buy mature companies that were already profitable and pay a monthly distribution with income from the portfolio companies.  See id.  This was very different from traditional private equity where investors have to wait years to make money.  See id.  Ascendant Capital, LLC ("Ascendant") was the marketing firm.  It sold the GPB investment to financial advisers, broker-dealers, and individual investors across the country.  Id.

Gentile was the Chief Executive Officer ("CEO") of GPB and Schneider was the CEO of Ascendant.  PSR ¶ 9.  Gentile and Schneider ran GPB and Ascendant as a "partnership."  PSR ¶ 10.  Together, they controlled everything at GPB and Ascendant.  GPB's Chief Financial Officer ("CFO"), William Jacoby and later Macrina Kgil, reported directly to Gentile, as did GPB's Chief Operating Officer Roger Anscher.  Tr. 691 (Jacoby); Tr. 2155 (Kgil); Tr. 4126 (Anscher).  Gentile was a hands-on CEO.  He received weekly dashboards with the financial results from Jacoby and at least quarterly results from Kgil.  See PSR ¶ 10.  He marketed the GPB funds to financial advisors, broker-dealers, and investors, and had knowledge of the marketing materials.  See PSR ¶ 10; GX-8099; GX-8184.

GPB offered different funds to investors.  PSR ¶ 10.  The charges in this case focus on the first three funds—GPB Holdings, LP ("Holdings I"), GPB Holdings II, LP ("Holdings II"), and GPB Automotive Portfolio, LP ("Automotive Portfolio")—but the defendants misrepresented the performance of Holdings I, Holdings II and Automotive Portfolio to induce investors to invest in other funds, including GPB Waste Management, LP ("Waste Management") and GPB Cold Storage, LP ("Cold Storage").  Id.

Between 2013 and April 2018, Gentile and Schneider raised over $1.68 billion from over 15,000 investors.  GX-8264-A; PSR ¶ 24.  The defendants profited substantially from the capital raise.  GPB charged investors upfront fees, including selling fees, that investors had to pay at the time they first invested as well as ongoing, continuing fees, including an annual 2% management fee.  PSR ¶ 12.  GPB obtained more than $64 million in management fees during the conspiracy period in connection with Holdings I, Automotive Portfolio, Holdings II, Waste Management, and Cold Storage.  Id.  Gentile personally earned over $15 million from the GPB funds between August 2015 and December 2018.  GX-6200 at 29.  In less than a one-and-a-half

2

year period, between approximately May 2017 and September 2018, as the GPB funds were significantly underperforming, Gentile earned over $6.3 million. Id. at 30.

B.    The Distributions Scheme

For over three years, between approximately August 2015 and December 2018, Gentile and Schneider personally misrepresented to investors that GPB's monthly distributions were being paid with income from the GPB funds' portfolio companies. PSR ¶ 13. In reality, GPB was using investor capital to fund a substantial portion of the distributions. Id. Gentile and Schneider lied about the source of the monthly distributions and the performance of the GPB funds at due diligence seminars, in individual meetings with investors, and in GPB's marketing materials and offering documents. See id.

The defendants were aware that the GPB funds did not have sufficient income to cover distributions to investors. PSR ¶ 14. The defendants were sent dozens of reports showing that the GPB funds were not making sufficient returns to pay distributions exclusively from income from the portfolio companies as they claimed. Id. They were told on numerous occasions that the monthly distributions should be lowered; however, they refused. Id. In fact, they even authorized "special distributions," against the advice that they could not be afforded. PSR ¶ 18.

The defendants knew that GPB was funding the monthly distributions using investor capital. Beginning in August 2015, GPB finance employees began transferring investor capital from the funds' "investment" accounts to the funds' "distribution" accounts to cover distributions. Jacoby and his employees kept an Excel sheet to track the transfers. GX-6171-C; GX-3072. This tracker was shared with Gentile, who approved the transfers. GX-7011; GX-7332; GX-7810; GX-7405.

Between September 2015 and October 2018, Holdings I paid approximately $57.4 million in distributions. PSR ¶ 15. Approximately $21.22 million or 36% was funded with money from the Holdings I investment account. Id. Between August 2015 and December 2018, Automotive Portfolio paid approximately $91.3 million in distributions. Id. Approximately $50.5 million or 55% was funded with money from the Automotive Portfolio investment account. Id. And between April 2017 and December 2018, Holdings II paid approximately $73.83 million in distributions. Id. Approximately $26.78 million or 36% was funded with money from the Holdings II investment account. Id.

The defendants were warned by their employees, including Jacoby and Anscher, that their representations to investors were false in light of the funds' poor performance and needed to be changed. Anscher sent the defendants a link to a *Wall Street Journal* article reporting that the principals of another fund had been charged in a similar fraud. GX-8326; GX-6201. He testified that he sent the defendants this article "because I was concerned we were going down the same path . . . after all the many conversations we'd had about lack of coverage, about not having sufficient capital to make the distributions, and therefore, it being a return of capital, we were in a position where we were doing the same thing as these guys were doing and did." Tr. 4308. The defendants fired both Anscher and Jacoby. Tr. 940–41, 4470, 4956.

C.    The Performance Guarantee Scheme

Gentile, Schneider, Lash, and GPB's attorney, James Prestiano, agreed to fraudulently inflate Holdings I's financial results for 2014 and Automotive Portfolio's results for 2015. PSR ¶ 19. At Gentile's direction and with his instruction, Lash executed three phony performance guarantees, which inflated Holdings I's income by 40% and Automotive Portfolio's income by 30%.

In March 2015, Lash was presented with two backdated performance guarantees (the "2014 Performance Guarantees") at a meeting in New York with Gentile, Schneider, and Prestiano, and was instructed by the defendants to sign them. Tr. 3106 (Lash). Gentile told Lash, "we're going to produce a performance guaranty for the two stores, and you're going to sign it. We're going to back-date it to the beginning of 2014 so it gives the appearance that we had a discussion there about these two basic documents . . . that we guaranteed them basically over a year ago." Tr. 3105:13–21 (Lash). Lash was also assured that he would not need to pay the sham guarantees; in Gentile's words, "You're not going to get hurt." Tr. 3113:25–3114:1 (Lash); see also Tr. 3114:9–19 (Lash) ("Dave said he would, numerous times, kind of take care of the accounting and I wouldn't get hurt financially by it at all. . . He always said that, you know, whether doing my taxes that he could basically make anything look the way you want to make it look, so that financially I wouldn't be on the hook for it."). Gentile instructed Lash and Schneider on how to execute these guarantees. See, e.g., GX-7008-A.

The next year, in 2015, Automotive Portfolio did not earn enough income to support the monthly distributions to investors. GX-7682 at 3. To make up the shortfall, in 2016, Gentile, Schneider, Lash, and Prestiano created another sham performance guarantee (the "2015 Performance Guarantee"). The 2015 Performance Guarantee purported to require Lash to cover a $1.05 million shortfall in net cash flow from operations, i.e., income, at the Country Motors II dealership owned by the fund. GX-7531-A. Like the 2014 Performance Guarantees, the 2015 Performance Guarantee was backdated to January 1, 2015 to create the appearance that the agreement had been in place throughout 2015. Gentile then routed a series of transfers from GPB accounts he controlled, including at another fund, Cold Storage, through Lash's account, and to Automotive Portfolio's accounts to create the appearance that Lash had actually paid the 2015 Performance Guarantee. GX-6200.

Lash first heard about the 2015 Performance Guarantee at a meeting with Gentile, Schneider, and Prestiano in New York in approximately April 2016. Tr. 3184 (Lash). At the meeting, Lash told Gentile he had not guaranteed Country Motors II's performance. Gentile responded, "we're in crunch time and, you know, I know you really didn't guarantee it, but, you know, this is something we have to do, if not it's going to affect performance . . . you know, capital is coming in and this would have a big impact on GPB if we didn't do this." Tr. 3184:10–18 (Lash). Gentile assured Lash he would not have to pay the 2015 Performance Guarantee. Referencing the 2014 Performance Guarantees, which Lash had not paid at that point, Gentile told Lash, "the first one you didn't get hurt on and you're still not going to get hurt. You have to trust me. You have to be the team. You have to be on team GPB." Tr. 3185:4–8 (Lash). Later, Gentile told Lash that he "put money in [his account] and then kind of taken it out the next day and taken part of funds that were in there to make the payment . . . to make it appear that the guarantee was being paid." Tr. 3197:16–21 (Lash).

