**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SME:JKW/NMA/KM
F. #2018R01064

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 10, 2025

By ECF

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. David Gentile, et al.
Criminal Docket No. 21-54 (RPK)

Dear Judge Kovner:

The government respectfully requests that the Court order the defendant David Gentile to pay forfeiture in the amount of $15,581,317 and the defendant Jeffry Schneider to pay forfeiture in the amount of $12,001,141. As explained below, these proposed amounts are conservative estimates of the defendants' ill-gotten gains from the fraudulent scheme for which they were convicted and are far lower than what the law permits the Court to order the defendants to pay based on the total amount of investor contributions in Holdings I, Holdings II and Automotive Portfolio (collectively, the "GPB Funds") less any direct costs, if proven by the defendants.

## I. Applicable Law

### A. The Forfeiture Rules and Statutes

Forfeiture is mandatory for defendants convicted of fraud offenses. 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court **shall** order the forfeiture of the property as part of the sentence in the criminal case." (emphasis added)); see United States v. Monsanto, 491 U.S. 600, 607 (1989) (concluding that statute setting forth that a court "'shall order' forfeiture of all property described" means that forfeiture is mandatory); United States v. Ng Chong Hwa, No. 18-CR-538 (MKB), 2023 WL 4194002, at *2 (E.D.N.Y. Mar. 24, 2023) (observing that "forfeiture is mandatory under the relevant criminal forfeiture statutes, 18 U.S.C. § 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c)"). The forfeiture statutes that apply to Gentile's and Schneider's securities and wire fraud offenses, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), require the forfeiture of all proceeds of their offenses. See 18 U.S.C. § 981(a)(1)(C) (requiring the forfeiture of "[a]ny property, real or personal, which

constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" as set forth in 18 U.S.C. §1956(c)(7), and further defined in 18 U.S.C. § 1961 to include wire fraud and "fraud in the sale securities"); see 18 U.S.C. § 2461(c). The forfeiture determination as to the amount of proceeds is governed by Rule 32.2 of the Federal Rules of Criminal Procedure.

Where, as in this case, forfeiture is sought in the form of personal money judgments, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). That amount "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B); United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007).

At the forfeiture phase, "the government must establish the nexus between the offense and the forfeiture request by a preponderance of the evidence." United States v. Peters, 732 F.3d 93, 98 (2d Cir. 2013); see also Libretti v. United States, 516 U.S. 29, 49 (1995); Capoccia, 503 F.3d at 116; United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing). "[S]o long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said" to be forfeitable. United States v. Torres, 703 F.3d 194, 199–200 (2d Cir. 2012).

"District courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case." United States v. Walters, 910 F.3d 11, 32 (2d Cir. 2018). Because the "calculation of forfeiture amounts is not an exact science," the court "need not establish the [amount] with precision but rather need only make a reasonable estimate . . . given the available information." United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011); see also United States v. Mathieu, 853 F. App'x 739, 742 (2d Cir. 2021) (observing that "[d]istrict courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case" and may make "a reasonable estimate" given the available information and evidence). Accordingly, the court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." Treacy, 639 F.3d at 48; see United States v. Roberts, 660 F.3d 149, 166–67 (2d Cir. 2011) ("[D]istrict courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence." ).

B. Section 981's Application to Securities and Wire Fraud

Under 18 U.S.C. § 981(a)(1)(C), the "proceeds" of specified crimes—including securities fraud and wire fraud conspiracies—are subject to forfeiture. Section 981 defines "proceeds" differently in different cases, depending on whether the defendants transacted in "illegal goods" or "lawful goods." Section 981(a)(2)(A) calls for the forfeiture of all property obtained through the sale of illegal goods or services, with no netting of the defendant's costs. 18 U.S.C. § 981(a)(2)(A). Section 981(a)(2)(B), on the other hand, permits the direct costs "incurred in providing the goods or services" (excluding overhead expenses and income taxes) to be deducted if proven by the defendant. Id. § 981(a)(2)(B).

Section 981(a)(2)(B) applies where, as here, the defendants provided a "lawful good"—units in private equity funds—to investors. See United States v. Watson, No. 23-CR-82 (EK), 2025 WL 510814, *1, *18 (E.D.N.Y. Feb. 16, 2025) (holding in a securities and wire fraud case that Section 981(a)(2)(B) applied where the "illegal transactions" at issue were the sale of stock pursuant to various misrepresentations).[1] This means the defendants have the burden to prove the "direct costs" to be deducted from the proceeds of the specified crimes. 18 U.S.C. § 981(a)(2)(B); United States v. Mandell, 752 F.3d 544, 554 (2d Cir. 2014) (holding that Section 981(a)(2)(B) "makes clear that the burden of proof is on [the defendant] with respect to the issue of direct costs"); United States v. Naranjo, No. 13-CR-351 (JSR), 2015 WL 2381322, at *3 (S.D.N.Y. May 13, 2015) ("Defendants bear the burden to prove not just that they incurred direct costs, but also the amount of the costs to be deducted."). In Watson, the court concluded that the direct cost to the defendants would be "the fair-market value of what [the defendants] gave up" in the illegal transactions. 2025 WL 510814, at *19. "That is to say, the direct cost of the 'goods' provided—the shares of stock—is the value of that stock." Id. (holding that defendants could not establish the stock had any value at all).

