# EXHIBIT A

*CONFIDENTIAL*
*Execution Copy*

## AGREEMENT
## FOR THE RESIGNATION OF JEFFREY LASH AND TRANSFER OF MEMBERSHIP/OWNERSHIP INTEREST

This agreement (the "Agreement") dated February 10, 2018 (the "Effective Date") sets forth the terms upon which Jeff Lash ("Lash," "you" or "your") will resign from and transfer any interest in GPB Capital Holdings, LLC and and/or its parents, subsidiaries and related entities.

*Transfer of GPB Interest*

Lash will transfer as of the Effective Date any and all ownership and membership interest in GPB Capital Holdings, LLC and/or its parents, direct and indirect subsidiaries, related entities and affiliates (collectively referred to herein as "GPB") to GPB and will execute any and all documents and take any action to effectuate such transfer as may be deemed reasonably necessary by GPB, including but not limited to the Omnibus Assignment attached as **Exhibit 1**. Lash will transfer any and all equity interest in Country Motors II Inc. (a/k/a Bob's Milford) ("CM II") as soon as reasonably practicable as consideration for the forgiveness of the debt owed by Lash and secured by Lash's equity interests in CM II.

*Transfer of Economic Interests in Reinsurance Entities*

Lash will promptly transfer any and all economic interests, including any rights to distributions or other payments, that Lash may have or hold in any currently existing reinsurance entities (that were initiated, formed or created after March 19, 2013), including without limitation Soundview Reinsurance Company, Ltd., in each case to an entity designated by GPB and will execute any and all documents and take any action to effectuate such transfer as may be deemed reasonably necessary by GPB.

*Resignation of Employment and/or Consulting:*

Lash will resign from any and all positions and/or employment with GPB effective February 10, 2018 (the "Resignation Date") and will execute any and all documents and take any action to effectuate such resignation or transfer such interest as may be deemed reasonably necessary by GPB including but not limited to the Resignation Letter attached as **Exhibit 2**.

*Transition Obligations*

All of the obligations described in this section are the "Transition Obligations". Within seven (7) business days of the Effective Date Lash will deliver to GPB a disclosure statement in the form attached hereto as **Exhibit 3** (the "Disclosure Statement") that lists any and all GPB property in Lash's possession, custody or control, including but not limited to vehicles, keys, computers, phones, and any other GPB property (the "Property"). The Disclosure Statement will also list any related party transactions (that occurred after March 19, 2013), including direct or indirect contracts between Lash (or any affiliate or entity directly or indirectly controlled by Lash) and any GPB controlled entity or any transaction or arrangement from which Lash derived any interest or benefit (including but not limited to reinsurance contracts, service contract rebates, other rebates, incentives, and fee packs) (collectively, "Related Party Transactions"). Except for vehicles, Lash will return the Property or pay wholesale value (as of the Effective Date) for the same on or before June 1, 2018. GPB agrees to allow Lash to keep vehicles and dealer plates in his possession and on GPB floor plan (the cost of which will be separately paid by Lash after April 1, 2018) until June 1, 2018 at which time Lash will deliver possession of the vehicles to GPB at its offices in New York, New York or pay the wholesale value of the vehicles; provided that GPB will invoice Lash for the actual floor plan fees or other charges for those vehicles still in Lash's possession and Lash will remit prompt payment in cash or check within fifteen (15) business days.

Lash agrees to the following, which will be documented in separate documentation where indicated:

• Lash will execute a subcertification of 2017 audit and Fraud/Lack of

Fraud Representation.

• Lash will complete a standard GPB compliance certification.

• Lash will sign, under the pains and penalty of perjury, an affidavit prepared jointly by Arnold & Porter LLP (or other counsel for GPB) and Lash (the "Dibre Litigation Affidavit"), subject to the approval of Lash's attorney, which truthfully and accurately discloses and details his personal knowledge of the facts and circumstances of GPB transactions and business relationship with Patrick Dibre. Lash will cooperate with GPB in any formal or informal dispute with Patrick Dibre including but not limited to voluntarily submitting for a deposition as may be requested with notice in any pending litigation between GPB and Mr. Dibre including but not limited to the case styled as GPB Capital Holdings, LLC, et al. v. Patrick Dibre, Nassau County No. 606417/2017 (the "Dibre Litigation").

• Lash will transfer and assign to GPB concurrently herewith any and all benefits, rights, duties, obligations and liabilities he has under and pursuant to the Master Agreement, dated as of November 14, 2016, by and among GPB Capital Holdings, LLC, Dibre and Lash, and will execute any and all documents and take any action to effectuate such assignment as may be deemed reasonably necessary by GPB including but not limited to the Master Agreement Assignment attached as **Exhibit 4**.

• After the execution of this Agreement, Lash will not interact with employees of GPB relating to GPB business other than communicating as necessary with senior executives of GPB to complete the obligations outlined in the Agreement.

• Lash represents that since January 1, 2018, he has not, and after executing the Agreement will not, sign any agreements on behalf of GPB, speak on behalf of GPB, or hold himself out to third-parties as a representative of GPB unless specifically directed to by GPB. GPB agrees that it will not use any signature stamps or sign any documents on Lash's behalf and affirms that it has not done so within the past ninety (90) days except for the Unanimous Written Consent of the Members of Capstone Automotive Group, LLC to the acquisition of an 85% membership interest in FX Caprara VW, LLC, as authorized by email communication from Lash to Scott Silverman, counsel to GPB, dated January 31, 2018.

Lash will be deemed to have violated the Transition Obligations if he: 1) fails to identify GPB property in his possession over $5000 in value for which GPB has no prior knowledge; 2) fails to identify transactions which have been completed or consummated prior to the date of this Agreement, which are unknown to GPB, which benefit Jeffrey Lash, and which amount to over $10,000.00 in value. In addition, Lash will be deemed to have violated the Transition Obligations if and when facts arise that conclusively demonstrate: (1) he failed to identify Property or transactions that should have been included within the Disclosure pursuant to the limitations stated above, or (2) he made materially false statements or material omissions within the Dibre Litigation Affidavit or in the course of cooperating in the Dibre Litigation.

Lash's failure to comply with these Transition Obligations shall be a material breach of this Agreement, shall relieve GPB from paying any and all future payments hereunder and obligate Lash to repay all payments made by GPB under this Agreement.

| | |
|---|---|
| *Severance and Transfer Consideration:* | GPB will pay Lash $3,750,000 (the "Separation Amount" and, to the extent it relates to any partial payment thereof, a "Separation Payment") as severance and in exchange for Lash transferring and/or relinquishing any and all ownership and membership interest in GPB; provided that the Separation Amount will be paid pursuant to the Payment Schedule below assuming and conditioned on Lash's continuous compliance with the Transition Obligations. |
| *$183k Note* | Lash agrees that he will reimburse GPB for the financial loss associated with the purchase, and sale, of a Ferrari vehicle in the amount of $183,000 (the "Ferrari Loss"). The Ferrari Loss will be memorialized in the promissory note (the "$183k Promissory Note") attached as **Exhibit 5** that Lash will execute |

and deliver to GPB as of the Effective Date and will be payable pursuant to the Payment Schedule below.

*$680k Note*

Lash agrees that he owes GPB for non-performance debt in the outstanding amount of $680,000 (the "Performance Debt"). The Performance Debt will be memorialized in the form of a promissory note (the "$680k Promissory Note" and together with the $183k Promissory Note, the "Notes") attached as **Exhibit 6** that Lash will execute as of the Effective Date and deliver to GPB concurrently herewith and will be payable pursuant to the Payment Schedule below. The combination of the Ferrari Loss and the Performance Debt totaling $863,000 is collectively referred to herein as the "Separation Debt." Any failure by GPB to pay the Separation Amounts (other than pursuant to a violation of this Agreement) will suspend Lash's obligations to make payments on the Notes.

*Compensation through March 31, 2018 and Health Benefits*

Lash will continue to receive health insurance through December 31, 2018. Lash will continue to receive his current compensation of $80,000 per month less $20,000 per month in contribution towards the Dibre Litigation (the "Dibre Contribution") for a total net monthly compensation of $60,000 to be paid in bi-weekly installments until March 31, 2018. This compensation shall be deemed to cover (a) Lash's unpaid salary for the period up to and including the Effective Date, and (b) accrued and unused vacation time, if any. For the avoidance of doubt, the Dibre Contribution includes $20,000 attributed to pay in November 2017, December 2017 and January 2018 – and the anticipated $20,000 allocation in February and March 2018. If and when the Dibre Litigation is fully resolved by settlement or final non-appealable judgment and GPB is paid therefrom, GPB will reimburse Lash in an amount equal to the Dibre Contribution, which if fully paid as detailed herein amounts to $100,000.

Other than the Dibre Contribution that will be returned as set forth above, the health insurance being paid until year end, use of vehicles until June 1, 2018, the Separation Amount and the Dibre Participation, Lash will not be entitled to any other compensation or payment of any type following March 31, 2018 including, without limitation, wages, commissions, holiday pay, vacation pay, bonuses, insurance remittance payments or severance.

*Cooperation with Transition:*

Lash agrees to execute any and all necessary and required documentation and reasonably cooperate with GPB and its personnel to provide an orderly transfer of his interests and/or his role, duties and responsibilities. GPB will prepare any necessary applications and/or communications with manufacturers. GPB will take the lead to ensure Lash is removed from any and all documents related to any GPB entities or dealerships, including but not limited to, any and all banking documents, RMV or DMV licenses, financing agreements and/or personal guaranties. Proof of all transfers and documentation will be provided to Lash. GPB further agrees to remove the Lash name from Lash Volkswagen of White Plains and Lash Volkswagen of Oneonta within the next six (6) months. Lash will assist in any way to expedite this process and will promptly sign and return any documents necessary to effectuate these changes. Lash's failure to materially cooperate as necessary shall be a material breach of this agreement, shall relieve GPB from paying any and all future payments hereunder and obligate Lash to repay all payments made by GPB under this Agreement GPB's failure to cooperate in transferring Lash from any documents associated with GPB entities or dealerships, including but not limited to all personal guaranties, is a material breach of this Agreement.

GPB agrees to pay all fees, costs and expenses related to such cooperation with transition, including but not limited to objectively necessary travel expenses, lodging, and meals. In addition, GPB agrees to reimburse Lash for any taxes that are assessed against Jeffrey Lash for any transfers of equity or ownership contemplated by this Agreement. Lash shall not bear any of the expenses, costs, fees or taxes associated with such transfer of his ownership or equity. GPB agrees to pay on behalf of Lash all reasonable fees, costs and expenses associated with Lash's cooperation in connection with the Dibre Litigation, including but not limited to court costs, travel, lodging and food. Lash agrees to submit all receipts for all such expenses to David Rosenberg or other designated GPB representative for approval and payment within thirty

(30) days of submitting.

| | |
|---|---|
| *Dibre Participation* | If and when the Dibre Litigation is fully resolved by settlement or final non-appealable judgment and GPB is paid therefrom, Lash will receive the Dibre Contribution and 2.5% of any damages or recovery actually received by GPB (excluding specific performance) over $10,000,000, but not exceeding $30,000,000, net of attorney's fees paid by GPB for pursuing the claims against Dibre (the "Dibre Participation"). |
| *Payment Schedule* | The Separation Amount and the Separation Debt will be paid and satisfied by the respective parties in thirteen (13) installments on the dates and in the amounts detailed in **Schedule A** attached hereto; provided that each Separation Amount due to Lash shall be offset by any amounts due to GPB under the Notes on such date.<br><br>When and if the Dibre Litigation is fully resolved by settlement or final non-appealable judgment and GPB is paid therefrom, any remaining amounts due as Separation Payment or amount due under the Notes will accelerate and be due within thirty (30) days of such final resolution of the Dibre Litigation. |
| *Miscellaneous Covenants* | Lash agrees not to directly or indirectly recruit, solicit or hire any current employee or consultant of any of the GPB dealerships, or induce or attempt to induce any employee or consultant of any of the GPB dealerships to terminate his/her employment with, or otherwise limit or cease his/her relationship with, any of the GPB dealerships for a period of twelve (12) months unless he has express written permission from GPB. This section does not apply to Javier Abreu and/or Car Factory. Lash's failure to comply with these nonsolicitation obligations shall be a material breach of this Agreement, shall relieve GPB from paying any and all future payments hereunder and obligate Lash to repay all payments made by GPB under this Agreement.<br><br>Lash agrees that until the Dibre Litigation is fully resolved by settlement or final non-appealable judgment he will not engage or participate, directly or indirectly, as principal, agent, director, proprietor, joint venturer, owner, trustee, employee, employer, consultant, partner or in any other capacity whatsoever, in the conduct or management of, or own any stock or any other equity investment in or debt of, or provide any products or services of any nature whatsoever to or in respect of any business involving Dibre or any entity owned directly or indirectly or affiliated with Dibre that is competitive with the business conducted by GPB. |
| *Confidential Information* | Lash agrees to keep strictly confidential and not disclose any and all confidential and proprietary information of or relating to GPB. Lash agrees he will not, directly or indirectly, use, disseminate, disclose, publish, or otherwise make available to any person, firm, corporation, unincorporated association or other entity any Confidential Information or any portion thereof, and will refrain from using it for his own purposes or from disclosing it to anyone outside GPB without GPB's prior written consent, except as defined below.<br><br>"Confidential Information" shall mean any confidential or proprietary information relating to GPB including, without limitation, the identity of GPB's clients, the identity of representatives of clients with whom GPB has dealt, the manner in which such services are performed or offered to be performed, the service needs of actual or prospective clients, client preferences and policies, pricing information, business and marketing plans, financial information, budgets, compensation or personnel records, non-public information concerning GPB's acquisition or disposition of assets, vendors, software, data processing programs, databases, client maintenance listings, computer software applications, research and development data, , and other trade secrets. "Confidential Information" shall not include any information that (a) is or becomes generally available to the public other than as a result of a breach of duty by Lash; (b) was available to Lash on a non-confidential basis prior to the disclosure of such Confidential Information by GPB or thereafter becomes available to Lash from a source not known to bound by any confidentiality restrictions with GPB; (c) is disclosed pursuant to a governmental order or demand or under compulsion of law or by order of any court, governmental agency or self-regulatory organization, in which event Lash shall promptly |

notify GPB of such request for disclosure or legal requirement compelling disclosure so that GPB may seek a protective order or other appropriate remedy; (d) is disclosed with the prior written consent of David Rosenberg or other designated representative of GPB; or (e) has been independently developed by Lash without use of or reference to the Confidential Information. Lash's failure to comply with these confidentiality obligations shall be a material breach of this Agreement, shall relieve GPB from paying any and all future payments hereunder and obligate Lash to repay all payments made by GPB under this Agreement.

