

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JPL:JKW/NMA                          *271 Cadman Plaza East*
F. #2018R01064                         *Brooklyn, New York 11201*

August 26, 2025

**By E-Mail and ECF**

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:     United States v. Jeffrey Lash
                    Criminal Docket No. 21-54 (RPK)

Dear Judge Kovner:

       The government respectfully submits this letter in advance of the sentencing for the defendant Jeffrey Lash pursuant to 18 U.S.C. § 3553(e) and United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") § 5K1.1. Lash provided substantial assistance to the government in its prosecution of the GPB Capital fraud and his co-defendants David Gentile and Jeffry Schneider. Lash was the sole cooperating witness called by the government at the Gentile trial in July 2024. Over three days, he provided complete and credible testimony that was essential to the government's case. His cooperation was exemplary. In addition, since beginning his cooperation, Lash has expressed sincere remorse for his actions and paid his forfeiture judgment in full.

       The government therefore respectfully moves the Court to consider Lash's substantial assistance to the government and requests that the Court impose a sentence well below the advisory Guidelines range.

    I.     Background

       The charges against the defendant and his cooperation with the government arise out of his involvement in a multi-year scheme to defraud investors in three private equity funds operated by GPB Capital Partners ("GPB"), GPB Holdings I ("Holdings I"), GPB Automotive Portfolio ("Automotive Portfolio"), and GPB Holdings II ("Holdings II"). In 2013, Lash, together with Gentile and Schneider, founded GPB. Presentence Investigation Report ("PSR") ¶ 5. Among other things, GPB promised investors it would use investor funds to purchase and operate car dealerships that would generate sufficient cash flow to pay an 8% annual distribution to investors.

Id. Each of the three partners brought their own expertise to the venture: Lash was an experienced owner and operator of car dealerships, Gentile was an experienced accountant, and Schneider was an experienced salesman. Lash became an operating partner at GPB, responsible for overseeing the car dealerships purchased by the GPB funds, Gentile became GPB's Chief Executive Officer, and Schneider was the Chief Executive Officer of GPB's placement agent Ascendant Capital. PSR ¶ 5, 6.

    A.    Offense Conduct

In 2014, Holdings I, GPB's first fund, did not generate sufficient income to fund the 8% distribution marketed to investors. PSR ¶ 17. To cover up the fund's poor performance, Gentile, Schneider, Lash, and GPB's attorney, James Prestiano, agreed to fraudulently inflate Holdings I's financial results for 2014. Id. At Gentile's direction and with his instruction, Lash executed two phony performance guarantees (the "2014 Performance Guarantees"), GX-6038, GX-6039, which purported to require Lash to cover the shortfall in income. PSR ¶ 17.

The 2014 Performance Guarantees related to three dealerships Lash sold to Holdings I in 2013 and 2014. PSR ¶ 17. As Lash admitted at trial, the sales agreements for the three dealerships did not include any guarantee of the dealerships' performance and the defendants had no other agreement that Lash would guarantee the dealerships' performance. Tr. 3094. Nonetheless, in March 2015, Lash was presented with two performance guarantees that were backdated to appear that they had been signed at the time the dealerships were sold. Tr. 3106. Gentile, Schneider and Prestiano explained that Lash would need to sign the guarantees but that he would not be expected to actually pay the guarantees. Gentile told Lash, "we're going to produce a performance guaranty for the two stores, and you're going to sign it. We're going to back-date it to the beginning of 2014 so it gives the appearance that we had a discussion there about these two basic documents . . . that we guaranteed them basically over a year ago." Tr. 3105. Lash was also assured that he would not need to pay the sham guarantees; in Gentile's words, "You're not going to get hurt." Tr. 3113; see also Tr. 3114 ("Dave said he would, numerous times, kind of take care of the accounting and I wouldn't get hurt financially by it at all. . . He always said that, you know, whether doing my taxes that he could basically make anything look the way you want to make it look, so that financially I wouldn't be on the hook for it."). Gentile instructed Lash and Schneider on how to execute these guarantees. See, e.g., GX-7008-A. Although Lash did not initially agree to sign the 2014 Performance Guarantees, he ultimately did so. After receiving related deficiency notices, Lash also confirmed to the dealerships' accountants that he agreed to pay the amounts due under the 2014 Performance Guarantees even though the defendants had already agreed he would not do so. See GX-7313; Tr. 3134.

The 2014 Performance Guarantees had the effect of artificially inflating Holding I's 2014 audited income by 40%. See GX-8028-J (audit workpapers showing that the 2014 Performance Guarantees covered losses at the dealerships and the income distributed by the dealerships to GPB); see also GX-7008-A (Gentile text messages explaining that a "1.1mm" guarantee was necessary to keep "neutral income and no losses on the tax returns"). The 2014 Performance Guarantees were in turn incorporated into Holdings I's audited financial statements. See GX-2008 at 5, 13.