4

D.    Obstruction

Gentile, Schneider, Lash, and Prestiano engaged in an effort to cover up the performance guarantee scheme and lie to the government. In 2019, after being approached by agents from the Federal Bureau of Investigation ("FBI"), Lash met with Schneider and Gentile. PSR ¶ 23; Tr. 3218 (Lash). Gentile wanted to make sure Lash was "on team GPB" and would "[s]tick to the story." Tr. 3219:10–15 (Lash). Lash, Gentile, and Schneider agreed that, if asked, Lash would lie and tell law enforcement that the transfer through his account related to the 2015 Performance Guarantee was actually a loan from Gentile. Tr. 3219–20 (Lash). Prestiano accompanied Lash to an interview with the fund's attorneys to ensure he stuck with the story. Tr. 3221 (Lash). Gentile and Prestiano threatened him to lie: "Q: Did the defendant or Mr. Prestiano tell you what might happen if you didn't stick to the story? A: In discussions it would be, we could take your basic severance package away and make it very difficult for you going forward." Tr. 3222:17–21 (Lash). After the FBI executed a search warrant at GPB's office, Lash overheard Gentile ask a lawyer how much jail time he (Gentile) was facing if he were to go to prison. Tr. 3230–31 (Lash).

II.    The Sentencing Guidelines

A.    The Government's Guidelines Calculation

The government submits that the defendant's offense level under the United States Sentencing Guidelines ("U.S.S.G. or "the Guidelines") is as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | | 7 |
| Plus: | Loss Exceeds $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(M)) | +24 |
| Plus: | Offense involved 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Offense involved sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Plus: | Defendant was associated with an investment advisor (U.S.S.G. § 2B1.1(b)(20)(iii)) | +4 |
| Plus: | Defendant was an organizer or leader of the criminal activity (U.S.S.G. § 3B1.1(a)) | +4 |
| Total: | | 43 |

The above is the same Guidelines calculation set forth in the presentence investigation report ("PSR") at paragraphs 47 through 56 except that it does not include a two-point enhancement for abuse of a position of public or private trust. See PSR ¶ 54 (citing U.S.S.G. § 3B1.3). As set forth in the government's responses to Gentile's objections to the PSR, see ECF Dkt. No. 533, the Guidelines provide that an enhancement for abuse of trust should not be applied

where the defendant is already subject to a four-level enhancement based on his association with an investment advisor.  See U.S.S.G. § 2B1.1 cmt. n.16(C).

Based on a criminal history category of I, this yields a Guidelines range of life imprisonment. PSR ¶ 101. Because the statutorily authorized maximum sentence is 1,020 months, i.e., less than the minimum applicable Guidelines range of life imprisonment, the restricted Guidelines range is the statutory maximum sentence of 1,020 months.  Id.; see also U.S.S.G. §§ 5G1.1(a), 5G1.2 cmt. n.3(B).

B.    Gentile's Objections to the Guidelines Should Be Rejected

1.    Loss Calculation

The Court should reject Gentile's argument that his fraud caused no loss and no harm to his victims.  As explained in the government's responses to the defendant's objections to the PSR, there are multiple reasonable methods of estimating the loss in this case—including the Probation Department's estimate of $98 million—all of which are in the tens of millions of dollars and reflect the significant harm caused by the defendants' fraud.  See ECF Dkt. No. 533 at 16–19.

As an initial matter, "a district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information." United States v. Powell, 831 F. App'x 24, 25–26 (2d Cir. 2020) (quoting United States v. Coppola, 671 F.3d 220, 250 (2d Cir. 2012) (internal quotation marks omitted)); U.S.S.G. § 2B1.1 cmt. n.3(B) (stating "[t]he court need only make a reasonable estimate of the loss," and "the court's loss determination is entitled to appropriate deference" (citing 18 U.S.C. § 3742(e) and (f))).  A district court's factual determinations regarding loss are reviewed for clear error.  See United States v. Rainford, 110 F.4th 455, 476 (2d Cir. 2024).  The Court of Appeals has explained that it will find error "only if, after reviewing all of the evidence, [they are] left with the definite and firm conviction that a mistake has been committed." United States v. Jones, No. 23-6113, 2024 WL 3371191, at *2 (2d Cir. July 11, 2024).  "[O]n clear error review, even if there are 'two permissible views' of the facts," the "factfinder's choice between them cannot be clearly erroneous." Rainford, 110 F.4th at 477–78.  "[B]ecause the sentencing court is in a unique position to assess the evidence and estimate the loss based upon that evidence, the sentencing court's loss determination is entitled to appropriate deference." United States v. Lacey, 699 F.3d 710, 720 (2d Cir. 2012) (internal quotation marks and citations omitted) (noting that this deferential standard is "certainly applicable" where the sentencing judge "presided over a weeks-long trial and heard a great deal of live testimony").  The district court has "broad discretion" to consider "all relevant information" when making factual findings related to sentencing.  United States v. Pico, 2 F.3d 472, 475 (2d Cir. 1993); see also United States v. Prince, 110 F.3d 921, 924 (2d Cir. 1997).

As set forth in the government's responses to the defendants' objections to the PSR, the Court should reasonably estimate loss in this case based on the pecuniary harm the defendants sought to inflict on their victims, i.e., the intended loss.  The intended loss was at least approximately $98 million, which represents the total amount of money that the defendants and their co-conspirators diverted from the funds' investment accounts to the distribution accounts used to pay the 8% annual distribution to investors during the charged conspiracy period.  The

defendants promised investors that this money would be used to purchase portfolio companies. Instead, the defendants diverted it to fund monthly distributions to make it appear like the GPB funds were generating at least 8% in annualized profit, which they were not, and lied to investors about how the monthly distributions were exclusively funded with profits from the portfolio companies. If the Court uses this method, which the government respectfully submits it should, the defendants will receive a 24-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(M).

In the alternative, the Court could reasonably estimate loss in this case based on the management fees paid by investors to invest in Holdings I, Holdings II, and Automotive Portfolio during the charged conspiracy period. The defendants' fraud created the false appearance that these three funds were highly successful, which attracted investors to the GPB funds, and induced them to pay millions of dollars in fees. Through the performance guarantee scheme, the defendants also fraudulently inflated the Holdings I and Automotive Portfolio income numbers in 2014 and 2015, respectively, to further make it appear that the funds were performing well. In truth, they were performing far worse, as evidenced by the fair market value of the funds. If the Court uses this method, the defendants will receive a 22-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

Finally, the Court could find that although there was a loss from the defendants' fraud, the loss amount "reasonably cannot be determined." U.S.S.G. § 2B1.1(b)(1), cmt. (B) to Loss Table. The Guidelines provide that, in such a situation, the Court "shall use the gain that resulted from the offense as an alternative measure of loss." Id. In so doing, the Court reasonably could conceptualize the loss as the difference between what investors believed, based on the defendants' lies, the GPB units were worth, and the true value of the units, which was far less. The government acknowledges that, in this scenario, it is difficult to isolate and estimate the loss attributable to the fraud while controlling for other factors that could affect the value of the units at the end of the fraud. In this circumstance, the Court could reasonably find that there was a loss, but that estimating it is not reasonably possible.