## II. Discussion

### A. The Proceeds from the Defendants' Fraud Exceed $1 Billion

Pursuant to 18 U.S.C. § 981(a)(2)(B), the Court could order Gentile and Schneider to each pay the total amount of investor money raised through the illegal transactions at issue less direct costs, if the latter were established by the defendants. Several courts in this district have calculated forfeiture in this way. See, e.g., Watson, 2025 WL 510814, at *18 (calculating forfeiture based on the total amount obtained from investors and lenders); Order, United States v. Shkreli, No. 15-CR-637 (KAM), ECF Dkt. No. 541 (Mar. 5, 2018) (calculating forfeiture based on the total amount of investor contributions), aff'd, 779 F. App'x 38, 42 (2d Cir. 2019); see also United States v. Bonventre, 646 F. App'x 73, 90-92 (2d Cir. 2016) (in securities fraud case, upholding forfeiture of over $19.7 million based on client investments during fraud scheme).

According to GPB, over the life of the funds, the GPB Funds (i.e., Holdings I,[2] Holdings II and Automotive Portfolio) raised a total of $1.57 billion from investors. Of that amount, more than $1.38 billion was invested after the first fraudulent performance guarantee, between April 30, 2015 and December 31, 2018. Even limiting the date to only those periods when the defendants were using investor capital to pay distributions for each fund, the defendants raised approximately $1.03 billion from investors while lying about the source of distributions.

At minimum, therefore, the Court could order forfeiture in the amount of $1.03 billion, and the burden would be on the defendants to prove they incurred direct costs and in what

---

[1] The court in Watson noted, however, that some courts have suggested that Section 981(a)(2)(A) may apply where "the entity issuing the shares has no true operations at all, as would be the case in (for example) a Ponzi scheme." 2025 WL 510814, at *18 n.32.

[2] Holdings I and GPB Holdings Qualified, LP ("Holdings Qualified") are collectively referred to as "Holdings I." Holdings Qualified was an entity formed for certain U.S. tax-exempt purchasers that invested the net proceeds it received into Holdings I.

amount. Cf. Mandell, 752 F.3d at 554 ("Because [the defendant] has failed to present any evidence and no more than cursory argument as to [the issue of direct costs], we hold that he has failed to meet his burden."); Shkreli, 779 F. App'x at 42 (rejecting defendant's argument that forfeiture award should be decreased based on the trading activities of his hedge funds, which he argued should be deemed "direct costs"); Watson, 2025 WL 510814, at *19 (holding defendant had not met his burden to establish direct costs).

B. The Amount of the Proposed Forfeiture Money Judgments Is a Conservative Estimate of Each Defendant's Personal Gain from the Fraud Based on a Cash-Tracing Analysis

Alternatively, as proposed by the government, the Court can determine forfeiture based on the amount of criminal proceeds the defendants received to their personal bank accounts: $15,581,317 to Gentile and $12,001,141 to Schneider. See United States v. Contorinis, 692 F.3d 136, 146 (2d Cir. 2012) ("Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains." (internal quotation marks omitted)).

*i. Mr. Petron's Tracing Analysis*

Initially, the government produced a flow-of-funds analysis showing that Gentile earned approximately $15.2 million and Schneider earned approximately $12.1 million from the fraud. See GX-6200 at 29 (Gentile); ECF Dkt. No. 541, Ex. B (Schneider). The defendants argued that this analysis was overinclusive because it included GPB-managed funds other than Holdings I, Holdings II and Automotive Portfolio. See ECF Dkt. No. 548 at 3; ECF Dkt. No. 583 at 7; ECF Dkt. No. 582 at 7. In anticipation of the forfeiture proceedings in this case, the government requested that Michael Petron undertake a "tracing" analysis to estimate the proceeds to the defendants from only the GPB Funds (as opposed to other GPB-managed funds) even though the GPB Funds accounted for approximately 86% of the capital raised by GPB overall.[3] This tracing analysis moots the defendants' argument that the government's flow-of-funds analysis is overinclusive.