| Indemnification: | Lash agrees to indemnify GPB, its owners, investors, officers, employees, agents, successors and assigns harmless from and against any and all third-party claims arising out of or based upon any fraud or illegal acts committed directly by Lash. Lash's indemnification obligations for any matter shall be reduced by the amount of any insurance proceeds actually received by GPB with respect to such matter. GPB will agree to indemnify Lash and hold him harmless from and against any and all third-party claims arising from his employment with or participation in GPB or any fraud or illegal acts committed by any partners or employees of GPB or partners or employees of Ascendant Capital. The indemnification obligations will not extend to claims that arise from any willful or intentional acts by Lash that caused financial harm to GPB. Further, GPB agrees to fully indemnify and defend and cover any costs related to any personal guaranties that Lash has executed in relation to the dealerships. Lash's failure to cooperate as necessary shall be a material breach of this Agreement, shall relieve GPB from paying any and all future payments hereunder and obligate Lash to repay all payments made by GPB under this Agreement GPB's failure to cooperate shall constitute a material breach of this Agreement. |
|---|---|
| Nondisparagement: | Unless otherwise required by law or in court (and where Lash provides reasonable advanced notice, if possible, so that GPB can take action to protect or defend itself), Lash agrees not to make any remarks or comments, orally, electronically or in writing, to manufacturers, banks, clients or otherwise, which could reasonably be construed to be derogatory or disparaging to, or which reasonably could be anticipated to be damaging or injurious to the reputation or good will of GPB or any of its members, shareholders, officers, directors, employees, consultants, agents or advisors. Unless as part of a court filing or necessary public disclosure, GPB and any of its shareholders, officers, directors, employees, consultants, agents or advisors will agree not to make any remarks or comments, orally, electronically or in writing, to manufacturers, banks, clients or otherwise which could reasonably be construed to be derogatory or disparaging to, or which reasonably could be anticipated to be damaging or injurious to the reputation or good will of Lash. Nothing herein shall prevent Lash from making statements consistent with those he has described in **Exhibit 7**; provided that GPB takes no liability with respect to such statements accuracy or truth and Lash shall not hold himself out as an agent or representative of GPB when such statements are made. GPB agrees to hold a management meeting where Lash's resignation is discussed so everyone in attendance is provided notice of GPB's nondisparagement obligation herein, and if any GPB management is asked about Lash's resignation, they shall respond that he departed to pursue other ventures. In addition, GPB must provide notice to all key GPB employees about this nondisparagement clause. |
| Mutual Releases: | In consideration of the terms and conditions contained in this Agreement, GPB and its affiliated entities, past, present and future owners, members, shareholders, directors, officers, managers, agents, attorneys, representatives, investors, collectively, and Lash and his affiliated entities, collectively, except as specifically provided for in this Agreement, do hereby forever and irrevocably release, discharge and acquit each other from any obligations to each other, and any other agreements by and between the such parties, except as may be specifically referenced or contemplated herein, and, for the avoidance of doubt, excluding any breaches of or other claims arising from this Agreement. |
| Taxes and Expenses | Except as specified above, each party shall bear its own respective taxes, costs and expenses, including the costs of their respective counsel, |

| | |
|---|---|
| | accountants, financial advisors and other representatives, in connection with the matters described in this Agreement. As provided above, GPB agrees to reimburse Lash for all costs, fees, and expenses related to transition obligations and cooperation in Dibre Litigation. GPB also agrees to reimburse Lash for taxes assessed against Jeff for his transfer of equity and ownership in GPB and individual dealerships. |
| *Confidentiality of Transaction Terms:* | Each party hereto agrees that it will not, without the prior written consent of the other party hereto, disclose publicly or to any third party (other than its key employees who are involved in the proposed transaction and its financial and legal advisors and accountants assisting them in connection with the proposed transaction ) the terms and conditions of this Agreement or the subsequent negotiations between the parties or the fact that discussions or negotiations have occurred or are occurring between the parties regarding the proposed transaction, except to the extent required by law, court order, or under any agreement to which GPB or Lash is a party or as reasonably necessary or appropriate to obtain the approval of the manufacturers or any other required third party consents.  Except (a) as expressly provided herein, (b) communications with auto manufacturers and/or distributors regarding Lash's resignation and departure from GPB and (c) for general statements regarding Lash's resignation and departure from GPB, neither party shall issue any press release or make any other public announcement regarding the subject matter of this Agreement or the transactions contemplated hereby without the prior consent of the other party hereto.  Notwithstanding the foregoing, either party may generally and publicly announce Lash's resignation without prior written consent. |
| *Choice of Law:* | This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the statutes, laws and decisions of the State of New York. |
| *Legal Effect of this Agreement:* | While there will be separate agreements that more specifically detail the procedural terms of certain referenced actions, this Agreement is binding on the parties. |
| *Notices:* | All notices hereunder shall be in writing (sent via Federal Express or other overnight delivery courier and shall be deemed delivered one (1) business day after the date sent upon sender's receipt of proof of delivery) and shall be sent to the applicable party at the address most recently identified or designated in writing to the sending party as its address for such purpose. |
| *Attorneys' Fees:* | Should any party hereto, or any heir, personal representative, successor or assign of any party hereto, resort to legal proceedings in connection with this Agreement, the party or parties prevailing in such legal proceedings shall be entitled, in addition to such other relief as may be granted, to recover his, its or their reasonable attorneys' fees and costs in such legal proceedings from the non-prevailing party or parties. |
| *Counterparts:* | This Agreement may be executed in two or more counterparts, each of which shall be deemed an original (including by means of PDF or other electronic transmission), and all of which together shall constitute one and the same instrument. |
| *Entire Agreement:* | This Agreement (including all exhibits referenced herein and all documents contemplated herein) constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, of the parties with respect to the subject matter hereof. |

*SIGNATURE PAGE FOLLOWS*

1

IN WITNESS WHEREOF, the parties have executed this Agreement for the Resignation of Jeffrey Lash and Transfer of Membership/Ownership Interest as of the date first above written.

GPB Capital Holdings, LLC

By:
    Name:
    Title:


Jeffrey Lash, Individually


## SCHEDULE A

| Date | Separation Amount | Separation Debt | Net Payment |
|---|---|---|---|
| February 12, 2018 | $2,500,000 | $(400,000) | $2,100,000 |
| March 1, 2019 | 104,000 | (38,500) | 65,500 |
| April 1, 2019 | 104,000 | (38,500) | 65,500 |
| May 1, 2019 | 104,000 | (38,500) | 65,500 |
| June 1, 2019 | 104,000 | (38,500) | 65,500 |
| July 1, 2019 | 104,000 | (38,500) | 65,500 |
| August 1, 2019 | 104,000 | (38,500) | 65,500 |
| September 1, 2019 | 104,000 | (38,500) | 65,500 |
| October 1, 2019 | 104,000 | (38,500) | 65,500 |
| November 1, 2019 | 104,000 | (38,500) | 65,500 |
| December 1, 2019 | 104,000 | (38,500) | 65,500 |
| January 1, 2020 | 104,000 | (38,500) | 65,500 |
| February 1, 2020 | 104,000 | (38,500) | 65,500 |

1

*CONFIDENTIAL*
*Execution Copy*

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement as of the date first above written.

GPB Capital Holdings, LLC

By:_____
Name: David Gentile
Title: Manager

GPB Holdings, LP

By:_____
Name: David Gentile
Title: Authorized Signatory

GPB Automotive Portfolio LP

By:_____
Name: David Gentile
Title: Authorized Signatory

GPB Holdings II, LP

By:_____
Name: David Gentile
Title: Authorized Signatory

GPB Holdings Automotive, LLC

By:_____
Name: David Gentile
Title: Manager

GPB Portfolio Automotive, LLC

By:_____
Name: David Gentile
Title: Manager

7

Capstone Automotive Group, LLC

By: _____
Name: David Gentile
Title: Manager

Capstone Automotive Group II, LLC

By: _____
Name: David Gentile
Title: Manager

_____
Jeffrey Lash, Individually

8

# EXHIBIT B

*CONFIDENTIAL*
*Execution Copy*

**AMENDED AND RESTATED AGREEMENT**
**FOR THE RESIGNATION OF JEFFREY LASH**
**AND TRANSFER OF MEMBERSHIP/OWNERSHIP INTEREST**

*April 30, 2018*

This amended and restated agreement (the "Amended Agreement") dated April 30, 2018 replaces and supercedes the agreement dated February 10, 2018 (the "Effective Date") and amends the terms upon which Jeff Lash ("Lash," "you" or "your") has resigned from, and transferred interests in, GPB Capital Holdings, LLC and and/or its parents, subsidiaries and related entities.

| | |
|---|---|
| *Transfer of GPB Interest* | Lash shall have transferred as of the Effective Date any and all ownership and membership interest in GPB Capital Holdings, LLC and/or its parents, direct and indirect subsidiaries, related entities and affiliates (collectively referred to herein as "GPB") to GPB and will execute any and all documents and take any action to effectuate such transfer as may be deemed reasonably necessary by GPB, including but not limited to the Omnibus Assignment attached as **Exhibit 1**. Lash will transfer any and all equity interest in Country Motors II Inc. (a/k/a Bob's Milford) ("CM II") as soon as reasonably practicable as consideration for the forgiveness of the debt owed by Lash and secured by Lash's equity interests in CM II. |
| *Transfer of Economic Interests in Reinsurance Entities* | Lash shall have transferred any and all economic interests, including any rights to distributions or other payments, that Lash may have or hold in any currently existing reinsurance entities (that were initiated, formed or created after March 19, 2013), including without limitation Soundview Reinsurance Company, Ltd., in each case to an entity designated by GPB and will execute any and all documents and take any action to effectuate such transfer as may be deemed reasonably necessary by GPB. |
| *Resignation of Employment and/or Consulting:* | Lash shall have resigned from any and all positions and/or employment with GPB effective February 10, 2018 (the "Resignation Date") and will continue to execute any and all documents and take any action to effectuate such resignation or transfer such interest as may be deemed reasonably necessary by GPB including but not limited to the Resignation Letter attached as **Exhibit 2**. |
| *Transition Obligations* | All of the obligations described in this section are the "Transition Obligations". Within seven (7) business days of the Effective Date Lash shall have delivered to GPB a disclosure statement which has been amended in the form attached hereto as Amended **Exhibit 3** (the "Amended Disclosure Statement") that lists any and all GPB property in Lash's possession, custody or control, including but not limited to vehicles, keys, computers, phones, and any other GPB property (the "Property"). The Amended Disclosure Statement shall list any related party transactions (that occurred after March 19, 2013), including direct or indirect contracts between Lash (or any affiliate or entity directly or indirectly controlled by Lash) and any GPB controlled entity or any transaction or arrangement from which Lash derived any interest or benefit (including but not limited to reinsurance contracts, service contract rebates, other rebates, incentives, and fee packs) (collectively, "Related Party Transactions"), and shall be certified as accepted and acknowledged by GPB Capital Holdings, LLC. Except for vehicles, Lash will return the Property owned by GPB or pay wholesale value (as of the Effective Date) for the same on or before June 1, 2018. GPB agrees to allow Lash to keep vehicles and dealer plates in his possession and on GPB floor plan at no cost until December 31, 2018 at which time Lash will deliver possession of the vehicles to GPB at its offices in New York, New York or pay the wholesale value of the vehicles. |

Lash agrees to the following, which will be documented in separate

documentation where indicated:

- Lash will execute a sub-certification of 2017 audit and Fraud/Lack of Fraud Representation based on information to the best of his knowledge.

- Lash will complete a standard GPB compliance certification for those acts based on information to the best of his knowledge.

- Lash will sign, under the pains and penalty of perjury, one or more affidavits prepared jointly by Arnold & Porter LLP (or other counsel for GPB) and Lash (the "Dibre Litigation Affidavit"), subject to the approval of Lash's attorney, which truthfully and accurately discloses and details his personal knowledge of the facts and circumstances of GPB transactions and business relationship with Patrick Dibre. Lash will cooperate with GPB in any formal or informal dispute with Patrick Dibre including but not limited to voluntarily submitting for a deposition as may be requested with notice in any pending litigation between GPB and Mr. Dibre including but not limited to the case styled as GPB Capital Holdings, LLC, et al. v. Patrick Dibre, Nassau County No. 606417/2017 (the "Dibre Litigation").

- Lash will transfer and assign to GPB concurrently herewith any and all benefits, rights, duties, obligations and liabilities he has under and pursuant to the Master Agreement, dated as of November 14, 2016, by and among GPB Capital Holdings, LLC, Dibre and Lash, and will execute any and all documents and take any action to effectuate such assignment as may be deemed reasonably necessary by GPB including but not limited to the Master Agreement Assignment attached as **Exhibit 4**.

- After the execution of this Amended Agreement, Lash will not interact with employees of GPB relating solely to GPB business that is confidential other than communicating as necessary with senior executives of GPB to complete the obligations outlined in the Amended Agreement.

- Lash represents that since January 1, 2018, he has not, and after executing the Amended Agreement will not, sign any agreements on behalf of GPB, speak on behalf of GPB, or hold himself out to third-parties as a representative of GPB unless specifically directed to by GPB. GPB agrees that it will not use any signature stamps or sign any documents on Lash's behalf and affirms that it has not done so within the past ninety (90) days except for the Unanimous Written Consent of the Members of Capstone Automotive Group, LLC to the acquisition of an 85% membership interest in FX Caprara VW, LLC, as authorized by email communication from Lash to Scott Silverman, counsel to GPB, dated January 31, 2018.

Lash will be deemed to have violated the Transition Obligations if he: 1) fails to identify GPB property in his possession over $5,000 in value for which GPB has no prior knowledge; 2) fails to identify transactions which have been completed or consummated prior to the date of this Agreement, which are unknown to GPB, which benefit Jeffrey Lash, and which amount to over $10,000.00 in value. In addition, Lash will be deemed to have violated the Transition Obligations if and when facts arise that conclusively demonstrate: (1) he failed to identify Property or transactions that should have been included within the Disclosure pursuant to the limitations stated above and to which GPB has no prior knowledge, or (2) he made materially false statements or material omissions within the Dibre Litigation Affidavit or in the course of cooperating in the Dibre Litigation.

Lash's failure to comply with these Transition Obligations shall be a material breach of this Agreement.