2

The next year, in 2016, the defendants undertook a substantially similar scheme to artificially inflate the performance of Automotive Portfolio, GPB's second fund. In 2015, Automotive Portfolio did not earn enough income to support the monthly distributions promised to investors. GX-7682 at 3. To make up the shortfall, in 2016, Gentile, Schneider, Lash, and Prestiano created another sham performance guarantee (the "2015 Performance Guarantee"). PSR ¶ 18. The 2015 Performance Guarantee purported to require Lash to cover a $1.05 million shortfall in net cash flow from operations, i.e., income, at the Country Motors II dealership owned by the fund. GX-7531-A. Like the 2014 Performance Guarantees, the 2015 Performance Guarantee was backdated to January 1, 2015 to create the appearance that the agreement had been in place throughout 2015. Id. Gentile then routed a series of transfers from GPB accounts he controlled, including at another fund, Cold Storage, through Lash's account, and to Automotive Portfolio's accounts to create the appearance that Lash had actually paid the 2015 Performance Guarantee. PSR ¶ 19; GX-6200.

Lash first heard about the 2015 Performance Guarantee at a meeting with Gentile, Schneider, and Prestiano in New York in approximately April 2016. Tr. 3184. At the meeting, Lash told Gentile he had not guaranteed Country Motors II's performance. Gentile responded, "we're in crunch time and, you know, I know you really didn't guarantee it, but, you know, this is something we have to do, if not it's going to affect performance . . . you know, capital is coming in and this would have a big impact on GPB if we didn't do this." Tr. 3184. Gentile assured Lash he would not have to pay the 2015 Performance Guarantee. Referencing the 2014 Performance Guarantees, which Lash had not paid at that point, Gentile told Lash, "the first one you didn't get hurt on and you're still not going to get hurt. You have to trust me. You have to be [on] the team. You have to be on team GPB." Tr. 3185. Later, Gentile told Lash that he "put money in [his account] and then kind of taken it out the next day and taken part of funds that were in there to make the payment . . . to make it appear that the guarantee was being paid." Tr. 3197. The 2015 Performance Guarantee was reflected in Automotive Portfolio's audited financials for 2015 and had the effect of artificially inflating the fund's income by approximately 30%. PSR ¶ 19.

The performance guarantees played a critical role in fueling GPB's growth. The audited financials for Holdings I and AP were distributed to prospective investors and were made available to existing investors. See Tr. 293, 1980–83, 5156–5157, 1915. As Gentile explained to Lash, the performance guarantees were created at a critical point for GPB, when "capital [was] coming in" and poor performance could have a "big impact" on capital raising. Tr. 3184. Schneider also explained that "performance at the beginning [of the fund] is most critical . . . bad performance could basically put us out of business or stop capital raising all together." Tr. 3102. Consistent with the defendants' beliefs, GPB's capital raising increased exponentially in the years following the performance guarantees. After raising approximately $121 million in 2014, GPB raised approximately $238 million for the three funds at issue in this case in 2015, approximately $392 million in 2016, and approximately $567 million in 2017. See GX-8264-A.

The performance guarantees were a part of a broader conspiracy to lie to GPB investors regarding the source of distributions from the funds and the funds' performance. PSR ¶ 10–11. As Lash explained at trial, the GPB funds were marketed to investors as providing an 8% annual distribution sourced from income generated by the portfolio companies. Tr. 3009. Because the dealerships owned by the funds consistently underperformed for years, GPB made up

3

the shortfall in income with approximately $98 million in investor funds. PSR ¶¶ 12–13. This scheme—to use new investor money to cover distributions to existing investors—concealed the funds' poor performance from investors. Id. While the performance guarantees supported this scheme by creating an appearance that the dealerships were performing in-line with expectations, Lash's involvement in the broader scheme was limited. The evidence at trial showed that Lash, unlike Gentile and Schneider, participated in few if any meetings with investors between 2016 and 2018 and he was not included on many of the performance reports showing the shortfall in distribution coverage. Tr. 3007–08; see e.g., GX-7682; GX-7411; GX-8327-A; GX-8009. He also played no role in the misleading language included in GPB's marketing materials and private placement memoranda, which were controlled by Gentile and Schneider, not Lash. Tr. 3072–73, 3239