Alternatively, the Court could find loss based on the lost opportunity caused by the defendants' diversion of funds intended for investments. As described above, the defendants diverted approximately $98 million from the Holdings I, Holdings II, and Automotive Portfolio investment accounts. Macrina Kgil, GPB's former CFO, testified that she was concerned about the diversion of funds, which she tracked, because "if you use the investor capital for distributions, you lose out on the opportunity to make further acquisitions and have better performance at the funds." Tr. 2963. Because of the defendants' fraud, investors lost the opportunity to earn a return on that $98 million. The government recognizes that precisely valuing this lost return would be difficult and dependent on a variety of factors. Nonetheless, even invested in the safest instrument, like treasuries, these funds would have earned a substantial return over the years. Under these circumstances as well, the Court could find that there was a loss, but that estimating it is not reasonably possible.

In these circumstances, where there was a loss, but it cannot reasonably be determined, the Guidelines instruct that the Court shall use gain as the alternative measure of loss. The gain that resulted from the offense was at least $56.99 million, i.e., the total amount of management fees collected by Holdings I, Holdings II, and Automotive Portfolio during the conspiracy period. The evidence introduced at trial established that the defendants lied to

prospective and existing investors about the performance of the funds and the source of the monthly distributions in order to, among other things, earn fees and profit at their victims' expense. If the Court uses this method, the defendants will receive a 22-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

\*       \*       \*

None of Gentile's arguments in response are persuasive. See ECF Dkt. No. 530 ("Br.") at 19–24.

First, as detailed in the government's responses to Gentile's objections to the PSR, it has never been the government's position that there was no loss in this case, and the few passages from the trial transcript that he cites are out of context. These passages relate to a government motion in limine to preclude the defendants from introducing irrelevant evidence of the GPB funds' performance after the end of the charged conspiracy. This evidence was not probative of whether the defendants made material misrepresentations. See ECF Dkt. No. 241 at 17–20. Rather, it was (and remains) the government's position that loss is not an element of the charged crimes. Indeed, at the jury charge conference, the Court stated that "loss is not something the jury would have to find." Tr. 6125; see also Tr. 6126 ("[T]hey don't need to make findings of loss . . . What I don't want to be doing is introducing whether a loss occurred."). Because it was irrelevant to the issues before the jury, the government refrained from arguing at trial that investors lost money. However, the fact that the government did not argue there was a loss does not mean there was no pecuniary harm to investors. As explained above, the government submits that the pecuniary harm that the defendants sought to inflict on their victims, i.e., the intended loss, was at least $98 million.

Second, Gentile argues that loss cannot be measured based on a return of investor capital because investors "received money," relying on U.S.S.G. § 2B1.1 cmt. n.3(D). This argument misapprehends the Probation Department's loss calculation, which is not based on the difference between the total capital invested and what investors received by the time the fraud was discovered. Under that approach, the Guidelines require the court to "credit" repayments to investors because loss is based on the amount of principal not returned. See United States v. Hsu, 669 F.3d 112, 122 (2d Cir. 2012) ("The guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested[.]"); see, e.g., United States v. Callahan, No. 13-CR-453 (ADS), 2020 WL 108452, at *2 (E.D.N.Y. Jan. 9, 2020) (measuring loss as the total money received by the defendant from investors less money returned to victims); United States v. MacCallum, No. 15-CR-204 (EAW), 2018 WL 2999907, at *8 (W.D.N.Y. June 15, 2018) (calculating loss as the victim's principal less money returned), aff'd and remanded, 821 F. App'x 11 (2d Cir. 2020). The Probation Department's loss calculation is not based on the difference between what investors were paid and what they invested. Rather, it is based on the amount of money misappropriated by the defendants, which was used to conceal the funds' poor performance rather than to invest and generate returns. Moreover, even accepting the defendants' crediting theory, and even assuming some investors received their own capital back, later investors did not. In arguing otherwise, Gentile asserts that the distributions should be "credited" because they were characterized as a return of capital in the waterfall provisions of the private placement memorandum ("PPM")

provided to investors. But the jury rejected this argument in its guilty verdict, concluding that the defendants misrepresented the nature of these payments to investors.

Gentile's argument that "promised profits" do not constitute losses, Br. at 21, is also wrong for the reasons set forth in the government's responses to Gentile's PSR objections. See ECF Dkt. No. 533 at 21.

Third, Gentile disputes that any loss was a direct result of the fraud. Br. at 22–23. Relying on a non-binding out-of-Circuit opinion, Gentile argues that to satisfy the "but for" causation requirement in U.S.S.G. § 2B1.1, the government must prove, either by direct or circumstantial evidence, that investors relied on the defendants' false statements in deciding whether to invest, and the government has failed to do so here. See id. (citing United States v. Stein, 846 F.3d 1135, 1153 (11th Cir. 2017)). To the extent reliance is required under Section 2B1.1, it was plainly established by the evidence at trial. Each of the victim-investors and advisors testified that the actual source of the annual distributions was important to them. See, e.g., Tr. 418–19 (Frederick), 1503–04 (Ghabour), 1682 (Crafa), 3663 (Lagiglia), 5016 (Goldberg). The witnesses who worked at GPB and Ascendant said the same thing. Anscher testified that the source of distributions was "definitely" an important part of the pitch." Tr. 4131:23–25. In fact, it was "the whole premise by which we were raising money was to enter into selling agreements with brokers, and those brokers heard consistently that the income from operations was paying the dividend, and that there would never be a return of capital — or that there never was return of capital at that point." Tr. 4132:2–7 (Anscher). Teeters testified that the "main focus [of GPB] was income producing private equity . . . the differentiator was the income component." Tr. 1898:10–13; see also Tr. 1898:24 (Teeters) (describing monthly distributions as the "focal point" of the GPB pitch). Gentile himself acknowledged that the ability to fund distributions from "net cash flow" was important to investors. See GX-7079 (Feb. 27, 2018 Email from Gentile to Schneider, Kgil and others: "Priority #1 to support capital raising in the future . . . Be able to predict (forecast) the results of our strategies as in net distributable cash flow to the Limited Partnership . . . Be able to predict (forecast) fund expense so we can determine net cash flow for distributions (coverage ratio) . . . The above establishes confidence to the investor body* and supports the overall growth of the company.").

Fourth, and finally, Gentile argues there is no intended loss in this case because there is no evidence that he intended investors lose money as he "[g]enuinely believed that investors would ultimately profit from their investments in the GPB funds." Br. at 20 n.5, 31. This is wrong. First, there is no evidence in the record that Gentile intended for investors to make money from the GPB investments. His self-serving statements in his sentencing submission are not evidence. But even if there were evidence that Gentile had good intentions and hoped investors would ultimately profit from their investment, it does not excuse his fraud. As the Eighth Circuit explained in United States v. Callaway: "Intended loss is based on a defendant's actual, subjective intent, . . . but is not to be confused with good intentions." 762 F.3d 754, 759 (8th Cir. 2014) (internal quotation marks omitted). "[W]hile the author of a Ponzi scheme might not intend that any of his investors lose anything . . . [and] that the scheme [would] continue until the end of the world, that does not excuse his fraud." Id. (citations and quotation marks omitted) (holding that "when a defendant's only subjective intent regarding payments relates to [the] illegal purpose of perpetuating the [fraudulent] scheme, a sentencing court may refuse to credit repayments against sums received from the victims"). The evidence at trial overwhelmingly established that Gentile

intended to deprive investors of approximately $98 million in investor funds and misused those funds to disguise the fact that the GPB funds were underperforming and keep capital raising going.

### 2.  Other Enhancements

For the reasons set forth in the government's responses to Gentile's objections to the PSR, the government believes enhancements under the Guidelines are appropriate for: (i) ten or more victims; (ii) use of sophisticated means; (iii) association with an investment advisor; (iv) abuse of trust; and (v) leadership.  See ECF Dkt. No. 533 at 22–24.  In addition, Gentile is not entitled to a two-level reduction for zero-point offenders because of his aggravating role in the offense.  See id. at 24.

## III.  Appropriate Sentence

The government respectfully submits that the Court should impose a sentence of 15 years' imprisonment.  Such a sentence would reflect the defendant's leading role in this years-long and sophisticated fraud, the harm visited on thousands of investors who still have not received their money, and the defendant's lack of remorse.  A 15-year sentence will also deter other would-be white-collar criminals and Gentile himself.