The government produced Mr. Petron's tracing analysis to the defendants on April 25, 2025. The tracing analysis is attached as Exhibit A to this letter. The red numbers on Exhibit A show the amount of funds transferred between entities that are traceable to the three GPB Funds using the "lowest intermediate balance rule," which is a tracing method repeatedly affirmed by the Second Circuit.[4] See, e.g., United States v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002); United

[3] In its March 18, 2025 letter regarding restitution and forfeiture, the government noted that it had engaged Mr. Petron to conduct this cash-tracing analysis. ECF Dkt. No. 552 at 5–6.

[4] Under the lowest intermediate balance rule or "LIBR," "tainted funds in an account are considered traceable to the offense unless the total sum in that account falls below the value of those funds. In other words, if $100 from a drug sale is deposited into an active account, the proceeds in the account are 'traceable' to the extent of $100 as long as the account balance never falls below that amount." United States v. Sixty-One Thousand Nine Hundred Dollars and No Cents ($61,900.00), No. 10-CV-1866 (BMC), 2010 WL 11623206, at *3 (E.D.N.Y. Sept. 8, 2010) (internal quotation marks omitted); see also United States v. Capoccia, No. 03-CR-35-01, 2009 WL 2601426, at *11 (D. Vt. Aug. 19, 2009), aff'd, 402 F. App'x 639 (2d Cir. 2010) (holding that under the LIBR, "funds are traced into and through a bank account so long as the balance over time in the account is never depleted of unlawful proceeds traced into it. The LIBR permits the United States to deduct debits in a checking account from the balance

States v. Banco Cafetero Panama, 797 F.2d 1154, 1159 (2d Cir. 1986); see also United States v. Hatfield, No. 06-CR-550 (JS), 2010 WL 4340632, at *1 (E.D.N.Y. Oct. 22, 2010).

Mr. Petron's tracing analysis focuses on the money sent from the GPB Funds (i.e., Holdings I, Holdings II and Automotive Portfolio) to GPB Capital and/or Ascendant Alternative Strategies ("AAS"), through various other accounts the defendants controlled, and ultimately to the defendants' personal bank accounts. The analysis is based on bank records that were produced to the defendants in discovery in 2021. The government has also provided the defendants with an Excel spreadsheet, which lists withdrawals from four bank accounts that Mr. Petron determined included proceeds from Holdings I, Holdings II, and/or Automotive Portfolio between March 2015 and December 2018. The government will provide the Court with a copy of the spreadsheet (Exhibit B) under separate cover.[5] Exhibit B provides a roadmap of Mr. Petron's tracing analysis as it isolates the transactions that Mr. Petron determined included criminal proceeds.

Mr. Petron found that Schneider received $12.001 million in compensation traceable to the GPB Funds, while Gentile received $15.58 million in compensation traceable to the GPB Funds.[6] This analysis is limited to the conspiracy period. It shows that between March 2015 and December 2018, the three GPB Funds paid $74 million into GPB Capital. Between April 2017 and December 2018, Ascendant Alternative Strategies ("AAS") received approximately $20 million from the three GPB Funds. In turn, GPB Capital paid Gentile $8.9 million traceable to the three GPB Funds. DJ Partners—another entity controlled by Gentile and Schneider—paid him $6.65 million traceable to the GPB Funds.[7] The same analysis shows that Schneider received $12 million from the three GPB Funds, including approximately $3.77 million from AAS, $3.18 million from Ascendant Capital, and $5.04 million from DJ Partners.[8]

---

of monies not linked to the counts of conviction. When that balance is depleted, debits must be deducted from the indicted proceeds balance. So long as the account retains a balance of indicted proceeds, that balance can be traced to subsequent transfers.").

[5] In his sentencing reply brief, Schneider argued, without citation to case law, that the government should be required to produce Mr. Petron's underlying workpapers to the defendants. ECF Dkt. No. 589-1. To date, the defendants have not provided case law support for their request, nor is the government aware of any cases that support the defendants' request. Notwithstanding, on May 30, 2025, the government provided the defendants with Exhibit B.

[6] These figures are largely consistent with the flow-of-funds profit figures Mr. Petron initially calculated.

[7] A review of the DJ Partners bank account reveals that it was funded with monies from accounts associated with Gentile, Schneider, GPB-related entities, Ascendant Capital, and AAS. See GX-3061, 3067, 3068. In addition, between July 2016 and March 2019, approximately $15,702 was deposited in the DJ Partners account from two unidentified accounts and wire transfers from unknown senders.

[8] "[P]roperty need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture" as long as "at some point, [it had] been under the defendant's control or the control of his co-conspirators." United States v. Contorinis, 692 F.3d 136, 147 (2d Cir. 2012) (internal quotation marks and citations omitted); see also United States v. Mathieu, 853 F. App'x 739, 742 (2d Cir. 2021); United States v. Bergstein, 788 F. App'x 742, 748 (2d Cir. 2019). Gentile or Schneider (or, in some cases, both defendants) were the signatories for every account included in Mr. Petron's tracing analysis.