*Severance and Transfer Consideration:*

GPB will pay Lash a severance amount over the next four (4) years (the "Amended Severance Amount" and, to the extent it relates to any partial payment thereof, an "Amended Severance Payment") as consideration and in exchange for Lash transferring and/or relinquishing any and all ownership and membership interest in GPB; provided that the Amended Severance Amount will be paid pursuant to the Amended Severance Chart and accompanying

language on the Amended Payment Schedule contained in Amended Schedule A; provided further that, if and when the Dibre Litigation is favorably resolved by either settlement or final non-appealable judgment and GPB is paid therefrom (the "Dibre Resolution Date"), the Amended Severance Payments in the Amended Severance Chart shall be revised from $25,000 to $50,000 and the Separation Debt offset shall be revised from $5,000 to $10,000, in each case as of the next Payment Date after the Dibre Resolution Date.

*$183k Note*

Lash agrees that he will reimburse GPB for the financial loss associated with the purchase, and sale, of a Ferrari vehicle in the amount of $183,000 (the "Ferrari Loss"). The Ferrari Loss will be memorialized in the promissory note (the "$183k Promissory Note") attached as **Exhibit 5** that Lash will execute and deliver to GPB as of the Effective Date and will be payable pursuant to the Payment Schedule below.

*Guarantees*

*$680k Note*

Lash agrees that he owes GPB for non-performance debt in the outstanding amount of $680,000 (the "Performance Debt"). The Performance Debt will be memorialized in the form of a promissory note (the "$680k Promissory Note" and together with the $183k Promissory Note, the "Notes") attached as **Exhibit 6** that Lash will execute as of the Effective Date and deliver to GPB concurrently herewith and will be payable pursuant to the Payment Schedule below. The combination of the Ferrari Loss and the Performance Debt totaling $863,000 is collectively referred to herein as the "Separation Debt." Any failure by GPB to pay the Amended Severance Amount and Amended Compensation Amount (together "Amended Separation Amount") whether due to bankruptcy or otherwise will suspend Lash's obligations to make payments on the Notes.

*Compensation and Health Benefits*

Lash will continue to receive health insurance through December 31, 2018. Lash will continue to receive his compensation of $50,000 per month (the "Amended Compensation Amount" to be paid as detailed in the Amended Payment Schedule below) to be paid in bi-weekly installments. This Amended Compensation Amount shall be deemed to cover (a) Lash's unpaid salary for the period up to and including the Effective Date, (b) accrued and unused vacation time, if any, and (c) continued use of Lash's name and financial guarantees until the Lash has been removed from any and all GPB-affiliated dealership documents, banking documents, RMV or DMV documents, personal guaranties with proof for each provided and for Lash's name to be removed from Lash Volkswagen of White Plains and Lash Volkswagen of Oneonta (the "Removal Date"). During the period November 1, 2017 through March 31, 2018, Lash had a total of $100,000 held back from his compensation to contribute to the costs of the Dibre Litigation. Upon the occurrence of a Positive Resolution, as defined below, in the Dibre Litigation, Lash shall be paid $100,000 to reimburse him for his contribution to the costs of the Dibre Litigation. For the purposes of this Agreement a "**Positive Resolution**" shall mean a non-appealable judgment or a final settlement. in which (1) (a) GPB and/or its affiliates in fact, acquire the four (4) automotive retail dealerships subject to the Dibre Litigation or (b) Dibre returns to GPB and/or its affiliates all of the advances paid towards the acquisition of such automotive retail dealerships; and (2) GPB and/or its affiliates recover an additional amount of at least $10,000,000 in damages from Dibre. Upon the occurrence of an Acceptable Resolution, as defined below, in the Dibre Litigation, Lash shall be paid $50,000 to reimburse him for his contribution to the costs of the Dibre Litigation. For the purposes of this Agreement an "**Acceptable Resolution**" shall mean a non-appealable judgment or a final settlement. in which (1) (a) GPB and/or its affiliates in fact, acquire the four (4) automotive retail dealerships subject to the Dibre Litigation or (b) Dibre returns to GPB and/or its affiliates all of the advances paid towards the acquisition of such automotive retail dealerships; and (2) GPB and/or its affiliates recover an additional amount of at least $5,000,000 in damages from Dibre.

← ✳

*Rosenberg negotiated this date w/ Gentile*

Other than the health insurance being paid until year end, use of vehicles until December 31, 2018, the Amended Severance Amount and the Amended Compensation Amount (together "Amended Separation Amount") pursuant to the Amended Payment Schedule below, the Dibre Contribution, and the Dibre Participation, all as set forth herein, Lash will not be entitled to any other compensation or payment of any type, including, without limitation, wages, commissions, holiday pay, vacation pay, bonuses, insurance remittance

payments or severance.

*Cooperation with Transition:*

Lash agrees to execute any and all necessary and required documentation and reasonably cooperate with GPB and its personnel to provide an orderly transfer of his interests and/or his role, duties and responsibilities. GPB will prepare any necessary applications and/or communications with manufacturers. GPB will take the lead to ensure Lash is removed from any and all documents related to any GPB entities or dealerships, including but not limited to, any and all banking documents, RMV or DMV licenses, financing agreements and/or personal guaranties by September 1, 2018. Proof of all transfers and documentation will be provided to Lash on or before September 1, 2018 (the Removal Date). GPB further agrees to remove the Lash name from Lash Volkswagen of White Plains and Lash Volkswagen of Oneonta by the Removal Date. Lash will assist in any way to expedite this process and will promptly sign and return any documents necessary to effectuate these changes. Lash's failure to materially cooperate as necessary shall be a material breach of this agreement. GPB's failure to cooperate in transferring Lash from any documents associated with GPB entities or dealerships, including but not limited to all personal guaranties, by September 1, 2018 is a material breach of this Agreement. Nothing in this document shall prohibit Lash from contacting manufacturers, banks or DMV directly to inform them of his resignation in response to their requests for information.

GPB agrees to pay all fees, costs and expenses related to such cooperation with transition, including but not limited to objectively necessary travel expenses, lodging, and meals. In addition, GPB agrees to reimburse Lash for any taxes that are assessed against Jeffrey Lash for any transfers of equity or ownership contemplated by this Agreement. Lash shall not bear any of the expenses, costs, fees or taxes associated with such transfer of his ownership or equity. GPB agrees to pay on behalf of Lash all reasonable fees, costs and expenses associated with Lash's cooperation in connection with the Dibre Litigation, including but not limited to court costs, travel, lodging and food. Lash agrees to promptly submit all receipts for all such expenses to a GPB representative designated by David Gentile for approval and payment within thirty (30) days of submitting.

| *Dibre Participation* | In the event of a Positive Resolution of the Dibre Litigation, Lash will receive 2.5% of any damages or recovery actually received by GPB (excluding specific performance) over $10,000,000 net of attorney's fees paid by GPB for pursuing the claims against Dibre (the "Dibre Participation"). |
|---|---|
| *Payment Schedule* | The Amended Separation Amount and the Separation Debt will be paid and satisfied by the respective parties on the dates and in the amounts detailed in Amended **Schedule A** attached hereto; provided that each Amended Separation Amount due to Lash shall be offset by any amounts due to GPB under the Notes on such date.

When and if the Dibre Litigation is fully resolved by settlement or final non-appealable judgment and GPB is paid therefrom, any remaining amounts due as Separation Payment or amount due under the Notes will accelerate and be due within thirty (30) days of such final resolution of the Dibre Litigation. |
| *Miscellaneous Covenants:* | Lash agrees not to directly or indirectly recruit, solicit or hire any current employee or consultant of any of the GPB dealerships, or induce or attempt to induce any employee or consultant of any of the GPB dealerships to terminate his/her employment with, or otherwise limit or cease his/her relationship with, any of the GPB dealerships for a period of twelve (12) months unless he has express written permission from GPB. This section does not apply to Brian Brown, Javier Abreu ("Abreu") and/or Car Factory.

Lash agrees that until the Dibre Litigation is favorably resolved by settlement or final non-appealable judgment he will not engage or participate, directly or indirectly, as principal, agent, director, proprietor, joint venturer, owner, trustee, employee, employer, consultant, partner or in any other capacity |

whatsoever, in the conduct or management of, or own any stock or any other equity investment in or debt of, or provide any products or services of any nature whatsoever to or in respect of any business involving Dibre or any entity owned directly or indirectly or affiliated with Dibre that is competitive with the business conducted by GPB.

A material breach by Lash of any of his obligations in this Agreement shall relieve GPB from paying any and all payments due hereunder.  A material breach by GPB shall relieve Lash from paying any and all amounts on the Separation Debt.  This shall not preclude either party from seeking additional remedies in the event of a breach.

| | |
|---|---|
| *Confidential Information:* | Lash agrees to keep strictly confidential and not disclose any and all confidential and proprietary information of or relating to GPB.  Lash agrees he will not, directly or indirectly, use, disseminate, disclose, publish, or otherwise make available to any person, firm, corporation, unincorporated association or other entity any Confidential Information or any portion thereof, and will refrain from using it for his own purposes or from disclosing it to anyone outside GPB without GPB's prior written consent, except as defined below.<br><br>"Confidential Information" shall mean any confidential or proprietary information relating to GPB including, without limitation, the identity of GPB's clients, the identity of representatives of clients with whom GPB has dealt, the manner in which such services are performed or offered to be performed, the service needs of actual or prospective clients, client preferences and policies, pricing information, business and marketing plans, financial information, budgets, compensation or personnel records, non-public information concerning GPB's acquisition or disposition of assets, vendors, software, data processing programs, databases, client maintenance listings, computer software applications, research and development data, , and other trade secrets.  "Confidential Information" shall not include any information that (a) is or becomes generally available to the public other than as a result of a breach of duty by Lash; (b) was available to Lash on a non-confidential basis prior to the disclosure of such Confidential Information by GPB or thereafter becomes available to Lash from a source not known to bound by any confidentiality restrictions with GPB; (c) is disclosed pursuant to a governmental order or demand or under compulsion of law or by order of any court, governmental agency or self-regulatory organization, in which event Lash shall promptly notify GPB of such request for disclosure or legal requirement compelling disclosure so that GPB may seek a protective order or other appropriate remedy; (d) is disclosed with the prior written consent of David Rosenberg or other designated representative of GPB; or (e) has been independently developed by Lash without use of or reference to the Confidential Information. Lash's failure to comply with these confidentiality obligations shall be a material breach of this Agreement. |
| *Indemnification:* | Lash agrees to indemnify GPB, its owners, investors, officers, employees, agents, successors and assigns harmless from and against any and all third-party claims arising out of or based upon any fraud or illegal acts committed directly by Lash. Lash's indemnification obligations for any matter shall be reduced by the amount of any insurance proceeds actually received by GPB with respect to such matter. GPB will agree to indemnify Lash and hold him harmless from and against any and all third-party claims arising from his employment with or participation in GPB or any fraud or illegal acts committed by any partners or employees of GPB or partners or employees of Ascendant Capital.  The indemnification obligations will not extend to claims that arise from any willful or intentional acts by Lash that caused financial harm to GPB.  Further, GPB agrees to fully indemnify and defend and cover any costs related to any personal guaranties that Lash has executed in relation to the dealerships.  Lash's failure to cooperate as necessary shall be a material breach of this Agreement. GPB's failure to cooperate shall constitute a material breach of this Agreement. |
| *Nondisparagement:* | Unless otherwise required by law or in court (and where Lash provides reasonable advanced notice, if possible, so that GPB can take action to protect or defend itself), Lash agrees not to make any remarks or comments, orally, electronically or in writing, to manufacturers, banks, clients or otherwise, which could reasonably be construed to be derogatory or disparaging to, or which reasonably could be anticipated to be damaging or injurious to the reputation or good will of GPB or any of its members, shareholders, officers, |

|  | directors, employees, consultants, agents or advisors. Unless as part of a court filing or necessary public disclosure, GPB and any of its shareholders, officers, directors, employees, consultants, agents or advisors will agree not to make any remarks or comments, orally, electronically or in writing, to manufacturers, banks, clients or otherwise which could reasonably be construed to be derogatory or disparaging to, or which reasonably could be anticipated to be damaging or injurious to the reputation or good will of Lash. Nothing herein shall prevent Lash from making statements consistent with those he has described in **Exhibit 7**; provided that GPB takes no liability with respect to such statements accuracy or truth and Lash shall not hold himself out as an agent or representative of GPB when such statements are made. GPB agrees to hold a management meeting where Lash's resignation is discussed so everyone in attendance is provided notice of GPB's nondisparagement obligation herein, and if any GPB management is asked about Lash's resignation, they shall respond that he departed to pursue other ventures. In addition, GPB must provide notice to all key GPB employees about this nondisparagement clause. |
| --- | --- |
| *Mutual Releases:* | In consideration of the terms and conditions contained in this Agreement, GPB and its affiliated entities, past, present and future owners, members, shareholders, directors, officers, managers, agents, attorneys, representatives, investors, collectively, and Lash and his affiliated entities, collectively, except as specifically provided for in this Agreement, do hereby forever and irrevocably release, discharge and acquit each other from any obligations to each other, and any other agreements by and between the such parties, except as may be specifically referenced or contemplated herein, and, for the avoidance of doubt, excluding any breaches of or other claims arising from this Agreement. |
| *Taxes and Expenses:* | Except as specified above, each party shall bear its own respective taxes, costs and expenses, including the costs of their respective counsel, accountants, financial advisors and other representatives, in connection with the matters described in this Agreement. As provided above, GPB agrees to reimburse Lash for all costs, fees, and expenses related to transition obligations and cooperation in Dibre Litigation. GPB also agrees to reimburse Lash for taxes assessed against Jeff for his transfer of equity and ownership in GPB and individual dealerships. |
| *Confidentiality of Transaction Terms:* | Each party hereto agrees that it will not, without the prior written consent of the other party hereto, disclose publicly or to any third party (other than its key employees who are involved in the proposed transaction and its financial and legal advisors and accountants assisting them in connection with the proposed transaction ) the terms and conditions of this Agreement or the subsequent negotiations between the parties or the fact that discussions or negotiations have occurred or are occurring between the parties regarding the proposed transaction, except to the extent required by law, court order, or under any agreement to which GPB or Lash is a party or as reasonably necessary or appropriate to obtain the approval of the manufacturers or any other required third party consents. Except (a) as expressly provided herein, (b) communications with auto manufacturers and/or distributors regarding Lash's resignation and departure from GPB and (c) for general statements regarding Lash's resignation and departure from GPB, neither party shall issue any press release or make any other public announcement regarding the subject matter of this Amended Agreement or the transactions contemplated hereby without the prior consent of the other party hereto. Notwithstanding the foregoing, either party may generally and publicly announce Lash's resignation without prior written consent. |
| *Choice of Law:* | This Amended Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the statutes, laws and decisions of the State of New York. |
| *Legal Effect of this Agreement:* | While there will be separate agreements that more specifically detail the procedural terms of certain referenced actions, this Amended Agreement is binding on the parties. |

| Notices: | All notices hereunder shall be in writing (sent via Federal Express or other overnight delivery courier and shall be deemed delivered one (1) business day after the date sent upon sender's receipt of proof of delivery) and shall be sent to the applicable party at the address most recently identified or designated in writing to the sending party as its address for such purpose. |
|---|---|
| Attorneys' Fees: | Should any party hereto, or any heir, personal representative, successor or assign of any party hereto, resort to legal proceedings in connection with this Amended Agreement, the party or parties prevailing in such legal proceedings shall be entitled, in addition to such other relief as may be granted, to recover his, its or their reasonable attorneys' fees and costs in such legal proceedings from the non-prevailing party or parties. |
| Counterparts: | This Amended Agreement may be executed in two or more counterparts, each of which shall be deemed an original (including by means of PDF or other electronic transmission), and all of which together shall constitute one and the same instrument. |
| Entire Agreement: | This Amended Agreement (including all exhibits referenced herein and all documents contemplated herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, including but not limited to the Agreement dated February 10, 2018, both written and oral, of the parties with respect to the subject matter hereof. |

*SIGNATURE PAGE FOLLOWS*

1

IN WITNESS WHEREOF, the parties have executed this Amended Agreement for the Resignation of Jeffrey Lash and Transfer of Membership/Ownership Interest as of the date first above written.