Lash, together with Gentile, Schneider, and Prestiano, also agreed to cover up the performance guarantee scheme and obstruct the government's investigation. In April 2019, Lash was approached by agents from the Federal Bureau of Investigation (the "FBI") at his home in Florida. In his initial interview with the FBI, Lash admitted the performance guarantees were backdated and also that Gentile had told him he would not need to pay the 2015 Performance Guarantee. See 3500-JLA-1-002. Lash omitted other relevant information, however. Following his meeting with the FBI, Lash arranged a meeting with Schneider and Gentile in New York in which the defendants agreed to cover up the performance guarantee scheme by lying to the government and law enforcement. Tr. 3218; PSR ¶ 20. Among other things, the defendants agreed that Lash would tell law enforcement that the transfers through his account related to the 2015 Performance Guarantee were actually a loan from Gentile when they were not. Tr. 3219–20; PSR ¶ 20. Later, Gentile and Prestiano threatened to withhold Lash's severance payments unless he stuck to the story and remained on "Team GPB." Tr. 3220–22. Lash provided the government, the FBI, and the SEC false information—as he had agreed with Gentile and Schneider—in a December 2019 proffer session. See 3500-JLA-3. Among other things, Lash told the government that he discussed performance guarantees with Schneider early on, that he expected he would have to pay the performance guarantees, and that the money that moved through his account in connection with the 2015 Performance Guarantee was an "advance" or "loan" from Gentile. 3500-JLA-3 at 6–7, 9, 14–15

B. Procedural History

On January 29, 2021, a grand jury sitting in this district returned an indictment charging Gentile, Schneider, and Lash with securities fraud, securities fraud conspiracy, and wire fraud conspiracy. Gentile and Lash were also charged with wire fraud in connection with the 2015 Performance Guarantee. Lash was arrested on February 4, 2021. PSR ¶ 21. On June 6, 2023, Lash pleaded guilty to Count Five of the indictment, charging wire fraud, pursuant to a cooperation agreement with the government. PSR ¶ 1. Lash's cooperation agreement required him to, among other things, attend meetings with the government, provide relevant documents, testify at trial if requested, and to pay approximately $3.34 million in forfeiture related to his compensation from GPB, which he has since paid in full. See 3500-JLA-5 ¶¶ 3, 4, 6.

II. Lash's Exemplary Cooperation with the Government

Lash provided detailed, complete, and truthful information that was of great value to the government, culminating in his testimony over three days at the Gentile trial in July 2024. Lash's testimony was critical to the government's case. Lash was the only cooperating witness called by the government at the Gentile trial. His testimony from inside the conspiracy and as a narrator of the scheme was of significant value to the government and the jury. Lash provided the jury with helpful background regarding the relationship among the conspirators, the partnership between Gentile and Schneider, and GPB's origins and value proposition for investors. Lash also provided detailed testimony about the performance guarantees: He walked the jury through the transactions whereby GPB purchased the dealerships, the shortfall in performance at the dealerships, and the development of the fraudulent and back-dated performance guarantees, including by giving the jury a first-hand description of crucial in-person meetings at which the conspirators planned the scheme. Lash's account was detailed, vivid, and corroborated by documents. He was also the only witness available to testify to these meetings, which otherwise would not have been known to the government. Similarly, Lash testified to the defendants' agreement to obstruct justice, following the FBI's initial approach of Lash, and provided a first-hand account of their conversations that no other, available witness could provide. Just as importantly, Lash did not overstate his knowledge or embellish. Where he was unsure or could not recall a specific date, he said so.

Lash's testimony was corroborated by documents and text messages that were presented to the jury through his direct examination, including the sales contracts related to the dealerships, the performance guarantees and deficiency notices, related transactions, and text messages among Gentile, Schneider, and Lash. Lash's testimony was the linchpin that tied this evidence together, providing the jury with a clear narrative explanation of a complex, multi-year accounting fraud. He was also the only witness available to authenticate text messages produced from Gentile's phone, which showed his planning of the performance guarantee conspiracy in real-time.

Lash's testimony was the product of diligent preparation beginning several months before trial. Over the course of his preparation, Lash met with the government approximately 20 times, often for hours at a time, to review (and explain) dozens of documents related to events nearly a decade before. He flew to New York to attend meetings at his own expense and paid for his own hotel rooms so that he could prepare in-person instead of virtually. His attention to preparation reflects the seriousness of his commitment to cooperating with the government. Lash's diligent preparation significantly aided the government in preparing both his testimony and the government's case more generally. For instance, Lash spent hours helping the government unravel payments he made or received after the performance guarantees were signed. Lash's assistance was invaluable in helping the government understand these transactions, which Gentile structured specifically to provide cover for the scheme. Lash also described in his preparation sessions conversations between Gentile, Schneider, and others related to the distribution scheme that he personally observed while at GPB. These conversations, previously unknown to the government, were important evidence of the defendants' intent and their effort to insert deliberately misleading language into the GPB private placement memoranda.

Lash's information related to the defendants' scheme to obstruct the government's investigation illustrates his commitment to cooperating fully with the government. The government was not aware of the defendants' agreement to obstruct the investigation into GPB.