### A.  Applicable Law

"A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).  Title 18, United States Code, Section 3553(a) provides that, in imposing its sentence, the court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

"[I]n the ordinary case, the [Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.").  Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives."  Rita v. United States, 551 U.S. 338, 358 (2007).  "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general."  Id. at 350. Furthermore, Guidelines

sentences promote Congress's goal in enacting the Sentencing Reform Act—"to diminish unwarranted sentencing disparity." Id. at 354.

The Supreme Court has recognized that "it is uncontroversial that a major departure should be supported by a more significant justification than a minor one." Gall, 552 U.S. at 50. If the court decides to impose a non-Guidelines sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id.

B.    The Section 3553(a) Factors

For the reasons set forth below, the government believes that a sentence of 15 years' imprisonment is warranted. Such a sentence accounts for the nature and seriousness of the defendant's offense. It is also a significant downward variance from the Guidelines. Such a sentence is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

1.    Nature and Circumstances of the Offense

The Court's sentence must reflect the nature and circumstances of the defendant's offense. See 18 U.S.C. § 3553(a)(1). Here, the Court's sentence should account for the scale and premeditation of the fraud and its impact on thousands of investors. Over approximately three years, the defendant orchestrated a scheme to misrepresent the performance of multiple GPB funds to raise approximately $1 billion from thousands of investors. The defendant's lies were pervasive, at due diligence conferences, meetings with investors and financial advisors, and in the funds' marketing materials and offering documents. The defendant also directed the transfers—from the funds' investment accounts to the distribution accounts—that were at the heart of the scheme, and he masterminded the performance guarantee scheme. The defendant created a trail of sham payments to create an appearance that the performance guarantees were legitimate.

The evidence at trial showed that the defendant continued his scheme despite repeated warnings from his employees that the marketing of the GPB funds was improper. Both Jacoby and Anscher testified to raising concerns with the defendant about GPB's marketing materials. Anscher went so far as to send the defendants an article from the Wall Street Journal announcing charges in a similar fraud case. The defendant ignored their advice. He berated Jacoby. And he ultimately fired Anscher after barely a year at GPB. In response to these warnings, the defendant could have made GPB's disclosures truthful or limited the harm to his investors by halting the capital raise. He did the opposite. Instead of heeding Anscher's warnings or Jacoby's, the defendant and Schneider raised hundreds of millions more from investors in Automotive Portfolio and Holdings II. They also made calculated changes to the marketing materials and PPMs for the funds to conceal the fraud. This conduct demonstrates Gentile's commitment to the scheme, his central role in it, and his understanding that his conduct was improper.

The harm from this years-long and sophisticated fraud to GPB's thousands of investors has been enormous. The victims of the defendant's crimes are hardworking, everyday people. They include small business owners, farmers, a retired electrician who served in the Vietnam war, teachers, and nurses. Contrary to defense counsel's repeated and improper refrain at trial, these are not wealthy people. See Tr. 87 (Menchel: "You had to be rich to invest in this

fund[.]"). Many of the investors have families to support. Some are single parents. Others are parents to disabled children. These are people who entrusted the defendants with money they had saved for retirement, for their children's college educations, and for medical bills. The defendants' fraud caused the victims to lose millions of dollars.[1] This monetary loss is meaningful to them, as evidenced by the more than 1,000 affidavits of loss and victim impact statements submitted by investors in connection with this case. Below are just some of the investors' stories of the impact the defendants' fraud has had on their lives.[2]

- "We were both raised on dairy farms. As is common for farm children we both began working in the fields and in the milking barns at a very young age. Neither of us had the opportunity to go to college. We had only our hard work ethics and desire to succeed to help us make a living, and give our three children, a better life. After working for others for a few years, we were able to get a loan to purchase our own auto repair shop, with an additional towing business. I worked part time as a waitress, and kept the financial records for the business and tried to spend as much time as possible with our children. [My husband] worked long days, and most nights and weekends to make the business a success. After 14 years we had the opportunity to farm -- as share-croppers. . . . Because we have only been self-employed, we always had to pay for our own health insurance, and of course did not have a company to give us a retirement income. When we finally did have enough money, we knew we needed to set up a source of income for our retirement. One of the things we invested in was GPB. We are counting on income from this investment. We feel that GPB knowingly took our very hard earned money that we spent so many days, weeks, and years acquiring and stole it from us. All of the literal blood, sweat, and tears we shed to work hard and be successful was taken from us! We feel betrayed and angry. We have so much mental strain from this potential loss." R.D. DOJ-0001522.

- "I am a 76 year old single woman that deposited $50,000 with GBP with the assurance this was a safe retirement investment. It took me 10 years to save the $50,000 and this was a significant portion of my retirement account. As a result of the loss, I must continue to work part time to cover my expenses. I would like to retire and yet I can't. This has caused both emotional and physical strain and stress." L.W. DOJ-0000903.

- "I am a 77 year-old retiree and widow, and my only source of income is from Social Security and my investment portfolio. My original investment in GPB, which totaled $500,000, represents a significant portion of my assets. The financial loss from this

---

[1]    See supra Section II.B.1. (arguing actual loss is at least $56 million).

[2]    Attached as Exhibit A is a log of the victims who submitted affidavits of loss and/or victim impact statements. Due to the volume of submissions, the government has requested permission to submit the underlying affidavits of loss and victim impact statements as digital media evidence. See ECF Dkt. No. 538. The request is pending. The government respectfully requests that the Court accept the affidavits of loss, victim impact statements and Exhibit A under seal. See 18 U.S.C. § 3771(a)(8) (providing that victims have the right to be treated "with respect for the victim's dignity and privacy") (emphasis added); see also United States v. Starr, No. 10-CR-520 (SAS), 2011 WL 1796340, at *1 (S.D.N.Y. May 2, 2011) (sealing victim impact letters and finding that the privacy interests of victims outweighed the public's right to access judicial documents, citing 18 U.S.C. § 3771(a)(8)).

investment, coupled with a significant decrease in my income, has profoundly and irreversibly altered my life. What once felt secure and stable has been shattered, leaving me in a constant state of uncertainty and distress. In 2023, I had to sell and downsize my home, something I never imagined I would have to do. I have also had to make painful cuts to my personal expenditures, with the most heartbreaking being my ability to travel. Not being able to visit my out-of-state grandchildren or spend time with my family has left me feeling increasingly isolated. This seclusion has taken a heavy toll on my mental and emotional well-being, and I am receiving medical treatment for depression." P.P. DOJ-0001174.

- "At 71 years old, I do not have time or physical capabilities to rebuild the quarter of a million dollars that you swindled from me." D.C. DOJ-0001129.

- "When I invested into GPB Capital, I was in the process to putting myself into position to retire, after working in the corporate world for nearly 35 years. I was bilked out of $25,000, which may not seem like a lot to some, but at my age it will be very difficult to save up that sum of money again. My wife and I made many sacrifices to save $25,000, which didn't include a private jet, a $30,000 party nor a Ferrari." S.R. DOJ-0002062.

    For more than six years, GPB's investors have had their money locked up in the funds because of the defendants' criminal conduct.[3] While investors will likely receive some of their principal back once the court approves a distribution plan in the parallel action brought by the U.S. Securities and Exchange Commission ("SEC"),[4] these investors needed the money they invested in GPB over the last several years. Without it, they have struggled to pay for even basic expenses.[5]

---

[3]    Distributions and returns of capital were halted in 2018 amidst numerous investigations of GPB and Gentile. The investigations led to criminal charges in the instant case, resulting in convictions of Gentile, Schneider and Lash, and enforcement actions by the SEC and multiple state agencies. In approximately March 2020, Holdings II investors collectively received a $35 million distribution from the sale of two portfolio companies.