*ii. The Defendants Cannot Meet their Burden of Proving Any Applicable Deductions from the Criminal Proceeds They Received*

The defendants bear the burden of proving any applicable deductions from the criminal proceeds they received. See Mandell, 752 F.3d at 554 (holding that Section 981(a)(2)(B) "makes clear that the burden of proof is on [the defendant] with respect to the issue of direct costs").

Schneider claims that the government's proposed forfeiture amount improperly includes "expenses reimbursements" to Schneider for out-of-pocket expenses he paid on GPB's behalf. See ECF Dkt. No. 548 at 4; ECF Dkt. No. 582 at 8. There are several flaws in this argument. First, the back-up documentation Schneider provides to the Court relates to reimbursements purportedly from GPB to AAS, not reimbursements to Schneider. See SEC_EDNY_G-015307595. Second, while Schneider notes that there were approximately $12.7 million in reimbursements, only $7.9 million relates to reimbursements from the three GPB Funds. See id. Third, examination of the bank records underlying Mr. Petron's analysis listed in Exhibit B (i.e., the bank accounts ending in 7440, 7303, 7281 and 2317) reveals that there are only eight transactions totaling approximately $60,000 that reference expense reimbursements of any kind to Schneider. This approximately $60,000 is included in the total amount of proceeds traced to Schneider's personal bank accounts. Finally, the forfeiture statute expressly states that "overhead expenses of the entity providing the goods or services" and "income taxes paid by the entity" are not direct costs deductible for purposes of forfeiture. 18 U.S.C. § 981(a)(2)(B). It would therefore be improper to deduct reimbursements for overhead expenses from Schneider's total proceeds figure.

Schneider further claims that acquisition fees are improperly included in the government's proposed forfeiture amount.[9] See ECF Dkt. No. 548 at 4; ECF Dkt. No. 582 at 8. This argument ignores the basic fact that the fraud is what allowed the defendants to raise capital, continue operating the GPB Funds and get paid fees, including acquisition fees. In other words, the acquisition fees are directly traceable to the defendants' wrongdoing. At trial, William Jacoby, the defendants' former CFO, testified that he proposed reducing distributions, and Schneider told him that "we couldn't do it because it would slow down the new deposits coming in, so you had to keep it the same in order to continue to raise money." Trial Transcript ("Tr.") 793:23–25. Macrina Kgil, Jacoby's successor as CFO, testified that the defendants told her that they could not reduce distributions because it would impact capital raising and might even prompt redemption requests. Tr. 2481:22–2482:19. Roger Anscher, GPB's former Chief Operating Officer, testified that Gentile told him "it was critical for the funds to be one hundred percent covering distributions from operations in order to continue to raise money and to sign selling agreements with other brokers and grow the funds." Tr. 4166:10–13. Jeff Lash, the defendants' operating partner and co-conspirator, testified that he raised the same issue and Schneider told him that ceasing monthly distributions and thereby revealing to investors the true poor performance of the funds was not an

---

[9] Schneider directs the Court to a spreadsheet listing acquisition fees purportedly paid by GPB entities to AAS, not Schneider. Further, while Schneider notes that the GPB entities paid approximately $16.3 million in acquisition fees, only approximately $12.9 million relates to acquisition fees for the three GPB Funds. Finally, there is no indication in the banking records listed in Exhibit B that any of the payments to Schneider were for acquisition fees.

option because it would stop capital raising. Tr. 3103. Time and again, the defendants themselves recognized that their ability to raise capital—and therefore to profit from the fees paid by investors—depended on lying to investors about the distributions. This is true for acquisition fees paid by GPB to Gentile and Schneider. Tr. 738:13–19 (Jacoby testifying that Schneider and Gentile were paid the acquisition fees). The fraud allowed the defendants to raise capital and purchase more portfolio companies, which resulted in the defendants getting paid acquisition fees. Schneider argues that "acquisition fees cannot have a causal nexus to the fraud because acquisition fees would be paid when portfolio companies *were* purchased—the opposite of this Government fraud theory." ECF Dkt. No. 582 at 8. This completely misses the point. The defendants repeatedly lied to investors about the performance of the GPB Funds and not, as Schneider suggests, about whether they purchased portfolio companies. The defendants were only able to purchase portfolio companies and get paid fees because they kept raising capital—and they did so by lying to investors.

## III. <u>Conclusion</u>

For the reasons set forth above, the government submits that the Court should order Gentile pay forfeiture in the amount of $15,581,317 and Schneider pay forfeiture in the amount of $12,001,141.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Jessica K. Weigel
Nicholas M. Axelrod
Kate Mathews
Assistant U.S. Attorneys
(718) 254-7000

cc: Defense counsel (by ECF)