GPB Capital Holdings, LLC

By:
   Name:
   Title:

Jeffrey Lash, Individually

## AMENDED SCHEDULE A

### Amended Severance Amount Chart

The following chart reflects the Amended Severance Payments to be paid to Lash:

| Payment Date | Amended Severance Amount | Separation Debt | Net Payment |
|---|---|---|---|
| February 12, 2018 | $2,500,000 | $(4,00,000) | $2,100,000 |
| May 1, 2018 | 25,000* | 0 | 25,000* |
| June 1, 2018 | 25,000* | 0 | 25,000* |
| July 1, 2018 | 25,000* | 0 | 25,000* |
| August 1, 2018 | 25,000* | 0 | 25,000* |
| September 1, 2018 | 25,000* | 0 | 25,000* |
| October 1, 2018 | 25,000* | 0 | 25,000* |
| November 1, 2018 | 25,000* | 0 | 25,000* |
| December 1, 2018 | 25,000* | 0 | 25,000* |
| January 1, 2019 | 25,000* | 0 | 25,000* |
| February 1, 2019 | 25,000* | 0 | 25,000* |

| | | | |
|---|---|---|---|
| March 1, 2019 | 25,000* | 0 | 25,000* |
| April 1, 2019 | 25,000* | 0 | 25,000* |
| May 1, 2019 | 25,000* | (5,000) | 20,000* |
| June 1, 2019 | 25,000* | (5,000) | 20,000* |
| July 1, 2019 | 25,000* | (5,000) | 20,000* |
| August 1, 2019 | 25,000* | (5,000) | 20,000* |
| September 1, 2019 | 25,000* | (5,000) | 20,000* |
| October 1, 2019 | 25,000* | (5,000) | 20,000* |
| November 1, 2019 | 25,000* | (5,000) | * 20,000* |
| * December 1, 2019 | * 25,000* | * (5,000) | * 20,000* |
| * January 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * February 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * March 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * April 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * May 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * June 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * July 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * August 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * September 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * October 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * November 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * December 1, 2020 | * 25,000* | * (5,000) | * 20,000* |
| * January 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * February 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * March 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * April 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * May 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * June 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * July 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * August 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * September 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * October 1, 2021 | * 25,000* | * (5,000) | * 20,000* |
| * November 1, 2021 | * 25,000* | (5,000) | 20,000* |



| | | | |
|---|---|---|---|
| December 1, 2021 | 25,000* | (5,000) | 20,000* |
| January 1, 2022 | 25,000* | (5,000) | 20,000* |
| February 1, 2022 | 25,000* | (5,000) | 20,000* |
| March 1, 2022 | 25,000* | (5,000) | 20,000* |
| April 1, 2022 | 25,000* | (5,000) | 20,000* |
| May 1, 2022 | 25,000* | (5,000) | 20,000* |

*In the event of a Positive Resolution of the Dibre Litigation before May 1, 2022, then the Amended Severance Payments in the Amended Severance Chart shall be increased from $25,000 to $50,000 and the Separation Debt offset shall be increased from $5,000 to $10,000, in each case as of the next Payment Date after the date of a Positive Resolution of the Dibre Litigation and continuing on the payment dates set forth in the above chart. In the event of an Acceptable Resolution of the Dibre Litigation before May 1, 2022, then the Amended Severance Payments in the Amended Severance Chart shall be increased from $25,000 to $37,500 and the Separation Debt offset shall be increased from $5,000 to $7,500, in each case as of the next Payment Date after the date of an Acceptable Resolution of the Dibre Litigation and continuing on the payment dates set forth in the above chart.

### Amended Compensation Amount Chart

The chart below shows the Amended Compensation Amount to be paid to Lash pursuant to this Amended Agreement until the Removal Date.

| Payment Date | Amended Compensation Amount | Separation Debt | Net Payment |
|---|---|---|---|
| April 15, 2018 (to be paid on April 27, 2018) | $50,000 | $(10,000) | $40,000 |
| April 30, 2018 | 50,000 | (10,000) | 40,000 |
| May 15, 2018 | 50,000 | (10,000) | 40,000 |
| May 31, 2018 | 50,000 | (10,000) | 40,000 |
| June 15, 2018 | 50,000 | (10,000) | 40,000 |
| June 30, 2018 | 50,000 | (10,000) | 40,000 |
| July 15, 2018 | 50,000 | (10,000) | 40,000 |
| July 31, 2018 | 50,000 | (10,000) | 40,000 |
| August 15, 2018 | 50,000 | (10,000) | 40,000 |
| August 31, 2018 | 50,000 | (10,000) | 40,000 |

In the event of a Positive Resolution of the Dibre Litigation, then at such time, GPB will reimburse Lash in an amount $100,000 for his prior contributions to the costs of the Dibre Litigation. In the event of an Acceptable Resolution of the Dibre Litigation, then at such time, GPB will reimburse Lash in an amount $50,000 for his prior contributions to the costs of the Dibre Litigation.

1

# EXHIBIT C

*CONFIDENTIAL*
*Execution Copy*

## SETTLEMENT AGREEMENT

This Settlement Agreement dated November 14, 2018 is made and entered into by and among Jeffrey Lash ("Lash") and GPB Capital Holdings, LLC, GPB Holdings, LP, GPB Automotive Portfolio LP, GPB Holdings II, LLC GPB Holdings Automotive, LLC, GPB Portfolio Automotive, LLC, Capstone Automotive Group, LLC and Capstone Automotive Group II, LLC (collectively, "GPB").

WHEREAS Lash formerly owned a minority interest in GPB Holdings Automotive, LLC, GPB Portfolio Automotive, Capstone Automotive Group, LLC, Capstone Automotive Group II, LLC and certain other entities and was employed by GPB and served as a manager of those entities;

WHEREAS Lash and GPB entered an Agreement for the Resignation of Jeffrey Lash and Transfer of Membership/Ownership Interest effective February 10, 2018 ("Resignation Agreement"), which terminated Lash's employment with GPB, and transferred his ownership interests in GPB Holdings Automotive, LLC, GPB Portfolio Automotive, Capstone Automotive Group, LLC, Capstone Automotive Group II, LLC and certain other entities as set forth in the Resignation Agreement;

WHEREAS the Resignation Agreement was superseded on April 30, 2018 by the legally binding Amended and Restated Agreement for the Resignation of Jeffrey Lash and Transfer of Membership/Ownership Interest ("Restated Agreement"). Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Restated Agreement;

WHEREAS Lash has alleged that GPB breached certain obligations under the Restated Agreement,

NOW THEREFORE, in order to resolve this dispute, without prejudice, and for consideration of the mutual covenants, promises and agreements contained herein, the sufficiency of which is hereby acknowledged, GPB and Jeffrey Lash, intending to be legally bound, hereby agree and stipulate to the following terms of this Settlement Agreement:

**1. Lash Removal.** GPB agrees to take immediate steps to remove Lash from all business, financial and/or regulatory documentation relating to GPB or its affiliated entities or dealerships as may be necessary to reflect that Lash has no responsibility for their operations or liabilities. The documentation ("Documentation") may include, but are not limited to, all banking documents, dealer agreements, RMV or DMV licenses, leases, financing agreements, and/or personal guarantees. Required actions may include, but are not limited to, removing Lash's name, formally transferring Lash's prior responsibilities or liabilities to a replacement person, and submitting information/obtaining approvals as might be necessary to effectuate these changes. Lash agrees to sign and return all documents as necessary to effectuate these changes.

Lash shall work with David Rosenberg ("Rosenberg") and Scott Silverman ("Silverman") to compile a list of all outstanding Documentation to completed as referenced above with a target date of March 31, 2019. When all items on the list are completed, GPB shall certify to Lash in a notarized writing that all such changes have been effectuated, and that there is no current

agreement or document indicating that Lash has any responsibility for the operations or liabilities of GPB or any of its affiliated entities or dealerships ("Removal Certification"). Until this true and complete Removal Certification is received, Lash will continue to receive the Amended Compensation Amount per the Restated Agreement ($50,000 per month, paid in two installments of $25,000 each on every 15th and last day of the month) without any reduction for Separation Debt ("Settlement Compensation Amount"). If the true and complete Removal Certification is delivered before the last day of any month, then such Settlement Compensation Amount shall be prorated by the number of days in the month during which it remains outstanding. It is understood and agreed that providing a Removal Certification without fulfilling all removal obligations will constitute a material breach of this Settlement Agreement.

Given that the Removal Certification is a material inducement for the Lash to enter into this Settlement Agreement, and given that Lash is reasonably relying on the veracity of the Removal Certification, the delivery of a Removal Certification that is untrue or incomplete in any material way shall not halt the accrual of the Settlement Compensation Amount, and the Settlement Compensation Amount shall continue to accrue until such time as GPB delivers a true and complete Removal Certification to Lash.

**2. Separation Debt.** The Resignation Agreement and the Restated Agreement both required Lash to pay a Separation Debt totaling $863,000. Lash has already paid $470,000 of that debt.

In order to satisfy the above terms agreed between the parties with respect to the Separation Debt, the following will actions will be taken:

- GPB hereby certifies that the Promissory Notes issued by Lash to GPB dated February 10, 2018, having a face value of $183,000 and $680,000 respectively, are null and void and that Lash is released from any further obligations thereunder.

- GPB shall pay to Lash an aggregate amount of $240,000 (representing a portion of the Separation Debt already paid by Lash) over twenty-four (24) months in equal monthly payments commencing on December 1, 2018 and continuing until November 1, 2020.

Failure of GPB to pay these amounts or honor its obligations under this Article will constitute a material breach of this Settlement Agreement.

**3. Amounts Owed and to be Paid under Restated Agreement (with Agreed Acceleration of Certain Payments).** GPB agrees to immediately pay all amounts previously withheld and overdue (as specified in this section below) and will proceed forward paying further amounts, with an agreed upon acceleration, according to the Restated Agreement and according to the terms set forth below (and in amounts specified and to be possibly increased and accelerated pending the resolution of the Dibre litigation).

a. **Past Due Amounts Owed.** GPB shall wire the full amount of past monies owed to Lash totaling $180,000 as detailed below no later than November 16, 2018. Failure to pay this

amount as provided herein will constitute a material breach of this Settlement Agreement.  The past due amounts are calculated as follows:

- $100,000 in past due amounts (through and including December 1, 2018) under Amended Severance Amount Chart in Amended Schedule A of the Restated Agreement without any reduction for Separation Debt;

- $80,000 in past due amounts (through and including November 30, 2018) under the Amended Compensation Amount Chart in Amended Schedule A of the Restated Agreement without any reduction for Separation Debt;

b. **Agreed Upon Acceleration of Severance Payments and Continued Payment of Amended Severance Amounts and Amended Compensation Amounts.** GPB has agreed to accelerate eighteen (18) months of the Amended Severance Amount, which shall be paid as set forth below, and pay the remaining 23 months as specified on the Payment Schedule attached hereto as Exhibit and as provided below.  Failure to pay any of the amounts detailed below will constitute a material breach of this Settlement Agreement.

- $300,000 to be wired on November 16, 2018, representing an accelerated amount of the last twelve (12) months of the Amended Severance Amount (June 1, 2021 through May 1, 2022) at the rate of $25,000 per month (without any reduction for Separation Debt).  This payment is set forth in the Payment Schedule attached hereto as Exhibit A.  This payment will not affect any additional amounts payable to Lash in the event of a Positive Resolution or an Acceptable Resolution of the Dibre litigation.

- $150,000 to be wired in twenty-four (24) equal monthly payments between December 1, 2018 and November 1, 2020, representing an accelerated amount of six (6) months of the Amended Severance Amount (December 1, 2020 through May 1, 2021) at the rate of $25,000 per month (without any reduction for Separation Debt).  These payments are set forth in the Payment Schedule attached hereto as Exhibit A. These payments will not affect any additional amounts payable to Lash in the event of a Positive Resolution or an Acceptable Resolution of the Dibre litigation.

- The remaining twenty-three (23) monthly payments of the Amended Severance Amount (January 1, 2019 through November 1, 2020) shall be paid on the first day of each month commencing on January 1, 2019 and ending on November 1, 2020 (without any reduction for Separation Debt). These payments are set forth in the Payment Schedule attached hereto as Exhibit A. These payments will not affect any additional amounts payable to Lash in the event of a Positive Resolution or an Acceptable resolution of the Dibre litigation.

As provided in Section 1 above, GPB agrees to continue to pay the Amended Compensation Amount until Lash received the Removal Certification.

c. **Other Amounts Owed Per the Restated Agreement.**  GPB has agreed to compensate Lash for other costs as detailed herein.  Failure to pay any of the amounts as specified herein, or not referenced here but in the Restated Agreement, shall constitute a material breach of this Settlement Agreement.

- In the event of a Positive Resolution of the Dibre Litigation, Lash will receive 2.5% of any damages or recovery actually received by GPB (excluding specific performance) over $10,000,000.00 net of attorney's fees paid by GPB for pursuing the claims against Dibre as specified in the Restated Agreement.