Lash initially did not provide this information to the government because the obstruction conspiracy involved an attorney, Prestiano, and the government and counsel instructed Lash not to share the details of any communications involving Prestiano. Lash then sat for multiple interviews with the filter team to describe these conversations so that the filter team could file an appropriate motion with the Court. Lash did not minimize his own role in the conspiracy and provided a complete description of the conduct, including his own participation in criminal acts otherwise unknown to the government. He was then subjected to a grueling cross-examination about the timing of his disclosure, which was in fact a product of his effort to follow instructions from attorneys rather than an effort to conceal his own criminal behavior.

### III. The Guidelines Calculation

#### A. The Government's Guidelines Calculation

The government's Guidelines calculation is set forth below:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | | 7 |
| Plus: | Loss exceeds $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(M)) | +24 |
| Plus: | Offense involved 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)) | +2 |
| Plus: | Defendant was associated with an investment advisor (U.S.S.G. § 2B1.1(b)(20)(iii)) | +4 |
| Less: | Minor Participant (U.S.S.G. § 3B1.2(b)) | -2 |
| Less: | Zero-Point Offender (U.S.S.G. § 4C1.1(a)) | -2 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1(a), (b)) | <u>-3</u> |
| Total: | | <u>30</u> |

Lash has no criminal history and is in Criminal History Category I. See id. ¶ 57. Offense level 30 and Criminal History Category I yield a Guidelines sentencing range of 97 – 121 months imprisonment. The government addresses the Probation Department's and Lash's differing Guidelines estimates below:

#### B. Loss Enhancement (U.S.S.G. § 2B1.1(b)(1))

In his sentencing submission, Lash challenges the application of a 24-point enhancement for a loss exceeding $65,000,000. See ECF Dkt. No. 640 at 8–9. The government recognizes that the Court has previously found that the intended loss or gain from the scheme was

6

at least $3,500,000 and applied an 18-point enhancement at sentencing for Gentile and Schneider.[1] Lash's objections to the loss enhancement are not based on any legal principles but rather on equitable considerations more appropriately considered as a part of the Court's analysis of the 18 U.S.C. § 3553(a) factors or through application of a role adjustment under the Guidelines. For instance, Lash contends that a lesser loss enhancement is appropriate because of his relative role in the broader conspiracy. But pursuant to U.S.S.G. § 1B1.3(b), Lash is responsible for the reasonably foreseeable conduct of his co-conspirators in furtherance of the conspiracy. See also U.S.S.G. § 2B1.1(b)(1) table n. (C)(i) ("'Actual loss'" means the reasonably foreseeable pecuniary harm that resulted from the offense.").

Moreover, even setting aside much of the criminal conduct at issue in this case, at least the 18-point enhancement for an intended loss or gain greater than $3.5 million previously applied by the Court would be appropriate. Lash personally agreed to forfeit approximately $3.3 million in compensation he gained from GPB. There is no doubt that Schneider and Gentile received at least $200,000 in compensation from the performance guarantee fraud, which played a crucial part in perpetuating the fraud. The performance guarantees created an appearance of a track record of success for GPB's first and second funds (Holdings I and Automotive Portfolio, respectively) and in the years that followed GPB raised more than $1 billion from investors in Holdings I, Holdings II, and Automotive Portfolio, generating tens of millions of dollars in fees and compensation for Gentile and Schneider. See GX-6200; supra at 3.

C. Association with an Investment Adviser (U.S.S.G. § 2B1.1(b)(20))

Lash also contends that a four-point enhancement for association with an investment adviser should not apply. Application of an enhancement pursuant to U.S.S.G. § 2B1.1(b)(20)(iii) is straightforward and compelled by the application notes to the Guidelines. Section 2B1.1(b)(20)(iii)(A) applies to any defendant who commits a violation of securities law and is a "a person associated with an investment adviser" at the time of the offense.[2] Lash described his involvement in the performance guarantee scheme at the Gentile trial and his co-defendants Gentile and Schneider were convicted of securities fraud conspiracy and securities fraud based in part on Lash's testimony. The indictment charged the execution of the 2015

---

[1] As the government stated at sentencing for Gentile and Schneider, the Court can reasonably find the intended loss or gain from the scheme based on the fees paid by investors and the compensation that flowed to the defendants. However, the government respectfully submits that this method results in a 22-point enhancement for a gain (or intended loss) of more than $25 million, rather than the more conservative 18-point enhancement applied by the Court. The Court's calculation appears to have credited Gentile and Schneider for "reimbursements" that were paid to AAS not Schneider and which do not clearly relate to expenses paid by Schneider and profits Schneider chose to re-invest into Ascendant Capital. See May 9, 2025 Tr. at 38 ("I would be cutting out about $7.6 million in expense reimbursements, and cutting out that $13 million in apparent returns). Applying an 18-point loss enhancement, Lash's Guidelines range would be 51 – 63 months in prison. Applying a 22-point loss enhancement, Lash's Guidelines range would be 63 – 78 months in prison.