[4]    According to the receiver's January 17, 2025 motion for approval of a distribution plan in the action commenced by the U.S. Securities and Exchange Commission, investors in Holdings I, Holdings II, and Automotive Portfolio are estimated to recover 40.0% to 50.0%, 90.0% to 100.0% and 80.0% to 90.0% of their investment, respectively. See SEC v. GPB Capital Holdings, LLC, et al., No. 21-CV-583 (MKB) (E.D.N.Y.), ECF Dkt. No. 228-1.

[5]    Many victims are frustrated with what they perceive is delay on the part of the defendants. Investor P.V. writes: "Instead of quickly showing remorse for their action and owning up to their crimes immediately, which would have minimized our losses and expedited any sort of victim relief or restitution…the defendants have dragged this process out in the courts as much as possible and racked up additional legal fees - which ironically have been paid by the very victims they have defrauded, further draining any funds we may collectively be able to recover in the future." DOJ-0001038. Investor M.P. remarks: "I have learned from the SEC monitor's reports that the defendants, by objecting to the appointment of the monitor as a receiver, have delayed, by at least a year, the final windup and distribution of partnership assets. These actions by the defendants clearly show that, even at this late pre-sentencing stage, they show no remorse for their actions and are continuing to slow and diminish the eventual return

- "I lost my whole life savings with GPB. [I]t was my intention to take the money out which I was not allowed to do in the end. This money was to pay for necessary repairs at my home and other bills including medical bills. I was forced to take out a home Equity loan on my home at ten percent. Any help that can be given both in monetary measures and also through expediting the payout would be appreciated as I am living from check to check." T.D. DOJ-0000938.

- "The loss of retirement income has made a significant impact on our daily lives. Our inability to meet our housing expenses necessitated in us taking on credit card debt to maintain our home in which we provide housing for our handicapped son. You can imagine the anxiety this has caused us in providing for his and our needs. We now have over $100,000.00 in credit card debt in addition to the interest we have incurred to allow us to maintain our mortgage and remain in our home. At the time of this investment we had NO credit card debt! As elderly senior citizens at the age of 82 and 76 our ability to find additional income is extremely limited. We are now at a point of looking at our belongings to sell to allow us to stay in our home. The emotional stress of this has taken a fiscal and mental toll on our ability to function. We felt we planned well for our retirement years and feel robbed by the actions of this crime." D.E. DOJ-0002356.

- "Since the GPB fraud stated, we have lost well over half of our family['] s net worth [and] a large portion of our income . . . At 74, I have been unable to retire now. My wife [] has contracted cancer and has ongoing treatment. And our daughter [], who has cerebral palsy, has had to ensure the ensuring stress from all of that." M.F. DOJ-0001930.

- "I was initially unaware of the GPB Capital fraud, but my father passed away in June 2023 and in the course of arranging his affairs and transition of his estate to my step-mother, realized that their GPB investment was illiquid and tied up in the fraud perpetrated by Gentile, Schneider and Lash. I needed to access the assets to pay for my step-mother's care – she's now 91, has advanced dementia, and lives in an assisted living facility with 24 hour care. That care is very expensive and the money my parents so carefully saved over their lives was meant to help ensure they were comfortable and cared for. The lack of access and seeming loss of their GPB investment has made that harder for me and my step-brother. I write primarily to remind the Court and the Defendants of the real-world impact of the Defendants' crimes – the financial harm they wreaked on two hard-working retired New York educators, along with the financial stress and lost time for me in following the cases and ensuring my parents' rights are protected." A.S. DOJ-0000720.

- "As an elderly victim, I have suffered/lost a significant portion of my retirement savings - plus any interest it may have made. This money was earmarked to help my

---

to the investors. Their actions continue to anger me, and only severe judicial consequences will ever end the anger that is boiling up inside me as I write." DOJ-0001403.

two grandsons pay for college. They had tragically lost their father and needed some financial assistance. So this loss attached my entire family." K.C. DOJ-0001122.

- "Two years ago, I was diagnosed with Acute Myeloid Leukemia. The funds from GPB were intended to help cover my treatment costs. Without these funds, we are struggling to manage the financial burden of my illness. This crime has not only caused us immense financial loss but has also deeply affected our emotional and physical well-being." A.W. DOJ-0001531.

- "All of the sudden we had 15% of our savings not working for us, and to add insult to injury, we couldn't withdraw it. The money was (still is) dead to us. I ask you to imagine how you would feel if that happened to you. Seven years later, I'm still working...in large part because the $150k that should have been recovered in capital and returns has left a big hole in our retirement savings. If this were an investment in the stock market and we lost everything, that would have been one thing. But it's unconscionable that this money was STOLEN from us by people who lied and cheated, and then enhanced their lives with our hard-earned savings. As a result of this experience, we've become much more cautious in our investment strategy, which has further slowed the growth of our retirement savings. I've continued to work several years past our original retirement plan because of this loss. Time is finite, and Mr Gentile has robbed us, not only of money but of time." J.V.D. DOJ-0002403.

All of the victims have to deal with the stress and anxiety that comes from being victimized by a fraud and the uncertainty of whether they will ever recover some of their investment.

- "This crime has negatively impacted me in a variety of ways. Specifically by increasing my stress level significantly. I'm a 94 year old woman in relatively good health and may need to plan for many more years of nursing home care. I do not want to become a financial burden to my family. My nursing home currently costs approximately $120,000 a year and will continue to increase over time as my health deteriorates or due to inflation. This investment was one of the ways I planned to continue to afford my own care. I also now have increased anxiety about my other investments." R.K. DOJ-0001616.

- "The constant worry about our financial future has led to sleepless nights and anxiety. We are both being treated by mental health therapists. The stress from this situation has taken a toll on our physical health." H.W. DOJ-0001533.

- "I am 81 years and I suffer from a history of rectal cancer, and severe cervical and [lu]mbar spinal degeneration. My wife has memory issues and we both require ongoing care. The loss of our principal as [w]ell as the income has severely impacted our ability to afford the care that we require. I cannot make up this loss anytime during the rest of my life. This loss has created stress between my wife and me, as well as my children. As a result, we have had to move into a retirement home to minimize our living

15

expenses. I am under significant stress because I am always worried about my finances and our ability to continue our present lifestyle." K.R. DOJ-0001620.

- "As an elderly person, being a victim of a fraudulent financial scam has left me feeling betrayed and vulnerable. Losing my retirement savings, which I had set aside for my "golden years", has been difficult. The financial loss is significant, but the emotional impact is even greater. I feel a profound sense of grief and loss, not just for the money, but for the security and peace of mind that it represented. This experience has shaken my trust in others and made me question my own judgment. I feel embarrassed, wondering how I could have been deceived so easily. The anxiety and stress from this ordeal have affected my overall well-being, leading to sleepless nights and worry about my future." S.S. DOJ-0002137.

- "This has hung over me for seven years and to this day I still feel anger, distrust, shame, contempt and feelings of powerlessness." B.W. DOJ-0001833.

- "The revelation of the fraudulent activities perpetrated by Mr. Gentile and Mr. Schneider has been devastating. I feel betrayed and anxious, knowing that my trust was exploited for their financial gain. The stress of following the legal proceedings, frequent lengthy phone calls with my financial advisor, the loss of distributions, the lack of transparency, and the uncertainty about the outcome has caused anxiety and affected my peace of mind." V.T.U. DOJ-0002192.

- "We are afraid we'll be cheated. There is a weariness that hangs over us when it comes to our finances and planning for the future. There has been, and still is, anger, distrust, shame, contempt and feelings of powerlessness. For over seven years this has hung over us and we can't wait to be free of it!" M.F. and M.F. DOJ-0002258.

Gentile caused this harm in order to enrich himself, making enormous sums of money at his victims' expense. Indeed, Gentile personally earned over $15 million from the GPB funds. See GX-6200 at 29; see, e.g., Tr. 2277 (Kgil testifying that Gentile was making $300,000 per month and over time, it grew closer to $400,000 per month). Gentile's arrogance surrounding how much money he was making is demonstrated by his comment to Lash that the "investors' money was his money and he could do with it really anything that he wanted to [do] with it." Tr. 3206 (Lash). This greed-driven criminal conduct warrants serious punishment.