- GPB agrees to pay all fees, costs and expenses related to cooperation with transition and/or cooperation with the Dibre Litigation as provided in the Restated Agreement.

- Per the Restated Agreement, GPB agrees to continue providing health and dental insurance for Lash and his family through December 31, 2018.

- GPB agrees to reimburse Lash for any and all taxes assessed against him relating to the transfer of his prior equity and ownership in GPB and individual dealerships as per the Restated Agreement.  GPB agrees that Lash is not liable for any expenses, costs, fees or taxes associated with such transfer of his ownership or equity or concerning, in whole or in part, the operations of any GPB entity or dealership since February 10, 2018.

- In the event that the Dibre litigation settles, then GPB shall pay an additional $100,000 payment to Lash.

- GPB agrees that Lash is not liable for any accounting fees charged by Gentile, Pismeny and Brengal over the past eighteen months relating to accounting for Bob's Buick/GMC or any other GPB dealerships**.**

**4. Indemnification.**  GPB shall indemnify and hold harmless Lash from and against all allegations, claims, actions, suits, demands, damages, liabilities, obligations, losses, settlements, judgments, costs and expenses (including without limitation attorney's fees and costs) which arise out of, relate to or result from any act, omission, or operations since February 10, 2018 of any and all entities or dealerships affiliated with GPB.

**5. Intentionally omitted.**

**6. Non-disparagement.**  GPB and Lash agree to abide by the non-disparagement clause of the Restated Agreement.

**7. Material Breach of this Settlement Agreement:** If GPB fails to pay any of the amounts in the time periods or on the dates as specified in Sections 1, 2, 3, 4 and 5 above, it will be considered a material breach of this Settlement Agreement and Lash is entitled to all relief as provided to him in the Restated Agreement, including but not limited to, all of the Performance Debt that Lash has already paid to GPB in addition to other remedies that may be available by

law.  If Lash fails to dismiss the lawsuit as provided in Section 7 above or fails to pay the amount owed under Section 2 after receiving all monies owed to him, GPB will be relieved from paying any and all payments due hereunder.

**8. Mutual Releases.**  In consideration of the terms and conditions contained in this Settlement Agreement , GPB and its affiliated entities, past, present and future owners, members, shareholders, directors, officers, managers, agents, attorneys, representatives, investors, and employees (collectively the "GPB Parties") and Lash and his affiliated entities (collectively the "Lash Parties"), except as specifically provided for in this Settlement Agreement , do hereby forever and irrevocably release, discharge and acquit each other from any obligations to each other, and any other agreements by and between the such parties, except as may be specifically referenced or contemplated herein or arising from this Agreement.  Notwithstanding anything in the foregoing sentence, in the event of any material breach by GPB including any breach any of its payment obligations under this Agreement, then Lash shall be authorized by GPB seek recovery of any Separation Debt paid by Lash, attorneys' fees or any other financial obligations under the Resignation Agreement and/or Restated Agreement.

Additionally, Lash does hereby absolutely, fully and forever, release and discharge the GPB Parties from any and all claims and liabilities that were included in the dismissed lawsuit entitled *Jeffrey Lash v. GPB Capital Holdings, LLC et al.*, and assigned case number 2:18-cv-05622 DRH AKT.

**9. Confidentiality.** Each party hereto agrees that it will not, without the prior written consent of the other party hereto, disclose publicly or to any third party (other than its key employees who are involved in the proposed transaction and its financial and legal advisors and accountants assisting them in connection with the proposed transaction ) the terms and conditions of this Settlement Agreement or the subsequent negotiations between the parties or the fact that discussions or negotiations have occurred or are occurring between the parties regarding the proposed transaction, except to the extent required by law, court order, subpoena, or under any agreement to which GPB or Lash is a party or as reasonably necessary or appropriate to obtain the approval of the manufacturers or any other required third party consents.  Nothing in this Agreement shall prohibit you from filing a charge or complaint, or reporting suspected violations of law or regulation to any governmental agency, regulatory body, self-regulatory organization, or law enforcement agency (collectively a "law enforcement entity"), or from making any other disclosures that are protected under any law or regulation, or from participating or cooperating in any inquiry, investigation, or proceeding conducted by such law enforcement entity.  No prior authorization of, or notice to, the Company is needed to make such reports or disclosures.

**10. Choice of Law/Dispute Resolution.** This Settlement Agreement, and all claims or disputes arising from or related to its subject matter, shall be governed and controlled by the statutes, laws and decisions of the State of New York without respect to conflicts of law provisions.  Prior to commencing any legal action in connection with any dispute based upon this Agreements, that parties represent and agree that aggrieved party shall first notify the other party of such dispute.  If the parties cannot resolve such dispute within fourteen (14) days, then the aggrieved party shall submit the dispute to non-binding mediation to a single mediator at JAMS with the mediation to take place in New York County, New York pursuant to the current

mediation rules adopted by JAMS.  If the parties cannot resolve the dispute within sixty (60) days of the submission of the dispute to JAMS, then the aggrieved party may commence a civil action in a court of suitable jurisdiction located in New York County, New York.

**11. Legal Effect of this Agreement.** While there will be separate agreements that more specifically detail the procedural terms of certain referenced actions, this Settlement Agreement is binding on the parties.

**12. Notices.** All notices hereunder shall be in writing (sent via Federal Express or other overnight delivery courier and shall be deemed delivered one (1) business day after the date sent upon sender's receipt of proof of delivery) and shall be sent to the applicable party at the address most recently identified or designated in writing to the sending party as its address for such purpose.

**13. Attorneys' Fees.**  Should any party hereto, or any heir, personal representative, successor or assign of any party hereto, resort to legal proceedings in connection with this Amended Agreement, the party or parties prevailing in such legal proceedings shall be entitled, in addition to such other relief as may be granted, to recover his, its or their reasonable attorneys' fees and costs in such legal proceedings from the non-prevailing party or parties.

**14. Counterparts.** This Amended Agreement may be executed in two or more counterparts, each of which shall be deemed an original (including by means of PDF or other electronic transmission), and all of which together shall constitute one and the same instrument.

**15. Entire Agreement.** This Settlement Agreement (including all exhibits referenced herein and all documents contemplated herein) and the Restated Agreement to which it refers constitute the entire agreement of the parties with respect to the subject matter hereof.  Any agreements or amounts not specified in this Settlement Agreement shall be paid as provided in the Restated Agreement.  In the event of any conflict between any provision of this Settlement Agreement and any provision of the Restated Agreement, the Settlement Agreement shall control and provide the pertinent right or obligation.

*SIGNATURE PAGE FOLLOWS*

*CONFIDENTIAL*
*Execution Copy*

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement as of the date first above written.

GPB Capital Holdings, LLC

By:_____
Name: David Gentile
Title: Manager

GPB Holdings, LP

By:_____
Name: David Gentile
Title: Authorized Signatory

GPB Automotive Portfolio LP

By:_____
Name: David Gentile
Title: Authorized Signatory

GPB Holdings II, LP

By:_____
Name: David Gentile
Title: Authorized Signatory

GPB Holdings Automotive, LLC

By:_____
Name: David Gentile
Title: Manager

GPB Portfolio Automotive, LLC

By:_____
Name: David Gentile
Title: Manager

7

Capstone Automotive Group, LLC

By: _____

    Name: David Gentile

    Title: Manager

Capstone Automotive Group II, LLC

By: _____

    Name: David Gentile

    Title: Manager

_____

Jeffrey Lash, Individually

8

# EXHIBIT D

# GPB CAPITAL HOLDINGS, LLC ORG. CHART



For illustrative purposes only
© 2016 GPB Capital Holdings, LLC  |  535 West 24th Street, Floor 4  |  New York, NY 10011  |  877.489.8484  |  GPB-Cap.com

FOR INSTITUTIONAL USE ONLY

# EXHIBIT E

Dear Judge Kovner,

My name is Ann Lash and I am Jeff Lash's mother. I am writing to tell you of the very special person my son Jeff is.

As I am writing this letter, I am thinking of a passage by Wordsworth-

"How far you go in life depends on your being Tender with the young, Compassionate with the aging. Sympathetic with the striving and Tolerant of the weak and the strong."

"Tenderness", is exemplified in the wonderful relationship Jeff has with his four teenagers. He has taught them to work hard and to use their considerable talents to better themselves and those around them. Jeff's mantra has always been hard work, love of country and kindness to everyone no matter what their color or creed. During the last three years, Jeff has discussed every aspect of what has happened in his business. His children received honest answers and knowledge of their father's stress and challenges and of the situation that their father had been facing.

Jeff has always had a great love and "Compassion"for the elderly. I can remember when Jeff who had only four days off over a Thanksgiving Holiday flew his wife and their new baby to Scotland to surprise to his widowed grandmother.  My mother never forgot this loving act of kindness and the thrill of seeing her first great grandchild.

"SYMPATHETIC "with the striving –

My husband and I recently visited Jeff's dealership in upstate New York. We met many of the over 70 employees who told us stories of how Jeff had helped them achieve their goals in the car business. Many said that they had been helped financially especially during Covid. Many just wanted us to know what a great guy and boss Jeff was. They appreciated the good working conditions and the standards Jeff set to help the employees and give time and value to the customers. I think in many ways this quote says what I feel-

"LET US LEARN FROM THE PAST, TO PROFIT BY THE PRESENT, TO LIVE BETTER IN THE FUTURE."

I sincerely ask you Judge Kovner to consider this man of kindness and compassion as you determine his sentence.

Sincerely

Ann Lash

# EXHIBIT F



12.30.24


To Whom It May Concern:


I request the court's permission to submit a letter attesting to Jeffrey Lash's (DOB 4-11-69) character for reference in his upcoming sentence hearing. I serve as the Executive Vice President and Surgeon in Chief at Connecticut Children's and the Vice Chair of Surgery at the University of Connecticut, having worked at these institutions since 2007. I am not familiar with the exact charges or circumstances of this hearing; however, I would like to share that Jeff is a good person, as I believe that is important.

Relevant to this attestation, I have known Jeffrey Lash for over 20 years both before and after he became my brother in law. Over the years, I have been able to witness Jeff's growth, maturity, philanthropy, and kindness, which are the traits I would like to highlight as they demonstrate positive contribution to society.

I first came to know Jeff when he began dating my sister. It was a tough time for me personally, as my first husband was suffering from a brain tumor and I was trying to complete my pediatric surgery fellowship far from home in Little Rock Arkansas. It was during this time where I witnessed Jeff's kind heart and compassion. He readily flew to Arkansas (even though he was not family yet) and spent a few weeks caring for Ross so I could complete my fellowship.  This entailed taking him to the doctor, cooking and cleaning as well as helping him with activities of daily living- not easy tasks. Not many individuals would be selfless enough to put their life on hold to care for a young individual with a terminal illness. On top of it, Ross was not always lucid and his care required constant vigilance. Jeff was up for the task and he contributed to my success in becoming a pediatric surgeon. Ross would most certainly thank him.

Similarly, my father fell ill to amyloidosis, a rare blood cancer, and that same compassion once again came shining through. Jeff would purposefully go to Long Island under the guise of picking up something for work so he could help my mom and dad on household chores as my dad's strength began deteriorating. He was a constant source of support during this time for my sister as well as my mom, two individuals who are currently steadfast in their support of Jeff. This is even more poignant now as his own father just received a cancer diagnosis of Hairy Cell Leukemia and the uncertainty of what this hearing will bring is weighing heavily on Jeff.

On a less personal note, I have witnessed Jeff take employees that are struggling financially and give them a few months' rent to get them through. He donates routinely to local charities and supports his wife in her role as Guardian Ad Litem. Jeff is inherently kind, and even when his world turned upside

down by his former employer and these allegations, he continued to act in selfless ways because it comes naturally to him.

I can also attest to the personal growth and maturity I have witnessed over the years as Jeff became a husband and then a father. Both of these roles required selfless acts and hard work. He has four beautiful children that cherish him. He has worked hard to provide for them and he would admit that he has not always been right; but he has <u>always</u> tried. He encourages them to get a college education and reminds them of the value of family. He participates in fundraisers with them to emphasize the importance of community service. Currently, their worry about their father is unparalleled.

In conclusion, I would like to emphasize that Jeff Lash is a kind, compassionate soul with a loving family. His presence is needed in his home while his four kids traverse their teenage years. His father, newly diagnosed with Hairy Cell Leukemia, needs him now. Thank you for your kind attention and grace in allowing me to submit this letter.


Sincerely,

Christine Finck, MD; FACS
EVP, Surgeon in Chief, Vice Chair of Surgery
Professor of Pediatrics and Surgery
Connecticut Children's
University of Connecticut
cfinck@connecticutchildrens.org
860-545-9520

# EXHIBIT G

Honorable Judge Rachel Kovner,

  I am writing to provide a character reference for my father, Jeffrey Lash. I am pleased to share how much he truly means to me, my family, and to so many others. For as long as I can remember if you asked me who my best friend was, I would never hesitate to tell you that it was my dad.My dad is the kind of person that gives you a jacket off his back no matter how cold he is, or to give you his last Twix bar, no matter how bad he knows he wants it. This is not only evident to my family, but almost everyone my dad meets. My father is constantly putting his family, friends, and even strangers in front of himself, and I truly believe to know him is to love him.

  Growing up, he worked tirelessly to provide for us, always working extra hard and long hours to ensure we got everything we needed. After a long day of work, many would think, like most fathers, that he would just come home, eat dinner, and go to sleep, but that never happened. No matter what, when my father got home, he would never fail to make time with his kids and his wife. No matter how stressful his day was, he would come through the door with the same peanut butter sunday from Friendly's for my mom, and always head straight to the playroom to play with us and re-assemble all the toys we had somehow broken during the day. In some cases, when he got home really late, he would make sure to go into all our rooms and give us all back scratches and kisses goodnight no matter how tired he was, even though most of the time, by the second or third back scratch he was fast asleep in his work clothes in one of our beds. My dad's dedication to my family is something I have always admired deeply, and a trait I strive to have with my future family one day.