[2] Section 2B1.1(b)(20)(iii) requires that the defendant's "offense" entail a "violation of securities law." U.S.S.G. § 2B1.1(b)(20)(iii). The Guidelines do not require that the defendant be convicted of securities fraud or securities fraud conspiracy. Where the Guidelines intend to refer only to the offense of conviction they so specify. See, e.g., U.S.S.G. § 2B1.1(a)(1) (referring to a defendant who was "convicted of an offense referenced to this guideline" and the "offense of conviction").

7

Performance Guarantee and the related payments through Lash's account as overt acts (a) – (c) of the securities fraud conspiracy. Lash's conduct therefore involved a violation of the securities laws. Lash is also "a person associated with an investment adviser." Application Note 16(A) to Section 2B1.1 cross-references the definition of a "person associated with an investment adviser" included in the Investment Advisers Act of 1940 (15 U.S.C. § 80b-2(a)(17)) (the "'40 Act"). The '40 Act defines a "person associated with an investment adviser" to include "any person directly or indirectly controlled by such investment adviser, including any employee of such investment adviser." 15 U.S.C. § 80b-2(a)(17) (emphasis added). There is no dispute that GPB was a registered investment adviser and that Lash was an employee of GPB; he was the fund's operating partner.

In arguing otherwise, Lash relies on inapposite caselaw addressing when a defendant who is not registered with the SEC or FINRA nonetheless acts as an investment adviser. See United States v. Regensberg, 635 F. Supp. 2d 306 (S.D.N.Y. 2009). The question presented in Regensberg was whether the defendant acted as an investment adviser—receiving compensation in exchange for investment advice—despite the fact that he was not so registered. See id. at 311–12; see also 15 U.S.C. § 80b-2(a)(11) (defining an "investment adviser" to include persons who for compensation, engage "in the business of advising others . . . as to the advisability of investing in, purchasing, or selling securities"). But that is not the question here. GPB was indisputably registered as an investment adviser. It is irrelevant whether Lash personally provided advice to investors because he was an employee of GPB within the scope of 15 U.S.C. § 80b-2(a)(17) and participated in a securities fraud.

D.  Minor Participant (U.S.S.G. § 3B1.2)

The government respectfully submits that a two-point reduction pursuant to U.S.S.G. § 3B1.2(a) is sufficient to account for Lash's limited role in the broader conspiracy and lesser culpability relative to his co-defendants. Lash was an essential participant in the performance guarantee scheme, and he understood that the purpose of the scheme was to mislead GPB's investors and prospective investors, as he admitted at the Gentile trial. Tr. 3104–07. He was also GPB's operating partner, responsible for overseeing the dealerships purchased by GPB and sourcing new acquisitions. In return, Lash was compensated in salary and also with a 15% "carry" or profit interest in the automotive sleeve of the funds. ECF Dkt. No. 640 at 18. These facts distinguish Lash from a defendant's whose participation in a conspiracy involves only ministerial acts or a nominee accountholder who might be entitled to a four-point adjustment as a minimal participant. See U.S.S.G. § 3B1.2 app. n. 3(C) (identifying among other factors the defendant's understanding of the "scope and structure of the criminal activity," the "degree to which the defendant stood to benefit," and the "acts the defendant performed").

The government submits that a two-point reduction recognizes Lash's significant role in the conspiracy while also accounting for the significant differences between his culpability and that of his co-defendants. Lash did not plan the performance guarantee scheme, which required Gentile's expertise in accounting, or draft the fraudulent documents, which was done by Prestiano. As Lash explained at trial, he executed the performance guarantees at the urging of his co-conspirators and they were presented to him as a fait accompli by Schneider, Gentile, and Prestiano. Tr. 3105; U.S.S.G. § 3B1.2 app. n. 3(C)(ii) (directing the court to consider the extent of the defendant's involvement in the "planning or organizing" of the criminal activity), (iii)

8

(directing the court to consider whether the defendant exercises "decision-making authority" in connection with the criminal activity). Moreover, Lash's participation in the broader distribution scheme was limited. Unlike his co-defendants, Lash rarely spoke to investors between 2016 and 2018, he did not author or control GPB's marketing materials, which contained many of the misrepresentations made to investors, he did not oversee the GPB and Ascendant Capital employees who were used to execute the fraud, and his compensation was significantly less than his co-defendants who each made more than ten million dollars from the scheme. See U.S.S.G. § 3B1.2 app. n. 3(C)(iv) (directing the court to consider the "nature and extent of the defendant's participation in the commission of the criminal activity"); U.S.S.G. § 3B1.2 app. n. 5 (describing a minor participant as a defendant who "is less culpable than most other participants" but whose role is not "minimal").