2.    The Defendant's Sentencing Submission Fails To Grapple
With the Nature and Circumstances of His Offense

The defendant's sentencing submission does not grapple with the impact of his crime on the victims—who he does not even acknowledge—or the facts as found by the jury. Instead, it relitigates the same arguments rejected by the jury to present the defendant as a visionary leader who had the interests of his investors at heart and whose mistakes (if any) were an accidental product of a growing business and a changing regulatory environment. This presentation demonstrates no understanding of the defendant's premeditated conduct, leading role in the offense, or greed.

In his sentencing submission, Gentile minimizes and makes excuses for his behavior. First, Gentile holds himself out as a visionary who built a "novel business" and who tried but failed to keep up with its "rapid growth." Br. at 27–29. Whatever the merits of Gentile's "novel" strategy to market private equity to retail investors, it in no way excuses his decision to grow his business (and his fees) through fraud. The anti-fraud laws violated by the defendant are not so-called "heightened" reporting requirements. Nor are they new. The evidence at trial showed that the defendant marginalized (and fired) compliance personnel who stood in his way. Moreover, while Gentile now asserts the "rapid growth" of GPB created issues for him, the evidence proved that Gentile was in control of GPB throughout this period, rejected multiple warnings from his subordinates that his conduct was improper, and instead fixated on raising even more capital. For example, Jacoby testified that he regularly suggested to Gentile and Schneider that they reduce the rate of monthly distributions in response to the funds' performance. Tr. 793. Schneider told him "that we couldn't do it because it would slow down the new deposits coming in, so you had to keep it the same in order to continue to raise money." Tr. 793:23–25 (Jacoby); see also Tr. 794:7–13 (same). Lash also testified that the performance guarantee scheme was justified to him as necessary to keep money flowing into the funds. See Tr. Tr. 3184:10–18 (recounting that Gentile told him that "I know you really didn't guarantee it, but, you know, this is something we have to do, if not it's going to affect performance . . . you know, capital is coming in and this would have a big impact on GPB if we didn't do this."). Kgil testified that she also discussed lowering Holdings I's monthly distributions with the defendants, and the defendants expressed concern about the impact that might have on capital raising and redemption requests. Tr. 2481:22–2482:19. Indeed, in 2017, at a time when the GPB funds were significantly underperforming, Gentile and Schneider threw themselves a party for raising more than $1 billion in assets under management. See Tr. 2480 (Kgil). Gentile and Schneider knowingly lied to investors to keep money coming in the door so they could continue to personally profit.

Second, Gentile argues there is nothing unlawful about GPB's business model and that GPB was authorized to return capital in its distributions. Br. at 29–30. This is both irrelevant and another distraction from the nature of the offense. Whether GPB could have been operated in a legitimate way or could have made returns of capital honestly has no bearing on what the defendants actually did. The jury found that Gentile and Schneider lied about the source of the distributions to investors to paint a misleading picture of the performance of the funds and keep capital coming in the door.

Third, Gentile argues, as he did at trial, that the fraudulent performance guarantees benefitted investors. Br. at 31. This is wrong. The fraudulent performance guarantees were designed to create an appearance that GPB's plan was working. That the funds had missed their performance goals but had a way to backstop the profits. Except that was not the case. The fraudulent performance guarantees were invented out of thin air when the end-of-year financials came in. They were fake and backdated. Moreover, the fraudulent performance guarantees were not paid pursuant to their terms. Contrary to his claim, Gentile was never "transparent" with investors about the fraudulent performance guarantees. Id.

Finally, the suggestion that Gentile has always looked out for GPB's investors is nonsense—a through-the-looking-glass perspective demonstrating that Gentile has no remorse or appreciation for the harm he has caused. Gentile looked out for himself. He repeatedly lied to investors to enrich himself. If he truly cared about investors and the success of the GPB funds, he

would have reduced the monthly distributions to accurately reflect the profits generated by the portfolio companies, he would have been honest about the funds' performance and he would not have manipulated the financial statements for Holdings I and Automotive Portfolio.  Gentile contends that "he continues to advocate in support of [GPB's] investors, including by encouraging GPB to pay out distributions that have been held at bay by the court-imposed monitor and now receiver."  Br. at 27.  While it is of course his right to litigate and defend himself, it is simply untrue that Gentile has advocated for investors in the parallel SEC action and receivership.  Among other delay tactics that have hindered investors from recuperating their money, Gentile appealed (and lost) the district court's decision ordering that the court-ordered monitorship be converted to a receivership, and he is now fighting the distribution plan proposed by the receiver.

Indeed, Gentile's objections to the receiver's proposed distribution plan are purely self-interested and further evidence of his greed.[6]  Among other things, the defendants objected to the plan's provisions for continued advancement and indemnification of their legal fees, including in this criminal action, and the plan's provisions related to designation of "excluded parties" who would not receive distributions by the receiver.  Thus, while Gentile professes that he supports distributions to investors, he has objected to the plan of distribution, further delaying distributions, because it may not provide sufficient guarantees that the funds will continue paying his legal bills or that he will receive a share of the distributions.  These objections do not benefit the victims.

In short, the defendant's attempts to ignore, minimize, and distract from the true severity of his crimes and culpability should not be credited to Gentile's benefit, and a substantial term of incarceration is appropriate.

3.    History and Characteristics of the Defendant

The Court must also consider the defendant's "history and characteristics."  18 U.S.C. § 3553(a)(1).  Unlike many of the defendants who appear before this Court, Gentile has enjoyed great advantages in his life.  He grew up with the support of a loving and supportive family.  He is an educated professional.  Before founding GPB, he had a long and successful career as an accountant.  But none of this was enough for Gentile.  Instead of using his family support, education and financial resources to lead a law-abiding and productive life, he chose to commit an expansive fraud, which impacted thousands of investors.  This was plainly a crime driven by greed and grandiose ambition rather than necessity.

Gentile leveraged his education, specifically, his training as an accountant, to execute the fraud.  First, he touted his background as an accountant to attract investors.  See Tr. 710 (Jacoby testifying that Gentile used his background as an accountant as part of his pitch to investors); Tr. 217 (Jones) ("Q. And was that certified public accountant and his status background

---

[6]    Relatedly, Gentile argues that he "cooperated with regulatory investigations," including the SEC's investigation.  Br. at 29 n.21.  This statement is at best imprecise.  While Gentile did respond to subpoenas from the SEC, he was legally required to do so.  He did not help the SEC with its investigation by pointing the regulators in new directions, for example, or by providing voluntary information.  Gentile further claims that he made changes to GPB's corporate governance system, but he leaves out that he only made these changes after he learned the SEC had serious concerns about his conduct.  Finally, Gentile only stepped down from his position as CEO after he was criminally indicted on fraud charges.

significant to you when making your investment decision? A. It is because you're looking for financial integrity any time you invest. And the fact that not only him, but other members of his executive team, had extensive accounting background . . . ."). Second, Gentile used his accounting expertise to mastermind the performance guarantee scheme. Lash testified that Gentile instructed him on what to do with respect to the 2014 and 2015 performance guarantees. See, e.g., Tr. 3105, 3113–14, 3131–34, 3136, 3202–05, 3184–85. Text messages introduced at trial also proved that Gentile was leading the effort. See, e.g., GX-7008-A. Gentile moved the money to make it appear that the 2015 Performance Guarantee had been paid. See Tr. 3197:16–21 (Lash testifying that Gentile told him that he "put money in [his account] and then kind of taken it out the next day and taken part of funds that were in there to make the payment . . . to make it appear that the guarantee was being paid"). Gentile used his education and privilege to defraud investors. This conduct warrants serious punishment.