  My dad, like many, has faced many challenges in life, but he has always managed to rise above them with grace and determination, and to teach us to do the same. He has always taught me the importance of resilience and staying positive even when nothing seems to be going your way. Recently, my grandfather was in the hospital in intensive care, and my dad stayed by his side day and night, holding his hand and reassuring him that everything would be ok, while also making sure my grandma was taking care of herself. Although he was at the hospital for 15 hours a day, he would make sure to come home for an hour or so to see me and my siblings and make dinner for us before heading back to stay overnight at the hospital. Another time, about a year ago, I had gotten a terrible stomach bug from the children I babysit. I was up all night throwing up almost every twenty minutes for three days. My dad did not leave my side for those three days and made sure I was drinking all the necessary fluids to get better, he sat through and watched my favorite shows with me, even though Gossip Girl and The Vampire Diaries were probably not the shows he wanted to be watching for three days straight. That weekend he canceled all of his own plans to keep me company, even though I did not need constant care. These examples are only few of many that show just how caring and compassionate he is, and how he will always put others before himself. He's the first to step up when anyone needs help no matter the effect on himself.

I recall a couple of years ago when my father would drive me to the Publix up the street, for school supplies or groceries we needed. The first couple of times, I got what I needed and went to the car; my father told me he would be there in a minute. So I would usually just play on my phone while I waited, not paying attention to what my father was doing. But then I asked myself what was taking so long. I looked over to see my father speaking with a homeless individual I had often seen outside the store. I would watch him sit next to this man, and after about five or ten minutes, the conversation ended, and my father, to my shock, got up and hugged this homeless person. At first this  took me back as I thought it was not normal in our society to approach strangers, yet hug them! Later, I would find out from my mother that my dad spent almost every day for months stopping by, giving him food  and just spending time talking with him. My father knew this man's history, family issues, problems, work history, and detailed information. I remember asking my father what they talked about each day, and he would only tell me it was just a special friendship. One night I saw my dad packing a big backpack and asked my father where he was going, he said he would be back in a minute and was just running up the street to make sure that his friend, Chuck was warm enough. In the backpack was a warm meal, water, and a blanket and pillow as it was very cold that night. I remember he returned and told my mother he could not find him anymore. The next day, he looked again, and nothing. He spent days looking around with no success and checking at the local hospitals.  He said he hopes Chuck made it back to Georgia to be with his family and was blessed with the time and relationship he had made with him. This instance showed me the importance of helping people no matter what society tells you. Now that I am grown up, I now try to always keep a little time free when going into Publix's to talk to whomever might be out there in need of a bottle of water or some food or just a little conversation. My friends ask me why I do this, I tell them it is what my father has taught me. "Try not to judge bye only what you see."

I could go on and on and give thousands of examples and instances that further shows my fathers selfless, and caring character. So as my dad goes in front of you, I hope you can see what a true blessing he is to his family, friends, employees and everybody else around him. I deeply appreciate your consideration, and can only hope for a positive outcome from all of this.

Thank you so much,

 Kylie Lash.

# EXHIBIT H



January 22, 2025


To Whom It May Concern:


I request the court's permission to submit a letter attesting to Jeffrey Lash's (DOB 4-11-69) character for reference in his upcoming sentence hearing.


I own an Advertising Agency that specializes in the Automotive Dealership category and have known Jeff in that capacity for about 20 years.


I first met Jeff when he was managing a large dealer group in Connecticut and then continued our working relationship when he hired us to be his Ad Agency in 2010 when he started his own dealership, Lash Volkswagen.


I found Jeff to be an honorable businessman. He paid all his invoices in a timely fashion. He was straightforward with his expectations and always treated my entire staff in a professional manner. Jeff was always willing to give his employees and vendors a second chance to correct or improve on something. Under his guidance, I saw the dealership grow to become one of the largest VW dealerships in the State of New York.


When you work with someone for such a long time you get to know their character well. I know that Jeff is a great family man, as he is always speaking proudly of his wife and children. I know that Jeff gives graciously to various charities.  I also know that whenever Jeff has given me his word, he has stuck to it.


It is my sincerest hope that the court sees fit to grant a second chance to a man who clearly deserves one.


Sincerely,


Henry Kwartler

President

Kea Advertising Inc.

217 Route 303

Valley Cottage, NY 10989

# EXHIBIT I



Nov 4th 2024

To Whom it May Concern:

I am writing to express my support for Jeffrey Lash, someone I am proud to call a friend and a person of integrity.

I've known Jeff since 2020, when I served as the Director of Variable Operations for West Herr Automotive Group. During that time, I was part of the team overseeing the sale of Spurr Subaru (Jeffs then dealership) to West Herr. Jeff impressed me with his honesty, helpfulness, and straightforward approach throughout all business dealings. As our landlord during the 36-month transition, he went above and beyond to ensure our needs were met and our operation were running smooth. Jeff even allowed us to get out of our lease early, with <u>no penalty</u> in order for us to move into our newly built Subaru store in Greece where it was relocated. It was a pleasure doing business with him then, and I would gladly work with him again in the future.

What I have come to admire most about Jeff over the years is his unwavering dedication to his wife, Danielle, and their children. He is a devoted husband and father, and his family is clearly his top priority. This shared commitment to family values is one of the reasons I hold Jeff in such high regard, both personally and professionally.

It is with full confidence that I vouch for Jeff as a kind, honest, and principled individual. He has much to offer his family, his community, and his professional network in the years ahead. I look forward to supporting him as he continues to grow and evolve.

Sincerely,

Charles Hardy

President / CEO
Legacy Automotive Partner
Buffalo, NY
716-531-5429
chardy@legacyautopartners.com

# EXHIBIT J

January 9, 2025


The Honorable Judge Rachel Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kovner:

My name is Jeff Selnick, I own an agency that works with auto dealers in Western NY for 16 yrs.

I met Jeff 7 years ago, we hit it off immediately not only from a business perspective, but on a personal level.

From a business standpoint I was introduced to Jeff by the two biggest and best dealers in town and two of the smartest men I know personally. I was told that I would like Jeff a lot not only because he was an exceptional car dealer but an exceptional person as well. Through that introduction Jeff gave me a continuing opportunity to work with his team at Spurr, a dealer I have worked with since I first started as an agent. Needless to say the numbers have never been better, my responsibility was to train his finance and sales department, and he would sell my products as compensation. That relationship has proven to be a successful one for both of us. I work with a lot of stores in the area and everyone I've dealt with says the same thing,he is a class act and extremely smart dealer that understands people and has an uncanny ability to connect with people on every level, whether talking to the janitor or executive of a bank.

 One of my responsibilities in his store is in some ways to be his eyes and ears when he isn't in. In one case I recommended that one of his sales managers be terminated for a negative pervasive attitude. Jeff listened and understood but took that employee aside to find out that he was having some difficulties at home and that it was affecting his work. Jeff was able to empathize with him and instead of terminating him worked with him to help. That's when I learned how special a boss and person Jeff was, and taught me how better to handle a  situation like that for my own business. One of the other things I do is help find employees for dealers, But I will not send a well qualified candidate into a bad situation, dealers are a different breed and often have bad practices, pay-plans etc... that said, I would send the best of the best to Jeff knowing that person will be treated with respect and a generous compensation plan. As evidenced by a Finance Manager I sent to him last year

that has worked out as good as either of us would have hoped. That employee thanks me regularly for putting him in this spot.

Being that we are roughly the same age our life experiences were early talking points that have led to a meaningful friendship based on mutual respect and appreciation. At my age it's easy to see through peoples' "stuff". There is nothing fake about him, he is genuine and it's easy to see. I am at a point with Jeff that I know if I needed help, I could go to him and he would help in any way he could without holding it over my head, And I would do the same for him. As time has gone on our wives and us have been together and we couldn't think of people we would rather hang out with more than Jeff and Danielle. When people are genuine it's easy to see. They are certainly that.

I don't put my name and reputation on many people, but I would put my name on Jeff Lash for any recommendation needed in a heartbeat.


Jeff.Selnick



Automotive Legacy Development Inc

716-628-4544

jeff@automotivelegacydevelopment.com

# EXHIBIT K

December 2, 2024

The Honorable Judge Rachel Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kovner:

I am Jeffrey Lash's wife of 22 years. I know Jeff is appearing before you for
sentencing, and I would like the opportunity to give you a glimpse of the man I
know and deeply love. I am an attorney who graduated from Boston College Law
School in 1997. As such, I am a staunch advocate for our justice system, and the
societal need for judges to impose punishment when it is warranted.

I know this case intimately, having lived through the years of anguish and trauma
that Jeff's former employment at GPB Capital brought to our family. Further, the
delay tactics by the defendants over many years since their arrest has been terribly
distressing. I am confident, especially given your extraordinarily impressive
record, that you will render a sentence for my husband that is fair given the
testimony and my husband's complete willingness to cooperate from the very first
time he was approached by the government.

First, I would like to shed some light on the man whose fate is in your hands. Jeff
was raised by two parents who have been married for 55 years, and he has one
brother who is married with 2 adult children. Jeff and I married in 2002, and we
raised 4 children (2 girls and 2 boys) in Sandy Hook, CT. We moved to Naples,
FL in 2013 after the horrific and senseless tragedy that took place on December 14,
2012. Jeff was working for GPB Capital at this point so this move meant he would
be traveling extensively away from his family. But moving the children away from
an environment where there were numerous lockdowns, and where they feared for
their safety was simply non-negotiable for us. Nevertheless, the move meant that
Jeff was essentially away from us for approximately 25 days out of every month.

Despite the long hours and constant travel, Jeff made it home most weekends and
would spend quality time with his children. In fact, I was a guardian ad litem for
several foster children, and Jeff would spring into action when he returned home.
He wouldn't only take care of our children, but he would pitch in with the foster
children. In fact, there was one child he took to dinner and football practice every

Friday night. Jeff never complained, despite evident exhaustion. He fully supported me when I had these additional children over our house or when they accompanied us on vacations. Jeff made a significant impact on several children who otherwise had no father figures, offering advice and providing stability.

But Jeff's kindness and compassion was not limited to children. Jeff is the type of person who cannot see someone suffer without offering significant assistance. For example, prior to Jeff's employment at GPB, we had an employee who had serious financial hardship as a result of being incarcerated for years. One Christmas Eve, Jeff had not returned home at his usual time. Jeff learned this employee did not have money to get his children gifts or really celebrate Christmas at all. Jeff took the employee out to purchase gifts, decorations, a tree and food for his family to have a wonderful Christmas. Jeff had downplayed what he had done – it was the employee who educated me about the full extent of Jeff's generosity.

Two years ago, we had an employee who we learned was homeless. Without the employee knowing, Jeff went out and found an apartment and paid the rent for an entire year so the employee could save money. A year ago, I went up to the grocery store and saw my husband sitting on a bench talking to a homeless man. I watched him as he gave the man his groceries, and then he hugged him. When I asked Jeff about it, he said he had spoken with Chuck many times and frequently gave him groceries. These events are remarkably commonplace and Jeff never seeks credit. Most times, I never learn about these kind acts from Jeff, but rather I hear about it from those whose lives he has impacted.

I am extraordinarily proud of Jeff, especially during this trial which has caused deep distress for our entire family. Jeff never wants his children to be affected by this, and he goes to great lengths to shield us as much as possible. Sadly, our children have been bullied and ridiculed as a result of Jeff's arrest. What is infuriating is that Jeff has always wanted to fully cooperate from the moment the FBI knocked on our door. He now fully understands that the documents he was pressured to sign were illegal. He asked many questions at the time and never felt comfortable with them. However, he was assured by the company attorney, who not only drafted these documents but also had previously worked for the SEC, that they were legitimate. Jeff relied on what he was told to his detriment. Sadly, Jeff was duped about many facts, and he never learned the sheer extent of the deception until the trial. Jeff deeply regrets signing these documents, and he feels awful that investors have suffered as a result of his actions. He wishes to make penance for his actions, and he will continue to assist the government and the SEC in whatever ways he can to insure that investors are made as whole as possible.

Ultimately, my husband is a generous, kind, and compassionate man.  Other than the signatures which he would do anything to erase, he contributes mightily to society and to our humanity as a whole.  I hope, Your Honor, you take this into consideration when deciding his fate.  Jeff already will never be able to own a dealership again – a goal he spent his entire adult life trying to achieve.  He can no longer be employed in the only industry he knows.  I had to apply to become the dealer of our family-owned dealership, which thankfully was granted.  Jeff was stripped of his livelihood, and he has sacrificed much to be as fully cooperative as possible.  Please offer your leniency when considering these factors.

With sincere gratitude for your grace and dedication,


Danielle Lash, Esq.

# EXHIBIT L

Kevin Lash
97 Jason Drive
Goffstown, NH 03045
603-965-6269
kmlash@comcast.net

The Honorable Judge Rachel Kovner

RE: My brother Jeffrey Lash

Dear Judge Kovener,

I am writing to you today on behalf of my brother, Jeffrey Lash, who is soon to appear before you for sentencing. As his older brother and someone who has closely witnessed Jeff's life at every stage, I want to offer my perspective on the man I know him to be, an individual of deep integrity, dedication, and commitment to his family and community.

My name is Kevin Lash, and I am the President and CEO of a business in Manchester, New Hampshire. I am 18 months older than Jeff, and we grew up together as two highly competitive young men given the closeness in our ages. Although we each choose different industries to pursue as our careers, the competitive nature founded in our youth drove each of us to work hard and create lives of value and purpose for ourselves, our families and those around us.

Early on, Jeff developed a deep love for anything to do with cars. Throughout his teenage years he always had an old car in the garage that he was working on, constantly tinkering and learning. This wasn't always a hit with our parents given the mess it occasionally would create but they saw the fulfillment it provided. His hobby eventually evolved into buying cars, fixing them up, and reselling them, which was his first real experience stepping into the world of automotive sales.

Jeff's love for cars naturally led him to pursue a career path with local automotive dealerships, where he could be engaged in this capacity full-time. He started from the ground up, absorbing every aspect of the business with a particular focus on the service side of the operations. His dedication and commitment quickly earned him respect and trust, and he built strong relationships with the manufacturer representatives of the various brands the dealerships represented.

Through years of hard work and persistence, Jeff achieved what he had always dreamt of, he became the owner of his own dealership. Unlike many franchises, automotive manufacturers require an experienced operator to entrust their brands with, and Jeff's long history of performance, dedication and respect was a key factor in making this achievement a reality.

While I am not entirely aware of all the details that transpired in the years that followed, I do know that an inflection point occurred when he became involved with a small groups of individuals who proposed bigger plans within the automotive industry. The new enterprise adopted an aggressive acquisition strategy and rapidly expanded to become one of the largest dealership groups in the country. In this new venture, Jeff's role remained critical; he provided the operational expertise, reputation and manufacturer relationships necessary for the financial organization to qualify for dealership ownership.