      E.      Obstruction of Justice (U.S.S.G. § 3C1.1)

A two-point enhancement is appropriate pursuant to U.S.S.G. § 3C1.1 to account for the false information Lash provided to the government at his December 2019 interview. Lash admitted that he agreed with Gentile and Schneider to provide the government with false information to cover up the performance guarantee scheme and that he did so in his December 2019 interview. Tr. 3219–23; PSR ¶ 20. Lash, at his co-defendants' urging, also provided false information to GPB's lawyers who in turn provided that false information to the SEC. Tr. 3222–23. Providing the government with false information hindered the government's investigation. U.S.S.G. § 3C1.1 app. n. 4(G). The government was required to investigate further Lash's claim that Gentile had loaned or advanced him the money to pay the 2015 Performance Guarantee, the timing of the execution of the performance guarantees, and the few repayments Lash made between 2016 and 2018 using money routed to him by Gentile for that purpose. Ultimately, the government was required to obtain an indictment against all three defendants without the benefit of Lash's truthful information more than a year after Lash's December 2019 proffer.

In arguing that an enhancement pursuant to U.S.S.G. § 3C1.1 should not apply, Lash relies on inapposite facts that are properly considered in connection with the Section 3553(a) factors, rather than as a part of the Court's Guidelines calculation. The government agrees that Gentile exercised significant control over Lash by virtue of his severance agreement. Although this economic pressure may explain (in part) Lash's decision to "stick to the story," it does not alter the analysis of whether he knowingly provided false information to the government or whether that information hindered the government's investigation. The fact that Lash was willing to lie to the government to cover up his own crimes (and did so), and to ensure he received millions of dollars in additional compensation from GPB, is not exculpatory. Likewise, the fact that a similar enhancement was not applied to his co-defendants' Guidelines calculation is irrelevant. The PSRs for Gentile and Schneider include the obstruction conspiracy and this conduct was before the Court at sentencing for Gentile and Schneider.

      F.      Sophisticated Means (U.S.S.G. § 2B1.1(b)(10)(C))

The Probation Department's Guidelines calculation includes a two-level increase for use of "sophisticated means." The government agrees with Lash that this enhancement does not apply to his conduct. In 2015, U.S.S.G. § 2B1.1(b)(10)(C) was amended "to narrow the focus of the enhancement to the sophisticated of the defendant's personal conduct, not the scheme as a

9

whole." United States v. Mangano, 749 F. App'x 910, 913 (11th Cir. 2018). Following this amendment, the Court must consider only Lash's personal conduct and not the relevant conduct of his co-conspirators in applying § 2B1.1(b)(10)(C). Lash's personal acts were not sophisticated. He signed the fraudulent performance guarantees, permitted Gentile and others to access his accounts, sent at least one false email, and, later, made several round-trip payments intended to make it look like he had either paid the guarantees or repaid a loan from Gentile. Individually or taken together, these acts do not amount to a sophisticated scheme. Lash did not use shell entities or nominee accounts, draft sham documents, or orchestrate the scheme, which required Gentile's expertise in accounting and Prestiano's legal acumen.[3]

IV. Applicable Law: Substantial Assistance (U.S.S.G. § 5K1.1)

Pursuant to Section 5K1.1 of the Guidelines, "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." Section 5K1.1 continues that "[t]he appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following" factors:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1.

Notably, "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance." U.S.S.G. § 5K1.1 app. n. 3. In addition, it is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense

---

[3] Gentile and Schneider, unlike Lash, used sophisticated means to execute the distribution scheme, which involved numerous false and misleading documents, including the GPB marketing materials and private placement memoranda, lies to GPB and Ascendant employees, and transfers from the investment accounts to fund distributions and conceal the funds' overall poor performance.

which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

V.  Analysis

Lash provided extensive and exemplary cooperation when called upon by the government. He testified at the Gentile trial for three days and spent countless hours preparing his testimony and assisting the government's investigation in advance of trial. Accordingly, the government respectfully submits that Lash has provided substantial assistance and moves pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 to allow the Court, in its discretion, to depart significantly downward from the applicable Guidelines range in sentencing Lash.

A.  The Government's Assessment of the Assistance Rendered

Lash's cooperation was of great value to the government. Beginning several months before the Gentile trial, Lash met with the government every week, sometimes more than once a week, and sometimes on weekends, to review documents and discuss the facts of the performance guarantee scheme. Almost all of these sessions lasted at least several hours. Lash reviewed dozens of documents throughout his preparation sessions. During these sessions, Lash never minimized his own culpability and committed himself to providing a fulsome account of the performance guarantee scheme. Lash also volunteered new details to the government of conversations he overheard and the defendants' obstruction conspiracy that otherwise would have been lost to the government.