Gentile has submitted numerous letters attesting to his positive qualities. Whatever support Gentile has provided his family and others in his community, he showed his investors none of the same grace. Many white-collar defendants like Gentile are outwardly successful and generous to their families and communities, but nonetheless choose to steal and defraud others. See United States v. Regensberg, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), aff'd, 381 F. App'x 60 (2d Cir. 2010) (noting that defendant's plea for mercy "falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors. And as worshipers they are devout, often rising as leaders of the congregation. Yet, for all of their outward rectitude, these otherwise good people suffer a fatal flaw: they lead a double life."); see also United States v. Vrdolyak, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card"). Gentile's positive qualities do not warrant a non-custodial sentence, as Gentile suggests.

Gentile also argues that his loss of social and professional standing as a result of his conviction warrant a lighter sentence. See Br. at 34. This claim should be rejected as the appeal for a two-tiered system of justice that it truly is. "[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012); see also United States v. Musgrave, 761 F.3d 602, 608–09 (6th Cir. 2014) (rejecting sentencing court's rationale that the defendant "had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life" and describing those circumstances as "[i]mpermissible considerations" in the context of sentencing).

Finally, this Court should place little weight on the fact that Gentile is a first-time offender. Accountants and other professionals who are convicted and sentenced for white-collar crimes are almost always first-time offenders. This does not set Gentile apart. Moreover, Gentile's

criminal conduct was not episodic. He intentionally lied to investors for years. This prolonged conduct merits serious punishment.

### 4. The Seriousness of the Offense, Respect for the Law and Just Punishment

The need for the sentence "to reflect the seriousness of the offense," "to promote respect for the law," and "to provide just punishment," 18 U.S.C. § 3553(a)(2), also weighs in favor of a 15-year sentence. As detailed above, the defendant's conduct is profoundly serious and warrants severe punishment. The defendant's offense conduct also evinces no respect for the law. At trial, Lash testified to the defendant's effort to obstruct justice after the FBI approached Lash at his home in Florida. Tr. 3218–22. Gentile directed Lash to lie to law enforcement and used GPB's corporate counsel, James Prestiano, to ensure Lash "stuck to the story." Tr. at 3219–21 (Lash). Gentile and Prestiano also used their control over GPB and Lash's severance package as leverage to ensure he provided false information to the FBI, as he ultimately did. Tr. 3222:17–21 (Lash). A substantial sentence is necessary to demonstrate that the defendant is not above the law.

### 5. General Deterrence

The Court must also impose a sentence that will deter the defendant and others from criminal conduct in the future. See 18 U.S.C. § 3553(a)(2)(B). This case presents a heightened need for general deterrence. As the Second Circuit recently explained, "consideration of general deterrence is especially important" in white-collar cases. Watts v. United States, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023); see also United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that are either lucrative or are difficult to detect and punish, since both go to increase the expected benefits of a crime and hence the punishment required to deter it."). Given the strong economic incentives to commit fraud, it is critical that there be equally strong counterincentives. See United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."); see also S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").

Notably, white-collar cases present the scenario where deterrence is most likely to be effective. As Judge Weinstein explained, "Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010); see also United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015), aff'd, 688 F. App'x 94 (2d Cir. 2017) ("[T]he Second Circuit has noted the appropriateness of significant sentences for those who feel white collar crime is 'a game worth playing.'"). Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006); see also United States v. Marsh, No. 10-CR-480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) ("[I]ndividuals who engage in financial fraud can, at least in theory, be deterred by a substantial

threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished.").

Achieving general deterrence is particularly important in a case like this one, involving an experienced professional in whose trust thousands of individuals placed their money, including retirement and college savings. When individuals in a position such as Gentile's lie to and abuse their investors' trust, it is incumbent upon courts to hold them accountable. The sentence recommended by the government will send the message to other would-be fraudsters that, when you get caught, the consequences will be steep, which will serve to deter similar crimes in the future. On the other hand, Gentile's requested non-custodial sentence would fail entirely to serve the goal of general deterrence. Such a lenient sentence would tell the community that a massive, years-long fraud by someone who repeatedly lied to investors for personal gain, and sought to obstruct the investigation of that fraud, is not worthy of serious punishment at all. Indeed, such a sentence would provide a would-be fraudster every incentive to perpetrate a fraud scheme—the reward is high, the chance of being caught and successfully prosecuted is low, and any resulting punishment is minimal at best. The government respectfully submits that this is not the message the Court should send to the public through its sentencing of Gentile.

6.    Specific Deterrence

A 15-year sentence is also necessary to adequately deter the defendant. See 18 U.S.C. § 3553(a)(2)(B). This is not a case in which the defendant has accepted responsibility for his conduct and expressed remorse. On those facts, a court may consider whether the interests of specific deterrence have been served by prosecution. By contrast, Gentile has expressed no remorse, acknowledged no mistakes, and presents himself as a champion of the investors that he in fact victimized. A severe sentence is necessary to deter the defendant personally. See Robinson v. Heath, No. 12-CV-2116, 2013 WL 5774544, at *11 (E.D.N.Y. Oct. 24, 2013) (noting that "lack of remorse and failure to acknowledge responsibility consistently have been recognized as constitutionally-permissible factors that courts may take into account in determining an appropriate sentence" (citing cases)).

Moreover, while one might hope a conviction will serve to protect the public by preventing others from trusting the defendant in the future, the unfortunate fact is that many fraudsters are able to continue to engage in fraud notwithstanding prior convictions. See, e.g., United States v. Sterritt, No. 21-CR-193 (KAM) (defendant defrauded investors of $17 million, in part by concealing his prior convictions for securities fraud); United States v. Isen, No. 17-CR-372 (JS) (defendant engaged in boiler-room scheme after previously being barred from acting as a broker by FINRA and prior conviction for wire fraud conspiracy and obstruction of justice); United States v. Liounis, No. 12-CR-350 (ILG) (defendant defrauded over 250 investors of more than $15 million mere months after serving 87-month sentence and while on supervised release for prior conviction of similar offense); see also United States v. Cosmo, 497 F. App'x 100, 102 (2d Cir. 2012) ("The court in imposing sentence on this plea was considering a multi-year Ponzi scheme, undertaken by a recidivist offender who began committing the instant crime within months of finishing his previous fraud sentence.").

Accordingly, the Court should impose a substantial sentence to deter Gentile to the extent possible.

7.    There Are No Unwarranted Sentencing Disparities

Gentile urges the Court to impose a non-custodial sentence because (i) neither Bill Jacoby nor Roger Anscher were prosecuted with a crime and, therefore, "their lives have not been destroyed" and "their reputations are intact"; (ii) similarly situated defendants nationwide purportedly have received sentences in line with Gentile's request; and (iii) "this was not a Ponzi scheme." Br. at 28–30. These arguments should be rejected.

First, neither Jacoby nor Anscher is similarly situated to the defendant. They were not indicted and no jury has found that they committed five federal crimes in connection with a years-long fraud. Section 3553(a)(6) directs the court to avoid unwarranted disparities among "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (emphases added). Anscher and Jacoby are not defendants and have been found guilty of nothing. Moreover, neither of them is similarly situated. The proof at trial showed that Gentile, as CEO of GPB, ran the show and was a co-leader, along with Schneider, of the fraud scheme—not Jacoby or Anscher. Contrary to Gentile's suggestion, Jacoby did not testify to "personally sign[ing] off" transfers from the funds' investment accounts to distribution accounts. Br. at 28. Instead, Gentile alone had the authority to approve the transfers and did approve them. Tr. 766:15–16, 1090:18–20 (Jacoby). Nor did Anscher testify to personally working "to 'sneak' the 'no present plans' language into the 2016 Automotive Portfolio PPM." Br. at 29. Rather, he testified to being involved in making changes to language in the PPM regarding there being "no assurance of distributions," explaining that "Schneider was adamant that we include this 'we have no present plans to do' so language." Tr. 4367 (Anscher). Far from being similarly situated to Gentile, both Jacoby and Anscher worked under and took their direction from Gentile, who held and maintained complete decision-making authority. And both Jacoby and Anscher repeatedly warned the defendant and tried to stop his criminal conduct. Both were fired and both came forward as SEC whistleblowers. In short, the Court should give no weight to the fact that Jacoby and Anscher were not charged in this case, which is irrelevant to its sentencing determination, and, instead, focus on the uncontroverted evidence of Gentile's leading role in carrying out the fraud.