Initially, Jeff was excited about the new direction and experienced considerable success. However, as the years past, he began to express his concerns to me. He mentioned that certain aspects of the financial organization's operations that were always an arm's length away, were starting to seem questionable, and he became increasingly uneasy with the direction. Not long after, Jeff made the difficult decision to leave the organization which had previously had so much hope for. He expressed to me, "I just want to go back to owning and running a couple of my own dealerships, which is what I really enjoyed."

Throughout his life, I have seen my brother work incredibly hard within an industry he adores. I have also witnessed the deep care and love he has for his family, including the four children he and his wife, Danielle, have raised to be outstanding young adults. This dedication to his family has also included hands-on involvement in his children's education and extracurricular activities, often coaching their sports teams despite his demanding schedule.

Jeff has always been generous to others, closely involved in his community, and always ready to step up and lend a hand to help those less fortunate including his employees, their families or local causes in need of assistance.

It is important to me that you understand that while Jeff has made a serious mistake, this action does not define the man I know him to be. His actions, though regrettable, are not reflective of the person he truly is, someone who has worked tirelessly to build a life and career rooted in passion, integrity, and dedication.

I respectfully ask that you consider Jeff's remorse, his long history of hard work and integrity, and the profound impact that this sentence will have on his family and community. I trust in your wisdom and fairness and hope you will see the full context of his life as you determine his sentence.

Sincerely,
Kevin Lash

# EXHIBIT M

Domenico Assalone
30 Lakeshore Drive Eastchester, NY 10709
7/29/2024

The Honorable Judge Rachel Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Honorable Judge Rachel Kovner,

I am writing to express my relationship with Jeff Lash. As a business partner and friend, I have had the privilege of knowing Jeff for over twenty years. I am aware that Jeff has been convicted of pressing crimes and is scheduled to appear before your honorable self.

Despite these harrowing circumstances, I want to highlight Jeff's positive qualities. He is a kind, thoughtful friend, husband, and father who never ceases to uplift those around him. I have experienced this kindness firsthand due to my declining health. Allow me to share an anecdote: About a year ago, I received news that I was in dire need of a kidney transplant. The minute I picked up the phone to tell Jeff, without hesitation, he was at the forefront of calling anyone and everyone he knew to get me the help I needed. He was the first to go through rigorous testing in hopes that he was a match; unfortunately, he was not. This setback did not stop him, though; he connected me with multiple doctors and specialists across the country in hopes of expediting this process and putting his personal life and business on hold to help his friend.

Furthermore, as a business partner, I have had the privilege of seeing him grow into a sophisticated and thoughtful entrepreneur. His knowledge and support have contributed to my accomplishments, including our joint venture into the automotive dealership business. Jeff's positive impact extends beyond our friendship. I trust you will consider these aspects of his character in your deliberations.

Reflecting on Jeff's journey, I am reminded of the great philosopher Plutarch's wisdom: "To make no mistakes is not in the power of man; but from their errors and mistakes, the wise and good learn wisdom for the future." Jeff embodies this ethos. His growth, acceptance of his own imperfections, and commitment to make better choices show his character worthy of deep contemplation. In closing, Jeff is a good-hearted individual who deserves deep consideration during sentencing.

Thank you for your attention to this matter.

Sincerely,

Domenico Assalone

# EXHIBIT N

Dear Judge Kovner,

I am writing you to offer my perspective as well as my relationship with Jeffery Lash. I feel compelled to share my thoughts and personal experience with him, as he has played an incredibly important role in my life and has truly made a difference to me. I have had the privilege of knowing Jeff since I became best friends with his eldest daughter Emily Lash when we were in 5th grade and fast-forward to now where we are 21 year old students in college. I was immediately welcomed into the Lash family as I became a second daughter to them and Emily became a second sister to me. I have had the chance to experience firsthand the type of person he is.

When my own father became seriously ill during my teenage years, I was faced with a lot of uncertainty and fear as he was a single dad with a daughter who was just learning to navigate life. During that time, Jeff stepped in to support me in ways that I will never forget or be able to repay him. He not only offered emotional support but also welcomed me into their home with open arms. Jeff immediately became the father figure I was looking for and cared for me as if I was one of his own children. He made sure that I made it to school on time, took me to the hospital to visit my father, and helped me manage daily responsibilities that I couldn't handle alone. His kindness went far beyond what most people would consider to be "family friend" duties. He was there when I needed someone to talk to or when I was struggling with difficult decisions about my future. I can't count the number of times he gave me advice or guidance that I still use to this day when I am overwhelmed by the challenges in my life. His comforting demeanor, wisdom, and genuine care made me feel like I had a second father figure during one of the hardest periods of my life.

What stands out to me most about Jeff is his selflessness. Even when he had his own responsibilities let alone four of his own children to care for, he consistently made time to look out for me and my family. He never hesitated to lend a hand, and I often found myself inspired by his dedication to many different commitments whiteout ever seeming to lose his patience or sense of humor. To me, he embodies the qualities that I now find myself looking for in a future parter as well as what a father figure should look like for my future children. I know I am not the only person whose life has been touched by his

unwavering support. He has always been a source of strength for my best friend and their family as a whole. The values he instilled in them are evident in their daily lives and I believe his influence has shaped not only them but also myself into the people we have become today. I am lucky to be able to count him as my second father as I know I am not alone in feeling this way.

I truly believe that he is a man of exceptional character who has made a positive impact in the lives of everyone around him. I trust that you will consider the full picture of who he is as a person and the good he continues to do for those that he loves. Thank you for your time and consideration in reading this letter. I appreciate the chance to be able to speak on behalf or someone who has meant so much to me.


Sincerely,

Kiara Nanda

# EXHIBIT O

Dear Judge Kovner,

Thank for you the opportunity to submit this letter on my behalf.  I would like to take this opportunity to express to you just how deeply sorry I am for the harm that my actions have caused.  For years, the thought that my actions have been the source of so much pain and suffering have been a real painful experience to me.  I have always tried to help people where I am able, and the knowledge that GPB caused large scale financial difficulties for so many people eats me alive.

In 2013, I began what I believed would be an exciting new chapter—expanding the small network of car dealerships I owned into the world of private equity.  At the time, I was unfamiliar with the private equity space. I had to look up the term just to understand the basics, and I still not understand the mechanics.  I was entering this venture with two people who I believed I could trust: Jeff Schneider, who brought a wealth of experience in private equity, and David Gentile whose background in accounting and prior business success seemed to be a good fit.

I came into this role with no formal education or experience in finance or securities.  Even so, I did not recognize then just how naïve I was. I believed that by surrounding myself with knowledgeable people, I could contribute meaningfully and grow into the role. For several months, I was taught the basics and when GPB was in its initial stage I attended some investor events. I remember being fascinated by the people I met—investors, brokers, and business owners—many of whom had inspiring stories about how they built their wealth or ran their companies. I was genuinely in awe and definitely a little intimidated.  During the short stint where I spoke with these people, I truly felt that we were acting in the best interests of these investors.

However, things began to change.  I was pushed out of attending events and giving presentations.  I realized that I had no say in how the company was being operated.  Despite originally being introduced as a partner, I was essentially just an employee and often found myself in late-night arguments with David Gentile over what I believed were irresponsible or unethical business decisions.  I was eventually told in no uncertain terms: "These are my decisions, not yours."  It became clear that my input was neither welcomed nor considered.

One of the things that drew me initially to the idea of GPB was that it could be a way to benefit people.  We all spoke to friends, family members, and acquaintances about the venture and I took very seriously the trust that people put in us to safeguard and grow their investments.  That personal connection, among others, makes this situation all the more painful.  The shame and humiliation I've experienced from being involved in GPB has

haunted me for a decade.  I have spent countless nights over the past 10+ years wishing I had made different choices—wishing I had walked away and told someone when I first sensed something was wrong.

To those investors who have suffered losses, please know that you deserved better. I am ashamed that I failed you personally.  You placed your trust in me and in GPB, and that trust was betrayed.  For that, I am deeply and truly sorry.

Moving forward, I am committed—regardless of my sentencing—to assisting the Government, the SEC, and state regulators in every possible way to help recover the money owed to investors. From the bottom of my heart, I express my deepest remorse for the harm caused. I will do everything within my power to support the process of justice and restitution for the investors.


Sincerely,

Jeffrey Lash

# EXHIBIT P

January 2, 2025

The Honorable Judge Rachel Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kovner:

I, Magdalena Joyce Finck, am the mother-in-law of Jeffrey Lash.  I am writing to attest to Jeff's character as I have known him for over 25 years.  Sharing some of my interactions with Jeff will exemplify his integrity, compassion and empathy for others.

At a young age, my older daughter's fiancé, Ross Getchell, was diagnosed with terminal brain cancer.  Jeff was dating my younger daughter, Danielle, at the time, and, without hesitation, Jeff offered to assist with Ross' care after one of his five surgeries.  At one point, Jeff drove from Manhattan to Syracuse and spent five of his vacation days caring for Ross upon his discharge from the hospital.

At the same time, my husband was suffering from amyloidosis, an incurable form of cancer.  I cannot begin to adequately describe the support I received from Jeff.  He was able to comprehend how I was feeling with me uttering a single word.  He traveled with me and my husband to Boston where my husband received his treatment.  Jeff was always by my side to give me unconditional emotional support which I so badly needed.  Jeff's unwavering compassion was something that proved to me what an exceptional man my daughter was dating.

I am an 80 year old widowed, retired schoolteacher living on my own.  Last year, I came down with a severe case of pneumonia.  Once again, Jeff was there, flying from Florida to Long Island to care for me.  He cooked for me, made certain I took my medications, and drove me to my doctor's appointments.  I did not request his assistance.  This was done of his own volition – another instance of Jeff's compassionate concern for others.

Jeff has taken in foster children, presently providing the love and support for a 15 year old boy.  He has given financial support to various employees who have had medical emergencies; has givem some of his own furniture to an employee who experienced an unexpected divorce; has prepared meals for the homeless; and has brought gifts and food at Christmastime to families who had been impacted by Hurricane Ian.  These are only a few of the numerous instances that exemplify Jeff's character.

It is without hesitation that I can honestly say that Jeff is the man I would

want my grandsons to emulate. He is a loving husband and a hands-on supportive father who has coached some of his children's athletic teams and makes it a priority to attend their school activities. He is a respected employer and friend to his neighbors. Jeff is not perfect, and I believe his greatest character flaw is that he is too trusting of others. I truly believe he would never intentionally deceive someone or knowingly commit fraud. Jeff is a man I am extremely proud to call my son-in-law.

January 18, 2025

Marilyn Lash Cluett
1057 Poppy Fields Ln
Wake Forest, NC 27587

The Honorable Judge Rachel Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklym, NY 11201

Re: Jeffrey Lash, nephew

Dear Judge Kovner:

I am writing to submit a character reference for my nephew, Jeffrey Lash, who will soon be appearing for sentencing by you. While I have no knowledge of the automotive industry or the details of his financial and business transgressions, I can speak clearly on his character, as I have known him all his life.

Jeff has always had an innate ability to connect with people no matter their status, abilities or position. He holds no preconceived judgments about people but is willing to give anyone the opportunity to develop their potential.  While this side of his character has served him well in sales and automotive service, it was evident early in his life.

He struggled in school with learning challenges and visual issues but managed to graduate from high school, eager to become an independent and successful adult. While academics were not his strength, early on he had an uncanny ability to launch small businesses even as a teenager. Whether it was a paper route or a video/pizza delivery business, he worked hard after school and on weekends. While motivated by an entrepreneurial drive to earn income beyond his weekly allowance, it was the challenge of creating and managing a successful business that was his reward. This innate drive served him well as an adult as his career developed and advanced in the automotive business.

Jeff has always had a special affinity and empathy for those in need, whether it be a person who is young, ill, disabled, elderly or homeless.  What I remember most is his compassion for my older brother Ritchie (now deceased) who was severely mentally ill while Jeff was growing up. Most teenagers would avoid or ridicule such a disturbed person.  However, Jeff always reached out to his uncle with respect and support, giving him rides so he could make holiday dinners and engaging in wandering and often irrational conversations as they watched football together.

This caring and empathy has become a defining quality of his character as an adult. He is there to help his aging parents as his father struggles with serious illness. He is there to travel to his children's sporting events and dance recitals even when exhausted by his business travel. He is the person who will not only stop and listen, but who truly cares about another's wellbeing whether it be a stranger, friend, or relative.

I ask that you consider these qualities as you determine his sentence. Helping and supporting his community has never been about making a financial donation. It is always about reaching out and connecting with people and directly trying to enhance their lives.

Respectfully submitted,
Marilyn Lash Cluett

The Honorable Judge Rachel Kovner

United States District Judge

Eastern District of New York

225 Cadman Plaza East

Brooklyn, New York 11201


Dear Judge Kovner

I am writing this letter on behalf of Jeff Lash to provide some insight into his character and professional accomplishments. I have had the privilege of knowing Jeff for 22 years, exclusively in a professional capacity. Our paths first crossed when he was a young general manager at a store in Greenwich, Connecticut. Despite his youth, Jeff exhibited remarkable composure and dedication to his role, particularly in the areas of customer care and satisfaction. He consistently went above and beyond to address any issues, even going so far as to cover expenses to resolve customer concerns personally. This level of commitment and integrity was extraordinary, especially in my experience as a factory representative working with many stores.


Three years later, I transitioned into a new role as a network placement manager. When we had an open dealership opportunity in White Plains, New York, Jeff and his team applied. After an extensive interview process, we selected Jeff because of his energy, vision, and potential to revitalize the franchise with younger, dynamic leadership. Jeff exceeded all expectations. He secured and renovated a property, hiring local contractors to support the community. Under his leadership, the dealership became one of the top 10 in the United States in both sales volume and customer satisfaction.


Jeff's commitment to giving back to the community is equally impressive. During one visit to his dealership, I noticed a group of special needs adults cleaning the showroom vehicles. When I inquired, Jeff explained that he had established a relationship with a nearby school for adults with special needs. He offered them an opportunity to work at his dealership, paying them for their efforts while also paying his detail team to clean the vehicles afterward. This initiative wasn't about business it was about creating a sense of purpose and inclusion for these individuals. Jeff's generosity extended to sponsoring local soccer teams, little league teams, and consistently supporting his community.

Jeff Lash exemplifies integrity, compassion, and a genuine commitment to the well-being of those around him. Losing someone of his caliber would be a tremendous loss to the community he has worked so hard to uplift.