Lash's cooperation was essential to the government's presentation of the performance guarantee scheme. Through his preparation sessions, Lash helped the government reconstruct the performance guarantee scheme in detail, stitching together emails, text messages, and transaction documents to provide a comprehensive explanation of a fraud that had occurred nearly a decade earlier. He described in-person meetings and phone calls that were hinted at in documents and text messages but not otherwise memorialized. He did not minimize his role in these meetings, and they provided important context for the documentary evidence of the fraud. Lash also helped the government understand seemingly unrelated transactions in late 2016 and 2017 that were intended by Gentile to appear as if Lash had partly repaid the 2014 Performance Guarantees and a "loan" from Gentile for the 2015 Performance Guarantee. Lash's diligent efforts during the pretrial meetings demonstrated his commitment to successfully complying with his cooperation agreement in all respects and directly contributed to the power of his testimony at trial.

Lash was the sole cooperator to testify at the Gentile trial. At trial, he narrated the performance guarantee scheme, providing the jury with an easy to understand summary of a complex accounting fraud, the background to the scheme, and the defendants' motives. Lash did not minimize his own criminal conduct and accepted responsibility for his own role in the fraud. Lash was then cross-examined for nearly two days by counsel for Gentile and Schneider. The cross-examination focused principally on impeaching Lash's credibility based on prior statements he made at Gentile's urging to cover-up the performance guarantee scheme, and legal determinations or instructions from counsel that Lash merely followed. The cross-examination ultimately revealed only that Lash had accepted responsibility for lying to the government, provided the information that he had, and truthfully answered any questions that he was asked.

11

Lash's testimony was notable not just for its substance but also for its presentation. He was patient and thoughtful in his answers. He expressed sincere remorse for his conduct but did not shy away from telling the jury the details of what he had done. During cross-examination for more than a day, he navigated to the best of his ability personal attacks and questions focused on legal minutiae designed to confuse him and the jury. He never waivered from his consistent course of carefully and truthfully answering every question put to him no matter the questioner. He took responsibility for his actions.

In sum, Lash's cooperation has been exceptional, and his assistance has been extremely significant and useful. He has done everything that he has been asked to do, he has consistently told the truth, and he has substantially contributed to the cause of bringing others to justice.

### B. Truthfulness, Completeness, and Reliability of the Information

Since agreeing to cooperate, Lash has provided truthful, complete, and reliable information during his meetings with the government and in his testimony at trial. Lash did not minimize his conduct, a common pitfall for cooperating witnesses. The government has no indication that he has concealed facts or shaded events to benefit himself. To the contrary, he volunteered his own involvement in a criminal conspiracy to obstruct justice without prompting from the government. He told the government about his initial effort to conceal the performance guarantee scheme, has been cross-examined extensively about it, and accepted responsibility for his role in the cover-up.[4] His information, about events nearly a decade ago, has been detailed and substantially supported by documents and testimony from other witnesses whenever corroborating information has been available. The government has found no reason to doubt, and every reason to believe, his total truthfulness, completeness and reliability.

### C. Nature and Extent of the Defendant's Cooperation

As set forth above, Lash provided exemplary cooperation and critical assistance to the government through information provided in numerous preparation sessions, through review of documents, and in testimony at trial. His cooperation was a critical part of the successful prosecution of Gentile and Schneider. Lash has remained cooperative and committed throughout the entire process and fulfilled all requests from the government.

### D. Injury Suffered or Any Danger or Risk of Injury to the Defendant or His Family Resulting from His Assistance

The government is not aware of any threats or intimidation faced by Lash. Nonetheless, he has been through a lengthy cross-examination in which defense counsel repeatedly impugned his credibility. The Gentile trial attracted significant press coverage and Lash has withstood significant negative publicity related to his guilty plea and truthful testimony.

---

[4] Notably, Lash was largely truthful in his first interview with the FBI, demonstrating his initial inclination to be honest with the government. Lash lied to the government only after meeting with Gentile and Schneider who urged him to "stick to the story" and only after Gentile and Prestiano threatened to withhold his severance if he did not stay on "Team GPB."

Throughout, he has not waivered in his cooperation.

  E.  <u>Timeliness of the Defendant's Assistance</u>

  Lash's cooperation was timely. He agreed to cooperate with the government more than a year in advance of the <u>Gentile</u> trial, providing sufficient time for him to prepare with the government and present his testimony at trial.

  F.  <u>Other Factors</u>

  The government submits that the Court' sentence should also reflect the essential need to incentivize cooperation in future cases. Lash, like any other defendant, faced the choice of cooperating, proceeding to trial, or pleading guilty. Lash accepted the potential consequences and became the only member of the conspiracy to cooperate with the government's investigation, knowing that it was likely he would be required to testify against his former partners.[5]

  The Court should impose a sentence that credits Lash for his choice to cooperate, rather than to proceed to trial or accept a guilty plea without cooperating. Lash is the least culpable of the three defendants charged in this case; his role was more limited, he profited less, and he acted largely at the direction of his co-conspirators. Had Lash pleaded guilty rather than cooperated, it is likely he would have received a sentence significantly lower than Gentile and Schneider who were sentenced to seven and six years in custody respectively. In determining Lash's sentence now, the Court should consider what sentence he likely would have received absent cooperation and should ensure that the ultimate sentence imposed is sufficiently lower that future defendants will be strongly incentivized to make the same worthy choice the defendant made here notwithstanding the difficulty and risks inherent in cooperation.