Second, the sentence recommended by the government would not result in unwanted disparities between Gentile and other similarly situated individuals sentenced in other cases. According to data from the United States Sentencing Commission, in cases such as this one, involving U.S.S.G. § 2B1.1, a Guidelines offense level of 43, and a criminal history category of I, from 2019 to 2023, the average defendant received a sentence of 197 months' imprisonment, and the median defendant received a sentence of 180 months' imprisonment. See Judiciary Sentencing Information, United States Sentencing Commission, https://jsin.ussc.gov. In other words, the sentence recommended by the government here is entirely consistent with the median sentence in frauds of a similar scale nationwide. On the other hand, the statistics cited by Gentile are irrelevant. They focus on sentences received by all defendants in the Eastern District of New York regardless of the crime of conviction, or cases involving first-time offenders and U.S.S.G. § 2B1.1 without regard to the applicable Guidelines range. See Br. at 29.

In urging for a non-custodial sentence, Gentile points to a handful of cases, each of which is easily distinguishable. He cites United States v. Nordlicht, in which the defendants were found to have lied to investors in connection with a scheme to fraudulently rig a vote among bondholders in an oil and natural gas company. No. 16-CR-640 (BMC) (E.D.N.Y.). In imposing sentences of time served, probation, or home incarceration, the Nordlicht court relied on Guidelines offense levels significantly lower than the level here, in large part because it concluded there was no harm based on a purported lack of market impact on publicly traded equities and, therefore, no loss attributable to the defendants' behavior. The court also reconceptualized the government's case as a right-to-control case that involved no money or property and therefore no real harm to any of the victims.[7]  For the reasons already explained, that is not the case here where there are thousands of victims and at least three ways the Court could reasonably estimate loss or gain, as relevant.

The other cases Gentile cites also do not support his unwarranted disparity argument. The defendant in United States v. Tournant, No. 22-CR-276 (S.D.N.Y.), pleaded guilty to two counts with a combined statutory maximum of 120 months' imprisonment, and the government recommended a significant downward variance in light of the defendant's serious health issues. The quotes from Tournant in Gentile's brief are from the defendant's own sentencing submission, not the actual sentencing transcript. Gentile also cites United States v. Petit, in which the defendants, who were each sentenced to one year in prison, were convicted of crimes with either a 20- or five-year statutory maximum. No. 19-CR-850 (JSR) (S.D.N.Y.). Finally, Gentile cites the defendant's five-year sentence in United States v. Tzolov, where the total offense level was 29 with a Guidelines range of 87–108 months' imprisonment. No. 08-CR-370 (JBW) (E.D.N.Y.). None of these cases are comparable, and they certainly do not support the non-custodial sentence that Gentile seeks.

Finally, the Court should reject the defendant's suggestion that a term of imprisonment is unwarranted because "this was not a Ponzi scheme." Br. at 30. Whether or not the government referred to the defendants' fraud as a Ponzi scheme has no bearing on the seriousness of the fraud and its impact on investors.

IV.    Forfeiture

The government respectfully requests that the Court order forfeiture in the amount of $15,287,639, which is a reasonable estimate of the defendant's ill-gotten gains from the scheme.

A.    Applicable Law

Forfeiture is mandatory for defendants convicted of fraud offenses. 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case."); see United States v. Ng Chong Hwa, No. 18-cr-00538 (MKB), 2023 WL 4194002, *2 (E.D.N.Y. Mar. 24, 2023) (explaining that "forfeiture is mandatory under the relevant criminal forfeiture statutes, 18 U.S.C.

---

[7]    The government is appealing the Nordlicht court's decision dismissing the defendants' wire fraud conviction, which rests on a flawed application of United States v. Ciminelli, 598 U.S. 306 (2023), and the sentences imposed in that case.

§ 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c)"). The forfeiture statutes that apply to the defendants' securities and wire fraud offenses of conviction, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), require the forfeiture of all proceeds of their offenses, see 18 U.S.C. § 981(a)(1)(C) (requiring the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" as set forth in 18 U.S.C. §1956(c)(7), and further defined in 18 U.S.C. § 1961 to include wire fraud and "fraud in the sale securities"). The forfeiture determination as to the amount of proceeds is governed by Rule 32.2 of the Federal Rules of Criminal Procedure.

Where, as in this case, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). That amount "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B); see United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007). As forfeiture is "an aspect of sentencing," forfeiture amounts are determined by a preponderance of the evidence. Libretti v. United States, 516 U.S. 29, 49 (1995); Capoccia, 503 F.3d at 116; United States v. Roberts, 660 F.3d 149, 166–67 (2d Cir. 2011) (noting that "district courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence"); United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing).

Further, because the "calculation of forfeiture amounts is not an exact science," "[t]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011); see also United States v. Mathieu, 853 F. App'x 739, 742 (2d Cir. 2021) (observing that "[d]istrict courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case" and may make "a reasonable estimate" given the available information and evidence). Accordingly, the Court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." Treacy, 639 F.3d at 48.

B.     Evidentiary Basis for the Government's Proposed Order of Forfeiture

Gentile's forfeiture liability should reflect the total amount Gentile obtained from various GPB entities (including but not limited to Holdings I, Holdings II and Automotive Portfolio) during the conspiracy period, which is conservatively estimated at $15,287,639.[8] See GX-6200 at 29. As shown at trial, Gentile and Schneider lied about the performance of Holdings I, Holdings II, and Automotive Portfolio to induce investors to invest in not only these three funds but others as well. See, e.g., GX-5053 (marketing Automotive Portfolio, Holdings II and Waste Management together); GX-7820 (marketing Automotive Portfolio, Holdings II and Cold Storage together); GX-8170 (marketing Automotive Portfolio, Holdings II and NYC Development together). The defendants' lies about the three charged funds allowed them to operate GPB Capital

---

[8]     This figure is conservative because it (i) represents only Gentile's net proceeds from the GPB Entities; and (ii) with respect to money from AAS, only captures money Gentile earned between May 2017 and December 2018.

Holdings, LLC as well as the individual GPB funds. The three charged funds were among the first GPB funds, see Tr. 2156 (Kgil), and served as the anchor funds for GPB. Indeed, the vast majority of capital raised for GPB is attributable to those three funds alone. See GX-8264-A (showing that, as of April 18, 2018, Holdings I, Holdings II, and Automotive Portfolio raised approximately $194 million, $673 million and $613 million, respectively, in assets, whereas the other GPB funds each raised less than $62 million except for Waste Management, which raised $141 million). Gentile would not have obtained approximately $15 million from the GPB entities but for the lies he told investors about the source of the monthly distributions and the performance of Holdings I, Holdings II, and Automotive Portfolio. The full amount that Gentle obtained from the GPB entities, i.e., $15,287,639, is therefore subject to forfeiture. See United States v. Torres, 703 F.3d 194, 199–200 (2d Cir. 2012) (concluding that "so long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said" to be forfeitable).

V.   Restitution

As per the PSR, restitution is mandatory pursuant to 18 U.S.C. § 3663A. PSR ¶ 112. The government respectfully submits that the Court should impose restitution in the full amount of the victims' actual losses, i.e., $56 million.

VI.   Conclusion

For the reasons set forth above, the government respectfully submits that a sentence of 15 years' imprisonment is appropriate, and not greater than necessary, to reflect the seriousness of the defendant's offense, his personal benefit from the crime, and to deter others from committing similar crimes in the future.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By:   _____/s/_____

Jessica K. Weigel
Nick M. Axelrod
Kate Mathews
Assistant U.S. Attorneys
(718) 254-7000