Michael J Rueckert

457 Wolf Lake Rd

Rock Hill, NY 12775

VWoA Sales Operations Manager

January 16, 2025


Worshipful Robert S. Cluett
1047 Poppy Fields Lane
Wake Forest, NC 27584
CluettBob@gmail.com
919-818-5626

The Honorable Judge Rachel Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Honorable Judge Rachel Kovner,

My name is Robert Cluett, and I am Jeff's Uncle and very fortunate to be married to Jeff's Aunt, Marilyn Lash Cluett for the past 27 years. I grew up in Boston, and now live in Wake Forest NC.

I am honored to submit this character reference, and trust it will help your decision process.

Having been the youngest past master of a Masonic Lodge in Boston, and a 50+ year member, I still live my life by the Masonic tenants of… Friendship, Morality, Brotherly Love, Relief and Truth.

I can say in all honesty, that even though Jeff is not a Mason, over the years I have watched him conduct himself and live his life by these same tenants. I was taught these values, Jeff just naturally has them. Our society could use more people like Jeff , that know the value of Morality and Truth.

I'm sure that you have read plenty of examples of Jeff's good deeds. My Masonic analogy goes directly to a man's soul and character.

Your Honor, I ask that you consider where Jeff can do the most good for himself and others… working in the community. Thank you.

Robert S. Cluett

September 9, 2024

Dear Judge,

I am writing this letter on behalf of Jeffrey Lash whom I have had the pleasure of knowing for the past six years.  Jeff was my employer when he owned Spurr Chevrolet GMC LLC (which his wife now owns) in Brockport, NY.  Jeff is charismatic and friendly; his positive spirit is infectious.  Even with all that has transpired with this case and having to resign as dealer, Jeff always brought a smile to the workplace making each employee feel welcome and valued.

In my opinion, Jeff is one of the most empathetic and compassionate men I have ever known.  Three years ago, Jeff learned that an employee was sleeping in his car for over a month during the frigid winter.  This greatly disturbed Jeff, and he took immediate action.  He went online and located housing for him unbeknownst to this employee.  Jeff met with the landlord and signed a rental agreement.  After, he went to a furniture store to purchase a bed and furnishings for the apartment.  He returned to the dealership with the van fully loaded and surprised this employee.  The employee was moved to tears, and they went to the apartment together to move him in during a massive snowstorm.  Jeff never mentioned this to anyone other than me (as the office manager) because he did not want the employee to be embarrassed.  Jeff did not need or want any recognition for his kind act, and that really reinforced for me the person I had always known Jeff to be.

On another occasion, an apartment complex had burned down in Rochester, NY.  Jeff made a significant donation, and enlisted employees to help those displaced from their homes.  These acts are commonplace for Jeff.  When employees experienced health or financial issues, Jeff quietly called them in and offered whatever assistance they needed.  People came to Spurr solely because they did not want to work for competitors who lacked this compassion and sense of family.

I have been an office manager in the dealership business for over 40 years, and I have never seen an owner value his employees first over finances.  I greatly admired his leadership, and I was heartbroken when he had to step

down as a result of pleading guilty.  Overall, I hope Jeff receives great leniency from the court as he has already endured significant hardship having given up his entire livelihood and lifelong career as a result of pleading guilty.


With Warm Regards,


Tammy Otto

Executive Manager

Spurr Chevrolet GMC LLC

585-455-0029

**Jay Lipner, C.P.A.**
415 Crossways Park Drive, Suite C
Woodbury, NY 11797
jaylipner@kvlsmcpa.com
516-294-0400

**May 6, 2025**

The Honorable Judge Rachel Kovner
United States District Court
Brooklyn, NY 11201

**Re: Character Reference for Jeff Lash**

Dear Judge Kovner,

I hope this letter finds you well. My name is Jay Lipner, and I have had the privilege of working as Jeff Lash's accountant for the past 7 years. Over this time, I have come to know him not only as a client but as a friend, and I write to you today to respectfully request leniency in his case.

Throughout the years I've worked with Jeff, I have observed his dedication to his work, his respect for others and his sincere efforts to improve himself personally and professionally. He has always been kind, respectful and incredibly responsible, and I have witnessed firsthand how deeply he cares for his family, friends, and those in his community. I can confidently say that the mistakes he may have made are not representative of the person he truly is.

In all my years knowing Jeff, I can confidently say he is not someone who would intentionally harm or disrespect others. He is a genuinely good person who, I believe, has learned from this experience and is committed to making better choices in the future.

In the time I've known Jeff, he has always demonstrated a strong work ethic and a genuine commitment to helping others. A recent experience highlighted just how far he's willing to go to ensure someone's safety and well-being.

During one of my visits to Jeff's office, I began having trouble with my car. I had recently had a transmission installed by a local mechanic near my home, so I assumed the issue wasn't serious. However, Jeff insisted that I not drive the vehicle until his service department had a chance to inspect it.

After a thorough check, his team discovered that the transmission was not new, as I had believed, but rather a poorly rebuilt one that was already showing signs of failure. Concerned, I called the original mechanic, who told me to just drive the car back the five hours to my home and he would take a look at it then. Jeff, worried about my safety, immediately stepped in and called the mechanic himself to explain that driving the car in its condition was not safe.

This experience is just one example of Jeff's integrity and willingness to advocate for others. He goes above and beyond—not because he has to, but because he genuinely cares.

Thank you very much for taking the time to read this letter and for considering my request for leniency. I hope you consider Jeff's character and his commitment to positive change while making your decision.

Sincerely,
Jay Lipner

Matthew & Dena Wells
709A SW 13th Street.
Fort Lauderdale, FL, 33315


7/29/2024


The Honorable Judge Rachel Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201


Dear Honorable Judge Rachel Kovner,

I am writing to explain to you about myself and my wife's relationship with Jeff Lash. To start I personally have known and been best friends with Jeff since high school. Jeff and I both attended Minnechaug Regional HS In Wilbraham, Mass. I was a grade above Jeff and we both worked together at Burger King where we formed our lifelong bond.

As a classmate, co-worker and friend I have had the privilege of knowing Jeff for over 40 years.

Jeff was a groomsman in our wedding in 1996 and my wife and I were also in Jeff and Danielle's wedding. Jeff has been a great friend and confidant for all these years.
I know Jeff to be an honest, open and trustworthy friend for my entire life.

I served in the United States Navy as a Deep Sea Diver and Petty Officer 2nd Class for 13 years and I currently serve the citizens of Fort Lauderdale Fire Rescue as a Fire Rescue Lieutenant for nearly 23 years. My wife Dena has worked in the health care industry for over 30 years and is a corporate regional supervisor. We both take our jobs and service very seriously and we also take our reputations just as seriously. We know Jeff has been accused and has been in court for some serious crimes.

Personally, I don't believe Jeff would ever knowingly be involved in such a scandalous affair and violate anyone's trust especially his families and friends trust. Jeff has been an outstanding businessman in his community and is known by anyone that knows him to be a great family man, father to his children, and a husband to his wife and son and brother to his parents and brother. Jeff is the guy who you can always call and talk to and get great advice and straight talk. He listens and is a friend who really cares and is there for his friends and family when anyone else is in need.

In light of the seriousness of his charges and the possibility of severe fines or any possibility of confinement I ask your Honor to please be lenient and merciful on Jeff when considering any punishments. His confinement or heavy fines would greatly harm him and his family as well as place great stress and grief for his family and friends if Jeff is judged harshly.

I ask the court to consider his loving, caring and honorable nature. His large loving family and friends should be a shining beacon to anyone that looks at him and this case as to his character, honesty and love of others.

I know in our many conversations Jeff has great regret and guilt in exposing himself, his family and friends and his reputation and possible freedom by not being more aware or vigilant in who he has done business with. I'm sure the great strain of dealing with the DLE members and his family being held at gunpoint despite his already working and talking with law enforcement as well as the shame it has brought his family and strain on his marriage should be considered by your Honor as restitution and time served enough so Jeff his wife and children can put this dark chapter behind them and they can heal and continue on a positive path.

Thank you for your attention to this matter.

Sincerely,

Matthew H. Wells & Dena M. Wells

# EXHIBIT Q

## UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### COOPERATION AGREEMENT

1.    In connection with an enforcement action, *SEC v. GPB Capital Holdings, LLC, et al.*, 21-cv-00583 (E.D.N.Y.) (the "Action"), the Division of Enforcement ("Division") of the United States Securities and Exchange Commission ("Commission") and Jeffrey Lash ("Defendant") enter into this cooperation agreement ("Agreement") on the following terms and conditions:

### COOPERATION

2.    The Defendant agrees to cooperate fully and truthfully in the Action and any other related enforcement litigation or proceedings to which the Commission is a party (the "Proceedings"), regardless of the time period in which the cooperation is required. In addition, the Defendant agrees to cooperate fully and truthfully, when directed by the Division's staff, in an official investigation or proceeding by any federal, state, or self-regulatory organization ("Other Proceedings"). The full, truthful, and continuing cooperation of the Defendant shall include, but not be limited to:

    a.    producing all non-privileged documents and other materials to the Commission as requested by the Division's staff, wherever located, in the possession, custody, or control of the Defendant;

    b.    appearing for interviews, at such times and places, as requested by the Division's staff;

    c.    responding fully and truthfully to all inquiries, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings;

    d.    testifying at trial and other judicial proceedings, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings;

    e.    accepting service by mail or facsimile transmission of notices or subpoenas for documents or testimony at depositions, hearings, trials or in connection with the Proceedings or Other Proceedings;

    f.    appointing his undersigned attorney as agent to receive service of such notices and subpoenas;

    g.    waiving the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, when requested to appear by the Division's staff; and

h.      entering into tolling agreements, when requested to do so by the Division's staff, during the period of cooperation.

## VIOLATION OF AGREEMENT

3.      The Defendant understands and agrees that it shall be a violation of this Agreement if he knowingly provides false or misleading information or materials in connection with the Proceedings or Other Proceedings. In the event of such misconduct, the Division will advise the Commission of the Defendant's misconduct and may make a criminal referral for providing false information (18 U.S.C. § 1001), perjury (18 U.S.C. § 1621), making false statements or declarations in court proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401-402) and/or obstructing justice (18 U.S.C. § 1503 *et seq.*).

4.      The Defendant understands and agrees that it shall be a violation of this Agreement if he violates the federal securities laws after entering into this agreement. It is further understood and agreed that should the Division determine that the Defendant has failed to comply with any term or condition of this Agreement, the Division will notify the Defendant or his counsel of this fact and provide an opportunity for the Defendant to make a submission consistent with the procedures set forth in the Securities Act of 1933 Release No. 5310. Under these circumstances, the Division may, in its sole discretion and not subject to judicial review, recommend to the Commission an enforcement action against the Defendant for any securities law violations, including, but not limited to, the substantive offenses relating to the Action. Nothing in this agreement limits the Division's discretion to recommend to the Commission an enforcement action against the Defendant for future violations of the federal securities laws, without notice, to protect the public interest.

5.      The Defendant understands and agrees that any statute of limitations applicable to any action or proceeding against him authorized, instituted, or brought by or on behalf of the Commission or to which the Commission is a party arising out of the Action, including any sanction or relief that may be imposed therein, is tolled or suspended from the date the Agreement is executed until the commencement of an enforcement action against the Defendant related to the Action or the Defendant provides written notice of unilateral termination of the Agreement to the Division. The Defendant will not assert any claim or defense based on the passage of time from the date of this Agreement to the commencement of any action or proceeding against him authorized, instituted, or brought by or on behalf of the Commission or to which the Commission is a party arising out of the Action including any sanction or relief that may be imposed therein, whether such claim or defense is constitutional, statutory (including any statute of limitations or Section 4E(a) of the Securities Exchange Act of 1934) or equitable (including laches or other equitable doctrines).

## COMPLIANCE WITH AGREEMENT

6.      Subject to the full, truthful, and continuing cooperation of the Defendant, as described in Paragraph 2, and compliance with the federal securities laws, the Division

will inform the Commission of the fact, manner, and extent of his cooperation during the Proceedings or Other Proceedings and recommend appropriate credit based upon the analytical framework set forth by the Commission in 17 CFR § 202.12. Upon the written request of the Defendant, the Division also may issue a letter to other federal, state or self-regulatory organizations detailing his cooperation during the Proceedings or Other Proceedings.

7.     The Defendant understands and agrees that this Agreement does not constitute a grant of immunity by the Commission, nor is it any other form of final disposition. If the Defendant fully satisfies his obligations under this Agreement, among other alternatives, the Division may recommend and the Commission may accept a settlement offer from the Defendant in the form of an Offer or Consent, or agree to such other disposition deemed appropriate by the Division and the Commission.

8.     The Defendant understands and agrees that this Agreement does not bind the Commission or any other federal, state or self-regulatory organization. The Division cannot, and does not, make any promise or representation as to whether or how the Commission may act on enforcement recommendations associated with this Action or the Defendant. The Commission has absolute discretion to accept or reject any enforcement recommendations made by the Division.

9.     The Defendant understands and agrees that the Agreement only applies to enforcement actions arising from the Action and does not relate to any other violations or any individual or entity other than the Defendant.

10.    The Defendant's decision to enter into this Agreement is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than those contained in this Agreement.

11.    The Defendant has read and understands this Agreement. Furthermore, he has reviewed all legal and factual aspects of this matter with his attorney and is fully satisfied with his attorney's legal representation. The Defendant has thoroughly reviewed this Agreement with his attorney and has received satisfactory explanations concerning each paragraph of the Agreement. After conferring with his attorney and considering all available alternatives, the Defendant has made a knowing decision to enter into the Agreement.

## ENTIRETY OF AGREEMENT

12.    This Agreement constitutes the entire agreement between the Division and the Defendant, and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein.

13.    This Agreement cannot be modified except in writing, signed by the Defendant and a representative of the Division.

14.     In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring the Division or the Defendant by virtue of the authorship of any of the provisions of the Agreement.

The signatories below acknowledge acceptance of the foregoing terms and conditions.

DEFENDANT

01/04/2023
Date

Jeffrey Lash

The foregoing instrument was acknowledged before me this 4 day of JAN , 2023, by JEFFREY LASH , who is a personally known to me or who has produced a valid driver's license as identification and who did take an oath.

Notary Public
State FLORIAN
Commission number: HH186576
Commission expiration: 10/14/2025

Notary Public State of Florida
Nicholas Harris
My Commission
HH 186576
Exp. 10/14/2025

DEFENDANT'S COUNSEL

Approved as to form:

1/5/2023
Date

Denelle M. Janey
The Janey Law Firm P.C.
111 Broadway Suite 701
New York, NY 10006
(646) 289-5276

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT

Date

Sheldon L. Pollock
Associate Regional Director