  The Court should also consider Lash's acceptance of responsibility, genuine remorse, and the collateral consequences he has already accepted. Lash expressed remorse at trial and did not minimize his criminal conduct. He has done so again in his letter to the Court, which recognizes the harm his conduct has caused for GPB's investors. <u>See</u> ECF Dkt. No. 640-1 at 62–63. Lash has paid his forfeiture judgment, which represents substantially all of his net profits from GPB, in full. Lash's choices since leaving GPB also reflect humility. He has returned to his business running car dealerships in upstate New York. It is highly unlikely that Lash will be in a position to commit a similar fraud again, and his letter reflects a real understanding of how hubris and greed led him astray.

  Finally, the Court should consider the fact that a sentence should reflect an adequate punishment for the crime. Lash engaged in a serious fraudulent scheme that harmed thousands of

---

[5] Recognizing the importance of incentivizing cooperation in future cases, judges in this district have recently imposed time-served or limited custodial sentences for cooperators in white collar cases. See, e.g., <u>United States v. Andrew Pearse</u>, No. 18-CR-681 (NGG) (time served); <u>United States v. Surjan Singh</u>, No. 18-CR-681 (NGG) (time served); <u>United States v. Michael Greer</u>, No. 21-CR-193 (KAM) (45 days incarceration); <u>United States v. Robert Magness</u>, No. 21-CR-193 (KAM) (time served); <u>United States v. Suzee Han</u>, No. 23-CR-48 (EK) (time served); <u>United States v. Samir Rao</u>, No. 23-CR-47 (EK) (time served); <u>United States v. Tim Leissner</u>, No. 18-CR-439 (MKB) (two years incarceration).

investors and he profited handsomely from his role at GPB. Like his co-defendants, Lash was already successful and chose to commit his crimes out of greed and a desire for outsized wealth rather than any necessity or desperation. When he was confronted by the FBI, Lash put aside his initial inclination to be honest and agreed to lie to the government. These are choices that require consequences. But there is also no dispute that Lash has made a sincere, substantial and consistent effort to remedy these mistakes. He has paid his forfeiture judgment, he has spent countless hours with the government, aiding the government's preparation of its case, and preparing for his own testimony. He spent three days on the stand, accepting responsibility for his conduct in front of a full gallery, and then cross-examination by a phalanx of defense attorneys. In the approximately seven years since he left GPB, in February 2018, Lash has made a sincere effort to build a productive life that he can continue after serving whatever sentence is imposed by the Court. Lash's story is a cautionary tale about greed and its consequences.

* * *

In sum, the factors set forth in U.S.S.G. § 5K1.1 all weigh heavily in favor of giving Lash's cooperation substantial weight. His cooperation also demonstrates sincere remorse, acceptance of responsibility, and a firm decision to fully separate himself from dishonesty and fraudulent conduct. The government submits that the Court should consider all these factors when determining Lash's ultimate sentence.

IV. Restitution

The government respectfully submits that the Court should defer calculation of restitution at this time. As the government has previously informed the Court, the government is considering whether imposing restitution in this case is feasible given the number of victims and attendant difficulty in making victim-by-victim calculations and ongoing parallel civil proceedings. See ECF Dkt. Nos. 618, 634. The government is also exploring the potential to apply forfeiture funds towards restitution through the remission process. Id. Accordingly, the government respectfully requests that the Court defer determining restitution for at least 90 days as permitted by statute. See 18 U.S.C. § 3664(d)(5).

V. Supervised Release Conditions

Because the government may need the defendant to testify again in the event of any possible retrial for Gentile or Schneider, the government respectfully requests that the Court include a special condition of supervised release requiring Lash to continue his cooperation with the government. The government has conferred with counsel for Lash regarding this request, and Lash consents to this condition being included in his conditions of supervised release.

VI. <u>Conclusion</u>

        For the reasons set forth above, the government respectfully submits that, in light of the defendant's substantial assistance to the government's prosecution in this matter, the Court should sentence the defendant well below the applicable Guidelines.

        Respectfully submitted,

        JOSEPH NOCELLA, JR.
        United States Attorney

By:     /s/
        Jessica K. Weigel
        Nick M. Axelrod
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Clerk of the Court (RPK)
       Robert Gottlieb, Esq.
       U.S. Probation Officer Frank Nikolaidis (by Email)